## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **CYNTHIA QUINNIE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO. 12302 AT 06** |
| | ) | **2:07-CV-314-WHA** |
| **DIALYSIS CLINIC, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I.    STATEMENT OF THE CASE

This is a race discrimination claim brought pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII").  Plaintiff, Cynthia Quinnie ("Plaintiff") filed a Complaint with this Court on or about April 11, 2007, claiming that the Plaintiff's termination from employment "was in violation of the Equal Employment Opportunity Act, also known as Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 e(2)(m) *et. seq.* [sic]."  Defendant Dialysis Clinic, Inc. ("DCI") filed an Answer with this Court denying the allegations of the Complaint.  DCI considered Plaintiff to have voluntarily terminated her employment when she refused to participate in an internal investigation.

Defendant has engaged in discovery including the deposition of Plaintiff, written discovery and document production.  No other discovery has been conducted.  Based on the evidence obtained in Defendant's discovery, Plaintiff cannot satisfy her burden of proof and this case should be dismissed as a matter of law.  This Memorandum is filed in support of Defendant's Motion for Summary Judgment filed with this Court on March 14, 2008.

## II.    STATEMENT OF THE FACTS

### A.    The Parties

DCI is a non-profit corporation that provides dialysis and related services to patients with end stage renal disease.  (Affidavit of Daniel Watson ("Watson") at ¶ 2).  DCI is incorporated under the laws of Tennessee, and it operates facilities in Montgomery, Alabama and the surrounding area.  Id.  The corporate headquarters is located in Nashville, Tennessee.  Id.

Plaintiff was employed by DCI from May 23, 2001 until August 22, 2006.  (Deposition of Cynthia Quinnie ("Plaintiff") p. 65, lines 11-12; Watson at ¶ 3).  Plaintiff worked at the Montgomery clinic as the LAN Administrator and a medical records clerk.  (Plaintiff at p. 67, lines 17-23, p. 68, lines 1-8).  As a LAN Administrator, Plaintiff was responsible for addressing computer problems at four clinics.  (Plaintiff at p. 67, lines 18-22).  Plaintiff worked primarily at the Montgomery clinic, but in her role as LAN Administrator, she would occasionally go to other nearby clinics if there was a major problem with the computers.  (Id., p. 68, lines 18-23, p. 69, lines 1-14).

Plaintiff's supervisor at DCI was the Clinic Administrator (Watson at ¶ 3).  During Plaintiff's employment, there were four Clinic Administrators in Montgomery:  Pam Heatherman (from the beginning of Plaintiff's employment until approximately August of 2001), Lee Ashbury (from August 2001 until February 2006), Rose Smith (acting Clinic Administrator from February 2006 until July 2006) and Glenda Gary (July 2006 through August 2006 (end of Plaintiff's employment)).  (Plaintiff at p. 83, lines 6-17, p. 117, line 11-23, page 118, line 14).  Ms. Smith is a corporate administrator that works in the corporate office in Nashville.  (Watson at ¶4).  After Mr. Asbury's death in February 2006, Ms. Smith assumed the role of Clinic

Administrator of the Montgomery Clinic until DCI hired a permanent Clinic Administrator. (Watson at ¶4).

### B.    Plaintiff's Termination

On Monday, August 7, 2006, one of Plaintiff's co-workers informed DCI that Plaintiff had falsified time records and had admitted to doing this.  (Watson at ¶ 5).  Mr. Daniel Watson, Associate Director of Human Resources, was informed of this issue regarding Plaintiff the week of August 7, 2006 by Rose Smith.  (Watson at ¶5).  Although Ms. Smith indicated to Mr. Watson that she wanted to terminate Plaintiff's employment because she believed that the witness was telling the truth, Mr. Watson suggested that DCI place Plaintiff on administrative leave pending the outcome of the investigation into the allegations.  (Watson at ¶5).

Ms. Smith followed the advice of Mr. Watson, and DCI placed Plaintiff on administrative leave pending the company's investigation into these serious allegations.  (Plaintiff at Exhibit 5, p. 102, lines 2, 3, 14; Watson at ¶5)).  Ms. Smith informed Plaintiff that DCI was going to investigate the allegations and that Plaintiff would be placed on administrative leave during the investigation.  (Plaintiff at p. 89, lines 4-18).

Mr. Watson and Ms. Smith conducted the investigation into the allegations that Plaintiff had falsified her time records.  (Plaintiff at p. 98, lines 2-14; Watson at ¶6).  Mr. Watson and Ms. Smith instructed Glenda Gary, who was the Clinic Administrator at the time, to arrange a meeting with Plaintiff on August 14, 2006 at the Montgomery clinic.  (Watson at ¶6; Plaintiff at p. 89, lines 22-23, p. 90, line 1).  Mr. Watson and Ms. Smith traveled to Montgomery to investigate the allegations and to specifically interview Plaintiff to get her side of the story. (Plaintiff at Exhibit 5, p. 107, lines 1-8, Watson Affidavit at ¶ 6).

When Plaintiff arrived at the scheduled meeting, she was accompanied by her attorney, Mr. Brett Harrison. (Plaintiff at p. 107, lines 1-8). Mr. Watson informed Plaintiff that he wanted to talk with her without her attorney present. (Plaintiff at p. 98, lines 8-11). DCI did not have an attorney present at the meeting. (Watson at ¶7). Mr. Watson called David Hagewood, Director of Human Resources, and explained the situation to him. (Watson at ¶8). Mr. Hagewood confirmed Mr. Watson's understanding that internal investigations such as this one were to be conducted with no attorneys present. (Watson at ¶8). Mr. Watson and Mr. Hagewood also discussed that if Plaintiff refused to participate in the internal investigation, then DCI would consider her to have voluntarily quit her employment. (Watson at ¶8). Mr. Watson then asked Mr. Harrison to leave. (Plaintiff at p. 98, lines 11-14). Plaintiff refused to meet with Mr. Watson and Ms. Smith without her attorney present. (Plaintiff at 110, lines 14-21, Plaintiff at Exhibit 5).

On the same day of the failed investigation meeting, Mr. Watson prepared a letter that he sent to Ms. Quinnie (Plaintiff at Exhibit 5, Watson at ¶ 9). In the letter, Mr. Watson asked Plaintiff to meet with him as part of the internal investigation. Id. Mr. Watson further explained that if Plaintiff did not meet with him as part of the internal investigation, the company would complete the investigation without any input from Plaintiff and view her refusal to participate in the investigation as a voluntarily termination. Id. On August 15, 2006, Plaintiff's attorney informed Mr. Watson by letter that Plaintiff would meet with DCI as part of the investigation only if her attorney could be present. (Plaintiff at Exhibit 1). Therefore, DCI considered Plaintiff's employment terminated on August 22, 2006. (Watson at ¶ 3).

Mr. Watson's race is Caucasian and Ms. Smith's race is African American. (Plaintiff at p. 173, lines 9-10).

C.      **Plaintiff's Wrongful Termination Claim**

In her Complaint, Plaintiff claims that her dismissal from employment was in violation of Title VII.  (Complaint at ¶ 17).  In her deposition, however, Plaintiff testified that she was terminated because she refused to meet with DCI without her attorney present.  (Plaintiff at p. 130, lines 8-20).  Specifically, Plaintiff testified as follows:

> "I was terminated because they – DCI placed me on administrative leave without pay, pending an investigation.  When I came there you asked for the meeting – Glenda Gary asked for the meeting.  I came to the meeting. You did not talk to me.  I did not voluntarily quit.  I was not going to ask – he asked my attorney to leave.  At that point you gave me the option, either I tell my attorney to leave or I voluntarily quit.  That is not an option.  I don't voluntarily quit."

(Plaintiff at p. 130, lines 8-20).

DCI did not hire another employee to replace Plaintiff.  (Watson at ¶10).  Instead, it divided her job duties among existing employees.  (Watson at ¶10).  Today, the majority of Plaintiff's former duties are being performed by an African American employee.  (Watson at ¶ 10).

Mr. Watson made the decision to consider Plaintiff's refusal to meet with him and Ms. Smith without her attorney a voluntary termination.  (Watson at ¶8).  To Mr. Watson's knowledge, no other employee at DCI has refused to cooperate in an internal investigation unless the company permitted his or her attorney to participate.  (Watson at ¶11).  Mr. Watson has never terminated nor considered an employee to have voluntarily quit because the employee refused to participate in an investigation as required by DCI.  (Watson at ¶11).  In fact, Mr. Watson has never terminated an employee at DCI based on their lack of cooperation in an investigation into serious allegations brought against the employee.  (Watson at ¶11).

### D.     Plaintiff's Purported Harassment Claim

In the Complaint, Plaintiff's Cause of Action only references her dismissal from employment.  (Complaint at ¶ 17).  In the facts cited in her Complaint, however, Plaintiff refers to a "racial hostile work environment" and "racial slurs on the job".  (Complaint at ¶¶ 10 and 14).  Even though Plaintiff's Complaint does not contain allegations to support all of the elements of a Title VII harassment claim, Defendants will address Plaintiff's seemingly stray allegations out of an abundance of caution.

DCI has a policy prohibiting harassment in the workplace.  (Plaintiff at Exhibit 7 at p. 12).  The policy instructs employees who feel victimized by any type of unlawful harassment to promptly report the matter to their supervisors, to the Human Resources Department in Nashville or to DCI's President.  Id.  Plaintiff received the employee handbook that contains this policy.  (Plaintiff at Ex. 4, p. 123, lines 16-23, p. 124, line 1).  Plaintiff further admits that she never contacted anyone in the corporate office to report any type of harassment complaints.  (Plaintiff at p. 318, lines 2-4).

In her deposition, Plaintiff was asked what she meant by the words "hostile work environment".  (Plaintiff at p. 141, lines 5-9).  Plaintiff responded that the work environment was hostile because she was given job duties of other employees in addition to her regular duties.  (Plaintiff at p. 141, lines 10-16, p. 142, lines 8-14).  Plaintiff further contends that she complained to Glenda Gary, the Clinic Administrator from July 2006 until the end of Plaintiff's employment in August 2006, about some of her additional duties.  (Plaintiff at p. 161, lines 3-19, p. 163, lines 12-23, p. 164, lines 1-23, p. 165, lines 3-20, p. 167, lines 20-23, p. 168, lines 1-14).  Plaintiff admits that she did not believe that her additional job duties were given to her because of her race.  (Plaintiff at p. 167, lines 11-15).

Although the majority of Plaintiff's allegations in support of her hostile environment claim can be classified as assignment of additional job duties, Plaintiff also alleges other conduct in support of her allegation. First, Plaintiff contends that she complained to Glenda Gary about a particular employee failing to clock out when she went to an AA Meeting. (Plaintiff at p. 145, lines 13-23, p. 146, lines 1-22). Plaintiff contends that when she complained to Glenda Gary, Ms. Gary confronted the person and the person stopped speaking to Plaintiff. (Plaintiff at p. 148, lines 10-21). Plaintiff further alleges that Ms. Gary did not take appropriate actions to solve the problem that Plaintiff raised to her, but in Plaintiff's opinion, Ms. Gary added more to the problem by talking to employees. (Plaintiff at p. 159, lines 1-6). Plaintiff also contends that she witnessed employees fighting on one occasion and that she and an employee got into an argument over another employee's termination. (Plaintiff at p. 152, lines 5-13, p. 142, lines 8-20, p. 143, lines 1-20). To be clear, Plaintiff does not contend that this "hostile environment" was because of her race.

At Plaintiff's deposition, defense counsel asked Plaintiff to identify every incident that she considered to be a racial slur as alleged in her Complaint. (Plaintiff at p. 186, lines 3-7, p. 195, lines 6-8, Complaint at ¶14). In response to this line of questioning by defense counsel, Plaintiff identified the following comments that she considered to be racial slurs:

1.    Brenda Haire talked about black people's hair and how black people complain that everything that happens to them is based on prejudice. This particular employee made no other racial slurs according to Plaintiff. (Plaintiff at p. 186, lines 3-16).

2.    Plaintiff claims Debbie Tullier commented that if you complained about black employees, the employees would beat you up. (Plaintiff at p. 194, lines 1-13). Plaintiff admits that she did not complain to anybody about these comments from this particular nurse. (Plaintiff at p. 194, lines 14-15).

During the examination by defense counsel, Plaintiff testified that the above list was an exhaustive list of the racial slurs about which she complained in her Complaint:

Q.    "Any other comments?  Any other racial slurs?"

A.    "No."

(Plaintiff at p. 195, lines 6-8).

In the deposition, Plaintiff's counsel examined Plaintiff.  (Plaintiff at p. 258, lines 21-23, page 259, lines 1-2).  Plaintiff's attorney asked her if she ever heard anyone use "the N word." (Plaintiff at p. 281, lines 19-20).  In response to the question by her attorney, Plaintiff testified that two employees used the word "nigger" in the workplace:  (1)  Brenda Haire, a nurse, and (2) Rachel Thompson, a patient care technician.  (Plaintiff at p. 281, lines 22-23, page 282, lines 5-6, p. 284, lines 17-22).  Plaintiff testified that no other employees at DCI used the word.  (Plaintiff at p. 287, lines 20-22).  Plaintiff further testified that Brenda Haire used the N word or other racial slurs "numerous times".  (Plaintiff at p. 284, lines 1-3).  According to Plaintiff, Rachel Thompson used the word in the following manner:

Q.    "Okay.  How would she [Rachel Thompson] say or use the N word?"

A.    "She bragged about having three different babies from three different black men and said the niggers ain't taking are of my babies, and this, this and that."

(Plaintiff at p. 285, lines 4-10).

After Plaintiff testified in her deposition that Brenda Haire and Rachel Thompson used the N word, her attorney asked her if anybody else used the N word or racial slurs.  (Plaintiff at p. 287, lines 20-21).  Plaintiff testified that no one else used the N word.  (Plaintiff at p. 287, line 22).  Her attorney then asked her, "Are you sure about that?"  (Plaintiff at p. 287, line 23).  Plaintiff continued to respond in the negative.  (Plaintiff at p. 288, line 3).  Plaintiff then testified that

"[Debbie] Tullier would get mad," which was apparently a reference to Plaintiff's earlier testimony about Ms. Tullier's use of what she considered racial slurs. (Plaintiff at p. 288, lines 3-5). Plaintiff's attorney then asked Plaintiff, in the same line of questioning, if she remembered a lady by the name of Mandy Bowen and whether Mandy ever used "racial slurs". (Plaintiff at p. 288, lines 6-14). Despite Plaintiff's earlier testimony on both cross and direct, Plaintiff responded that Ms. Bowen had used the word "nigger" and the word "mammy." (Plaintiff at p. 288, lines 15-23).

After the line of questioning pertaining to the use of the "N word", defense counsel then asked Plaintiff why she did not testify to the use of the N word when she was asked to describe all racial slurs she ever heard at DCI. (Plaintiff at p. 300, lines 12-23, page 301, lines 1-12). Plaintiff responded that she did not testify about the use of the word "nigger" because defense counsel did not specifically ask her if that word was used in the work place. (Plaintiff at p. 301, lines 13-14, p. 302, lines 1-3). In the Complaint and the EEOC Charge of Discrimination, Plaintiff never refers to the use of the word "nigger", but instead, only refers to "racial slurs". (Plaintiff at Exhibit 8 and Exhibit 9).

Plaintiff's attorney asked her in the deposition if she ever felt threatened, hurt or humiliated when people used the word "nigger" in the work place:

> Q.    "Did you feel threatened or hurt by people using that word?"
>
> A.    "The only reason I was upset about it was because it was used in front of patients. Elderly black people, being brought up in the time that they came up in, I didn't think that was very professional. And I felt—"
>
> Q.    "Did you feel humiliated by that?"
>
> A.    "I felt bad for the patient."
>
> Q.    "Did you feel – "

> A.   "Not only black patients, but white patients as well, because that
>       was disrespectful.  I was always brought up to respect my elders,
>       and certain things you don't say in front of old people."
>
> Q.   "So did you feel like that created a hostile work environment?"
>
> A.   "For me it did, yes."

(Plaintiff at p. 285, lines 11-23, p. 286, lines 1-8).  Again, in response to questioning by defense

counsel, Plaintiff made it clear that her concern over the use of the "N word" was based on the

fact elderly patients might have heard it, not because she was personally offended.  (Plaintiff at

p. 302, line 23, p. 303, lines 1-3).

Plaintiff admits that the only person she ever complained to about comments related to

racial slurs was Lee Ashbury, who was the Clinic Administrator until his death in February 2006.

(Plaintiff at p. 317, lines 14-23, p. 318, lines 1-4).  Specifically, Plaintiff complained to Mr.

Ashbury only about Brenda Haire.  (Plaintiff at p. 318, lines 5-14).

### III.   ARGUMENT

### A.   Summary Judgment Standard

In ruling on a motion for summary judgment, the court determines only if a genuine issue

of material fact exists, not whether any factual issue exists. Summary judgment "shall be

rendered" if there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(c). The Eleventh

Circuit Court of Appeals has highlighted the standard according to which a court must consider a

summary judgment motion. See Bailey v. Allgas, Inc ., 284 F.3d 1237, 1243 (11th Cir. 2002).

> Once the moving party has properly supported its motion for summary judgment,
> the burden shifts to the non-moving party to come forward with specific facts
> showing that there is a genuine issue for trial. The mere existence of some
> evidence to support the non-moving party is not sufficient for denial of summary
> judgment; there must be sufficient evidence favoring the nonmoving party for a
> jury to return a verdict for that party. If the evidence is merely colorable, or is not
> significantly probative, summary judgment may be granted.

Id. (internal citations omitted).

Whether a fact is material requires looking to the substantive law governing the claim. If a fact would not affect the outcome of the lawsuit under governing law, the fact is not material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202, 211-212 (1986). Furthermore, an issue is only genuine if a reasonable jury could return a verdict for the nonmoving party. Otherwise, no genuine issues exist. (Id.)(Nonmoving party can defeat a properly supported motion for summary judgment only by producing ". . . concrete evidence from which a reasonable juror could return a verdict in his favor."); see also Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265, 274 (1986) (party opposing summary judgment must "go beyond the pleadings" and designate specific facts supported by discovery or affidavits showing there is a genuine issue of material fact for trial); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538, 552 (1986) (non-movant must show that the record would support a finding by a "rational trier of fact" in favor of the non-movant).

When the Court applies these standards to the undisputed facts in this case, the record reveals that DCI is entitled to summary judgment dismissing Plaintiff's Title VII claim.

**B.    Plaintiff's Wrongful Termination Claim Should Be Dismissed**

Plaintiff has alleged that she was wrongfully terminated from DCI in violation of Title VII. Presumably, Plaintiff's claim is based on her race, African American. Plaintiff alleges no conduct, however, in her Complaint that links her termination to her race. In fact, Plaintiff has not plead that her termination from employment was based on her race. Plaintiff has not so much as suggested that Mr. Watson considered her race when he determined that she voluntarily terminated her employment. These flaws are fatal to Plaintiff's bald assertion of wrongful

termination under Title VII. Her Complaint should be dismissed because it does not set forth that her termination was based on her race.[1]

If the Court construes Plaintiff's Complaint liberally and determines that it states a cause of action for termination based on race, then it should still dismiss the claim. In the first place, Plaintiff cannot meet her burden of establishing a *prima facie* case. Moreover, even if she could, there is no question that DCI had a legitimate, nondiscriminatory reason to terminate her. Plaintiff cannot present any evidence to suggest that DCI's reason was pretextual. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L.Ed.2d 207 (1981).

### 1.    Plaintiff Cannot Establish a *Prima Facie* Case of Wrongful Termination

Under the McDonnell Douglas and Burdine framework, Plaintiff first must raise an inference of discrimination by establishing a *prima facie* case. Batey v. Stone, 24 F.3d 1330, 1333 (11th Cir. 1994) (citations omitted). The purpose of the prima facie case is to demonstrate that the adverse employment decision was a result of discriminatory motive. See Perryman v. Johnson Products Co., 698 F.2d 1138, 1143 (11th Cir. 1983).

In order to establish her prima facie case, Plaintiff must prove that she was: (1) a member of a protected class; (2) qualified for the position; (3) suffered an adverse employment action; and (4) replaced by a person outside his protected class or treated less favorably than a similarly-situated individual outside of her protected class. Maynard v. Bd. Of Regents, 342 F.3d 1281, 1289 (11th Cir. 2003) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). For purposes of this Motion only, Defendant concedes that Plaintiff meets the first three

---

[1] See the discussion *infra* regarding the appropriate standard for a well-plead complaint.

elements of the *prima facie* case. Based on the undisputed facts, however, Plaintiff cannot possibly meet the fourth element.

There is no dispute that Plaintiff was *not* replaced by a white employee. This means that Plaintiff is unable to establish her *prima facie* case unless she is able to prove that DCI treated similarly situated white employees more favorably than it treated Plaintiff. See Hawkins v. Ceco Corp., 883 F.2d 977, 984 (11th Cir. 1989). Specifically, Plaintiff must prove that she "was qualified for the position and was discharged for misconduct which was nearly identical to that engaged in by one outside of the protected class whom the employer retained." Hawkins v. Ceco Corp., 883 F.2d 977, 984 (11th Cir. 1989).

When evaluating "similarly situated" comparators, a plaintiff must demonstrate that the person she identifies as a comparator is similarly situated to her "in all relevant respects." Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (citations omitted). In the disciplinary context, the plaintiff must prove that the quality and quantity of the comparator's misconduct is "nearly identical to prevent courts from second-guessing employers' reasonable decisions." Maniccia v. Broan, 171 F.3d 1364, 1368 (11th Cir. 1999) (citations omitted). If the plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate when there is no other evidence of discrimination. Holifield, 115 F.3d at 1562.

Plaintiff cannot present evidence that DCI retained a similarly situated white employee who engaged in the same conduct as Plaintiff because no such evidence exists. DCI considered Plaintiff to have voluntarily terminated her employment because she did not meet with Mr. Watson and Ms. Smith to explain her side of the story related to allegations against her of serious misconduct, namely falsification of time. Mr. Watson testified that no other employee has demanded to have her attorney present at an internal investigation and then refused to participate

in the investigation because DCI would not allow the attorney to participate. Plaintiff has not attempted to compare herself to any other white employee who was treated more favorably nor can she.

Plaintiff can point to no other evidence of discrimination. In fact, Plaintiff has not even alleged any conduct in support of her subjective belief that her termination violated Title VII. Plaintiff has failed to establish a *prima facie* case of discrimination, making summary judgment appropriate.

### 2. DCI Unquestionably Had a Legitimate Business Reason for Considering Plaintiff's Actions a Voluntarily Termination

If the Plaintiff could establish a *prima facie* case, the burden would shift to DCI to articulate a legitimate, nondiscriminatory reason for its actions. Crawford v. City of Fairburn, 482 F.3d 1305, 1308 (11th Cir. 2007) (citing McDonnell Douglas, 411 U.S. at 802-03). Clearly, DCI had a legitimate, nondiscriminatory reason for considering Plaintiff's actions a voluntary termination. Plaintiff refused to participate in the internal investigation unless DCI allowed her to bring her attorney to the meeting. Ms. Quinnie had absolutely no right to demand that her attorney be present, and DCI certainly has every right to conduct its own internal investigations without attorneys being present. Plaintiff will likely attempt to persuade the Court that she was entitled to an attorney at the investigation. Such argument would be futile.

Failure to cooperate in an internal investigation constitutes a legitimate, nondiscriminatory reason for discharging an employee. In Jones v. U.S. Department of Veterans Affairs, 2007 U.S. App. LEXIS 948 (11th Cir. 2007) (case attached), the plaintiff, a nurse, took an unpaid leave of absence and filed a charge of discrimination with the EEOC when she was moved from the night shift to the day shift. The plaintiff then took a leave for the second time in a year based on a representation that her son needed full time care for his illness. Id. Her

employer suspected that she was falsifying her leave documents and contacted human resources regarding the same. Id. at 935.

Thereafter, one of the plaintiff's co-workers informed the employer that she believed that the plaintiff was tape recording her conversations with her and that the plaintiff intimidated and scared her. The plaintiff was suspended pending an investigation. Id. When the plaintiff's supervisors met with her to discuss the co-worker's complaint, the plaintiff was uncooperative and would not respond to her employer's questions. As a result, the decision was made to terminate the plaintiff, which was based, in part, on the plaintiff's failure to cooperate with the employer's internal investigation regarding her conduct. Id. In affirming the lower court's decision to grant summary judgment in favor of the employer, the court found it compelling that the employer's reason for the plaintiff's termination throughout the litigation was entirely consistent with the termination letter sent to the plaintiff's attorney. Id. Specifically, the court determined that the plaintiff could not overcome the fact that her refusal to cooperate in the investigation was relied on by the decision-maker who terminated her employment. Id.

In a similar case, allegations were brought against the plaintiffs that they racially harassed a co-worker. Tullo v. City of Mount Vernon, 237 F. Supp. 2d 493, 496 (S.D.N.Y. 2002). When the employer sought to interview the plaintiffs regarding the allegations, the plaintiffs refused to make themselves available for an interview. Specifically, the plaintiffs showed up with their lawyer, a stenographer, and a witness, and their lawyer ultimately refused to let the plaintiffs be interviewed. Id. at 506.

Thereafter, the plaintiffs brought a claim under Title VII against their employer alleging that they were discharged based on their race. Id. at 501. The Court held that the plaintiffs' failure to submit themselves to an interview was cause for dismissal. Id. In granting Defendant's

motion for summary judgment, the Court stated that a reasonable jury could only find that failure to cooperate with the internal investigation was a legitimate, nondiscriminatory reason to discharge the plaintiffs.  Id. at 507; see also Richard v. Cingular Wireless LLC, 2007 U.S. App. LEXIS 8547 (5th Cir. 2007) (case attached) (holding that refusal to fully cooperate in the employer's internal investigation constituted a legitimate, nondiscriminatory reason for terminating the plaintiff); EEOC v. Total Sys. Servs., 221 F.3d 1171, 1176 (11th Cir. 2000) (holding that lying during an internal investigation constitutes a legitimate nondiscriminatory reason for discharge); O'Dell v. Trans World Entm't Corp., 153 F.Supp.2d 378, 389 (S.D.N.Y. 2001) (holding that it is "patently unreasonable" for an employee who complained about harassment to refuse to participate in an internal investigation, even when such refusal is based on advice of an attorney); McGrotha v. Fed Ex Ground Package Sys., 2007 U.S. Dist. LEXIS 34047 (M.D. Ga. 2007) (case attached) (holding that Fed Ex rebutted plaintiff's prima facie case by proving that it discharged plaintiff based on her refusal to cooperate with an internal investigation); Allen vs. St. Cabrini Nursing Home, Inc., 198 F. Supp.2d 442, 451 (S.D.N.Y. 2002) (holding that plaintiff's refusal to cooperate in an internal investigation is a legitimate, nondiscriminatory reason for discharge).

These cases are all based on the well-established principal that employers need to be able to conduct internal investigations by meeting with their employees.  An employee's refusal to meet with her employer is a serious impediment to this principal.  Plaintiff will likely respond to this undisputed fact by claiming that she was willing to cooperate with the investigators so long as her attorney was present.  Plaintiff's anticipated argument misses the point.  Plaintiff can point to no case authority (because there is none) holding that an employee of a private employer has a right to have an attorney present at meetings between the employer and the employee as part of

an internal investigation. DCI did not have a lawyer present at the meeting. Mr. Watson and Ms. Smith wanted to get answers from Plaintiff, not her attorney. Mr. Watson's letter to Plaintiff explained that without Plaintiff's explanation of the allegations that she falsified time, DCI would only have the other employee's side of the story. When Plaintiff refused to give her side of the story, it was only appropriate that DCI considered her to have terminated her employment. Thus, DCI had a legitimate reason to consider Plaintiff's refusal to cooperate in the investigation as a voluntary termination.

### 3.    Plaintiff Has Alleged Nothing to Prove Pretext.

Now that DCI has set forth a legitimate business reason for the decision, any presumption of discrimination that Plaintiff could have established in her *prima facie* case has been rebutted. The burden of production shifts to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination." Id. (citing Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir. 2004)). In order to prove that the reason was pretextual, the Plaintiff must prove that the reason was both false, and that discrimination was the real reason. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

Plaintiff cannot overcome her own admission that her employment ended because of the ultimatum she imposed on DCI – either she had her attorney at the internal investigation or she did not participate. Plaintiff admitted that this was why her employment ended in her deposition. (Plaintiff at p. 130, lines 8-20). It is undisputed that Plaintiff arrived at the clinic with her attorney. It is undisputed that Mr. Watson asked the attorney to leave. It is undisputed that Plaintiff refused to participate unless her attorney could be present. It is undisputed that Mr. Watson informed Plaintiff that the company would consider her actions a voluntary termination. Plaintiff cannot prove that the legitimate reason was false.

In an attempt to meet her insurmountable burden, Plaintiff will likely point to broad allegations of discrimination that did not involve her. Plaintiff used this classic "smoke and mirrors" approach in her Complaint. For example, she alleged that DCI refuses to rehire former African American employees while steadily rehiring Caucasian employees. (Complaint at ¶11). In her deposition, Plaintiff identifies a white employee who was rehired, two black employees who were not rehired and one black employee who was rehired. (Plaintiff at p. 173, line 17 through p. 176, line 22). Not only is Plaintiff's allegation in her Complaint unsupported by her own testimony, but also, it is completely irrelevant because Plaintiff does not have a failure to hire claim. Other examples are found in Paragraph 12 and Paragraph 13 of the Complaint. Plaintiff alleges that DCI permits white employees who are related to work together but does not permit black relatives to work together, and that DCI fires African American whistleblowers but not white whistleblowers. Neither of these allegations has any relevance to Plaintiff's claims before the Court.

Plaintiff also alleges in her Complaint that she was denied access to her personnel file. (Complaint at ¶¶ 6-8). Plaintiff clarifies her allegations in her deposition by testifying that on Thursday, August 3, 2006, she asked Glenda Gary, the new Clinic Administrator, to see her personnel file. Ms. Gary initially said she did not believe that employees were permitted to see their personnel files but she had to contact Rose Smith to verify – Ms. Gary had only been the administrator for a few weeks at this point. (Plaintiff at p. 120, line 18 through p.121, line 18, p. 125, lines 12-17). Ms. Quinnie was placed on administrative leave on two work days later.

To the extent Plaintiff claims she was placed on leave because she asked to see her personnel file (which is completely contrary to the undisputed testimony), such conduct is not protected under Title VII and is not a claim properly before the Court. In other words, Title VII

18

affords no protection to employees who ask to see their personnel files. Apparently, Plaintiff intends to argue that she was placed on administrative leave because she asked for her personnel file and this action would not have happened but for her race. Of course, such argument ignores the real, undisputed reason that Mr. Watson and Ms. Smith put her on administrative leave – the allegations that Plaintiff falsified her own time records. See Elrod v. Sears Roebuck & Co., 939 F.2d 1466, 1471 (11th Cir. 1991) (holding that when the decision maker is a member of the same protected class as the plaintiff, it is more likely that the decision makers would be victims of discrimination rather than perpetrators of it); Moore v. Ala. Dep.'t of Corr., 2005 U.S. App. LEXIS 12079 (11th Cir. 2005) (case attached) (noting that when the decision maker is also a member of a protected class, the plaintiff has a greater burden in establishing his/her case) (citing Moore). Ms. Gary was not even in the decision-making process and Plaintiff cannot prove otherwise. There is simply no evidence that Plaintiff's employment ended because of her race.

**C. To the Extent Plaintiff Alleges a Harassment Claim, It Should Be Dismissed**

Plaintiff's only cause of action in her Complaint is unlawful discharge pursuant to Title VII. Plaintiff does not state a cause of action for harassment nor does she plead facts to support the elements of a harassment claim. Plaintiff does refer to some conduct in her Complaint that she might attempt to use in support of a harassment claim. Therefore, Defendant will address those allegations and show that Plaintiff cannot establish that DCI was "permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of the victim's employment, and create and abusive working environment" as required by Title VII. Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993).

### 1.    Plaintiff Has Not Plead a Harassment Claim

Rule 8(a) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). A plaintiff is not required to specifically plead facts that support every element of a cause of action.  Snow v. DirecTV, Inc., 450 F.3d 1314, 1320 (11th Cir. 2006) (citing Roe v. Aware Woman Ctr. for Choice, Inc., 253 F.3d 678, 683 (11th Cir. 2001 )). However, a complaint must "still contain either direct or inferential allegations respecting all material elements of a cause of action." Id. "Thus, *at a minimum*, notice pleading requires that a complaint contain inferential allegations from which we can *identify each of the material elements necessary* to sustain a recovery under some viable legal theory." Id. (emphasis added).

In the Complaint, Plaintiff alleges only that she was dismissed in violation of Title VII, not that she suffered harassment in violation of Title VII.  The only allegations in the Complaint that could be construed to support a harassment claim is a reference to a "hostile work environment" in Paragraph 10 and the use of racial slurs in Paragraph 14.  No where, in either the Complaint or her deposition, does Plaintiff even allege that the conduct was sufficiently severe or pervasive to alter the conditions of employment.  In fact, she offers no facts that could even establish such an allegation.  Defendant is entitled to judgment as a matter of law because Plaintiff failed to properly allege, either directly or through inference, each of the material elements necessary to properly bring a hostile environment claim against Defendant. Id,

### 2.    Plaintiff's Allegations Do Not Establish an Actionable Harassment Claim

Plaintiff cannot prove what she failed to properly allege – that she was the victim of unlawful racial harassment during her employment at DCI.  Plaintiff essentially alleges three (3) distinct sets of facts that she may use to support a harassment claim:

      a.   Incidents creating a hostile environment (primarily Plaintiff's job assignments)

      b.   Racial slurs overheard in the workplace

      c.   The use of the word "nigger"

Each of these will be discussed in turn within the framework of a Title VII hostile environment claim. That framework is set forth in <u>Mendoza v. Borden, Inc.</u>, 195 F.3d 1238, 1245: (1) the plaintiff belongs to a protected class; (2) the plaintiff was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic of the employee; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) the employer is responsible for such environment under either a theory of vicarious liability or direct liability. Plaintiff cannot establish as a matter of law the third, fourth and fifth elements above with respect to the allegations she may use in support of a harassment claim. Defendant concedes the first and second elements only for purposes of this motion.

      **a.**     **The Hostile Environment Identified by Plaintiff Was Not Based on Race**

As an initial matter, none of the conduct that Plaintiff identified as creating a "hostile environment" seems to relate to her race in any manner. Nevertheless, Defendant will address each allegation. As discussed in the Statement of Facts *supra*, Plaintiff explained that the "hostile environment" to which she was referring in her Complaint consisted primarily of what she perceived to be an unfair workload for her. This is the only "hostile environment" conduct referred to by Plaintiff that she even suggests interfered with her work. Plaintiff admits in her deposition that the assignment of additional duties was not based on her race. Therefore, none of the testimony related to her job duties can support a claim for racial harassment under Title VII.

Plaintiff also testified that she was not pleased with the new Clinic Administrator, Glenda Gary. Specifically, Plaintiff testified that when she complained to Ms. Gary about an employee who failed to clock out, Plaintiff thought Ms. Gary did not handle it properly by discussing the complaint with the employee in question.  Of course, nothing about this allegation suggests race was a consideration.  Plaintiff also testified that two employees once got into a fight.  Plaintiff identified nothing more when she explained in her deposition what she meant in the Complaint by "hostile environment."

Conduct must be racial in nature before it is considered in determining whether the severe or pervasive requirement of a harassment claim is met.  Washington v. The Kroger Co., 2007 U.S. App. LEXIS 2876 (11th Cir. 2007) (quoting Gupta v. Florida Board of Regents, 212 F.3d 571, 583 (11th Cir. 2000)).  None of the conduct described above constitutes racial conduct.  To the extent it can even be considered "harassment," it is certainly not based on race.

The conduct is also not sufficiently severe or pervasive, nor can Plaintiff establish that she complained about all of the alleged incidents so as to put her employer on notice of racial harassment.  While Plaintiff may have complained about her workload, nothing in that complaint gave DCI notice that Plaintiff believed she was being harassed based on her race.  Thus, Plaintiff fails to establish the required elements of a harassment claim based on what she described as a hostile environment.

**b.    The Racial Slurs Identified by Plaintiff Do Not Rise to the Level of Racial Harassment**

In her deposition, defense counsel asked Plaintiff to identify all racial slurs to which she referred in her Complaint.  She identified (1) comments about black people's hair, (2) a white employee remarking that black people often complain about prejudice and (3) a comment that complaining about a black person at work would probably result in getting "beat up."

The record fails to demonstrate that Plaintiff perceived the behavior as so severe or pervasive that it altered the terms or conditions of [her] employment. In evaluating whether conduct complained of would alter the terms and conditions of employment and create a discriminatorily abusive working environment, factors considered include the frequency of the discriminatory conduct, the severity of the discriminatory conduct, whether the conduct was threatening or humiliating and whether the conduct unreasonably interfered with the plaintiff's performance at work. Harris, 510 U.S. at 21. Plaintiff has not sufficiently alleged that the comments were frequent, severe, humiliating or that they unreasonably interfered with her work performance.

Plaintiff's hopes of surviving summary judgment are dashed based on the fact that these remarks were apparently infrequent and isolated. "[T]easing, offhand comments, and isolated incidents" are insufficient to result in discriminatory change in the terms and conditions of employment. Id. Likewise, the " 'mere utterance of an . . . epithet which engenders offensive feelings in an employee,' does not sufficiently affect the conditions of employment to implicate Title VII." Harris, 510 U.S. 17, 20 (quoting Meritor). Title VII is not a general civility code for the American workplace. See Baldwin v. Blue Cross/Blue Shield of Ala., 480 F.3d 1287, 1302 (11th Cir. 2007) (citing Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998)). The law does not require employees to be nice to each other – instead, it requires a workplace free of conduct so severe and pervasive that it rises to the level of racial harassment.

In Brown v. Great West Healthcare, 2007 U.S. Dist. LEXIS 96209 (N.D. Ga., June 8, 2007), the plaintiff's allegations are similar to Quinnie's. Specifically, the co-workers in Brown made repeated comments about the hair of black people, discussed whether black people have a

difficult time losing weight, accused the Plaintiff of stealing, referred to the "ghetto" and "African do-nags", and shunned the Plaintiff. Id. at *38-39. The court determined that such conduct did not rise to the level of "severe or pervasive." In reaching its conclusion, the court relied on Edwards v. Wallace Comm. College, 49 F.3d 1517, 1521 (11th Cir. 1995) which held that racial slurs must be "so commonplace, overt and degenerating that they create an atmosphere charged with racial hostility." Brown at *40. Likewise, the racial slurs identified by Plaintiff Quinnie simply do not rise to the level of racial harassment.

As for the company's knowledge, Plaintiff's testimony[2] regarding her complaints to management is confusing at best. For example, Plaintiff indicates that the comments by Brenda Haire were made *after* Lee Ashbury died (Plaintiff at p. 191, lines 8 -14) yet she also claims to have complained to Ashbury (Plaintiff at p. 192, lines 4-6). At another point in her deposition Plaintiff seems to indicate that Ms. Haire made the statements "all the time". (Plaintiff at p. 191, lines 8-20). Plaintiff does not allege that DCI was aware of the frequency of Ms. Haire's comments. Plaintiff admits that she never complained to the Human Resources Department. She claims she complained to Rose Smith, the African American Acting Clinic Administrator. (Plaintiff at p. 193, lines 11-13). Plaintiff does not, however, provide specifics as to the nature of her complaints, when she made them or what she complained about. Such allegations are insufficient to establish the fifth element of a harassment claim. See Edwards v. Wallace Community Coll., 49 F.3d 1517, 1522 (11th Cir. 1995).

### c.    Plaintiff Was Not Offended by the Use of the N Word

In plaintiff's deposition, she never referred to the word "nigger" when she was questioned by defense counsel and asked to provide an exhaustive list of all racial slurs at DCI.

When her own attorney led her and asked her if she had ever heard that word, she answered in the affirmative.  Her only explanation for her seemingly contradictory testimony was that defense counsel did not specifically ask her about the word.  Notably, Plaintiff's complaint simply alleges "racial slurs," not the word "nigger."  Plaintiff never explained why she did not specifically refer to the N word in her Complaint.  While Plaintiff's distinction between racial slurs and the N word seems curious at first glance, the rest of her testimony sheds light on the distinction.  Given the context in which it was allegedly used at DCI, Plaintiff did not consider the use of the word racially offensive.  Thus, she did not plead it in her Complaint nor did she identify it as a "racial slur."

The fourth element of a harassment claim requiring conduct to be sufficiently severe and pervasive includes both subjective and objective components.  Mendoza at 1246.  To meet the subjective component, "[t]he employee must personally perceive the harassment is severe or pervasive."  Njie v. Regions Bank 2006 U.S. App. LEXIS 24076 (case attached) (citing Mendoza at 1246).  Plaintiff made it clear in her deposition that she did not personally perceive the use of the word "nigger" as severe or pervasive.  In fact, she repeatedly testified that her only objection to the way in which it was used at work was that elderly patients were present and it might have offended them.  Plaintiff explained that she was concerned that the word may have offended both *white and black* elderly patients.  Plaintiff's admission proves that context is critical.  A word that is often racially derogatory was apparently not used in a derogatory manner in this context.  Instead, according to Plaintiff, it was used in a way that may have offended *elderly* patients, not African American employees, and certainly not Plaintiff by her own

---

[2] All of the racial slurs to which Plaintiff refers were made by co-workers.  Thus, knowledge of the company is essential to establish the fifth element of a harassment claim.  See Mack v. ST Mobile Aero Engineering, Inc., 2006 U.S. App. LEXIS 19470 (11th Cir. 2006) (case attached).

admission. Even if it was used in a racially derogatory manner, Plaintiff did not perceive it as such which is the fatal flaw in her claim.

Perhaps an even more compelling reason for dismissing the use of the word "nigger" as alleged by Plaintiff is that no reasonable juror would believe Plaintiff's version of the events making summary judgment appropriate. Plaintiff never mentioned the word in her Complaint. She never mentioned it in her EEOC Charge of Discrimination. She never even mentioned it in her deposition as an example of a "racial slur." She only mentioned it when her attorney led her to admit it. At best, it was an after thought for Plaintiff. She conveniently testified that the only person she complained to about the use of the word was Lee Ashbury who is deceased. Plaintiff identifies no other member of management or Human Resources aware of the use of the word in the workplace. While Plaintiff believes that Glenda Gary could have heard it, she admittedly never talked to Ms. Gary about whether she heard it or not. (Plaintiff at p. 312, line 19 through p. 313, line 9). While it is certainly questionable whether DCI ever had knowledge of the use of the word nigger, it is unquestionable that no reasonable juror would believe that Plaintiff was offended by it.

In summary, the Court should disregard Plaintiff's allegations that are not based on race including work assignments, her complaint about a co-worker clocking out and her observation of two employees fighting. When viewing the racial slurs and the use of the word "nigger" together, the Court should dismiss this conduct because it is not sufficiently severe or pervasive as a matter of law. Furthermore, Plaintiff has not established that the company had knowledge of these allegations.

## IV.  CONCLUSION

The Court should dismiss Plaintiff's wrongful discharge claim as a matter of law.  The

Court should not consider any harassment claim the Plaintiff may attempt to raise because it is

no properly plead in her Complaint.  Even if the Court overlooks the procedural defect,

Plaintiff's allegations do not rise to the level of actionable harassment based on race.

Respectfully Submitted,

BASS, BERRY &  SIMS, PLC

/s/ Leslie Goff Sanders
Leslie Goff Sanders (TN #018973)
AmSouth Center
315 Deaderick Street, Suite 2700
Nashville, Tennessee 37238
(615) 742-6200

Henry C. Barnett, Jr.
150 South Perry Street
P.O. Box 2069
Montgomery, Alabama  36102-2069
(334) 241-8059
*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th of March, 2008 a copy of the foregoing Defendant's
Memorandum In Support of Defendant's Motion for Summary Judgment was filed
electronically.  Notice of this filing will be sent by operation of the Court's electronic filing
system to:

Jackson B. Harrison
The Harrison Firm, LLC
8425 Crossland Loop
Montgomery, AL  36117

Parties may access this filing through the Court's electronic filing system.

/s/ Leslie Goff Sanders

1       A.      Hourly?

2       Q.      Right.

3       A.      $11.

4       Q.      Do you work full-time?

5       A.      Yes.

6       Q.      40 hours a week?

7       A.      Yes.

8       Q.      Do you ever work overtime?

9       A.      No.

10      Q.      What about when you did your

11   six-week assignment with Snelling

12   Staffing?  Do you recall what your wages

13   were?

14      A.      $11 an hour.

15      Q.      Did you work overtime?

16      A.      No.

17      Q.      Did you work 40 hours?

18      A.      Yes.

19      Q.      How about at Alacare Hospice

20   for those five weeks?

21      A.      Alacare was only $9 an hour.

22      Q.      Did you work 40 hours?

23      A.      Yes.

**American Court Reporting**
**toll-free (877) 320-1050**

1      A.      No.  Patricia Jackson was
2    working there at the time.
3      Q.      Who's Patricia Jackson?
4      A.      She's an RN.  She was charge
5    nurse at DCI at the time.
6      Q.      And are you friends with
7    Patricia?
8      A.      Yes.
9      Q.      And she told you about a job?
10     A.      Yes.
11     Q.      What was the job opening at the
12   time?
13     A.      I started at DCI as unit clerk,
14   and I did that for two weeks before they
15   changed the position to land
16   administrator, medical records.
17     Q.      What was that?
18     A.      Land administrator.  I was
19   responsible for computer problems for four
20   clinics, which was Georgiana, Union
21   Springs, Thomasville, as well as
22   Montgomery.
23     Q.      So it was land administrator

1    and medical records, and that was for four

2    clinics?

3         A.    Yes.

4         Q.    Did you work at one clinic?

5         A.    Montgomery.

6         Q.    Did you ever have to go to the

7    other clinics?

8         A.    Yes.

9         Q.    How often?

10         A.    I went there a lot.  Because at

11    one time, we had a storm here and it tore

12    up all the computers in every clinic.  At

13    one time -- Benjamin -- I don't know his

14    last name, but he came from Chicago.  We

15    went to the clinics, and, also, Jason have

16    come down and gone with me, and one other

17    guy.

18         Q.    Was that -- is it safe to say

19    that that was more sporadic?  In other

20    words, were you regularly at Montgomery?

21         A.    If they had a change made on

22    the computers, then I was responsible for

23    making sure that all four clinics'

1    computers worked.  Not as much as worked,

2    but was advanced to those changes.  I also

3    was responsible for getting everyone's

4    passwords and setting up home drives and

5    all for RNs on the computers.

6         Q.    But you didn't have a regular

7    schedule where you would regularly go

8    to --

9         A.    No.  I only went to the other

10   clinics if they had a major problem --

11        Q.    Kind of like an as-needed

12   thing?

13        A.    -- that I couldn't do over the

14   computer in Montgomery.

15        Q.    Let me ask you this:  Did you

16   have any training in computers?

17        A.    No.

18        Q.    So working at DCI, was that

19   your only job that you've had working with

20   computers?

21        A.    Yes.

22        Q.    Did you get any training at

23   DCI?

1       Q.     So any other positions that you

2   held at DCI other than what's in Exhibit 3

3   and the things that you told us about in

4   addition to Exhibit 3?

5       A.     No.

6       Q.     Let me ask you about this.

7   When you applied at DCI, who hired you?

8       A.     Pam Heverman (phonetic).

9       Q.     Who was Ms. Heverman?

10      A.     She was acting as administrator

11  at the time.

12      Q.     Was Mr. Ashbury there?

13      A.     No.

14      Q.     Do you recall when Mr. Ashbury

15  came to DCI?

16      A.     I was there in May of '01.  He

17  came in August of '01.

18      Q.     Okay.  Do you recall -- strike

19  that.  I want to show you one more

20  document -- well, that was misleading.

21  I'm going to show you a lot more

22  documents.  But right now, I want to show

23  you this document and ask you if that's

**American Court Reporting**
**toll-free (877) 320-1050**

1  is the basis of your allegation against

2  DCI?  What are you claiming that DCI did

3  wrong?

4      A.    I've worked at DCI five years.

5  I have never been presented with a

6  write-up.  I have never been written up.

7  DCI -- on August 7, 2006, at 3:30 when I'm

8  about to go out the door to go home,

9  Ms. Gary comes into my office and asks for

10  my keys.  I asked her what was going on,

11  and she said she couldn't tell me.  She

12  asked me did I want to talk with Rose

13  Smith.  I spoke with Rose Smith on the

14  phone.  She said that there were some

15  accusations brought up against me, but

16  they had no proof.  They were

17  investigating, and I was being placed on

18  administrative leave without pay.

19          I tried numerous times to call

20  Glenda Gary to see what was going on, when

21  do I come back to work.  She did not talk

22  to me.  At one time, Glenda Gary called me

23  and asked me to be in her office that

1  morning.  I said yes, but then I called my

2  attorney.  He told me to call her back and

3  ask can we come at 1:30.  When I came into

4  that building that particular day, they

5  would not talk with me.

6      Q.    What day was that?

7      A.    This was in -- do you remember

8  the date?  It was in August of '06.

9      Q.    Let's back up just a minute.

10  You said that you were -- do you remember

11  the date on which you were asked to leave

12  and told --

13      A.    It was August 7th.

14      Q.    Okay.  So based on that date,

15  does that help you remember what date it

16  was that you went in at 1:30?

17      A.    It was August 10th or 11th.

18  I'm not sure.

19      Q.    Was Mr. Harrison your attorney

20  at the time?

21      A.    Yes.

22      Q.    All right.  So then you --

23  we'll get into the details of that with

**American Court Reporting**
**toll-free (877) 320-1050**

1    Tell me about it.

2         A.    Well, we stood in the hallway

3    for a little while, and then Rose Smith

4    came and asked us did we want to have a

5    seat.  We sat in an office.  A few minutes

6    after we got in the office, Dan Watson

7    came in, introduced himself, and we

8    introduced ourselves.  And he said that --

9    Dan Watson made the statement that he

10   wanted to talk with me alone, that he

11   would not -- he asked my attorney to

12   leave.  He said, at this point, I need to

13   ask you to leave.  That's what he said to

14   my attorney.

15        Q.    And then what happened?

16        A.    And he said if he could not

17   talk with me without my attorney present,

18   then my attorney needed to advise me to

19   voluntarily quit.

20        Q.    That's what Dan said?

21        A.    Yes.

22        Q.    Did Rose --

23              THE WITNESS:  Did I make a

1      A.      Uh-huh.

2      Q.      Now, I would like to go through

3  this letter by Mr. Watson.  If you'll

4  notice in the first paragraph, he says

5  that you were placed on administrative

6  leave on August 7, 2006.  Does that sound

7  about right, about a week between?

8      A.      Yes.

9      Q.      Okay.  And then he indicates

10  that it was pending an investigation into

11  serious allegations about time records.

12  Is that the falsification of time as you

13  understood it?

14      A.      Yes.

15      Q.      Okay.  Now, he indicates here

16  in his letter that, "It is our

17  understanding that the same afternoon you

18  called a coworker."  Would that be LaTonya

19  Buchanan?

20      A.      Yes.

21      Q.      Did you call her that

22  afternoon?

23      A.      Yes.

1    Q.    Let's read this third paragraph

2    in Mr. Watson's letter.  "Today I was in

3    Montgomery for the purpose of completing

4    the investigation.  You arrived at the

5    clinic, as requested by Ms. Gary, with the

6    person claiming to be your lawyer."

7    Again, that was Mr. Harrison; correct?

8        A.    Yes.

9        Q.    "He did not have a letter of

10   representation and no such letter was

11   presented."  Is that true?  Was there any

12   kind of letter of representation exchanged

13   between Mr. Watson and Mr. Harrison that

14   you recall?

15       A.    Not that I recall.  He had a

16   card, one of his cards.

17       Q.    He had a business card?

18       A.    Yes.

19       Q.    Well, here Mr. Watson says, "He

20   did not present any business card or any

21   other written information indicating that

22   he was a lawyer, much less that he

23   represented you."  Do you recall whether

1    days off?

2        A.    Yes, I did.

3        Q.    Other than that, had you ever

4    had any interaction with Dan Watson?

5        A.    No.

6        Q.    So you knew he was in human

7    resources?

8        A.    Yes.

9        Q.    And in Nashville?

10        A.    Yes.

11        Q.    Had you met him personally

12    before that day?

13        A.    No.

14        Q.    Then he says, "You refused to

15    meet with me without the person who was

16    accompanying you present."  Is that

17    correct?

18        A.    Uh-huh.

19        Q.    You wouldn't meet with him

20    without Mr. Harrison?

21        A.    No.

22        Q.    That was a bad question.  Let's

23    start over.  Mr. Watson says, "You refused

1    earlier when we read through this letter

2    that on August 14th -- that meeting that

3    was set for August 14th, it was your

4    understanding that the point of that was

5    to talk about this falsification of time

6    issue?

7        A.    Like I said, the only person

8    that I was aware that I was meeting with

9    at that point, prior to even getting to

10   that clinic, was Glenda Gary.

11       Q.    Let me ask you about Ms. Gary.

12   Was she the clinic administrator at that

13   time?

14       A.    Yes.

15       Q.    Where was Mr. -- had -- I know

16   Mr. Ashbury died.

17       A.    Mr. Ashbury died in February.

18       Q.    Okay.  So from February until

19   August, who was the clinic administrator?

20       A.    It took a while.  I think

21   Glenda Gary got the administrator position

22   in June or July, because Rose Smith was

23   coming back and forth.

1      Q.     And who was Rose?  Do you know?

2      A.     She works in corporate.

3      Q.     Okay.  So it's your

4   understanding that she works in Nashville?

5      A.     Yes.

6      Q.     And she was responsible for the

7   clinic in that interim period?

8      A.     Yes.

9      Q.     Or that is your understanding?

10     A.     Yes, that's my understanding.

11     Q.     When you were working there

12  during that time, was Mr. Ashbury your

13  boss?

14     A.     Mr. Ashbury was my direct boss.

15     Q.     And then was Glenda Gary your

16  boss --

17         (Brief interruption.)

18         (Brief recess.)

19     Q.     (By Ms. Sanders)  Ms. Quinnie,

20  we left off talking about this letter that

21  we marked as Exhibit 5, and it was a

22  letter from Daniel Watson.  Let me ask you

23  this, Ms. Quinnie.  Why did you think that

1    signed?

2        A.    Yes.

3            MS. SANDERS:  All right.  Let's

4    make that the next exhibit.

5            (Whereupon, a document was

6    marked as Defendant's Exhibit 6 and is

7    attached to the original transcript.)

8        Q.    Ms. Quinnie, we've marked this

9    document as Exhibit 6.  What was the

10   purpose for you signing that document?  I

11   realize you didn't prepare it.  I know Mr.

12   Harrison did.  But what was the point of

13   that?

14       A.    Because we needed my personnel

15   file.

16       Q.    Why did you want your personnel

17   file?

18       A.    On August 4th -- August 3rd, I

19   asked Glenda Gary just out of the blue if

20   I could see my personnel file because this

21   policy reads I could read my personnel

22   file any time I wanted to as long as I

23   gave you notice.  At that point, she told

1    me, no, that it was not done.  I did not

2    ask her about it again on that Friday,

3    which was the 4th, because I left early.

4    And Monday the 7th, that a.m., Monday

5    morning was -- when I asked her, she said

6    that it was not done and she had to talk

7    with Rose Smith.  So Monday morning I

8    asked her had she talked with Rose Smith,

9    and she acted like she didn't know what I

10   was talking about.  I reminded her of my

11   personnel file, and she said, get with me

12   before you leave.

13       Q.    Okay.

14       A.    I got busy.  I did not go by

15   and see Glenda Gary that Monday prior to

16   leaving early.  I left 30 minutes early

17   that Friday because I wasn't feeling well.

18   That Monday at 3:30, she came in and asked

19   for my keys.

20       Q.    Why did you ask to see your

21   personnel file on Friday, August 3rd?

22       A.    Thursday was August 3rd.

23       Q.    Okay.  Right, because Saturday

1          MS. SANDERS:  Just for the

2    record, that's the employee handbook

3    portion of the DCI benefit pack and

4    booklet that Ms. Quinnie received.

5          MR. HARRISON:  It's a 96- to

6    100-page document.

7          MS. SANDERS:  It's about 96

8    pages.  But it's front and back.

9          MR. HARRISON:  Is that going to

10   be Exhibit 7?

11         MS. SANDERS:  Yes.  We'll just

12   make that the next collective exhibit.

13         (Whereupon, a document was

14   marked as Defendant's Exhibit 7 and is

15   attached to the original transcript.)

16     Q.    (By Ms. Sanders)  Ms. Quinnie,

17   just for the record, if you'll look back

18   at Exhibit 4.  When you signed Exhibit 4,

19   which you've already identified, were you

20   signing that you received this?

21     A.    Yes, this book.

22     Q.    What's now been marked Exhibit

23   7?

1        A.      Yes.

2        Q.      All right.  Now, you indicated

3   that there was a policy in the handbook

4   that allowed you to see your personnel

5   file?  Can you identify that policy?

6        A.      It's on page 66.

7        Q.      Is this the policy you were

8   referring to when you asked Ms. Gary about

9   your personnel file?

10        A.      Yes.

11        Q.      And did you have any reason to

12   suspect that there was something in your

13   personnel file that you disagreed with --

14        A.      No.  I'm sorry to cut you off.

15   I have never asked to see my personnel

16   file since 2001 that I was hired there.  I

17   had never asked for it.

18        Q.      What prompted you to ask for

19   it?

20        A.      I don't know.  Because I was

21   talking to the unit secretary, and she

22   made the statement that you can be written

23   up and it will go in your personnel file

1    even if you don't see it or even if you

2    don't sign it.  And I wanted to know what

3    was in my personnel file, because I know

4    that I had never been presented with a

5    write-up.

6        Q.    Did you think that you had ever

7    been disciplined?

8        A.    No.

9        Q.    Tell me again.  You asked

10   Ms. Gary for a copy of your personnel

11   file?

12       A.    No.  I asked to see my

13   personnel file.

14       Q.    Okay.  And Ms. Gary's response?

15       A.    Was, no, it's never been done.

16   Then she said she had to talk with Rose

17   Smith.

18       Q.    Okay.  So it's your

19   understanding that she did talk with Rose

20   Smith, or do you know?

21       A.    When I asked that Monday

22   morning, which was August 7th, had she

23   talked with Rose Smith, she acted like she

1          Q.     Okay. Now, Ms. Quinnie, I can

2     tell by the choice of your words, you do

3     not believe that you quit. You believe

4     that you were terminated.

5          A.     I was terminated.

6          Q.     All right. Why do you think

7     you were terminated?

8          A.     I was terminated because they

9     -- DCI placed me on administrative leave

10    without pay, pending an investigation.

11    When I came there, you asked for the

12    meeting -- Glenda Gary asked for the

13    meeting. I came to the meeting. You did

14    not talk to me. I did not voluntarily

15    quit. I was not going to ask -- he asked

16    my attorney to leave. At that point, you

17    gave me the option, either I tell my

18    attorney to leave or I voluntarily quit.

19    That's not an option. I don't voluntarily

20    quit.

21          Q.     Let me ask you this: Did you

22    say to Glenda Gary on the phone, I'll be

23    there for the meeting but I'm bringing my



1        Q.     Do you know where she currently

2   works?

3        A.     She works at Fresenius where I

4   work.

5        Q.     Now, if you will look at

6   paragraph ten of your complaint, in there

7   you claim that you were subjected to a

8   hostile work environment when you worked

9   at DCI.  What do you mean by that?

10       A.      Hostile work environment is

11  where I'm being put in a position where I

12  have to -- you're timing me, giving me a

13  deadline to get my work done, but you're

14  putting -- wanting me to put my work on

15  hold.  I can't very well do my job and

16  somebody else's, too.

17       Q.     Who else's were you --

18       A.      And if I didn't do what it was

19  asked for me to do, you were going to

20  reprimand me anyway.

21       Q.     Who else's job were you asked

22  to do?

23       A.      I played backup to a lot of

**American Court Reporting**
**toll-free (877) 320-1050**

1    people in that clinic.

2         Q.    Who?

3         A.    The clinical manager.

4         Q.    Who was that?

5         A.    Sherry Pereira.  Debra Goodnoe,

6    the secretary.  When the social workers

7    were out, they'd come to me.

8         Q.    Just so I understand this.  You

9    think the fact that you were backup to

10   other people and that you were in a

11   position of having to meet deadlines,

12   that's the basis of your hostile work

13   environment claim?

14        A.    Not only that.  When people are

15   talking to you any way they want to.  But

16   the minute I say something back, then I

17   have an attitude.  That's hostile to me

18   when you're talking to me in a tone of

19   voice, and when I give it back to you,

20   then I'm reprimanded for it.

21        Q.    Okay.  Let's talk about that.

22   Tell me about the times you were

23   reprimanded at DCI.

1     A.    I was reprimanded because it

2  was an employee that told me after Regina

3  was fired -- Rachel Thompson, to be

4  exact -- she said, Cynthia, I'm not going

5  to tell you who said it, but you're going

6  to be the next one.  When I told her okay,

7  that's fine, but fire me because of a

8  reason, for something I did; you better

9  not fire me for something I didn't do.

10  Okay.  With me making that statement, she

11  went to Glenda Gary.  Glenda Gary came and

12  told me, she said, Cynthia, I heard that

13  you have a problem with Regina being

14  fired.  No, that was not even the

15  conversation.  I don't have a problem with

16  anybody being fired.  I have nothing to do

17  with Regina being fired.  I work for me.

18  I don't work for Regina, and I don't work

19  for anybody else.  Regina don't make my

20  mortgage payments, and I don't make hers.

21     Q.    So, then, did -- is it your

22  testimony that Glenda Gary reprimanded you

23  for having that conversation with Rachel--

1    everybody would know about it.

2        Q.    Why is that?

3        A.    Because they were very

4    outspoken.  They didn't care what they

5    said or who they said it to.

6        Q.    Did they ever say to people --

7    did you ever hear them say they had been

8    reprimanded for anything else?

9        A.    No.

10       Q.    So you never heard them talk

11   about being reprimanded?

12       A.    No.

13       Q.    Now, anything else that's the

14   basis of your hostile work environment

15   allegation?

16       A.    If you say -- if you go to

17   Ms. Gary and make a complaint, then what

18   it boils down to is you're being

19   blackballed.  You're put on the blacklist.

20   Because if you go to her and complain

21   about another employee, which I have

22   complained to her on numerous occasions --

23   we had an RN there that I know for a fact

1  go to her AA meetings and she don't clock

2  out.

3      Q.    Who is that?

4      A.    Debbie Tullier.  I went to

5  Glenda Gary and I told her, I said, when

6  does going to an AA meeting have anything

7  to do with your job description.  She said

8  it didn't.  I said, well, Debbie Tullier

9  did not clock out, and she -- her meetings

10  was on Tuesdays, and she would be gone for

11  two hours.  You're still on the clock.

12  They always told me when you leave the

13  premises, you're supposed to clock out,

14  anything could happen.

15      Q.    So why did you report that to

16  Ms. Gary?

17      A.    Because when you leave the

18  premises you're supposed to clock out.

19  When I left the premises, I had to clock

20  out.  So what makes her better than me?

21  Why did I have to clock out and she

22  didn't?

23      Q.    I'm just curious because

1   nurses clocking in and out?

2       A.    I was doing their time at the

3   time.  That's why I reported it to her.

4       Q.    And when was that?  Do you know

5   when you reported that to Glenda Gary?

6       A.    No, I don't know an exact date.

7       Q.    Was Glenda Gary the clinic

8   administrator at the time?

9       A.    Yes, she was.

10      Q.    You said if you complained, you

11  got on the blacklist.  What do you mean by

12  that?

13      A.    Because if you complained to

14  Glenda Gary, then Glenda Gary would tell

15  the person that -- if you go in there and

16  say, Glenda, I have a complaint, then

17  Glenda would get with that person -- not

18  to reprimand them -- and the next thing

19  you know, that person is not speaking to

20  you, or they're in a corner talking and

21  laughing.  And Glenda is acting strange

22  with you, and that person is also acting

23  strange with you.  So it didn't help to go

1    Glenda was education coordinator.

2         Q.    Okay.  So then, I guess, Glenda

3    wasn't her boss?

4         A.    No.

5         Q.    Any other incidents that you

6    can think of that support your claim that

7    there was a hostile work environment?

8         A.    I've seen people literally go

9    at it.  Not throw blows, but they were

10   told if they were going to throw blows to

11   clock out and go in the next parking lot.

12   They have gone at each other, and nothing

13   was done about it.

14        Q.    Who was that?

15        A.    Rachel Thompson and Marshekia

16   Pitts.

17        Q.    Can you tell me when that

18   happened, when they went at it?  Was it

19   more than once?

20        A.    It was more than once, but one

21   particular time when I witnessed it.

22        Q.    .When did you witness it?

23        A.    They were on the stairs.

1    Glenda Gary's responsibility because

2    Glenda Gary, at that time, was the

3    administrator, and she did nothing to

4    alleviate this problem.  To me, her

5    actions were -- she added more to the

6    problem than solving the problem.

7        Q.    I guess, Ms. Quinnie, I'm still

8    trying to figure out exactly what the

9    problem is.  So let's just break this down

10   so I can figure out exactly what the

11   problem is.  Did you ever complain to

12   Glenda Gary that you thought there was a

13   hostile work environment at DCI?

14       A.    I went to Glenda Gary on

15   numerous occasions.  Not so much as a

16   hostile environment, but just to let her

17   know how I felt about things that were

18   going on around there.

19       Q.    Okay.  Tell me exactly what you

20   said to Glenda Gary, the best you can

21   remember.

22       A.    It was on more than one

23   occasion about more than one thing.

1    might have made complaints to Glenda Gary?

2        A.    Yes.

3        Q.    So in that time frame, I need

4    you to tell me about every complaint that

5    you can think of that you made to Glenda

6    Gary.

7        A.    I complained to Glenda Gary

8    about, first of all, the flow sheet issue

9    with Debra Goodnoe. Debra Goodnoe stated

10    that she's been there ten or eleven years

11    and she had DCI in her back pocket. So

12    she would do what she wanted to do. If

13    she wanted to come in and do flow sheets

14    that day, she would -- Debbie was the

15    fastest typist in that building. There

16    was no reason why she couldn't do her flow

17    sheets. Why did I always have to put my

18    medical records on hold to enter flow

19    sheets.

20        Q.    Let me ask you this: How

21    long -- was Debbie Goodnoe -- did you have

22    to be backup to Debbie Goodnoe prior to

23    Glenda Gary being the administrator, like

1       Q.      Okay.  Who else?

2       A.      Mandy Martin Bowen, Rachel

3   Thompson, Tabitha Mack.  It was a whole

4   lot of employees that did not clock out

5   every time they left that building.

6       Q.      And you complained to Glenda

7   Gary about that?

8       A.      Yes.

9       Q.      Did you complain to Lee Ashbury

10  about that?

11      A.      Yes, I did.

12      Q.      Did you make any other kind of

13  complaints to Glenda Gary or Lee Ashbury?

14      A.      Yes, because we had had another

15  -- it was -- finally, they made -- when

16  Lee Ashbury -- before Lee Ashbury died,

17  they started this service support.  I

18  still had the same job duties that I was

19  responsible for, plus I was still having

20  to go to other clinics.  At one time, they

21  had taken flow sheets away from Debra and

22  given them to me.  So I was responsible

23  for entering flow sheets, but I still

1  hadn't -- they hadn't alleviated anything

2  from me.  So Debra at that point was

3  supposed to have been my backup.  I was

4  responsible -- it was either Georgiana or

5  Union Springs, they had problems with

6  their mini server, and also they

7  changed -- we had Telecom at one time, and

8  they switched over.  I had to go down and

9  do that work on the mini server, on the

10  routers.  And when I came back to the

11  clinic, the flow sheets for the day prior

12  to me going there were not entered.  So

13  why am I having to run all over

14  Montgomery -- all over everywhere -- and

15  then come back and do flow sheets when

16  Debra was there and she could have done

17  them.

18      Q.    And you complained about that?

19      A.    Yes, I did.  Because when she

20  was out, it was my responsibility to do

21  them as her backup.  But as my backup, she

22  was not responsible for doing them.

23  Nobody made her responsible for them.

1       Q.      Any other kind of complaints

2   that you made?

3       A.      They had another employee

4   there, Sharon Sankey.  She was a sweet

5   person.  But she was also a backup for

6   myself and Debra Goodnoe.  But when stuff

7   was not done, it would point back to me.

8   She was responsible for thinning the

9   charts on the floor.  Certain charts on

10  the floor, she was taking certain things

11  out.  And she was responsible for filing.

12  But when Sharon didn't do the filing

13  correctly, they would bring that back to

14  me.

15      Q.      Was that part of your job

16  duties?

17      A.      No, it was not.

18      Q.      In medical records?

19      A.      Medical records is part of my

20  job duty, but not filing.

21      Q.      Did you ever express a

22  complaint about that?

23      A.      Yes, I did.

1    the filing.

2        Q.    Let me ask you this:  Do you

3    think that, as you've described it -- and

4    I don't want to put words in your mouth,

5    so you tell me if this is true.  It sounds

6    like some of these complaints that you

7    made were based on the fact that you felt

8    like you were being given additional job

9    duties; is that correct?

10       A.    Yes.

11       Q.    Did you think that anybody at

12   DCI was giving you additional job duties

13   because of your race?

14       A.    No, I don't think it was

15   because of my race.

16       Q.    I mean, do you have an opinion

17   as to why -- did you have an opinion as to

18   why you were getting these extra job

19   duties?

20       A.    Because I would do it.  I would

21   fuss about it, but I would do it.  Like I

22   told her, I was also responsible for doing

23   Dr. Krothapalli's unstables.  He does

1    those once a month.

2         Q.    What's that?

3         A.    Where he -- they would come

4    in -- he and the social worker and the

5    nurse manager and the dietitian would make

6    rounds at each patient's chair, and he

7    needed a specific packet for that patient.

8    And I was responsible for getting those

9    packets together.  I was responsible for

10   doing those packets.  Lee Ashbury would

11   tell you -- Lee Ashbury, Glenda Gary, and

12   Sherry Pereira would tell you, I was the

13   one doing the RN and LPN's work.  They

14   would just sign what I had done.

15        Q.    Did you work overtime when you

16   were at DCI?

17        A.    Yes, I did.

18        Q.    How often?

19        A.    I worked overtime prior to

20   unstables, to get all that stuff together,

21   get it ready.

22        Q.    I guess you were there about

23   five years; is that right?

1      A.      Sankey.

2      Q.      Sankey.

3      A.      She's white.

4      Q.      Sherry Pereira?

5      A.      She's white.

6      Q.      Rose -- what's Rose's last

7  name?

8      A.      Smith.

9      Q.      Rose Smith.

10      A.      She is black.

11      Q.      Lee Ashbury?

12      A.      He was white.

13      Q.      And Glenda Gary?

14      A.      White.

15      Q.      Tammy Griswold?

16      A.      White.

17      Q.      In paragraph 11 of your

18  complaint, you indicate that

19  African-Americans are -- actually, I think

20  you allege that Caucasians are rehired and

21  African-Americans are not; is that

22  correct?  You might want to take a look at

23  paragraph eleven.

**American Court Reporting**
**toll-free (877) 320-1050**

1        A.      Yes.

2        Q.      What is the basis of that?

3    Give me some examples.

4        A.      For example, I had asked Glenda

5    Gary if I can move out of medical records

6    and go to the treatment floor.  She told

7    me DCI had a freeze on hiring.

8        Q.      Okay.

9        A.      Well, Rachel Thompson had left

10   DCI and moved to Mississippi, decided she

11   didn't like it.  At the same time that you

12   got a freeze on hiring, you let this woman

13   come back to work.

14       Q.      What was Rachel Thompson's job?

15       A.      She's a patient care tech.

16       Q.      A tech.  And that's the

17   position that you wanted, patient care

18   tech?

19       A.      Yes.

20       Q.      Do you know when that was?

21       A.      This was just prior to me being

22   terminated.

23       Q.      Any other examples?

**American Court Reporting**
**February 6, 2008**

1      A.    No.

2      Q.    In your complaint, you talk

3   about African-Americans not being rehired.

4   You were --

5      A.    I'm sorry.  My mistake.  There

6   was Marshekia Pitts.  She also left the

7   clinic.  She didn't get terminated.  But

8   she asked to come back, and Glenda Gary

9   was telling her that they had a freeze on

10  hiring.

11     Q.    Do you know when that was?

12     A.    This was around the same time,

13  August.

14     Q.    How did you -- did Ms. Pitts

15  tell you this?

16     A.    Yes.

17     Q.    All right.  Any other examples?

18     A.    Kimberly Reeves, also.

19     Q.    Tell me about her.

20     A.    She left, found another job,

21  but she decided to come back.  She

22  couldn't come back.

23     Q.    How do you know that?

**American Court Reporting**
**toll-free (877) 320-1050**

1          A.      She told me.

2          Q.      Anybody else?

3          A.      No.

4          Q.      What about Tabitha Mack?

5          A.      Tabitha Mack was just recently

6     rehired.

7          Q.      What is Tabitha Mack?  Is she a

8     nurse or patient care --

9          A.      LPN.

10         Q.      Kimberly Reeves, what was she?

11         A.      She's a patient care tech.

12         Q.      How about Marshekia?

13         A.      Patient care tech.

14         Q.      Other than Rachel Thompson, do

15    you know of any Caucasians that have been

16    rehired?

17         A.      Not at this time.

18         Q.      Do you know of any

19    African-Americans that have been rehired?

20         A.      Other than Tabitha Mack?

21         Q.      Other than Tabitha.  Sorry.

22         A.      Anybody besides Tabitha, no.

23         Q.      In paragraph 12 of your

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

1  fired or is still there?

2      A.    No.

3      Q.    Now, in paragraph 14 of your

4  complaint, you talk about nurses that have

5  made racial slurs.  You just mentioned

6  Brenda Haire.  Tell me about that.  What

7  did she say?

8      A.    Brenda Haire is always talking

9  about black people's hair.  She's always

10  talking about how nappy it is, and how

11  black people are always complaining;

12  everything's got to be prejudiced; I

13  thought they overcame.

14      Q.    Okay.  Anything else Brenda --

15  any other slurs?

16      A.    No.

17      Q.    Did you overhear -- I'm sorry.

18  I didn't mean to cut you off.

19      A.    No.

20      Q.    Did you overhear Brenda make

21  these comments?

22      A.    Yes, I did.

23      Q.    Both of these comments?

1    of?

2        A.    Rachel was there as well.

3        Q.    Did you ever complain to --

4    well, let me back up.  Do you recall

5    during your employment when these comments

6    were made?

7        A.    No.

8        Q.    Was it when Lee Ashbury was the

9    clinic administrator?

10        A.    No, no.

11        Q.    Was it when Glenda Gary --

12        A.    This was when Glenda Gary was

13    acting as the administrator.  We didn't

14    actually have an administrator.

15        Q.    Did you ever hear Brenda make

16    these comments when Lee Ashbury was the

17    administrator?

18        A.    Brenda always -- I mean, Brenda

19    always made those comments.  That was just

20    Brenda's way of talking.  That was Brenda.

21        Q.    Okay.  So did you ever complain

22    to either Lee Ashbury, Rose, or Glenda

23    Gary about these comments?

1      A.     I also complained to Brenda.

2      Q.     Well --

3      A.     Yes.

4      Q.     So tell me who you complained

5  to.

6      A.     I complained to Lee.

7      Q.     Anybody else?

8      A.     I have told Rose Smith about

9  them.

10     Q.     Anybody else?

11     A.     And I have also talked to

12 Brenda Haire herself.

13     Q.     What did you tell Brenda?

14     A.     I asked her why she's always

15 making snide comments about black

16 people --

17     Q.     What did she say --

18     A.     -- and what is the problem.

19     Q.     What was her response?

20     A.     And she said, ain't no problem;

21 it's just that y'all get around here and

22 y'all complain about this; it's not

23 slavery time anymore.  And she said, you

1    wasn't back in that time anyway; why is it

2    bothering you.  It bothers me because I'm

3    a black person.

4         Q.    So this is a conversation you

5    had with Brenda?

6         A.    Yes.

7         Q.    What about Lee Ashbury?  When

8    you told Lee about Brenda?

9         A.    If it didn't bother Lee, Lee

10   didn't bother it.

11        Q.    How about Rose?  What about

12   Rose when you complained to her?

13        A.    She wrote it down.

14        Q.    Do you know whether she did

15   anything about it?

16        A.    No, I don't.

17        Q.    But you didn't complain to

18   Glenda Gary about Brenda Haire?

19        A.    No. Like I said, Glenda Gary

20   was not administrator at the time.

21        Q.    Anybody other than Brenda Haire

22   who made -- you say several nurses.  Any

23   other nurses that made racial slurs, or

1  was that Brenda Haire?  Actually, that

2  several may have been my word.  Can you

3  think of any other nurses that made racial

4  slurs?

5       A.    Debbie Tullier would every now

6  and then.

7       Q.    What would Debbie --

8       A.    Debbie would get mad with

9  certain techs, and she would say, it don't

10 do any good to complain about them because

11 black people are known to beat you up.

12      Q.    Did you hear Debbie say that?

13      A.    Yes, I did.

14      Q.    Did you complain to anybody?

15      A.    No.

16      Q.    Do you know if anybody else

17 ever heard Debbie say that?  Was anybody

18 around you at the time you heard her make

19 that comment?

20      A.    Debbie was talking about Regina

21 Chapman at the time.  And Regina heard

22 her, and her and Regina had a

23 confrontation.

1    Q.    So Regina was the one she was

2    referring to?

3    A.    Yes.

4    Q.    And Regina heard it?

5    A.    Yes.

6    Q.    Any other comments?  Any other

7    racial slurs?

8    A.    No.

9    Q.    Let me ask you this, because

10   you indicated in your discovery responses

11   that Melissa Hill has knowledge regarding

12   your claims.  You've already told me about

13   Ms. Hill, that you've talked to Ms. Hill.

14   You indicated that she is the one that

15   told you about Arthur Taylor being

16   terminated.  Anything else that Ms.

17   Hill -- any other information that you

18   think Ms. Hill has?  Any other reason you

19   listed her as having knowledge of your

20   claims?

21   A.    Melissa works there.  Melissa

22   knows what's going on around there.  Not

23   only Melissa Hill, I also gave you Charlie

**American Court Reporting**
**toll-free (877) 320-1050**

1    than that, you haven't thought about the

2    amount of damages you want; is that

3    correct?

4            MR. HARRISON:   Objection.

5    She's already answered that.

6        A.    I've thought about it a lot.

7    That's all I've thought about.  I want to

8    know where this started from, who started

9    this, why me.

10       Q.    Have you ever asked anybody at

11   DCI that question?

12       A.    No, because I have not talked

13   with anyone at DCI.  And I didn't want to

14   call DCI and talk with anybody there so

15   that they can say, well, Cynthia called

16   and said this or Cynthia is harassing me.

17   No.  That's why I have an attorney.  I let

18   him talk for me.

19           MS. SANDERS:   Nothing further.

20   That's it.

21              EXAMINATION

22   BY MR. HARRISON:

23       Q.    Ms. Quinnie, I've just got a

**American Court Reporting**
**February 6, 2008**

1    few questions to go through here. Again,

2    my name is Brett Harrison for the record.

3    All right. And I'll just try to go

4    through as Ms. Sanders did. Let's see.

5    Let's go back to Exhibit 1 here. On

6    Exhibit 1 here, Defendant's Exhibit 1, she

7    brought your attention to having three

8    jobs prior to coming to employment with

9    DCI; is that correct?

10        A.    Yes.

11        Q.    Now, on your statement here,

12   you really only stated that you had two

13   jobs that you had worked prior to coming

14   on to DCI; isn't that correct?

15        A.    Yes.

16        Q.    And the third job you had was

17   with Marriott; correct?

18        A.    Yes, sir. That's right.

19        Q.    But that was just a part-time

20   job; right?

21        A.    Yes.

22        Q.    Your two main jobs were with

23   Jackson Hospital --

1    necessarily know that we need to put --

2            MS. SANDERS:  Let's just let

3    the record reflect that he's referring to

4    the blue DCI benefits package, the first

5    portion of which has been marked as

6    Exhibit 7.  He is referring to the full

7    book.  I think we all know what he's

8    talking about.

9        Q.    (By Mr. Harrison)  Let's see.

10   All right.  Let's get to kind of the meat

11   and potatoes of this.  Okay?  In your

12   complaint, it is alleged, on your behalf,

13   that you had to work or were forced to

14   work in a hostile work environment.

15   Included in that hostile work environment,

16   did you ever hear anybody use racial

17   slurs?

18       A.    Yes.

19       Q.    Did you ever hear anybody use

20   the N word?

21       A.    Yes.

22       Q.    Who used the N word?

23       A.    Brenda Haire.

1      Q.      What did she say?

2      A.      She was always talking about

3   black people this, and she had made the

4   statement, oh, nigger, please.

5      Q.      And who is Brenda Haire?

6      A.      Brenda Haire is an RN.

7      Q.      She's a nurse; right?

8      A.      Yes.

9      Q.      She is kind of up the ladder

10  from you, although she is probably not

11  your boss?

12     A.      Yes.

13     Q.      She's got a higher stature in

14  DCI than you do; correct?

15     A.      Yes.  She's a registered nurse.

16     Q.      Did Glenda Gary ever hear her

17  say that?

18     A.      Yes.

19     Q.      So Glenda Gary, your boss,

20  heard Brenda Haire use the N word at DCI;

21  correct?

22     A.      Yes.

23     Q.      Did you ever hear Glenda Gary

1    Brenda Haire use the N word or typical or

2    common racial slurs like that?

3         A.    Numerous times.  I can't count.

4         Q.    Okay.  Did you ever witness or

5    see that she was severely disciplined at

6    all?

7         A.    No, I didn't.

8         Q.    Do you have any knowledge that

9    she was severely disciplined in the least?

10         A.    No.

11         Q.    Did she get fired for saying

12    that?

13         A.    No.

14         Q.    Did Glenda Gary ever say, we're

15    not going to allow that to be said at DCI?

16         A.    No.

17         Q.    All right.  Have you heard

18    anybody else use the N word?

19         A.    Rachel Thompson.

20         Q.    All right.  Now, who is Rachel

21    Thompson?

22         A.    She was a patient care tech.

23         Q.    Did Glenda Gary hear her say

1      the N word?

2           A.    Yes.  It was just -- to them,

3      it was casual conversation.

4           Q.    Okay.  How would she say or use

5      the N word?

6           A.    She bragged about having three

7      different babies from three different

8      black men and said, the niggers ain't

9      taking care of my babies, and this, this,

10     and that.

11          Q.    Did that -- did you feel

12     threatened or hurt by people using that

13     word?

14          A.    The only reason I was upset

15     about it was because it was used in front

16     of patients.  Elderly black people, being

17     brought up in the time that they came up

18     in, I didn't think that was very

19     professional.  And I felt --

20          Q.    Did you feel humiliated by

21     that?

22          A.    I felt bad for the patients.

23          Q.    Did you feel --

1          A.     Not only black patients, but

2    white patients as well, because that was

3    disrespectful.  I was always brought up to

4    respect my elders, and certain things you

5    don't say in front of old people.

6          Q.     So did you feel like that

7    created a hostile work environment?

8          A.     For me it did, yes.

9          Q.     And Glenda Gary heard her say

10   that; correct?

11         A.     Yes.

12         Q.     Did you ever see Glenda Gary

13   ever apologize for that?

14         A.     No.

15         Q.     Reprimand Rachel Thompson for

16   that?

17         A.     No.

18         Q.     Did she let the other black

19   employees know that she wouldn't tolerate

20   that?

21         A.     No.

22         Q.     Did Glenda Gary ever use racial

23   slurs such as that?

**American Court Reporting**
**toll-free (877) 320-1050**

1    A.    She would only ask about the

2  hair, and she said that black people can

3  sing better than white people because of

4  something with the nose thing up in here.

5  I don't know.  I'm not an RN.  I don't

6  know.

7    Q.    Did you feel that her

8  terminology and verbiage kind of fell in

9  line with that of Rachel and Brenda

10  Haire's, as far as talking about black

11  people in a negative way?

12    A.    When Rachel did it, it was

13  discriminating.  It was just outright...

14    Q.    Hateful?

15    A.    Yes.  But like Glenda Gary

16  would just talk about -- you know, we wear

17  weave in our hair and different color

18  hair, and is that your real hair and stuff

19  like that.

20    Q.    Did you ever hear anybody else

21  use the N word or racial slurs?

22    A.    No.

23    Q.    Are you sure about that?  Do

1    you remember --

2              MS. SANDERS:  Objection.

3         A.    Not anybody -- no.  I'm sorry.

4    Tullier would get mad.  She got mad once

5    or twice.

6         Q.    Do you remember a lady by the

7    name of Mandy Bowen?  Did she ever do

8    that?

9         A.    Mandy and Rachel would talk

10   across the room.  One was on one side in

11   one section and the other was on this

12   side, and they talked.

13        Q.    When you say talked, did you

14   ever hear Mandy use racial slurs?

15        A.    She would say stuff like,

16   nigger, your mammy, and all this kind of

17   stuff.  To me -- you know, maybe I was

18   taking it the wrong way.  But to me a

19   mammy is a black person taking care of a

20   white child.  I remember seeing that in

21   the movie once, Imitation to Life.  When

22   this girl said that her mother -- the

23   black mother was her mammy.  And I don't

1      them what to say.

2                  MR. HARRISON:   Okay.   Nothing

3      further.

4                  FURTHER EXAMINATION

5      BY MS. SANDERS:

6          Q.    Okay.   A few new things came

7      up, so I have to ask you about them.

8      First of all, this Plaintiff's Exhibit 1,

9      did you review that before Mr. Harrison

10     sent that to Dan Watson, Ms. Quinnie?

11         A.    Yes, I did.

12         Q.    And then earlier I asked you

13     about things that created a hostile

14     environment.   You told me about Debbie

15     Tullier talking about black people's hair,

16     and you told me about Debbie making

17     another reference to blacks.   I asked

18     you -- we went through that.   We talked

19     about everything that created a hostile

20     environment.   You never mentioned anybody

21     using the word nigger.

22         A.    You never asked me.

23         Q.    I asked you about any racial

1    slur, anything that created a hostile

2    environment.  All you told me about was

3    the comment about the black hair from

4    Debbie Tullier, and black people always

5    complaining -- actually, I think it was

6    Brenda Haire.  It wasn't Debbie Tullier.

7         A.     It was Brenda Haire.

8         Q.     Right.  You talked about Brenda

9    Haire making comments about black people's

10   hair and blacks always complaining.  Why

11   didn't you tell me when I asked you about

12   people using the N word?

13        A.     You didn't ask me about people

14   using the N word.

15        Q.     What --

16        A.     When she made the statement, it

17   was like oh, nigger, please.

18        Q.     When I asked you about racial

19   slurs, you talked about black people's

20   hair and black people complaining.  Did

21   you not consider her use of the N word a

22   racial slur?  Is that why you didn't tell

23   me about it?

**American Court Reporting**
**toll-free (877) 320-1050**

1          A.     If you had asked me had anybody

2     used the N word, I would have told you

3     that.

4          Q.     Well, I didn't ask you if

5     anybody referred to black people's hair,

6     and you told me about that.

7          A.     Yes.

8          Q.     I didn't ask you if anybody

9     referred to people as black.  I didn't ask

10    you that.  And you told me those things.

11    Is it true that you didn't consider her

12    use of the N word a racial slur?

13              MR. HARRISON:  Objection.

14    Asked and answered.

15              MS. SANDERS:  No, that's not

16    answered.

17         Q.     (By Ms. Sanders)  Is it true

18    that you did not consider --

19              MR. HARRISON:  You can -- my

20    objection --

21         Q.     -- her use of the -- use of the

22    N word a racial slur?

23         A.     Her using the N word in the

**American Court Reporting**
**February 6, 2008**

1  sense that she used it, was hurting to me

2  because of where she used it, because of

3  the elderly patients there.

4      Q.    Was that Rachel?

5      A.    No, that was Brenda Haire, as

6  well as Rachel Thompson and Mandy Bowen

7  across the room from each other.

8      Q.    I want to talk about Brenda

9  Haire first.  You didn't answer my

10  question, my original question.  When I

11  was asking you about racial slurs, why

12  didn't you tell me about the use of the N

13  word?

14          MR. HARRISON:  Objection.

15  Asked and answered.

16          MS. SANDERS:  She didn't answer

17  it.  Go ahead.

18      A.    You didn't ask me about the N

19  word.  To me, the N word is the N word.

20      Q.    Is the N word not a racial

21  slur?

22      A.    Yes, it is.

23      Q.    So when I asked you that --

1    oath that Rachel used it every day --

2        A.    Yes.

3        Q.    -- during her entire employment

4    with DCI?

5        A.    Yes.

6        Q.    How about Mandy?  When did she

7    use the N word?

8        A.    Mandy and Rachel talk across

9    the floor when one is over in one section

10   and one is across the room in another

11   section -- nigger, you got shot today,

12   didn't you -- talking about the section

13   they were in.

14       Q.    And Mandy would use that word?

15       A.    Yes.

16       Q.    How often did Mandy use that

17   word?

18       A.    She didn't use it every day.

19       Q.    Were you around when Glenda

20   Gary was around and could have heard Mandy

21   say it?

22       A.    Yes.  She could have heard her,

23   yes, if she was on the floor.

1      Q.    Do you know whether she heard

2  her?  Did she ever tell you, hey, I just

3  heard her say that?

4      A.    No.  Glenda and I didn't talk

5  like that.

6      Q.    Did you ask Glenda, did you

7  hear Mandy, Rachel, or Brenda use the N

8  word?

9      A.    No, I didn't.

10      Q.    I think you testified

11  earlier -- or, actually, your attorney

12  testified --

13          MR. HARRISON:  Objection.

14      Q.    -- that when Rachel used it, it

15  was hateful and you agreed?

16      A.    Beg your pardon?

17      Q.    Your attorney asked you if when

18  Rachel used it, was it hateful, and you

19  agreed and said yes; is that correct?

20      A.    Yes.

21      Q.    But when Glenda used -- Glenda,

22  I don't think, ever used the N word;

23  correct?

**American Court Reporting**
**toll-free (877) 320-1050**

1   one second, please?

2           (Brief interruption.)

3       Q.     (By Ms. Sanders)   Any other

4   employee said anything about blacks?

5       A.     Not to my knowledge.

6       Q.     When you left DCI's employment,

7   did you take any documents with you?

8       A.     No.

9           MS. SANDERS:   That's all I

10  have.   Thanks.

11          MR. HAGEWOOD:   Can we have two

12  seconds?

13          (Brief recess.)

14      Q.     (By Ms. Sanders)   Ms. Quinnie,

15  I had asked you earlier if you had

16  complained to anybody about any of the

17  racial comments, and you said no.   But now

18  we've talked about some new comments.   Did

19  you ever complain to Glenda Gary, Lee

20  Ashbury, any supervisor, or anybody at the

21  corporate office at DCI, about any of

22  these comments?   The use of the N word or

23  a comment about blacks?   Did you ever

1    complain to anybody?

2        A.    The only person I complained to

3    was Lee Ashbury.   I never called anybody

4    in corporate.

5        Q.    When did you complain to Lee?

6    Is that what you already testified and

7    told me about?

8        A.    Yes.

9        Q.    Was that in regards to Brenda

10   or Debbie?

11       A.    Brenda.

12       Q.    And that was when Mr. Ashbury

13   was clinic administrator?

14       A.    Yes.

15       Q.    Now, your attorney asked you

16   about, in that book, if there's anything

17   in that book -- what we have been talking

18   about as the DCI benefit package, he asked

19   you if there was anything in that book

20   that showed you where you waived the right

21   to an attorney.   Do you recall that?

22       A.    Yes.

23       Q.    Is there anything in that book,

# Dialysis Clinic, Inc.

(A NON-PROFIT CORPORATION)



**DEFENDANT'S EXHIBIT**

*1*

# APPLICATION

# FOR

# EMPLOYMENT

### AN EQUAL OPPORTUNITY EMPLOYER

NAME (Please Print) *Quinnie* *Cynthia* *Washington* Date *4/25/01*
Last        First        Middle

PRESENT ADDRESS *Montg., Al.*    TELEPHONE NUMBER
*36116*

POSITION APPLIED FOR *Patient Care Tech.*

We are pleased that you are interested in employment with us. We offer equal opportunities to all persons without regard to race, color, religion, age, sex, national origin, disability or veteran status. Please complete this application form in ink in your own handwriting. Answer all questions fully since all statements made by you will be checked for accuracy. We will give this application every consideration, however, accepting it does not imply a commitment of employment.

000044

**PERSONAL INFORMATION** — Please Print In Ink

| DATE OF APPLICATION | DATE AVAILABLE FOR EMPLOYMENT | TYPE OF EMPLOYMENT |
|---|---|---|
| 4/25/01 | ASAP | ☑ FULL TIME  ☐ PART TIME  ☐ TEMPORARY |

Name: Quinnie    Cynthia    'W.'    Social Security No.: __
　　　 Last        First        Middle

Present Address _____
　　　　　　　　　　No. Street    City    State    Zip
　　　　　　　　　　　　　　　Montg., Al. 36116    Area Code / Telephone No. (

Previous Address (If at Present
Address Less than One Year) ...........................................................
　　　　　　　　　　No. Street    City    State    Zip

If applying for a Part Time Position: Days ........................................... Hours from

.......... ☐ A.M.  ☐ P.M. to .......... ☐ A.M.  ☐ P.M.    Shift Preference: ☐ 1st    ☐ 2nd    ☐ 3rd

Are there any days or schedules that you would not be available to work on a regular basis? ...................
.......... Sunday ..........

Are you over the age of 18? ☑ Yes    ☐ No    If no, employment subject to verification of minimum legal age by age certificate or work permit.

Do you have the legal right to live and work in the U.S.? ☑ Yes    ☐ No.    If not a U.S. Citizen, please provide proof that you can legally be employed in the United States (Form Nos. 1-151 or 1-94)

Have you ever applied for employment with us before? ☐ Yes    ☑ No.    If yes, when ................... (Date)
Have you ever been employed by us? ☐ Yes    ☑ No    If Yes, from .......... (mo./yr.) to .......... (mo./yr.)

Are you presently employed? ☑ Yes    ☐ No.
If now employed, does your employer know of your plans to change employment? ☐ Yes    ☑ No.
May we contact your present employer? ☑ Yes    ☐ No.
Why do you desire to make a change in employment at this time? ...................
.......................................................................................
.......................................................................................

Have you ever been discharged or asked to resign from a position? ☐ Yes    ☑ No    If so, explain: ...................
.......................................................................................
.......................................................................................

Have you ever been convicted of any crime, other than minor traffic violations, since the age of 18 or within the last five years, which has not subsequently been expunged from the records of the court? ☐ Yes    ☑ No

If yes, state details (date, court, offense, place of occurrence) ...................
.......................................................................................

000045

Do you have steady transportation to work? ☑ Yes    ☐ No

If applying for a position requiring the driving of a motor vehicle, do you have a valid license for the type vehicle to be operated? ☑ Yes    ☐ No
If so, expiration date   2004   license number ...................    state of issue ...   Alabama

## EDUCATION

| Type of School | Name & Address of School | Major Course of Study | Circle Last Year Completed | Graduate | | Degree |
|---|---|---|---|---|---|---|
| Elementary | ............................................. | | 5 6 7 (8) | ☑ Yes | ☐ No | Certificate |
| High School | | | 1 2 3 (4) | ☑ Yes | ☐ No | Diploma |
| Vocational or Bus. School | ............. | Medical Asst. | 1 (2) 3 4 | ☑ Yes | ☐ No | Diploma |
| College | ............................................. | | 1 2 3 4 | ☐ Yes | ☐ No | ......... |
| Graduate School | ....................... | | 1 2 3 4 | ☐ Yes | ☐ No | ......... |
| Other (Specify) | ............................ | | 1 2 3 4 | ☐ Yes | ☐ No | ......... |

Describe any other specialized professional training (such as technical, correspondence, or night school courses): .........

I perform EKG's, chest X-rays, and draw lab work on patients; as well as Basic nursing assistant duties.

## LICENSE CERTIFICATIONS — Special Skills and Qualifications

Summarize licenses, special skills and qualifications acquired from employment or other experience .........

I assist physicians with procedures such as: Bronchoscopy, Endoscopy procedures, and train employees to draw blood work. Also enter physician orders into the computer.

## MILITARY SERVICE

Have you served in the armed forces? ☐ Yes  ☑ No    If yes, from ................................. to .................

Which service? ............................................ What branch of that service? .........................

Starting rank ........................... Final rank ......... What type of discharge did you receive? .............

List schooling and special training received in service with approximate time .........................

.........................................................................

000046

## REFERENCES — List personal references (Do not include relatives or former employers)

Name  Dr. Joseph Jackson ............ Address  Montgomery, Al. 36111  Telephone

Name  Marie Graves ..................... Address  Montgomery, Al. 36108.  Telephone

Name  Patricia Jackson .............. Address  Montgomery, Al. ......  Telephone

**WORK HISTORY**—The company expressly relies upon this information. Start with your first recent or present employer and include all of the three most recent previous employers. Failure to accurately complete this information could be cause for not successfully completing the application process or could be grounds for termination upon discovery that such information was not complete.

1. Name of Employer .....Jackson Hospital + Clinic..........................................................
   Address ...1725 Pine St.   Montg., Al. 36116.......... Telephone No. ...293-8000....
   Immediate Supervisor (Name and Position) ...Loyerma McKinnon.... Date Hired ..03/91.. Starting Rate ..4.55 hr....
   ...............................Registered Nurse......................................................
   Present or Final Position ...Nursing Support Tech........ Date Left ..Still Employed.. Final Rate ..8.70 hr....
   Job Duties ..Draw Blood work, Asst. physician with varies procedures, EKG's, chest X-Ray..
   Reason for leaving .....Seeking full-time employment.   40 hours wkly.....................

2. Name of Employer .....Montgomery   Police Department.....................................
   Address .......Ripley   St.   Montgomery, Al. 36101....... Telephone No. ..240-4620....
   Immediate Supervisor (Name and Position) ..Corpal  Johnny Cotton.. Date Hired ..01/01.. Starting Rate ..9.66 hr....
   Present or Final Position ..School Patrol Officer........ Date Left ..Still Employed.. Final Rate ..9.66 hr....
   Job Duties ...To Assist children crossing the street and to monitor traffic..
   Reason for leaving .......Seeking full-time Employment.........................................

3. Name of Employer .....Connecticut General Life Ins. Co........................................
   Address .......Syossett, New York.......................... Telephone No. .................
   Immediate Supervisor (Name and Position) ..Janie Fusco.. Date Hired ..05/85.. Starting Rate ..5.15 hr....
   Present or Final Position ..Assisstant  Supervisor of Mailroom.. Date Left ..02/90.. Final Rate ..12.00 hr....
   Job Duties ..Asst. the supervisor in preparing the mail and Traing the employees..
   Reason for leaving ..Company Closed  -  Moved Back to Alabama.....................

## JOB APPLICANT'S AGREEMENT AND CERTIFICATION

"I certify that the information given by me in this application is true in all respects, and I agree that if employed and it is found to be false in any way, that I may be subject to dismissal without notice, if and when discovered. I authorize the use of any information in this application to verify my statements, and I authorized the past employers, doctors, all references, and other persons to answer all questions asked concerning my ability, character, reputation, and previous employment record. I release all such persons from any liability or damages on account of having furnished such information. I further agree, if employed, that I am to work faithfully and diligently, to be careful and avoid accidents, to come to work promptly, and I am not to be absent for any reason without prior notice to my supervisor."

"I understand that this is an application for employment and that no contract of employment is being offered or created by this application or by my subsequent employment. I understand that if I am employed, such employment is for an indefinite period of time and may be terminated at any time by the employer. I agree to submit to a physical examination which may, at the employer's discretion, include a urinalysis or other drug-screening process, either as part of the employment process or whenever requested at the employer's discretion after employment. I understand that my application can be rejected or my employment terminated based on the results of any such examination. I agree to abide by all personnel policies and rules of the employer, either presently existing or as subsequently issued or modified."

Date ...4/25/01............  Signature of Applicant ..Cynthia W. Guissie..............

## RECORDS OF INTERVIEWS

— DO NOT WRITE BELOW THIS LINE —

1. Interviewed by ............................. Department .................... Date .........

   Comments and Recommendations .................................................

2. Interviewed by ............................. Department .................... Date .........

   Comments and Recommendations .................................................

**If accepted for employment:**

Starting date .............. Starting Rate .......... Employee Number ............

Position .............. Department ............ Location ..............

Date .......... Employed by ................................................

Date .......... Approved by ................................................

000047



DEFENDANT'S
EXHIBIT

4

RECEIPT FOR THE DCI BENEFITS PACKAGE BOOK

I have received a copy of the DCI Benefits Package Book for
Dialysis Clinic, Inc. (2001edition). I understand that the
policies and procedures contained in this manual may be
modified or amended by DCI at any time and are in no way
to be interpreted as a contract between DCI and any of its
employees. I further understand and acknowledge that my
employment is not for a specific term, but shall be deemed to
be an employment at will which can be terminated either by
DCI or by me at any time.

I agree to read and keep my DCI Benefits Package Book for
future reference and observe all present and future personnel
policies and rules outlined in the DCI Benefits Package Book.

_Cynthia Quinnie_
Signature

_12/07/05_
Date

1

03/01

000076

DEFENDANT'S
EXHIBIT
5

August 14, 2006

Cynthia Quinnie

Dear Cynthia:

This letter will confirm our conversation on Monday, August 14, 2006. As you will recall, on Monday, August 7, 2006 you were place on administrative leave pending our investigation into serious allegations about your time records. It is our understanding that the same afternoon, you called a co-worker indicating that you had been placed on administrative leave for stealing time, and you asked the co-worker to not share any information with any company representatives as part of the investigation.

On Thursday of last week, I received a call from a person claiming to be your lawyer, demanding employment records. I explained to him that before I could respond to any request, I would need a letter of representation from him. He explained that he would provide such a letter.

Today, I was in Montgomery for the purpose of completing the investigation. You arrived at the clinic as requested by Ms. Gary, with the person claiming to be your lawyer. He did not have a letter of representation, and no such letter was presented. He did not present any business card or any other written information indicating that he was a lawyer, much less that he represented you. As I explained, I was hoping to meet with you, as part of an internal investigation without any company lawyer present, to understand your reaction to the allegations made. You refused to meet with me, without the person who was accompanying you present. I then explained that I would consider your actions as voluntary quit. You continued in your refusal to meet with me and then left the premises.

This letter presents our understanding of these developments. If you believe our understanding is not accurate, you must contact me immediately to clarify. If you wish to reconsider your position, and meet with me as part of this internal investigation, you must contact me at 615-342-0427 by Friday, August 18, 2006 at noon to arrange a mutually convenient time to meet.

Otherwise, we will complete the investigation without your input, accepting as true the statements made by others about your conduct, and continue to view your actions as a voluntary quit.

Sincerely,

Daniel L Watson

Daniel L. Watson
Associate Director of Human Resources

DEFENDANT'S EXHIBIT

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

PHILOSOPHY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

EQUAL OPPORTUNITY . . . . . . . . . . . . . . . . . . . . . . . 11

UNLAWFUL HARASSMENT . . . . . . . . . . . . . . . . . . . . 12

UNIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

WHY YOU WERE SELECTED . . . . . . . . . . . . . . . . . . . 14

EMPLOYMENT CATEGORIES . . . . . . . . . . . . . . . . . . 15

HIRING OF RELATIVES . . . . . . . . . . . . . . . . . . . . . . . 19

LENGTH OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . 20

OUTSIDE EMPLOYMENT . . . . . . . . . . . . . . . . . . . . . . 21

PHYSICAL EXAMINATION . . . . . . . . . . . . . . . . . . . . . 22

PROMOTIONS AND TRANSFERS . . . . . . . . . . . . . . . . 23

INTRODUCTORY PERIOD . . . . . . . . . . . . . . . . . . . . . 24

YOUR SUPERVISOR . . . . . . . . . . . . . . . . . . . . . . . . . 26

ERRORS IN YOUR PAY . . . . . . . . . . . . . . . . . . . . . . . 27

2

03/01

000142

PAY POLICY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

THE WORKWEEK . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

WORK SCHEDULES . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

OVERTIME . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

TIMEKEEPING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

EXCEPTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

FUNERAL LEAVE . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

JURY DUTY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

HOLIDAYS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

FLOATING HOLIDAYS . . . . . . . . . . . . . . . . . . . . . . . 39

SICK TIME ACCRUAL . . . . . . . . . . . . . . . . . . . . . . . . 40

SICK TIME BUY BACK . . . . . . . . . . . . . . . . . . . . . . . 42

VACATION WITH PAY . . . . . . . . . . . . . . . . . . . . . . . 44

EDUCATIONAL ASSISTANCE POLICY . . . . . . . . . . . 47

REST PERIODS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

TEN YEAR SERVICE AWARD . . . . . . . . . . . . . . . . . 51

000143

FAMILY AND MEDICAL LEAVE OF ABSENCE
POLICY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

PERSONAL LEAVE POLICY . . . . . . . . . . . . . . . . . . . . . 58

BULLETIN BOARDS . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

PROBLEM SOLVING COMMITTEE . . . . . . . . . . . . . . . 62

PROBLEM SOLVING PROCEDURES . . . . . . . . . . . . . . 63

YOUR PERSONNEL RECORDS. . . . . . . . . . . . . . . . . . . 65

ACCESS TO PERSONNEL FILES . . . . . . . . . . . . . . . . 66

PERSONAL DATA CHANGES. . . . . . . . . . . . . . . . . . . . 67

EMPLOYMENT APPLICATIONS . . . . . . . . . . . . . . . . . 68

ATTENDANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

ATTITUDE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

CONFIDENTIAL INFORMATION . . . . . . . . . . . . . . . . 71

CONFLICTS OF INTEREST . . . . . . . . . . . . . . . . . . . . . 72

INTERNET & E-MAIL ACCEPTABLE USE POLICY . . 73

CONSERVATION OF SUPPLIES AND TIME . . . . . . . . 77

CREDIT STANDING. . . . . . . . . . . . . . . . . . . . . . . . . . . 78

4

03/01

000144

FIRE AND DISASTER PLAN . . . . . . . . . . . . . . . . . . . . . 79

GIFTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

ACCIDENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

ACCIDENT REPORTS . . . . . . . . . . . . . . . . . . . . . . . . 82

PERSONAL CONDUCT . . . . . . . . . . . . . . . . . . . . . . . 83

PATIENT CARE RULES. . . . . . . . . . . . . . . . . . . . . . . 84

SAFETY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

HOUSEKEEPING . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

SMOKING. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

SOLICITATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

TRANSPORTING PATIENTS. . . . . . . . . . . . . . . . . . . 90

TRAVEL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

RESIGNATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

TRANSFER OF EMPLOYEES . . . . . . . . . . . . . . . . . . 93

INDEX. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

000145

## INTRODUCTION

Welcome to Dialysis Clinic, Inc.

We are pleased that you have joined our staff to begin a relationship we believe will be beneficial to you and to DCI. This employee handbook has been designed to help you know us better. We hope you and your family will read it carefully.

The handbook is a summary of the principles for which we stand, the benefits to which you are entitled, and the obligations you assume as an employee. The provisions of this handbook apply to all regular full-time and regular part-time, part-time, temporary, introductory and casual employees.

The provisions of this handbook are not intended, and shall not be deemed, to constitute or create, a contract of employment. The benefits and policies set forth in this handbook may be altered, amended, revised or canceled at any time by DCI. You will be notified when such changes are made.

Employment with DCI is voluntary, and the employee is free to resign at will at any time, with or without cause. Similarly, DCI may terminate the employment relationship at will at any time, with or without notice or cause, as long as there is no violation of applicable federal or state law.

These provisions supersede all existing policies and practices and may not be amended or added to without the express written approval of DCI's President or Chief Executive Officer.

6

03/01

HISTORY OF DIALYSIS CLINIC, INC.

In the latter part of the 1960's, an increasing pressure was being felt by all nephrologists to make available the techniques of hemodialysis to those patients dying of renal failure. In Nashville, this situation had reached crisis proportions with acute dialysis, home training, transplant back-up and chronic dialysis all being managed in a three-bed in-hospital dialysis facility. The hospital was unable to dedicate more space and resources to dialysis; therefore, another solution was needed. Although the concept of non-hospital based dialysis was still rather new at the time, we were aware that a free-standing dialysis facility in Seattle had worked quite well.

As none of the other private Nashville hospitals provided chronic dialysis, the out-patient approach seemed not only a sensible solution - but the only solution to the Nashville dialysis dilemma. After many meetings with Chiefs of Services, Deans and Chiefs of Hospital Staffs, approval of the medical center was obtained. A New York foundation, the Life Extension Foundation, generously provided support for the undertaking, and on April 20, 1971, Dialysis Clinic, Inc. was formed as a non-profit corporation to provide care for ESRD patients in an out-patient dialysis facility in Nashville. The initial four bed unit opened just one month later - May 20 - with borrowed and donated equipment and a group of very attentive nephrologists. Despite the concern, all went well through those most important early days, and despite the fact that federal aid for the dialysis patient was not to become a

7.

03/01

000147

~~reality for over a year, the facility continued to be solvent.~~
As time went on, and as the Nashville facility grew and the
operation seemed to be proceeding quite smoothly, we
became aware that many of our patients were traveling
extraordinary distances to receive treatment. No facilities
existed in Chattanooga, Knoxville, or Jackson, although each
community served large medical populations. Therefore,
with local medical support, DCI established facilities in these
other communities so that patients could be dialyzed closer to
home. By this time, the Federal Government, through
Medicare, was funding dialysis, and more patients were being
considered for treatment. These facilities were on hand to
meet the needs of their communities.

The need for out-patient facilities was not unique in
Tennessee. The pressure for patient care was being felt by
other university and community nephrology programs.
Through the years, some of those programs have invited DCI
to participate with them in providing care for the ESRD
patient. Where practical and non-jeopardizing to the parent
corporation, we have welcomed these associations and the
sharing of expertise and ideas which they have made possible.

000148

## THE PHILOSOPHY UNDER WHICH WE WORK

The primary responsibility of DCI is to perceive, initiate and provide comprehensive patient care. We serve society by providing care for patients with end-stage renal disease. Our goal is complete patient rehabilitation. We recognize the patient as an individual resulting from his or her genetics, life experience, habits, beliefs, emotions; and as a member of his or her family, and the community. The patient deserves the highest standard of care possible regardless of race, status or creed. The application of comprehensive care is on a personal level. We become acquainted with our patient as a person and seek to understand his or her problems and needs - physical, emotional, spiritual, and social.

Through a team approach each staff member performs functions within his or her capabilities in his or her defined role based on the specific needs of the individual patient. Patient care is assessed, planned, implemented, and evaluated with the consistent aim of improving care and finding more efficient and effective methods for delivery of care. Realistic goals which promote safe, therapeutically effective and individualized care for each patient are defined in the patient care plan. These goals adhere to quality standards of care within the framework of defined policies and procedures. The team strives to provide the highest quality of patient care possible through the utilization of available human and material resources. There is, however, a further responsibility to which DCI is devoted. DCI was established as a non-profit corporation, hopefully to generate funds for research in order

000149

~~that the methods for treatment of ESRD patients might be~~ improved. We are not content to dialyze the next group of patients in the same imperfect way that the last group was dialyzed without at least making the attempt to better the patient's lot through research. As a corollary to this, education of ESRD health care professionals is another goal to which DCI resources are dedicated to support.

DCI endorses the patient's right to choose the facility and the mode in which the patient's ESRD should be treated - i.e., dialysis or transplant. To help insure that those patients desiring transplant may be offered this form of treatment, DCI currently actively supports several organ procurement agencies and also contributes to research to improve methods of immunosuppression.

We are a service organization. The care of the patient is our reason for existence.

*H. Keith Johnson, M.D.*
H. Keith Johnson, M.D.
Chairman

**10**

03/01

000150

## EQUAL EMPLOYMENT OPPORTUNITY

In order to provide equal employment and advancement opportunities to all individuals, employment decisions at DCI will be based on merit, qualifications, and abilities. DCI does not discriminate in employment opportunities or practices on the basis of race, color, religion, sex, national origin, age, disability, or any other characteristic protected by law.

DCI will make reasonable accommodations for qualified individuals with known disabilities unless doing so would result in an undue hardship. This policy governs all aspects of employment, including selection, job assignment, compensation, discipline, termination, and access to benefits and training.

As an employee, you are not to show prejudice or discrimination in matters concerning patients, visitors, or fellow employees under any circumstances.

Any employees with questions or concerns about any type of discrimination in the work place are encouraged to bring these issues to the attention of their immediate supervisor, the Administrator or the Corporate Human Resources Department. Employees can raise concerns and make reports without fear of reprisal. Anyone found to be engaging in any type of unlawful discrimination will be subject to disciplinary action up to and including termination of employment.

000151

With these objectives of individual and organizational conduct in mind, we are committed to equal employment opportunity, actively seeking and contacting all sources of manpower in the community. We welcome all qualified applicants.

## UNLAWFUL HARASSMENT

DCI is committed to providing a work environment that is free of discrimination and unlawful harassment. Actions, words, jokes, or comments based on an individual's sex, race, ethnicity, age, religion, or any other legally protected characteristic will not be tolerated. Harassment (both overt and subtle) is a form of employee misconduct that is demeaning to another person, undermines the integrity of the employment relationship, and is strictly prohibited. Anyone engaging in unlawful harassment will be subject to severe discipline up to and including termination of employment.

Any employee who feels victimized by any type of unlawful harassment is urged to promptly report the matter in confidence to his or her supervisor. If the supervisor is unavailable or the employee believes it would be inappropriate to contact that person, the employee should contact the facility Administrator, the Corporate Human Resources Department or DCI's President.

Any supervisor who becomes aware of possible unlawful harassment should promptly advise the facility Administrator who will assure that the matter is thoroughly and discreetly investigated.

12

03/01

000152

## A WORD ABOUT UNIONS

At DCI, we strive for good working conditions and honest, personal relationships. You can talk directly with your supervisor or any member of the management team, and supervisory personnel can, and will, talk directly with you. We hope to build and maintain a close personal working relationship. We strive to treat each employee as an individual and as an important member of our team. We do not believe that it is necessary or beneficial for any employee of DCI to have a union imposed between the management and our employees.

We strongly believe the real concern for each individual on our team provides the best possible climate for your maximum development and the achievement of your goals and those of DCI. We do not believe that union representation would be in the best interest of DCI, our employees, our patients, or the business growth on which we all depend for our livelihood.

We have accepted our responsibility to provide you with good working conditions, competitive wages and benefits, fair treatment, and the personal respect that is rightfully yours. These programs have been developed and improved voluntarily by DCI as our business has grown. No employee of DCI has had to pay an outside party for any of the benefits which you will enjoy as an employee of DCI.

**13**

03/01

000153

~~We hope that you will bring your problems and suggestions~~ to us so that we can understand each other better. At DCI you can speak for yourself. You have the commitment of DCI to listen and to give you a prompt and responsible reply.

## WHY YOU WERE SELECTED

The success of DCI depends upon YOU! That is why we carefully select our employees through written applications, interviewing, and careful checking of references.

Our objective is to find skilled employees who are committed to providing quality patient care. After all available information was carefully considered and evaluated, you were selected to become a member of the DCI team. We hope that our relationship will be a long and happy one.

000154

## EMPLOYMENT CATEGORIES

It is the intent of DCI to clarify the definitions of employment classifications so that employees understand their employment status and benefit eligibility. These classifications do not guarantee employment for any specified period of time. Accordingly, the right to terminate the employment relationship at will at any time is retained by both the employee and DCI.

Each employee is designated as either NONEXEMPT or EXEMPT from federal and state wage and hour laws. NONEXEMPT employees are entitled to overtime pay under the specific provisions of federal and state laws. EXEMPT employees are excluded from specific provisions of federal and state wage and hour laws. An employee's EXEMPT or NONEXEMPT classification may be changed only upon written notification by DCI management.

In addition to the above categories, each employee will belong to one other employment category:

> REGULAR FULL-TIME employees are those who are not in a temporary or introductory status and who are regularly scheduled to work DCI's full-time schedule of 40 hours per week.

15

03/01

000155

REGULAR PART-TIME employees are those who are not assigned to a temporary or introductory status and who are regularly scheduled to work less than the full-time work schedule, but at least 20 hours per week.

PART-TIME employees are those who are not assigned to a temporary or introductory status and who are regularly scheduled to work less than 20 hours per week. While they do receive all legally mandated benefits (such as Social Security and workers' compensation insurance), they are ineligible for all of DCI's other benefit programs.

INTRODUCTORY employees are those whose performance is being evaluated to determine whether further employment in a specific position with DCI is appropriate.

TEMPORARY employees are those who are hired as interim replacements, to temporarily supplement the work force, or to assist in the completion of a specific project. Employment assignments in this category are of a limited duration. Employment beyond any initially stated period does not in any way imply a change in employment status. Temporary employees retain that status unless and until notified of a change. While temporary employees receive all legally-mandated benefits (such as workers' compensation insurance and Social Security), they are ineligible for all of DCI's other benefit programs.

CASUAL employees are those who have established an employment relationship with DCI but who are

16

03/01

000156

assigned to work on an intermittent and/or unpredictable basis. While they receive all legally mandated benefits (such as Social Security), they are ineligible for all of DCI's other benefit programs.

Eligible employees at DCI are provided a wide range of benefits. A number of the programs (such as Social Security, workers' compensation, state disability, and unemployment insurance) cover all employees in the manner prescribed by law.

Benefits eligibility is dependent upon a variety of factors, including employee classification. Your Administrator or the Corporate Human Resources Department can identify the programs for which you are eligible. Details of many of these programs can be found elsewhere in the DCI Benefits Package Book.

Some of the benefit programs available to eligible employees are:

> *Accidental Death & Dismemberment Insurance
> *Annual Sick Leave
> *Bereavement Leave
>  Dental Insurance
> *DCI Scholarship Program
>  Educational Financial Assistance
> *Family and Medical Leave
> *Holidays
> *Jury Duty Leave
> *Life Insurance
> *Long-Term Disability Insurance
>  Medical Insurance
> *Military Leave

17

03/01

000157

*Pension Plan
*Personal Leave
  Prescription Drug Program
*Service Awards
  Supplemental Life Insurance
  Supplemental Cancer/Intensive Care Insurance
*Tax-Sheltered Annuities
*10 Year Service Award
*Vacation Benefits

Some benefit programs require contributions from the employee, but most are fully paid by DCI.

* = Provided to DCI Regular Full-Time employees at no cost to the employee.

**18**

03/01

000158

## HIRING OF RELATIVES

Under most circumstances, only one member of a family may be employed by DCI. No member of the immediate family of present employees may be employed in the same facility for regular full-time or regular part-time positions. No relative will be hired, promoted, or transferred where they will supervise or be supervised by, other members of their immediate family.

For the purposes of this policy, "immediate relatives" shall include an employee's spouse, parent, child, brother, sister, grandparent, grandchild, or in-law. Subject to management approval under special or unusual circumstances, an immediate relative may be employed for a temporary or part-time position where no other qualified candidate can be found for the position. An immediate relative may also be employed in a different facility or corporate department from that of an existing employee.

When two employees working for DCI in the same facility are married after their employment or enter into a marriage which would result in them becoming "immediate relatives" under this policy, one must terminate employment. The employees may determine which will terminate. If the employees cannot decide or DCI is not advised of the decision within 30 working days from the date of the marriage, the employee with the shortest company service will be terminated.

**19**

03/01

000159

## LENGTH OF SERVICE

Employees build up length of service by continuing their employment without unauthorized interruptions or termination's. Length of service is important to DCI because it assures the availability of an experienced work force, and to you because it enables you to qualify for higher wages, increased benefits, and promotions. Length of service may also be a factor in the event of layoff or reduction in the work force.

Since an increase in length of service is expected to be reflected in your performance and ability, length of service is a factor in wage and salary reviews. Length of service is also considered in promotions, layoffs and recalls, along with ability and qualifications. Where the ability and qualifications of competing employees are determined by DCI to be relatively equal, length of service will be the determining factor in such decisions.

20

03/01

000160

## OUTSIDE EMPLOYMENT

DCI does not want to control your personal affairs or attempt to regulate the use of your own time. However, because holding another job in addition to your position with DCI could interfere with, or distract from, you work with DCI, you are discouraged from accepting employment with another employer.

Employees may hold a job with another organization as long as they satisfactorily perform their job responsibilities with DCI. All employees will be judged by the same performance standards and will be subject to DCI's scheduling demands, regardless of any existing outside work requirements.

If DCI determines that an employee's outside work interferes with performance or the ability to meet the requirements of DCI as they are modified from time to time, the employee may be asked to terminate the outside employment if it is the employee's wish to remain with DCI.

If DCI determines that an employee's outside employment presents a conflict of interest, the employee may be asked to terminate the outside employment if it is the employee's wish to remain with DCI.

21

03/01

000161

## PHYSICAL EXAMINATION

After an employment offer has been made and accepted, you may be required to submit to, and pass, a physical examination. At the time of employment, testing for Tuberculosis and Hepatitis B antigen and a drug screen may be expected. DCI retains the option to require a physical examination of any employee when deemed appropriate by DCI, including an annual Tuberculosis test, periodic testing for Hepatitis B antigens and/or antibodies, and periodic testing for drug use.

000162

## PROMOTIONS AND TRANSFERS

All employees of DCI are given equal consideration for transfers and promotions without regard to race, sex, religion, national origin or disability status.

DCI sincerely believes that promotion from within is of the utmost importance in maintaining good employee morale and efficient internal operations. This policy, of course, allows employees who have progressed successfully to be rewarded through positions with higher compensation and responsibility. You are encouraged to actively seek upward mobility and to grow personally and professionally with DCI. If you have an interest in a different position you should notify your Administrator of your desires.

When ability and experience are determined by DCI to be substantially equal, the employee with the greatest length of service who meets stated job requirements, such as special skills, training, and education, will be offered the first opportunity for promotion. Management reserves the right to hire outside the Company.

000163

## INTRODUCTORY PERIOD

The introductory period is intended to give new employees the opportunity to demonstrate their ability to achieve a satisfactory level of performance and to determine whether the new position meets their expectations. DCI uses this period to evaluate employee capabilities, work habits, and overall performance. Either the employee or DCI may end the employment relationship at will at any time during or after the introductory period, with or without cause or advance notice.

All new and rehired employees work on an introductory basis for the first six months after their date of hire. Employees who are promoted or transferred within DCI must complete a secondary introductory period of the same length with each reassignment to a new position. Any significant absence will automatically extend an introductory period by the length of the absence. If DCI determines that the designated introductory period does not allow sufficient time to thoroughly evaluate the employee's performance, the introductory period may be extended up to an additional three months.

In cases of promotions or transfers within DCI, an employee who, in the sole judgment of management, is not successful in the new position can be removed from that position at any time during the secondary introductory period. If this occurs, the employee may, at the discretion of management, be allowed to return to his or her former job or to a comparable job for which

24

03/01

000164

the employee is qualified, depending on the availability of such positions and DCI's needs or the employee may be terminated.

Upon satisfactory completion of the initial introductory period, employees enter the "regular" employment classification.

Benefits eligibility and employment status is not changed during the secondary introductory period that results from a promotion or transfer within DCI.

000165

## YOUR SUPERVISOR

Your immediate supervisor is the person on the management staff who is the closest to you and your work. Through day-to-day contact with you, your supervisor has a chance to provide guidance and counsel about your assignments and the progress you make on your job. Get to know your supervisor. You will find him or her to be a helpful person who can show you how your work fits into the overall picture, teach you how to do it, explain the "hows" and "whys", and encourage you when things look a little tough. Please discuss any questions you have regarding DCI's personnel policies and programs, as well as the details of your work, with your supervisor.

000166

## ERRORS IN YOUR PAY

Every precaution is taken to avoid errors in your paycheck. If an error does occur, tell your supervisor. Your supervisor will obtain the correct information for you or refer you to payroll. If an error is found, the adjustment will be made on your next regularly scheduled payday.

27

03/01

## PAY POLICY

DCI makes a sincere and dedicated effort to be competitive with other facilities of similar size and scope of operation in the compensation of its employees. Compensation programs have been established that provides fair wages and salaries among jobs of varying skills and responsibilities. This policy permits individual consideration so that each employee is paid in accordance with his or her responsibilities, job performance and length of service. The amount of your wage or salary is a confidential matter between you and DCI.

Wage surveys are conducted on a periodic basis by DCI to insure that our overall pay ranges in each job classification are competitive with those of similar facilities. This procedure assures that your pay has been fairly determined in relation to other jobs at DCI, and that it is in line with what is being paid for comparable work in your area.

When you start to work, your starting salary is based on your skill, past experience and your immediate responsibilities. From then on, your pay progression depends upon how successfully you, as an individual, apply yourself.

Your performance will be reviewed after the first six months of your employment, and thereafter on an annual basis. Pay increases are based on the annual performance review and the pay range established by DCI for your position and location. Your supervisor will discuss your performance with you at the time of each review and at any other time that such a

000168

discussion is necessary. If you have any questions about how you are doing or what you can do to improve on your performance, please ask your supervisor.

## PAYDAY

Employees of DCI are paid bi-weekly on Thursday or Friday with the exception of Boston employees who are paid weekly on Friday. Checks or Direct Deposit advice slips are handed out by the Administrator or their designated representative, or mailed to your home. If you are unable to pick up your check or direct deposit advice slip, you must give DCI written permission in order to have someone pick it up for you. Direct deposit advice slips will be handed out on Thursday. Checks will be handed out on Friday.

## PAY ADVANCES

DCI does not provide pay advances on unearned wages to employees.

## PAY DEDUCTIONS

The law requires that DCI make certain deductions from every employee's compensation. Among these are applicable federal, state, and local income taxes. DCI also must deduct Social Security taxes on each employee's earnings up to a specified limit that is called the Social Security "wage base." DCI matches the amount of Social Security taxes paid by each employee.

000169

If you have questions concerning why deductions were made from your pay check or how they were calculated, your supervisor can assist in having your questions answered.

## THE WORKWEEK

The official workweek for employees of DCI begins at 12:01 a.m. on Monday and ends at midnight the following Sunday. The normal workweek for nonexempt employees of DCI is 40 hours.

30

03/01

## WORK SCHEDULES

Work schedules for employees vary throughout our organization. Supervisors will advise employees of their individual work schedules. Staffing needs and operational demands may necessitate variations in starting and ending times, as well as variations in the total hours that may be scheduled each day and week.

**31**

03/01

## OVERTIME

When operating requirements or other needs cannot be met during regular working hours overtime may be required. Employees will be given the opportunity to volunteer for overtime work assignments prior to overtime being assigned. All overtime work must receive the supervisor's prior authorization. Overtime assignments will be distributed as equitably as practical to all employees qualified to perform the required work.

Overtime compensation is paid to all nonexempt employees in accordance with federal and state wage and hour restrictions. Overtime pay is based on actual hours worked. Time off on sick leave, vacation leave, or any leave of absence will not be considered hours worked for purposes of performing overtime calculations.

Failure to work scheduled overtime or overtime worked without prior authorization from the supervisor may result in disciplinary action up to and including possible termination of employment.

000172

## TIMEKEEPING

Accurately recording time worked is the responsibility of every nonexempt employee. Federal and state laws require DCI to keep an accurate record of time worked in order to calculate employee pay and benefits. Time worked is all the time actually spent on the job performing assigned duties.

Nonexempt employees should accurately record the time they begin and end their work, as well as the beginning and ending time of each meal period. They should also record the beginning and ending time of any split shift or departure from work for personal reasons.

Altering, falsifying, copying, tampering with time records, or recording time on another employee's time record may result in disciplinary action up to and including termination of employment.

Nonexempt employees should report to work no more than five minutes prior to their scheduled starting time nor stay more than five minutes after their scheduled stop time without expressed, prior authorization from their supervisor.

It is the employees' responsibility to sign their time record to certify the accuracy of all time recorded. The supervisor will review and then initial the time record before submitting it for payroll processing. In addition, if corrections or modifications are made to the time record, both the employee

33

03/01

000173

and the supervisor must verify the accuracy of the changes by initialing the time record.

## EXCEPTIONS

The benefits described in this DCI Benefits Package Book are those generally provided by DCI, but they may be varied where units are operated in hospital facilities, or where state law mandates other benefits.

34

03/01

000174

## FUNERAL LEAVE

In the event of a death in your immediate family, you will be allowed time off with pay from the day of the death through the day of burial, or up to three days, whichever is the lesser period. Unused vacation days, or bonus holidays may also be used in addition to the three days, if requested in advance. Part-time employees without benefits are not eligible for the funeral leave benefit. For the purposes of paid funeral leave, immediate family shall include: parent, brother, sister, spouse, child (natural or adopted), parent-in-law, grandparent, or grandchild.

000175

## JURY DUTY

DCI encourages employees to fulfill their civic responsibilities by serving jury duty when required.

Jury duty pay will be calculated on the employee's base pay rate times the number of hours the employee would otherwise have worked on the day of absence less any moneys received because of the jury service.

Employees must show the jury duty summons to their supervisor as soon as possible so that the supervisor may make arrangements to accommodate their absence. Employees are expected to report for work whenever the court schedule permits.

Either DCI or the employee may request an excuse from jury duty if, in DCI's judgment, the employee's absence would create serious operational difficulties.

36

03/01

## HOLIDAYS

All active regular full-time and regular part-time employees who have completed 30 days of employment are entitled to holiday pay.

Holiday pay will be based on eight hours pay for regular full-time employees with a maximum benefit being 72 hours per year. Regular part-time employees will be paid a prorated amount according to the number of hours they are regularly scheduled to work. Employees will be paid at their regular straight time rate of pay.

The holidays observed by DCI are: New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Christmas Eve, and Christmas Day.

Employees working a Monday through Friday schedule will observe holidays that occur on a regular workday the day of the holiday. If a holiday occurs on a Saturday, it will be observed on the Friday preceding it. If a holiday occurs on a Sunday, it will be observed on the Monday following it.

Employees working a Monday through Saturday schedule will observe holidays that occur on a regular workday the day of the holiday. If a holiday occurs on a Sunday, it will be observed on the Monday following.

37

03/01

000177

Employees who are required to work on a holiday will be paid based on one of the following choices:

1. Eight hours holiday pay plus straight time pay for all hours worked on the holiday, or

2. Straight time pay for all hours worked on the holiday plus be allowed to take an additional day off with eight hours pay to be scheduled within 30 days preceding or following the regular holiday.

If an employee chooses the second option and has not taken the additional day off within 30 days following the holiday, eight hours straight time pay will be paid to the employee in lieu of the day off.

If an eligible employee is scheduled to work on a holiday but calls in sick they will receive no holiday pay for that day. Sick pay will be utilized if available and the employee will be scheduled to work the next holiday.

Qualified employees, not on an unpaid leave of absence, are entitled to holiday pay if they work all scheduled hours on their last scheduled work day before and their first scheduled work day after the holiday.

38

03/01

000178

## FLOATING HOLIDAYS

In addition to regular holidays DCI will allow each employee two undesignated floating holidays per year, and these will be allocated as follows:

1. The first floating holiday will be earned on January 1 of each year, and the second floating holiday will be earned July 1 of each year.

2. During the first calendar year of employment with DCI you will earn floating holidays according to the following schedule, after 30 days of employment: If you are hired between January 1 and May 15 you will earn two floating holidays that year. If you are hired between May 16 and September 30 you will receive one floating holiday that year. If you are hired between October 1 and December 31 you will receive no floating holiday that year.

000179

## SICK TIME ACCRUAL

Sick time is provided for your welfare and income protection when you are unable to work because of a non-serious illness or non-job related injury. Sick time may be used for personal illness or non-job related injury as well as an illness or injury of an immediate family member. For the purpose of this policy immediate family members shall include spouse, children (natural or adopted) or parents. Regular full-time employees earn sick leave at the rate of one day for each month of continuous employment.

Regular part-time employees earn sick leave on a prorated basis according to the number of hours for which they are scheduled to work. Part-time employees are not entitled to earn sick leave.

An employee who is hired on the first through the fifteenth of the month earns one day of sick leave for that month. An employee who is hired on the sixteenth day of the month through the end of the month does not earn a day of sick leave for that month.

Sick leave is earned from the date of employment, but may not be reimbursed until the end of the six month introduction period. If the introduction period is extended, reimbursement will not be made until the extension is completed.

This policy only refers to the amount of sick time an employee earns, when it is earned and the things it may be

40

03/01

000180

used for. Each DCI Facility may determine a absenteeism policy for their local facility.

Other stipulations with regard to the sick leave benefit are as follows:

1. Each employee may accumulate up to 1,040 hours of sick leave.

   a. After an employee reaches the 1,040 hour maximum bank. They may continue to sell ½ of their earned sick benefit for the year but in no case will a sick bank exceed 1,040 hours.

2. Sick pay is computed at your current hourly rate times the number of hours requested.

3. Any employees who fail to notify their supervisor personally as to their condition on a daily basis during sick leave will not be entitled to receive sick leave benefits.

**41**

03/01

000181

## SICK TIME BUY BACK

Any employee who has been employed for a period of at least six months prior to the 31st of December each year, and who has a minimum of 48 hours of unused sick time accrued (or one half of the annual sick time hours allocated in the case of prorated benefits) may elect to be paid for up to one/half of such earned sick time hours. Payment will be made in the first pay period in January. The remaining hours will be carried over to the next year. The maximum number of sick time hours which an employee may sell in any calendar year is 48 hours. All hours taken as sick time will be charged against the hours earned in the current year and hours carried over from prior years will be used only after the current year's hours have been depleted. Employees may not receive pay for unused hours accumulated from a prior year.

If you choose not to receive pay for unused sick time, all unused sick time hours will be carried over to the next calendar year.

Unused sick time is not normally a termination benefit and employees are not entitled to be paid for unused sick time at the time of the termination of their employment, except in the case of retirement.

Unused sick time will be paid to those employee's retiring from DCI that have reached their 55th birthday before their retirement, according to the following schedule:

42

03/01

000182

| Age | Yrs Service | % Buy Back |
|---|---|---|
| 55 or beyond | 0 - 9 | 0% |
| 55 or beyond | 10 but less than 15 | 50% |
| 55 or beyond | 15 but less than 20 | 75% |
| 55 or beyond | 20 or more | 100% |

Sick time bought back by DCI will be paid at the rate of pay at the time of retirement.

NOTE: *Only time worked for DCI counts towards this benefit. Time worked that may have been grandfathered for other DCI Benefits will not count towards this benefit.*

**43**

03/01

000183

## VACATION WITH PAY

We believe that every employee should have a time of rest and relaxation each and every year. Vacation with pay is one of the ways DCI shows its appreciation to you for your length of service and performance.

Vacation time is calculated on an annual basis from the date of employment. Regular full-time employees, who have completed at least one full year of service with DCI, are eligible for vacation leave and pay in accordance with the following schedule:

| Years of Service Completed | Vacation Allowed |
|---|---|
| 1 Year | 80 Hours |
| 2 Years | 80 Hours |
| 3 Years | 120 Hours |
| 4 Years | 120 Hours |
| 5 Years | 120 Hours |
| 6 Years | 128 Hours |
| 7 Years | 136 Hours |
| 8 Years | 144 Hours |
| 9 Years | 152 Hours |
| 10 Years | 160 Hours |

Regular part-time employees, who have completed at least one full year of service with DCI, are eligible for vacation

44

03/01

000184

leave and pay on a prorated basis according to the number of hours for which they are regularly scheduled to work.

Other stipulations with regard to vacation leave are as follows:

1.    All vacation requests must be submitted to your supervisor at least 30 days prior to the requested date. If more than one employee requests the same day, the date of the submission of the request and the employee's length of service will be factors which are considered in determining who will receive the requested date.

2.    Employees are requested to take at least 40 continuous hours of vacation during a year. The remainder of the vacation leave in that year may be taken in shorter increments, but vacation leave and pay will not be granted for less than four hours at a time.

3.    Vacation will be forfeited if not taken within one year of the date earned.

4.    Any employee that has earned at least 120 hours of vacation is required to use at least 80 hours of that vacation within 12 months. The first 80 hours of vacation will be forfeited if not used by the next anniversary date. An employee may receive pay in lieu of vacation for any unused hours in excess of 80 that were earned in a previous year, provided the request for payment is made within 30 days following the employee's anniversary date.

45

03/01

000185

5.  In any year of employment, an employee who has worked for the first six months of the year is eligible to request to borrow 40 hours of vacation leave in the second six months of that year which is not completely earned until the completion of the full year of employment. The decision to grant or deny the request for borrowed vacation will be made by the administrator at the time of the request. If an employee terminates employment with DCI prior to completion of the full year of service, any unearned vacation pay which has been paid to the employee will be deducted from the employee's final paycheck.

46

03/01

000186

## EDUCATIONAL ASSISTANCE POLICY

The intent of this policy is to encourage employees to further their under-graduate education in subjects related to their work. It's intent is also to broaden the knowledge and skill of employees in their present position and to enhance DCI's future growth through the individual development of employees.

Employees who meet the following conditions are eligible to receive educational assistance.

1.  The desired course is related to present or anticipated DCI responsibilities or is necessary for the completion of an approved under-graduate degree plan.

2.  All course work, in order to be eligible for approval, must be conducted outside of the employee's work schedule.

3.  Employees eligible for veteran's assistance or other types of aid will be eligible to receive educational assistance when such benefits are exhausted, or when the employee is unable to use such benefits for acceptable reasons before their expiration date.

4.  Employees must currently be regular full-time employees and have been so for a period of at least one year in order to be eligible for educational assistance. Employees on leave of absence at the

47

03/01

000187

time the course work begins will not be eligible; ~~however, educational assistance will continue during~~ the approved period of the course(s) for an employee who is subsequently placed on leave of absence during that period.

5.  No reimbursement will be made to employee's that terminate their employment (either voluntary or involuntary) before the reimbursement is made.

6.  Approval will not be granted to employees who choose to pursue educational interests on a full-time leave of absence basis.

7.  Any desired course work must receive all required approvals as soon as possible, but not later than one month following course registration, or one week following the Add/Drop deadline for the course, whichever is later. Employees who register for a course prior to obtaining such approval do so at their own risk.

8.  Correspondence courses will not be considered for reimbursement. In order to be an eligible course, work must be taken in a classroom.

9.  Any desired course work must be for course credit in order to be eligible.

10. The employee must complete and satisfactorily pass the course with the equivalent of a "C" grade or better. Grades of "C-" or lower will not be eligible for reimbursement.

48

03/01

000188

An acceptable institution will be a college, university, junior college or technical school that is accredited by a regional or national accrediting agency or association (as recognized by the U.S. Secretary of Education). Examples include:

1. Traditional college curriculum institutions

2. Institutions offering external degree programs

Employees are responsible for the actual admission and enrollment fees. Reimbursement is limited to tuition (including CLEP and other proficiency examinations for credit) and lab fees.

Reimbursement for approved costs will be 80%. Approved reimbursement will be made to the employee within 30 days following satisfactory completion and documentation of completion of the course being received by the Corporate Human Resources Department. This program will be administered to comply with current tax laws and regulations. If a reimbursement is determined to be taxable income to the employee, any resulting tax liability will be the responsibility of the employee.

It is the responsibility of the employee to file all forms and documents with the Corporate Human Resources Department in Nashville. Please send all correspondence to DCI Educational Assistance, 1633 Church Street Suite 500, Nashville, TN 37203.

49

03/01

## REST PERIODS

DCI attempts to provide each employee with two fifteen minute rest breaks during each scheduled shift. Breaks are taken when directed by each employee's supervisor. Work requirements and patient care requirements sometimes require flexibility in the scheduling and taking of breaks.

50

03/01

000190

## TEN YEAR SERVICE AWARD

Employees who have completed ten years of continuous service with DCI are eligible for one of the following awards:

1. Two nights lodging, per diem for both the employee and their spouse, and mileage from the employee's work place to a state park and return. The state park must be in the same state as the employee's normal workplace. Per diem will be paid as follows:

   1st day - Dinner
   2nd day - Breakfast, Lunch, Dinner
   3rd day - Breakfast, Lunch

   or

2. Two nights lodging at any motel/hotel and per diem for both the employee and their spouse. The maximum amount payable for the motel/hotel room will be $70 per night. No mileage will be paid if the employee selects this award. Per diem will be paid at the prevailing standard rate, according to the DCI accounting manual and will be paid as follows:

   1st day - Dinner
   2nd day - Breakfast, Lunch, Dinner
   3rd day - Breakfast, Lunch

000191

Either trip can be taken on any day of the week the employee chooses. However, if the trip is taken on a normal workday, the hours away from work must be taken as personal vacation or bonus holiday time. The trip must be scheduled within the 12 months following the employee's tenth anniversary.

Once the employee determines the dates and state park or motel/hotel to be visited, he or she should contact the Administrator for proper reimbursement procedures.

52

03/01

000192

## FAMILY AND MEDICAL LEAVE OF ABSENCE POLICY

Employees who have worked for DCI for at least 12 months and at least 1,250 hours during the prior 12 months preceding the start of the leave may take up to 12 weeks of unpaid leave for any one of the following reasons:

1. Birth and/or care of a child of the employee (expires 12 months after birth);

2. Placement of a child into the employee's family by adoption or by a foster care arrangement (expires 12 months after placement);

3. In order to care for the employee's spouse, child, or parent who has a serious health condition; or

4. A serious health condition which renders the employee unable to perform the essential functions of the employee's position.

In the case of unpaid leave for the birth of and/or care for a child, intermittent leave or working a reduced number of hours is not permitted unless both the employee and DCI agree.

In case of unpaid leave for serious health conditions, the leave may be taken intermittently or on a reduced hours basis only if such leave is certified as being medically necessary.

000193

If intermittent or reduced hours leave is required, DCI may at its sole discretion temporarily transfer the employee to another job with equivalent pay and benefits that better accommodates that type of leave.

During a FMLA leave, coverage under DCI's group health, life, accidental death and dismemberment, and long-term disability plans will be continued provided the employee continues to pay any applicable employee contribution. Failure by the employee to pay such contribution before the expiration of a 30-day grace period will result in loss of coverage. If the employee does not return to work after the expiration of the leave, the employee will be required to reimburse DCI for total payment of insurance premiums during the FMLA leave, unless the employee does not return due to a serious health condition which prevents the employee from performing their essential job functions with reasonable accommodation or circumstances beyond the control of the employee.

Employees are required to use any earned but unused vacation or bonus holiday hours as part of the approved period of leave. The only exception to this will be for employee's on an FMLA that is the result of a claimed worker's comp injury.

Employee's are required to use sick time if the FMLA is for the birth of a child, to care for the employee's spouse, child, or parent who has a serious health condition; or a serious health condition which renders the employee unable to perform the essential functions of the employee's position.

A maximum of twelve weeks' leave may be taken for any and all of the above reasons during any 12-month period

000194

measured backward from the date an employee uses any
FMLA leave (but not extending back before August 5,
1993).

Employees who return to work from a FMLA leave within or
on the business day following the expiration of the 12 weeks
are entitled to return to their job or an equivalent position
without loss of benefits, pay or status.

Benefit accruals, such as vacation, sick leave, or holiday
time, will be suspended during the leave, and the employee's
evaluation date will be extended by a period equal to the
duration of the leave.  Any employee who is on a leave of
absence at the end of the calendar year will not be entitled to
receive pay for any unused sick time, employee's on a leave
of absence when Year End Bonuses are paid the following
criteria will be used:

1. No year end bonuses will be paid to anyone not working
   for DCI the day the bonus checks are passed out.  (If an
   individual is no longer a DCI employee when the checks
   are passed out they will not receive a bonus.)

2. An employee must have worked at least 6 months of
   the bonus qualifying period (DCI fiscal year) in order
   to participate in the bonus program for that year.  An
   employee with less than 6 months service in the bonus
   period, may be paid a bonus at the discretion of the
   Administrator.

3. If an employee is on a Leave of Absence at the time
   year end bonuses are paid they will not receive a bonus

55

03/01

until they have returned to an active status with DCI and have worked their regular shift for 90 calendar days.

Application for FMLA leave must be submitted in writing. Employees are required to give DCI at least 30 days advance notice before a family and medical leave begins if the need for the leave is based on pregnancy, adoption, foster care placement or planned medical treatment. If such notice is not possible, notice must be given as soon as is practicable but at the very least within two days after the need for leave becomes known to the employee. The written application must be submitted to the Facility Administrator to initiate leave. Employees requesting medical leave should provide DCI with an appropriate medical certification from a licensed physician. DCI has the right to verify this medical certification or to request a second opinion from a DCI appointed physician. Periodic recertifications may be required to be submitted at 30 day intervals.

Before an employee will be permitted to return to work from medical or maternity leave of absence, you must provide evidence from your doctor that you are physically able to perform the essential functions of your job with or without reasonable accommodation. If, at the time you are released by your doctor, you are offered a job and refuse, your employment will be terminated at that time.

No pyramiding of leave is permitted. An eligible employee is permitted a total of 12 weeks during any 12 month period. Leaves granted under this policy will be identified as family

56

03/01

000196

and medical leave and counted against the Family and Medical Leave Act entitlement.

NOTE: This policy is intended to follow the regulations adopted under the federal Family and Medical Leave Act of 1993. To the extent that any matters not covered under this policy arise, DCI will look first to these regulations for appropriate action.

57

03/01

000197

## PERSONAL LEAVE POLICY

DCI will provide a leave of absence to any employee eligible for such leave for the following reasons:

1. When such leave is mandated by federal law for military service, including reserve duty;

2. When such leave is mandated by applicable state law for the purposes of (a) pregnancy-related disability or other reasons relating to maternity or paternity, (b) workers' compensation, or (c) disability or sickness. However, such leave will be granted only to the extent that the applicable state law imposes greater leave requirements on employers than those set forth previously with respect to a family or medical leave. Leave provided under this section will run concurrently with a family or medical leave and, to the extent possible, the first 12 weeks of leave under this section will be counted as a family or medical leave as well.

3. When such leave is requested for "personal" reasons, including those family or medical reasons set forth previously, by an employee who otherwise does not qualify for family or medical leave. DCI, at it sole discretion, may provide such leave not to exceed 30 days.

000198

NOTE: In the event a leave is mandated by federal or state law as set forth above, the provisions of the applicable federal or state law will apply regarding pay, continuation of benefits, the employee's right to return to work, and the employee's accrual or maintenance of seniority during the leave. If the applicable federal or state law is silent with respect to any or all of these matters, or otherwise allows DCI to determine these matters, DCI will provide any leave of absence under the terms and conditions set forth below with respect to a leave for "personal" reasons.

DCI will provide a leave of absence under this section only on an unpaid basis.

Employees are required to use any earned but unused vacation, sick or bonus holiday hours as part of the approved period of leave. The only exception to this will be for employee's on a personal leave that is the result of a claimed worker's comp injury.

During the leave, coverage under DCI's group health, life, accidental death and dismemberment, and long-term disability plans will be continued, provided the employee pays any applicable contribution within 30 days from the date the leave began. Failure by the employee to pay such contribution before the expiration of this 30 days will result in loss of coverage.

000199

Benefit accruals, such as vacation, sick leave, or holiday time will be suspended during the leave, and the employee's evaluation date will be extended by a period equal to the duration of the leave. Any employee who is on a leave of absence at the end of the calendar year will not be entitled to receive pay for any unused sick leave.

Employee's on a leave of absence when Year End Bonuses are paid the following criteria will be used:

1. No year end bonuses will be paid to anyone not working for DCI the day the bonus checks are passed out. (If an individual is no longer a DCI employee when the checks are passed out they will not receive a bonus.)

2. An employee must have worked at least 6 months of the bonus qualifying period (DCI fiscal year) in order to participate in the bonus program for that year. An employee with less than 6 months service in the bonus period, may be paid a bonus at the discretion of the Administrator.

3. If an employee is on a Leave of Absence at the time year end bonuses are paid they will not receive a bonus until they have returned to an active status with DCI and have worked their regular shift for 90 calendar days.

Furthermore, while on leave under this section, an employee will not accrue benefits and will not be guaranteed of a return to employment at the end of the leave. At the end of the leave under this section, DCI, at its sole discretion, will

60

03/01

000200

attempt to place the employee in any available position for which the employee is qualified. A refusal of an offer to return to work at the end of the leave will result in termination of employment.

## BULLETIN BOARDS

Information regarding your employment is regularly posted on our bulletin boards. You have the responsibility to check the bulletin boards daily so that you will be familiar with the information posted there. Posting of information on the board will be deemed to constitute notice to employees of that information.

As a service to our employees, employees may post personal notices on the bulletin board regarding the sale of personal property, sale of raffle tickets, etc., for charitable purposes, car pooling information, etc., provided that such notices are in a form approved by the Administrator and are submitted to the Administrator for approval prior to posting.

000201

## PROBLEM SOLVING COMMITTEE

The Problem Solving Committee is composed of three staff members elected by the employees of the facility, one each representing nurses, technicians and administrative employees. A new problem solving committee will be elected for each problem brought before the committee. The purpose of the committee is to act as a sounding board before which any employee may present any problem concerning his or her employment. After hearing the issue, the Committee can either try to resolve the problem between the parties, or request to meet with the administrative staff (Administrator, Medical Director, and Head Nurse) of the facility to discuss the problem. The Problem Solving Committee has no authority to make decisions related to facility policies, but may make recommendations to both management and staff to insure that equal and fair judgments are made.

000202

## PROBLEM SOLVING PROCEDURES

If you have a problem or complaint regarding your working conditions, treatment by your supervisor, the granting or withholding of benefits, or any other matter affecting your employment, DCI has adopted the following procedure for you to present your problem and have it resolved:

Step 1.    Discuss the matter openly and frankly with your immediate supervisor. It could well be that the problem is a simple misunderstanding which may be resolved easily.

Step 2.    If your problem is not, or cannot be, satisfactorily resolved by your supervisor, take the issue through the chain of command, up to the Administrator for resolution.

Step 3.    If after Step 2 your problem has not been resolved to your satisfaction, you should present the problem in writing to the Problem Solving Committee.   The Committee will conduct an investigation on an informal basis to gather all the facts, after which the Committee will discuss the problem with you and attempt to resolve the issue. If you have a problem which you are unable to work out with your supervisor, you must present your problem to the Problem Solving Committee

63

03/01

000203

within 10 days after the problem arises. Since most matters can be worked out best when they are still fresh in your mind, the Committee is required to provide you with a written response or to discuss its decision with you within 10 working days after you have advised the Committee of the problem.

Step 4.     In attempting to resolve the issue, the Committee, may present the issue on your behalf to the facility administrative staff (Administrator, Medical Director, and Head Nurse).

Step 5.     If you are not satisfied with the decision of the Committee, you should submit your problem to the Executive Committee, in writing, listing the results at Steps 1, 2, 3, and 4. The Executive Committee will consider your request within 10 days of receipt and render a decision. The decision of the Executive Committee is final.

64

03/01

000204

## YOUR PERSONNEL RECORDS

When you came to work at DCI, you completed a form supplying us with various facts we must know about you. This information is transferred to a permanent and confidential file. Keeping this record correct and up-to-date is important to you because it enables the facility to reach you in an emergency, to maintain your insurance and other benefits properly, to compute your payroll deductions accurately, etc.

Your supervisor and the Administrator should be notified promptly of changes in:

1.  Name
2.  Address and telephone number
3.  Marital status
4.  Beneficiary or dependents listed in your insurance policy
5.  Number of dependents for withholding tax purposes
6.  Person to notify in case of emergency

In addition, you should give notification of the completion of additional training or education so that you may receive proper consideration as job opportunities arise.

000205

## ACCESS TO PERSONNEL FILES

DCI maintains a personnel file on each employee. The personnel file includes such information as the employee's job application, resume, records of training, documentation of performance appraisals and salary increases, and other employment records.

Personnel files are the property of DCI, and access to the information they contain is restricted. Generally, only supervisors and management personnel of DCI who have a legitimate reason to review information in a file are allowed to do so.

Employees who wish to review their own file should contact the facility Administrator. With reasonable advance notice, employees may review their own personnel files in DCI's offices and in the presence of an individual appointed by DCI to maintain the files.

000206

## PERSONAL DATA CHANGES

It is the responsibility of each employee to promptly notify DCI of any changes in personal data. Personal mailing addresses, telephone numbers, number and names of dependents, individuals to be contacted in the event of an emergency, educational accomplishments, and other such status reports should be accurate and current at all times. If any personal data has changed, notify the facility Administrator.

67

03/01

000207

## EMPLOYMENT APPLICATIONS

DCI relies upon the accuracy of information contained in the employment application, as well as the accuracy of other data presented throughout the hiring process and employment. Any misrepresentations, falsifications, or material omissions in any of this information or data may result in DCI's exclusion of the individual from further consideration for employment or, if the person has been hired, termination of employment.

68

03/01

000208

## ATTENDANCE

Because of the urgent nature of our work, regular attendance by all employees is mandatory. If you are unable to report to work as assigned, you must personally notify your supervisor or the Administrator immediately. For absences to be excused, notice must be given as far in advance of your scheduled starting time as possible. In order to receive paid sick leave, notice must be given at least one hour prior to the beginning of your scheduled shift.

If you are absent because of illness, you should advise your supervisor daily of your status and estimate the date of your return. If requested to do so, you must supply a doctor's statement describing your illness and releasing you to return to work.

Frequent absences or tardiness cause scheduling problems and impose additional burdens on other employees. Excessive absenteeism and/or tardiness may result in disciplinary action up to and including discharge.

69

03/01

## ATTITUDE

Perhaps no other attribute means as much to our patients, your fellow employees, the public, or to DCI as your attitude toward others and toward your job. A cheerful manner, willingness to learn, and intelligent interest in our patients, a feeling of pride and loyalty to our job, and a spirit of consideration and friendliness toward others - all these together bring about an understanding attitude and a happy work relationship.

70

03/01

000210

## CONFIDENTIAL INFORMATION

All employees are directed not to give out information to anyone about any DCI patient or employee without specific authorization. Doing so may involve you and DCI in legal action. Inquiries from patients and their friends and relatives are to be directed to the Head Nurse. Inquiries from other individuals, media, or any other sources of public information should be referred, in order, to the following individuals:

1.    Administrator or Medical Director

2.    Corporate Officers

71

03/01

000211

## CONFLICTS OF INTEREST

A conflict of interest can arise when an employee or an employee's family member has a financial or other interest in a business customer, supplier or other person or company dealing with DCI. Each employee must manage personal and business affairs to avoid situations that might lead to a conflict, or even the appearance of conflict, between self-interest and the obligations of DCI.

03/01

000212

# INTERNET & E-MAIL
## ACCEPTABLE USE POLICY

Acceptable uses of the Internet and company e-mail:

Dialysis Clinic, Inc. (DCI) provided Internet and e-mail access is intended to be for business reasons only. DCI encourages the use of the Internet and e-mail because they make communication more efficient and effective. However, Internet service and e-mail are company property, and their purpose is to facilitate company business. Every employee has a responsibility to maintain and enhance the company's public image and to use company e-mail and access to the Internet in a productive manner. To better define these responsibilities, the following guidelines have been established for using e-mail and the Internet. Any improper use of the Internet or e-mail is not acceptable and will not be permitted.

Unacceptable uses of the Internet and company e-mail:

DCI's e-mail and Internet access may not be used for transmitting, retrieving or storage of any communications of a discriminatory or harassing nature or materials that are obscene or X-rated. Harassment of any kind is prohibited. No messages with derogatory or inflammatory remarks about an individual's race, age, sex, disability, religion, national origin, physical attributes or sexual preference shall be transmitted. No abusive, profane or offensive language is to be transmitted through the company's e-mail or Internet system. Electronic media may also not be used for any other purpose which is

000213

illegal or against company policy or contrary to the company's best interest. Solicitation of non-company business or any use of the company e-mail or Internet for personal use is prohibited at any time except during those hours specifically designated for personal activity.

Communications:

Each employee is responsible for the content of all text, audio or images that they place or send over the company's e-mail/Internet system.  No e-mail or other electronic communications may be sent which hides the identity of the sender or represents the sender as someone else or someone from another company.  All messages communicated on the company's e-mail/Internet system should contain the employee's name or e-mail address.

Any messages or information sent by a DCI employee to another individual outside of the company via an electronic network (e.g. bulletin board, online service or Internet) are statements that reflect on the company.  Even if electronic messages include personal "disclaimers", there is still a connection to DCI, and the statements may be tied to the company.

All communications sent by employees via the company's e-mail/Internet system must comply with this and other company policies and may not disclose any confidential or proprietary company information.

Software:

To prevent computer viruses from being transmitted through the company's e-mail/Internet system, there will be no

74

03/01

000214

unauthorized downloading of any unauthorized software. All software downloaded must be registered to the company. Virus detection software must be installed <u>and enabled</u> during the entire time that a user is connected to the Internet. Employees should contact MIS if they have any questions.

Copyright Issues:

Copyrighted materials belonging to entities other than DCI, may not be transmitted by employees on the company's e-mail/Internet system. All employees obtaining access to other companies or individuals materials must respect all copyrights and may not copy, retrieve, modify or forward copyrighted materials, except with permission, or as a single copy to reference only. Failure to observe copyright or license agreements may result in disciplinary action up to and including termination.

Security:

DCI routinely monitors usage patterns for its e-mail/Internet communications. The reasons for this monitoring are many, including cost and resource analysis and the management of the company's gateway to the Internet. All messages created, sent, or retrieved over the company's e-mail/Internet are the property of DCI and should be considered public information. DCI reserves the right to access and monitor all messages and files on the company's e-mail/Internet system. Employees should not assume electronic communications are totally private and should transmit highly confidential data in other ways.

75

03/01

000215

Violations:

Any employee who abuses the privilege of company facilitated access to e-mail or the Internet, will be subject to corrective action up to and including termination. If necessary, the company also reserves the right to advise appropriate legal officials of any illegal violations. DCI's management may restrict access to e-mail or the Internet on an individual basis or entirely for inappropriate behavior or to preserve the integrity of DCI's MIS system.

Personal Use:

Employees may utilize the Internet access for personal use during non-business hours. Non-business hours are defined as the time prior to, and following the employee's normal work hours (i.e. before 8:00 a.m., after 5:00 p.m.) and during the employee's normal scheduled "lunch break" (not to exceed one hour). During this personal use time, all rules and guidelines concerning Unacceptable Use, Communications, Software, Copyright Issues and Security will still apply. All messages, files, communications, web sites visited and other Internet activity will not be confidential during the personal usage, and may be reported on Corporate activity summaries.

000216

## CONSERVATION OF SUPPLIES AND TIME

Medical and office supplies are important cost items in DCI's operating expenses. Conserve them at every opportunity. Take care of the equipment and machines you use. Be prompt in notifying your supervisor of your need for supplies or of any malfunctioning equipment.

77

03/01

000217

## CREDIT STANDING

If unusual or emergency situations develop that create a
financial burden upon you, it is imperative that provisions for
these be made so that neither action for collection nor
garnishment of wages will follow.  If a creditor obtains a
garnishment of your earnings, DCI is required by law to
deduct the necessary payment.

78

03/01

000218

## FIRE AND DISASTER PLAN

Fire is always a potential hazard and the importance of fire prevention cannot be overemphasized. Each employee is responsible for alert attention to the basic rules of fire prevention. It is your duty to become completely familiar with the facility's safety, fire and disaster plans, and your individual responsibilities for the area in which you work. Failure to comply with established fire, safety and disaster rules and standards, and carelessness affecting personal safety is considered serious offenses.

000219

## GIFTS

No employee of DCI may accept, directly or indirectly, entertainment or gifts from any person or firm seeking to, or doing business with DCI, where it might be reasonably inferred that such gift or entertainment could influence the employee in the conduct of the Company's transactions with the donor.

**80**

03/01

000220

## ACCIDENTS

You should report any accident immediately to the nearest supervisor. Caution: Do not attempt to move an injured person yourself; wait for assistance.

Be alert to conditions which might have caused the accident and to any unusual circumstances which might aggravate an injured person's condition. Listen carefully to the injured person's report of the accident but avoid any statements concerning cause, fault or liability. An accident report should be prepared by the supervisor in charge or the Administrator.

All job-related accidents and injuries, no matter how minor they may seem, must be reported immediately to your immediate supervisor and the Administrator so the necessary incident report can be completed. Needed treatment will be provided upon approval of your supervisor or department head.

Prompt reporting of accidents expedites the processing of claims. Benefits may be lost unless accidents are reported promptly. Employees are expected to be safety conscious, to work safely, and to report safety hazards to their immediate supervisor without delay.

81

03/01

000221

## ACCIDENT REPORTS

From time to time, accidents or incidents occur at DCI which
are out of the ordinary and should be reported to
management or recorded for future evaluation.  Such
incidents might involve a visitor, an employee or patient, or
questions about injury, theft, or unusual occurrence.  These
incidents should be reported in writing and submitted
through your supervisor, to the Administrator prior to the end
of the work shift during which the incident occurred.

82

03/01

000222

## PERSONAL CONDUCT

Your personal conduct as an employee of DCI should be in keeping with our reputation of providing quality patient services. We have purposely avoided establishing rules and regulations to govern your behavior. You have the responsibility to DCI and to your fellow employees to conduct yourself in a manner which will serve the best interest of the patient, your fellow employees and the employer. Since DCI employees do not have written contracts of employment for specific terms and are considered to be employees at will, any deviation from this standard of conduct as determined by DCI may result in termination of the employment relationship.

Work rules will be posted in each facility. Violation of these rules will constitute grounds for disciplinary action up to and including discharge. These work rules are not all inclusive and actions not listed may also result in disciplinary action or discharge.

83

03/01

000223

## PATIENT CARE RULES

Our prime concern at DCI is the welfare of our patients. A few basic rules of conduct and performance are necessary to insure cooperation of patients and employee teamwork.

1.  So that each employee may complete work assignments, do not visit in any other areas of the facility unless it is necessary in the performance of assigned duties.

2.  Be courteous to patients, visitors and other employees at all times.

3.  Personal visitors are not allowed while you are at work. Arrange for personal solicitations, collectors or business friends to contact you at home.

4.  Be considerate of others. The very nature of our work requires a cheerful, considerate and professional, reserved manner while on duty.

5.  Extreme tact must be exercised in all contact with the patients and visitors. Situations which involve differences or difficulties should be promptly referred to your immediate supervisor or the Administrator.

6.  Your conduct should be above reproach at all times. When at the facility, you are required to conduct yourself quietly and efficiently with special regard to

84

03/01

the patients and in consideration of your fellow workers.

7. Honesty is a basic requirement for employment.

8. Differences between employees or problems arising out of employment should never be discussed with patients or visitors or where they may see or hear such discussions.

9. Information concerning patients or staff is absolutely confidential and must not serve as a topic of conversation either inside or outside DCI. You are forbidden to investigate, repeat or discuss the condition or situation of any patient or staff with anyone except when required as a part of your duties.

10. Be a booster for DCI. Adverse criticism about it by your fellow workers should be reported to your supervisor so corrective measures can be taken. Criticism voiced against DCI is harmful and marks you as a disloyal employee. However, constructive suggestions are welcomed and should be addressed to your immediate supervisor or Administrator.

11. Telephone equipment is limited. Personal telephone calls must be kept to an absolute minimum and be limited to calls of an urgent or emergency nature only.

12. You will be expected to act in a manner which exhibits respect for the patient, yourself, your fellow employees and the best interest of DCI.

85

03/01

## SAFETY

Safety is of paramount importance at DCI because upon it hinges the well-being of patients and employees alike. The philosophy that every accident can be predicted has been adopted as a cardinal Company rule. Consequently, employees are responsible for both their personal actions and safe conditions in their work areas. Any unsafe condition or procedure should be reported to your supervisor for corrective action.

It is the policy of DCI to provide a safe environment for all employees and all activities, at all times. All reasonable action will be taken to insure safe and efficient work operations.

Know your duties. If you have any questions or suggestions for safe conduct, be sure to speak with your supervisor or Administrator. Your full cooperation and active participation are required for our safety program to obtain maximum effectiveness. Safety can be achieved only through our team effort.

86

03/01

000226

## HOUSEKEEPING

A clean orderly work area indicates an efficient worker, reduces accidents, improves health conditions, reduces fire hazards, adds to the efficiency of your work and improves the quality of your work. We can all help by placing trash in the containers provided and by applying a few simple rules of tidiness. Everyone must take responsibility for keeping the facility's work areas clean and sanitary.

87

03/01

000227

## SMOKING

Because smoking is acknowledged to be both a fire and health hazard, a continuous effort will be made to reduce its presence in our facilities. Smoking is not allowed in the following places:

1.    Patient rooms or treatment areas

2.    Anywhere there are fire hazards or the danger of explosion.

3.    Elevators

4.    Classrooms and laboratories

5.    Other designated non-smoking areas.

88

03/01

000228

## SOLICITATION

Persons not employed by DCI may not solicit or distribute literature for any purpose at any time.

Employees may not distribute literature to patients or visitors, nor may they solicit patients or visitors for any purpose at any time.

Employees may not distribute literature to other employees for any purpose during working time or in patient care areas.

Employees may not solicit other employees for any purpose during working time.

This rule is not applicable to distribution of official DCI information or educational material.

89

03/01

000229

## TRANSPORTING PATIENTS

The transportation of patients to or from our facilities by employees for their treatment is prohibited, except when specific prior permission is obtained from corporate counsel.

000230

## TRAVEL

Employees who attend conferences and seminars funded by the DCI must adhere to the following rules:

1.  All travel requests must be submitted to the administrator in the form of "Notice of Planned Itinerary" for approval.

2.  Airline tickets and hotel arrangements must be booked by DCI.

3.  Expenses can only be reimbursed when employees complete an expense report and furnish receipts and ticket stubs for the following items: airline tickets, hotel bills, transportation (taxi, limo) receipts, registration receipts, and receipts for materials purchased (books, slides, tapes, etc.). Meals will be paid for by DCI on a per diem basis. The Administrator can provide details on the meal per diem for a particular trip. Further information on DCI's travel and meeting attendance policy may be obtained from the Administrator or the bookkeeping department. A cash advance may be issued prior to the trip if necessary. Any settlement in the difference in the cost will be made as soon as possible upon the employee's return.

91

03/01

000231

## RESIGNATIONS

Although we hope you remain with us for a long time, sometimes personal circumstances force a change in jobs. In such cases, you should notify your supervisor at the earliest possible time. Employees are requested to give their supervisor at least two full working weeks' notice in order to allow their supervisor to adjust working schedules and secure a qualified replacement.

92

03/01

000232

## TRANSFER OF EMPLOYEES

If you transfer from one DCI location to another your earned benefits (length of service, sick leave, vacation and holidays) will be transferred with you to the new location.

If you are interested in transferring to another DCI please contact your Administrator.

**93**

03/01

000233

# INDEX

ACCESS TO PERSONNEL FILES. . . . . . . . . . . . . . . . . 66

ACCIDENT REPORTS . . . . . . . . . . . . . . . . . . . . . . . 82

ACCIDENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

ATTENDANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

ATTITUDE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

BULLETIN BOARDS . . . . . . . . . . . . . . . . . . . . . . . 61

CONFIDENTIAL INFORMATION . . . . . . . . . . . . . . . 71

CONFLICTS OF INTEREST . . . . . . . . . . . . . . . . . . 72

CONSERVATION OF SUPPLIES AND TIME . . . . . . . . 77

CREDIT STANDING. . . . . . . . . . . . . . . . . . . . . . . . 78

EDUCATIONAL ASSISTANCE POLICY. . . . . . . . . . . 47

EMPLOYMENT CATEGORIES . . . . . . . . . . . . . . . . . 15

EMPLOYMENT APPLICATIONS. . . . . . . . . . . . . . . . 68

EQUAL OPPORTUNITY. . . . . . . . . . . . . . . . . . . . . . 11

94

03/01

000234

ERRORS IN YOUR PAY . . . . . . . . . . . . . . . . . . . . . . . . . 27

EXCEPTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

FAMILY AND MEDICAL LEAVE OF ABSENCE . . . . . 53

FIRE AND DISASTER PLAN . . . . . . . . . . . . . . . . . . . . 79

FLOATING HOLIDAYS . . . . . . . . . . . . . . . . . . . . . . . . 39

FUNERAL LEAVE . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

GIFTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

HIRING OF RELATIVES . . . . . . . . . . . . . . . . . . . . . . . 19

HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

HOLIDAYS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

HOUSEKEEPING . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

INTERNET & E-MAIL ACCEPTABLE USE POLICY . . 73

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

INTRODUCTORY PERIOD . . . . . . . . . . . . . . . . . . . . . 24

JURY DUTY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

LENGTH OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . 20

OUTSIDE EMPLOYMENT . . . . . . . . . . . . . . . . . . . . . 21

03/01

000235

OVERTIME . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

PATIENT CARE RULES . . . . . . . . . . . . . . . . . . . . . . . . 84

PAY DEDUCTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

PAY ADVANCES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

PAY POLICY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

PAYDAY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

PERSONAL DATA CHANGES . . . . . . . . . . . . . . . . . . . 67

PERSONAL CONDUCT . . . . . . . . . . . . . . . . . . . . . . . . 83

PERSONAL LEAVE POLICY . . . . . . . . . . . . . . . . . . . . 58

PHILOSOPHY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

PHYSICAL EXAMINATION . . . . . . . . . . . . . . . . . . . . . 22

PROBLEM SOLVING COMMITTEE . . . . . . . . . . . . . . . 62

PROBLEM SOLVING PROCEDURES . . . . . . . . . . . . . 63

PROMOTIONS AND TRANSFERS . . . . . . . . . . . . . . . 23

RESIGNATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

REST PERIODS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

SAFETY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

96

03/01

000236

SICK TIME ACCRUAL . . . . . . . . . . . . . . . . . . . . . . . . . . 40

SICK TIME BUY BACK . . . . . . . . . . . . . . . . . . . . . . . . 42

SMOKING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

SOLICITATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

TEN YEAR SERVICE AWARD . . . . . . . . . . . . . . . . . 51

THE WORKWEEK . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

TIMEKEEPING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

TRANSFER OF EMPLOYEES . . . . . . . . . . . . . . . . . . 93

TRANSPORTING PATIENTS . . . . . . . . . . . . . . . . . . . 90

TRAVEL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

UNIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

UNLAWFUL HARASSMENT . . . . . . . . . . . . . . . . . . . 12

VACATION WITH PAY . . . . . . . . . . . . . . . . . . . . . . . 44

WHY YOU WERE SELECTED . . . . . . . . . . . . . . . . . . 14

WORK SCHEDULES . . . . . . . . . . . . . . . . . . . . . . . . . 31

YOUR PERSONNEL RECORDS . . . . . . . . . . . . . . . . 65

YOUR SUPERVISOR . . . . . . . . . . . . . . . . . . . . . . . . 26

97

03/01

000237

DEFENDANT'S
EXHIBIT

8

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| CYNTHIA QUINNIE | ) | 2007 JUN 11 A 11: 33 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 12302 AT 06 |
| | ) | 2:07-CV-314-WHA |
| DIALYSIS CLINIC, INC., | ) | |
| | ) | |
| Defendant, | ) | **JURY TRIAL DEMANDED** |

## COMPLAINT FOR DAMAGES

COMES NOW Plaintiff, Cynthia Quinnie (hereinafter referred to as Quinnie), and alleges the following against the Defendant:

## PARTIES

1)    Quinnie, is over the age of eighteen (18) and is a resident of Montgomery County, AL.

2)    The Defendant Dialysis Clinic, Inc. (hereinafter referred to as "D.C.I.") is a corporation organized under the laws of Tennessee, qualified to do business in Alabama, with its principle place of business being located in Tennessee, at 1633 Church Street, Suite 500, Nashville, Tennessee.

## VENUE AND JURISDICTION

3)    This action is brought pursuant to 28 U.S.C. § 1343(a)(3-4) and 42 U.S.C. § 2000(e)(1-15). The rights, privileges and immunities sought herein to be redressed are those secured by the equal protection and Due Process clauses of the Fifth and Fourteenth Amendment of the United States Constitution.

4)    Jurisdiction for this action exists under 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3-4), and 42 U.S.C. § 2000(e)(1-15).

5)    Venue for this action is proper pursuant to 28 U.S.C. § 1391 and 28 U.S.C. § 1343(a)(3-4).

## FACTS

6)    Quinnie is an eighteen year old African-American female who worked for the D.C.I. in Montgomery, AL until the incident that is the basis of this suit.

7)    On or about August 3, 2006, Quinnie asked D.C.I. management to see her personnel file. Quinnie was told she could not see her personnel file by D.C.I. management. This is against the policies and procedures of D.C.I.

8)    On or about August 7, 2006, Quinnie asked D.C.I. management a second time to see her personnel file, and was denied access again. Quinnie was placed on administrative leave without pay on August 7, 2006 because she was an African American Female.

9)    In the last four years every African American who asks to see their personnel file has been put on leave or fired, while Caucasian employees are allowed to look at their files without fear of being fired or placed on leave without pay.

10)    D.C.I. has created a racially hostile work environment. African American employees are strictly held to policy and procedures of Dialysis Clinic, Inc., while Caucasian employees are allowed to violate rules, policies and Procedures repeatedly without penalty.

11)    Dialysis Clinic, Inc. has repeatedly refused to rehire former African American employees while steadily rehiring Caucasian employees.

12)    Dialysis Clinic, Inc. has a policy of not hiring people who are related to present employees, however they have disregarded this policy on two occasions with Caucasian employees while never relaxing policy and procedures for African Americans.

13)    Dialysis Clinic, Inc. has repeatedly fired African American employees for whistle blowing on Caucasian employees but never fires Caucasian employees for whistle blowing on African American employees.

14)    Several nurses at Dialysis Clinic, Inc. have made racial slurs on the job during wok hours without penalty.  All complaints in this regard are summarily dismissed.

15)    Plaintiff, Quinee, has received a right to sue letter from the EEOC dated January 11, 2007.

## CAUSE OF ACTION

16)    The foregoing paragraphs 1 thru 15 are incorporated by references as if fully stated herein.

17)    Quinnie's dismissal was in violation of the Equal Employment Opportunity Act, also know as Title VII of the Civil Rights Act of 1964, 42 U.S.C.§ 2000e(2)(m), *et seq.*, and guidelines promulgated thereunder.

18)    WHEREFORE, premises considered, Langford seeks relief as the jury deems appropriate, including compensatory damages, reasonable attorney's fees and cost.

## PRAYER FOR RELIEF

WHEREFORE, based on the foregoing, Plaintiff, Quinnie, respectfully prays that this Court:

(a)    Assume jurisdiction over this action;

(b)    Empanel a jury to decide such triable issues as may exist in this case;

(c)    Grant to Plaintiff such relief to which it is entitled;

(d)    Make such award of costs, attorney's fees and expenses as may be

permitted by law or equity.


Respectfully submitted this 10TH day of APRIL, 2007.

Jackson B. Harrison (HAR285)
Attorney for Plaintiff


**PLAINTIFF DEMANDS TRIAL BY JURY.**

Of Counsel


OF COUNSEL:
The Harrison Firm, LLC
8425 Crossland Loop
Montgomery, AL 36117
(334) 819-8920
(334) 819-8923 fax

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form.

| | ENTER CHARGE NUMBER |
|---|---|
| | ☐ FEPA |
| | ☒ EEOC |

_____ (State or local Agency, if any) _____ and EEOC

| NAME (Indicate Mr., Ms., or Mrs.) | HOME TELEPHONE NO. (Include Area Code) |
|---|---|
| MS. CYNTHIA QUINNIE | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | MONTGOMERY, AL 36117 | MONTGOMERY |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NO. OF EMPLOYEES/MEMBERS | TELEPHONE NUMBER (Include Area Code) |
|---|---|---|
| DIALYSIS CLINIC, INC | 25 | 334-265-9190 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|
| 544 SOUTH McDONOUGH ST | MONTGOMERY AL 36104 |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|
| | |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☐ AGE  ☐ RETALIATION  ☐ OTHER (Specify)

DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE (Month, day, year)
AUG 7TH 2006

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s)):

See Attached Exhibit A

DEFENDANT'S EXHIBIT

9

☑ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the foregoing is true and correct.

NOTARY - (When necessary to meet State and Local Requirements)

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

Cynthia Quinnie

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year)

Date _____
Charging Party (Signature)

EEOC FORM 5 MAR 84

PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED

# EXHIBIT A

* Mrs. Quinee, who is an African American female, called in sick to work before she was placed on Administrative leave.
    - She provided a Doctor's excuse.

* On Thursday, August 3rd, 2006, asked for personnel file, Glenda Gary said no and said to speak with Rose Smith at corporate office.

* Friday August 7th, 2006, asked Glenda Gary about personnel file. She said to make appointment and to see her before the day was over. On the same date at 3:30 Glenda Gary said "you are placed on administrative leave". Spoke with Rose Smith and she said Human Resources said to place on administrative leave For falsifying time.

* Every person who has asked for personnel file has been fired. All of which were African American.

* African American employees are strictly held to policy and procedures of Dialysis Clinic, Inc., while Caucasian employees are allowed to violate rules, policies and Procedures repeatedly without penalty.

* Dialysis Clinic, Inc. has repeatedly refused to rehire former African American employees while steadily rehiring Caucasian employees.

* Dialysis Clinic, Inc. has a policy of not hire people who are related to present employees, however they have disregarded this policy on two occasions with Caucasian employees while never relaxing policy and procedures for African Americans

* Dialysis Clinic, Inc. repeatedly fires African American employees for whistle blowing on Caucasian employees but never fires Caucasian employees for whistle blowing on African American employees.

* Several nurses at Dialysis Clinic, Inc. have made racial slurs on the job during work hours without penalty. All complaints in this regard are summarily dismissed.

Case 2:07-cv-00314-WHA-TFM    Document 21-8    Filed 03/14/2008    Page 3 of 3
04:30:50 p.m.    11-16-2007    2 /11

EEOC Form 161 (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: | **Cynthia Quinnie** | From: | **Birmingham District Office** |
|---|---|---|---|
| | | | **Ridge Park Place** |
| | **Montgomery, AL 36117** | | **1130 22nd Street, South, Suite 2000** |
| | | | **Birmingham, AL 35205-1130** |

|  | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR § 1601.7(a)) |
|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **420 2006 04867** | **Devoralyn J. McGhee, Investigator** | **(205) 212-2070** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

| | |
|---|---|
| ☐ | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
| ☐ | Your allegations did not involve a disability as defined by the Americans with Disabilities Act. |
| ☐ | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
| ☐ | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge. |
| ☐ | Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge. |
| ☐ | While reasonable efforts were made to locate you, we were not able to do so. |
| ☐ | You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged. |
| ☒ | The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge. |
| ☐ | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
| ☐ | Other (briefly state) |

### - NOTICE OF SUIT RIGHTS -

(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this Notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

Delner Franklin-Thomas, District Director

**1 1 JAN 2007**

(Date Mailed)

Enclosure(s)

cc:    **J. Brett Harrison, Attorney**
**Tim K. Garrett, Attorney**

LEXSEE 2007 U.S. APP. LEXIS 948

**VOLANDA JONES, Plaintiff-Appellant, versus U.S. DEPARTMENT OF VETER-ANS AFFAIRS, et al., Defendants, SOMERBY AT UNIVERSITY PARK, L.L.C., Defendant-Appellee.**

**No. 06-12293 Non-Argument Calendar**

**UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT**

*213 Fed. Appx. 933; 2007 U.S. App. LEXIS 948*

**January 17, 2007, Decided**
**January 17, 2007, Filed**

**NOTICE:**    [**1] NOT FOR PUBLICATION

**PRIOR HISTORY:**    Appeal from the United States District Court for the Northern District of Alabama. D.C. Docket No. 03-02437-CV-SLB.

**DISPOSITION:**    AFFIRMED.

**COUNSEL:** For Volanda Jones, Appellant: James M. Wooten, Law Offices of James M. Wooten, P.C., BIR-MINGHAM, AL.

For Somerby at University Park, L.L.C., Appellee: Tammy L. Dobbs, Shannon L. Miller, Constangy, Brooks & Smith, Birmingham, AL.

**JUDGES:** Before EDMONDSON, Chief Judge, DUBINA and CARNES, Circuit Judges.

**OPINION**
[*934]

PER CURIAM:

Plaintiff Volanda Jones ("Jones") appeals the district court's grant of summary judgment for defendant Somerby at University Park, L.L.C. ("Somerby")[1] on Jones's claims of retaliatory discharge, brought under Title VII of the Civil Rights Act of 1964 ("Title VII"), *42 U.S.C. § 2000e-3(a)*. We find no reversible error; we affirm.

------

1 Jones's original complaint also named the U.S. Department of Veterans Affairs ("VA") as a defendant, but Jones resolved the dispute with the VA and did not name the VA as a defendant in the Amended Complaint.

[**2] Jones, a nurse licensed by the State of Alabama, began working at the Birmingham, Alabama, Veterans Affairs facility in 1997. After she was moved from the night shift to the day shift in early 2002, she applied for and went on leave without pay from the VA. She then filed a complaint of race discrimination and retaliation against the VA with the Equal Employment Opportunity Commission ("EEOC").

In April 2002, while on leave from the VA, Jones began working the evening shift at Somerby, a senior residential community located in Birmingham. In April and June 2002, Jones again applied for and received leave without pay from the VA, based on her representations that her son, who was recovering from throat surgery and has Down's Syndrome, needed constant care. In December 2002, the VA began investigating Jones's employment at Somerby and contacted Allison Naugher ("Naugher"), Somerby's human resources director, requesting specific information on Jones's employment. On 7 February 2003, Naugher questioned Jones about the VA's investigation; Jones informed her of the EEO complaint. Naugher testified that Jones then told her that the VA was "trying to take her [nursing] license" and that [**3] she was not "supposed to be working." Jones denies making such statements and maintains that the VA informed Naugher that the VA suspected Jones of falsifying her VA leave documents and that her nursing license was at risk.

Around 20 February 2003, Naugher received a complaint from one of Jones's co-workers, Chris Miranda ("Miranda"), who told Naugher that she believed that Jones was tape recording her and that she was intimidated by Jones and afraid to work with her. Naugher then questioned two other co-workers, Shirley Beck ("Beck") and Gabrielle Warner ("Warner"), who expressed similar

worries. Naugher suspended Jones pending an investigation.

On 27 February 2003, Naugher and Eddie Cummings ("Cummings"), Somerby's Director of Assisted Living, met with Jones to discuss the complaints. Naugher and Cummings both testified that Jones was uncooperative and would not respond to their questions, including those about Jones's dispute with the VA. After this meeting, Vance Holder ("Holder"), Somerby's Executive Director, decided to terminate Jones's employment. The decision was based on information from Naugher, Cummings, and "upon advice of counsel." On 12 March 2003, Somerby's lawyer [**4] sent Jones's lawyer a letter terminating Jones's employment; the letter stated - among other things -- that, based on Jones's refusal to cooperate and on her conflicting [*935] statements to Naugher, Somerby had "conclude[d] that it cannot place trust in your client's statements."

Jones filed a complaint with the EEOC, alleging that Somerby terminated her employment in retaliation for filing an EEOC charge against the VA. The EEOC dismissed the charge in June 2003, concluding that no Title VII violation could be established. Jones then filed suit against Somerby, claiming retaliatory discharge in violation of Title VII, *42 U.S.C. § 2000e-3(a)*. Somerby moved for summary judgment, arguing that the employment was terminated based on the following factors: (1) Jones's initial failure to cooperate in Somerby's internal investigation; (2) concerns about her honesty and trustworthiness; and (3) concerns for the safety of the staff and residents based on the complaints lodged against Jones by her co-workers. Jones responded by arguing that Somerby's stated reasons were incredible, by alleging that Naugher falsified her written notes of the complaints, and by pointing [**5] to discrepancies between the written notes and the employees' later depositions. Jones also disputed the factual bases for the complaints, as well as several points of Naugher's testimony. [3]

> 2 Jones argues that she never told Naugher that Jones was not supposed to be working and that the VA was trying to take her nursing license. She also contends that her "uncooperativeness" was solely based on her refusal to answer questions about the pending EEO charge against the VA.

The district court granted summary judgment for Somerby. The court determined that Jones failed to present evidence that Somerby's stated reasons for terminating Jones were pretextual, as Jones's arguments were "based on evidence that Naugher was mistaken or wrong," and that Jones presented no evidence that Holder, the ultimate decisionmaker, did not base his decision on the stated reasons. Jones now appeals.

We review a district court's order granting summary judgment *de novo*, viewing all facts in the record in the light most favorable [**6] to the non-moving party and drawing all reasonable inferences in its favor. *Frederick v. Sprint/United Mgmt. Co., 246 F.3d 1305, 1311 (11th Cir. 2001)*. The moving party must show that no genuine issues of material fact exist and that it is entitled to judgment as a matter of law. *Id.*

To establish a prima facie case of retaliation under Title VII, a plaintiff must show that (1) she engaged in statutorily protected expression, (2) she suffered an adverse employment action, and (3) there was some causal relation between the two events. *Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001)*. The employer then has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action. *Id.* If accomplished, the plaintiff bears the ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct. *Id.*

The plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy [**7] of credence." *Carter v. City of Miami, 870 F.2d 578, 584 (11th Cir. 1989)*(quotation marks and citation omitted). The court's only concern is the honesty of the employer's explanation, even if the employer was mistaken about the facts underlying those reasons. *See Cooper v. Southern Co., 390 F.3d 695, 730 (11th Cir. 2001)*. To survive a motion for summary judgment, the plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or [*936] contradictions in the employer's proffered legitimate reasons . . . that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997)*(citation and internal quotation marks omitted).

Even assuming - as the district court did - that Jones established a *prima facie* retaliation case, the district court properly granted summary judgment for Somerby because she failed to introduce evidence sufficient to support a jury finding of pretext. At most, Jones's evidence suggests that Naugher was mistaken about the content of their conversations regarding Jones's dispute with the VA, about the substance of the co-workers' [**8] complaints, and about Jones's failure to cooperate. The evidence does not establish that Naugher [3] did not honestly believe that Jones had been less than forthcoming about her employment with the VA and that Jones was thus untrustworthy. The minor inconsistencies between some of Jones's co-workers' signed statements and their later depositions do not contradict that the co-workers did complain to Naugher about Jones, did feel

213 Fed. Appx. 933, *; 2007 U.S. App. LEXIS 948, **

intimidated by her, and did believe that she was recording their conversations. [4] Jones produced no evidence to support her assertions that Naugher fabricated the complaints.

> 3  As acknowledged by the district court, Holden was the actual decisionmaker in this case. On appeal, Jones argues that Naugher used Holden as her "cat's paw" and that Naugher should be regarded as the real decisionmaker. *See Llampallas v. Mini-Circuits, Lab, Inc., 163 F.3d 1236, 1249 (11th Cir. 1998)*("[I]f the plaintiff shows that . . . the decisionmaker acted in accordance with the harasser's decision without h[im]self evaluating the employee's situation[,] causation is established."). We need not address this argument, which was not raised below, as we conclude that Jones failed to present sufficient evidence to show that Naugher - much less Holder - was motivated by an improper animus.

[**9]

> 4  Jones specifically argues that Naugher added language to both Miranda's and Beck's statements indicating that they knew that Jones carried a tape recorder at work. Although both co-workers testified at their depositions that they never actually saw the tape recorder, they also testified that they believed that Jones carried a recorder with her

and that they were afraid that she would record their conversations.

Also, Jones propounded no evidence contradicting Naugher's and Cummings's testimony that she was uncooperative and belligerent during the internal investigation; that Jones may have refused to answer questions that she felt were unfair or beyond the scope of Somerby's investigation and that she had a legitimate reason for raising her voice (laryngitis) does not show that Naugher and Cummings did not perceive her as uncooperative. Last, contrary to Jones's assertions, Somerby's stated reasons for Jones's termination throughout this litigation have been entirely consistent with the termination letter sent to Jones's lawyer. In fact, Jones testified that she understood that she was terminated [**10] because she was seen as untrustworthy and uncooperative. Thus, although Jones's evidence may raise a question of fact about whether her termination was mistaken or unfair, she has produced no evidence disputing Somerby's assertions of honest reliance on the proffered reasons.

Because Jones has failed to introduce evidence that the reasons proffered by Somerby were mere pretexts for retaliation, the district court properly granted Somerby's motion for summary judgment. The judgment is therefore

AFFIRMED.

LEXSEE 2007 U.S. APP. LEXIS 8547

**FRANCIS RICHARD; ET AL Plaintiffs FRANCIS RICHARD Plaintiff-Appellant v. CINGULAR WIRELESS LLC; CINGULAR WIRELESS EMPLOYEE SERVICES LLC Defendants-Appellees**

**No. 06-30396 Summary Calendar**

**UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT**

*233 Fed. Appx. 334; 2007 U.S. App. LEXIS 8547*

**April 13, 2007, Filed**

**NOTICE:** [**1] PLEASE REFER TO FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1 GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**PRIOR HISTORY:** Appeal from the United States District Court for the Eastern District of Louisiana. No. 2:04 CV 2197.

**COUNSEL:** FRANCIS RICHARD, Plaintiff - Appellant: David Augustus Capasso, Hollis shepherd, New Orleans, LA.

For CINGULAR WIRELESS; CINGULAR WIRELESS EMPLOYEE SERVICES LLC, Defendants - Appellees: Jennifer Burrows McNamara, Baker Donelson Bearman, Caldwell & Berkowitz, New Orleans, LA; Phyllis Guin Cancienne, Baker Donelson Bearman, Caldwell & Berkowitz, Baton Rouge, LA.

**JUDGES:** Before DeMOSS, STEWART, and PRADO, Circuit Judges.

**OPINION**

[*334] Per Curiam: *

    * Pursuant to *5TH CIRCUIT RULE 47.5*, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in *5TH CIRCUIT RULE 47.5.4*.

Plaintiff-Appellant Francis Richard ("Richard") brought suit against Defendants-Appellees Cingular Wireless LLC and Cingular Wireless Employee Services LLC [**2] (collectively, "Cingular"), alleging that his demotion and subsequent termination constituted unlaw-

ful retaliation in violation of Title VII of the Civil Rights [*335] Act of 1964, *42 U.S.C. §§ 2000e, et seq. (2000)* ("Title VII"). The district court granted summary judgment to Cingular and Richard now appeals. For the reasons that follow, we AFFIRM the judgment of the district court.

**I. FACTUAL AND PROCEDURAL HISTORY**

Richard was employed by Cingular as a Radio Frequency Performance Engineer IV, a position with responsibilities that included interviewing and recommending applicants for the position of Radio Frequency Specialist. In September 2003, Richard interviewed three applicants for an available Radio Frequency Specialist position. Richard subsequently sent an email to his superior, Ramiro Peredo ("Peredo"), recommending that Dwayne Barnes ("Barnes") be selected for the position. Cingular alleges that before sending this email, Richard showed it to Barnes and told Barnes that he was Richard's "pick." [1] Subsequently, however, Richard met with Peredo, who expressed several concerns about Barnes's fitness for the Radio Frequency Specialist position. [**3] Richard then revised his recommendations, and someone other than Barnes was hired for the open position. Richard informed Barnes that he would not be getting the position because "upper management did not want him."

    1    Richard now denies that he voluntarily showed Barnes the email, though he earlier conceded this.

Thereafter, Barnes approached human resources employee Kim Willey ("Willey"), related to her his conversations with Richard, and complained about his failure to be offered the Radio Frequency Specialist position. Willey alerted Richard's supervisors to the alleged conversations. When questioned about whether he had showed Barnes the email or otherwise told Barnes that

Barnes was being recommended, Richard twice denied showing or telling Barnes anything of the sort. Cingular commenced an investigation into the matter, led by Susan Horcharik ("Horcharik"). According to Horcharik, Barnes repeated his account of his conversations with Richard but later refused to sign a statement confirming the same. Richard, [**4] however, did sign a statement admitting that he had told Barnes he was being recommended, showed Barnes the email, and subsequently lied about both events. In October 2003, Richard was demoted to a non-managerial position, Radio Frequency Performance Engineer II. This demotion entailed a salary decrease from $ 78,000 to $ 65,000, which, after an initial oversight, went into effect in February 2004.

On February 24, 2004, Richard called Cingular's Ethics Line and complained that he had been "forced to unfairly disregard an African-American candidate" (Barnes) and that his demotion had been in retaliation for his initial recommendation of Barnes. Cingular investigated this complaint and concluded that the facts "fully support[ed] the decision and the reasons for which in their entirety." On March 24, 2004, Richard filed an EEOC charge alleging that he was unlawfully demoted in retaliation for opposing practices made illegal by Title VII. On May 27, 2004, the EEOC dismissed the charge and issued Richard a right to sue letter.

On May 28, 2004, Barnes began to receive calls from Richard's wife, Maria Richard, on his Cingular-issued cellphone. Maria Richard left Barnes a voicemail stating, [**5] among other things, that he was evil, arrogant, and had ruined her husband's career, and that she wanted to meet [*336] him so "she could look him in the eyes." On June 1, 2004, Barnes reported the phone calls and voicemail to Willey. Barnes indicated that he did not welcome the phone calls and did not want to meet Mrs. Richard, and that Barnes's wife had heard the message and feared for Barnes's safety. Willey has stated that while Richard initially denied that his wife made the calls, he then admitted that he had given her Barnes's cellphone number. Willey reported Barnes's complaint to Horcharik, who began another investigation. Horcharik discovered that additional calls to Barnes's cellphone had been placed from Richard's home and Richard's own Cingular-issued cellphone. On June 8, 2004, Richard met with his superiors, including Peredo and Horcharik. Richard refused to answer many of the questions posed to him regarding the phone calls. Following the meeting, Richard's employment at Cingular was terminated.

On August 5, 2004, Richard and Maria Richard filed suit against Cingular in the Eastern District of Louisiana, alleging that Richard's demotion and termination constituted unlawful [**6] retaliation under Title VII. Cingular filed a motion for summary judgment seeking dismissal of both Richard and Maria Richard's claims. On February 22, 2006, the district court issued an order granting Cingular's motion as to both plaintiffs. The district court held that because Maria Richard had never been an employee of Cingular and her claims were wholly derivative of Richard's, she could not maintain an action against Cingular under Title VII. Maria Richard has not appealed. The district court also held that Richard had not satisfied his burden of creating a genuine issue of material fact regarding whether Cingular's proffered non-retaliatory reasons for his demotion and termination were pretextual. Richard now appeals.

## II. JURISDICTION

The district court's February 22, 2006 ruling was a final judgment that disposed of all of Richard's claims. Accordingly, this court has jurisdiction pursuant to *28 U.S.C. § 1291.*

## III. ANALYSIS

### 1. Standard of Review

We review a district court's grant of summary judgment de novo. *Dallas County Hosp. Dist. v. Assocs. Health & Welfare Plan, 293 F.3d 282, 285 (5th Cir. 2002).* Summary [**7] judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *FED. R. CIV. P. 56(c).* A dispute about a material fact is genuine if the evidence is such that a reasonable fact-finder could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).* When deciding whether there is a genuine issue of material fact, this court must view all evidence in the light most favorable to the non-moving party. *Daniels v. City of Arlington, 246 F.3d 500, 502 (5th Cir. 2001).*

### 2. Title VII Retaliation Framework

Under Title VII, it is "an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice" by the statute or "because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, [**8] proceeding, or hearing" under Title VII. *42 U.S.C. § 2000e-3(a).* [*337] To establish a claim of retaliation under Title VII, a plaintiff must demonstrate that: (1) he engaged in a protected activity; (2) an adverse employment action occurred; and (3) a causal link exists between the protected activity and the adverse employment action. *Fabela v. Socorro Indep. Sch. Dist., 329 F.3d 409, 414 (5th Cir. 2003).*

233 Fed. Appx. 334, *; 2007 U.S. App. LEXIS 8547, **

A plaintiff alleging Title VII retaliation may establish a causal link in two ways: either by presenting direct evidence of retaliatory motive or by providing circumstantial evidence that creates a rebuttable presumption of retaliatory motive. *Id. at 414-15.* Where the plaintiff provides only circumstantial evidence of causation, the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973),* applies. *Sandstad v. CB Richard Ellis, Inc., 309 F.3d 893, 896 (5th Cir. 2002).* Under that framework, the employee must first make a prima facie case for the three elements of retaliation. This prima facie case is satisfied by the production of evidence; persuasion [**9] is not necessary at this stage. *Baker v. Am. Airlines, Inc., 430 F.3d 750, 753 (5th Cir. 2005).* If the employee succeeds in making a prima facie case, the burden of production shifts to the employer to state a legitimate, non-retaliatory reason for the employment action. *Id. at 754-55.* If the defendant meets its burden, the presumption of discrimination created by the prima facie case disappears, and the plaintiff is left with the ultimate burden of proving that the protected activity was the but-for cause of the adverse employment action. See *Montemayor v. City of San Antonio, 276 F.3d 687, 692 (5th Cir. 2001).* In other words, the employee must show that the employer's putative justification is unworthy of credence and is instead a pretext for retaliation. *Mato v. Baldauf, 267 F.3d 444, 452 (5th Cir. 2001).*

3. Richard's Demotion

Richard argues that he has made out a prima facie case that his demotion was retaliatory and has created a genuine issue of material fact regarding whether Cingular's proffered reasons for his demotion were pretextual. The district court held that Richard had failed to demonstrate [**10] that Cingular's non-retaliatory reasons were mere pretext. This court may affirm the district court's grant of summary judgment on any grounds supported by the record. *Lifecare Hosps., Inc. v. Health Plus of La., Inc., 418 F.3d 436, 439 (5th Cir. 2005).* Here, we do not reach the issue of pretext because we hold that Richard has not made out his prima facie case of retaliation.

Richard has failed to produce evidence that he engaged in activity protected by Title VII prior to his demotion. Protected activity in the context of a retaliation claim is (1) opposing discriminatory practices or (2) making a charge, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing under Title VII. *42 U.S.C. § 2000e-3(a).* At the time of his demotion, Richard had not yet called the Cingular Ethics Line to complain, nor had he filed his charge with the EEOC. Richard presents as protected activity prior to the demotion his acts of (1) recommending that Barnes be given the Radio Frequency Specialist position and (2) telling Barnes that he would not be receiving the position

and encouraging him to "seek justice." Richard's [**11] act of recommending Barnes for the open position does not qualify as protected activity because it did not oppose or protest an unlawful employment practice. See *Moore v. United Parcel Serv., Inc., 150 F. App'x 315, 319 (5th Cir. 2005)* (unpublished). Richard's subsequent conversation [*338] with Barnes also fails to qualify as protected conduct. Even if we assume, *arguendo,* that telling a co-worker that he had suffered unlawful discrimination is protected activity, Richard does not allege nor produce any evidence that he suggested to Barnes that Barnes's failure to receive the available position was due to racial discrimination. To satisfy the protected activity requirement, an employee must oppose conduct made unlawful by Title VII; complaining of unfair or undesirable treatment not addressed by Title VII will not suffice. See *id.;* see also *Harris-Childs v. Medco Health Solutions, Inc., 169 F. App'x 913, 916 (5th Cir. 2006)* (unpublished). We therefore conclude that Richard has not demonstrated that he engaged in protected activity prior to the demotion. Accordingly, the district court properly granted summary judgment to Cingular on Richard's [**12] claim that his demotion was retaliatory.

4. Richard's Termination

Richard also brings a claim for retaliation on the basis of his termination by Cingular. Before his termination, Richard had called the Cingular Ethics Line to complain of retaliatory demotion and had also filed a complaint with the EEOC. We therefore conclude that Richard had engaged in activity protected by Title VII. See *Walker v. Thompson, 214 F.3d 615, 629 (5th Cir. 2000).* Richard's termination qualifies as an adverse employment action, thus satisfying the second prong of his prima facie retaliation case. *Dehart v. Baker Hughes Oilfield Operations, No. 05-21087, 214 Fed. Appx. 437, 2007 U.S. App. LEXIS 1362, at *10 (5th Cir. Jan. 19, 2007).* We therefore turn to whether Richard has demonstrated that a causal link existed between his protected activity and subsequent termination. Cingular argues that Richard has made no such showing. This court allows, however, for an inference of causation to be drawn where the adverse employment action occurs in close temporal proximity to the protected conduct. *Evans v. City of Houston, 246 F.3d 344, 354 (5th Cir. 2001).* In Evans, we [**13] relied upon decisions from district courts in this circuit that found "a time lapse of up to four months . . . sufficient to satisfy the causal connection for summary judgment purposes." Id. [2] In this case, the time span between Richard's EEOC complaint and his termination was roughly two and a half months. We therefore will allow for an inference of causation, and we conclude that Richard has made out his prima facie case of retaliation.

2  We note, however, that the Supreme Court has acknowledged other circuit court decisions that found three and four month periods too long to allow for an inference of causation. *Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-74, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001).*

Cingular, however, has satisfied its burden of stating a legitimate, non-retaliatory justification for Richard's termination. Cingular presented several such justifications: (1) Richard's wife's harassing phone calls to Barnes, which were in violation of Cingular's policy against employee harassment; [**14] (2) Richard's refusal to cooperate fully with Cingular's investigation into his involvement in the harassing phone calls; and (3) Richard's earlier lies to Cingular supervisors regarding his conversations with Barnes. The burden therefore falls to Richard to demonstrate that retaliation was the but-for cause of his termination. See *Montemayor, 276 F.3d at 692.* Accordingly, at the summary judgment stage, Richard must demonstrate that a genuine issue of material fact exists regarding whether Cingular's justifications were pretextual.

[*339] Richard first argues that he presented evidence that Barnes did not find the phone calls from Maria Richards threatening. He cites to a memorandum by Willey in which she stated that Barnes told her that Maria Richard's voicemail was "not very nice." This memorandum, however, also stated that Barnes's wife feared for his safety after the calls. Based on Barnes's statements to Willey, Cingular could have concluded that Richard's wife had made phone calls to a Cingular employee that were, if not physically threatening, certainly harassing and inappropriate. Cingular also could have concluded, in light of the facts that Maria Richards [**15] called Barnes's Cingular-issued cellphone and that Barnes "heard a male voice in the background" during the voicemail, that Richard was complicit in his wife's calls. We agree with the district court that Richard has not demonstrated that a genuine issue of material fact exists regarding whether Cingular's justification based on Maria Richards' phone calls was pretextual.

Richard then proposes that Cingular's justification based on his failure to cooperate with their investigation into the phone calls was mere pretext because he was, in fact, cooperative. While Richard concedes that he did not answer numerous questions posed during the meeting with his supervisors, Richard argues that he was told that he could have additional time to answer these questions in writing. The parties dispute how long Richard was

told he would have to submit these answers--Richard claims forty-eight hours, Cingular claims twenty-four-- and when exactly the decision was made to terminate Richard--Richard argues that the decision was made before even twenty-four hours had elapsed.

Even if we were to conclude that Richard had demonstrated that a genuine issue of material fact exists regarding whether his [**16] alleged lack of cooperation was merely a pretext, however, Richard "must put forward evidence rebutting each of the nondiscriminatory reasons the employer articulates" to satisfy his burden. *Wallace v. Methodist Hosp. Sys., 271 F.3d 212, 220 (5th Cir. 2001).* As we have seen, Richard has not successfully rebutted Cingular's justification based on his wife's phone calls to Barnes. Richard has also not rebutted Cingular's justification based on his earlier lies to his supervisors regarding his conversations with Barnes. Richard argues that "there's no evidence in the record that [he] lied to his superiors, except for the self-serving reports generated by Cingular." On the contrary, Cingular has presented a statement signed by Richard, dated October 6, 2003, admitting that he lied twice to Cingular personnel regarding his statements to Barnes because he "was afraid of what would happen" to him. Even if Richard could establish that he did not in fact lie, "an incorrect belief that an employee's performance is inadequate constitutes a legitimate, non-discriminatory reason" for termination. *Little v. Republic Ref. Co., 924 F.2d 93, 97 (5th Cir. 1991).* Based [**17] on Richard's conduct and admissions at the time, Cingular could have believed that Richard had lied to his supervisors. We conclude that Richard has not demonstrated that a genuine issue of material fact exists regarding whether Cingular's justification based on Richard's false statements to his superiors was unworthy of credence.

In sum, Richard has not satisfied his burden under the *McDonell Douglas* framework of demonstrating that Cingular's proffered reasons for his termination were pretextual and that retaliation was the but-for cause of his termination. Accordingly, the district court properly granted summary judgment to Cingular on [*340] Richard's claim that his termination was retaliatory.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the order of the district court granting summary judgment to Cingular.

AFFIRMED.

LEXSEE 2007 U.S. DIST. LEXIS 34047

**JULIE MCGROTHA, Plaintiff, vs. FED EX GROUND PACKAGE SYSTEM, INC.
D/B/A FED EX GROUND and VAN HAYES, Defendants.**

**5:05-CV-391 (CAR)**

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF
GEORGIA, MACON DIVISION**

*2007 U.S. Dist. LEXIS 34047; 89 Empl. Prac. Dec. (CCH) P42,865*

**May 9, 2007, Decided
May 9, 2007, Filed**

**SUBSEQUENT HISTORY:** Reconsideration denied by
*McGrotha v. Fed Ex Ground Package Sys., 2007 U.S.
Dist. LEXIS 93016 (M.D. Ga., Dec. 19, 2007)*
Summary judgment granted by, Judgment entered by
*McGrotha v. Fed Ex Ground Package Sys., 2008 U.S.
Dist. LEXIS 6275 (M.D. Ga., Jan. 29, 2008)*

**PRIOR HISTORY:** *McGrotha v. Fed Ex Ground Pack-
age Sys., 2007 U.S. Dist. LEXIS 18794 (M.D. Ga., Feb.
24, 2007)*

**COUNSEL:** [*1] For Julie McGrotha, Plaintiff: Lonzy
F. Edwards, LEAD ATTORNEY, Macon, GA.

For Fed Ex Ground Package, Inc., doing business as Fed
Ex Ground, Van Hayes, Defendants: Edward Scott
Smith, LEAD ATTORNEY, Brian Matthew Herman,
Atlanta, GA, US.

**JUDGES:** C. ASHLEY ROYAL, JUDGE.

**OPINION BY:** C. ASHLEY ROYAL

**OPINION**

**ORDER ON DEFENDANTS' MOTION FOR SUM-
MARY JUDGMENT**

**I. INTRODUCTION**

Plaintiff Julie McGrotha ("McGrotha") initiated this
action against Defendant Fed Ex Ground Package Sys-
tem, Inc. ("Fed Ex") alleging, inter alia, that Fed Ex
sexually discriminated against her in violation of Title
VII of the Civil Rights Act of 1964 ("Title VII"), *42
U.S.C.A. §§ 2000e to 2000e-17 (West 2005)*. Before this
Court is Defendants' Motion for Summary Judgment

(doc. 22). For the reasons stated below, Defendants' mo-
tion is **GRANTED IN PART** and **DENIED IN PART.**

**II. FACTUAL AND PROCEDURAL BACK-
GROUND**

Construing the record in the light most favorable to
McGrotha, and drawing all reasonable inferences in her
favor, the relevant facts - recounted in some detail - are
these. McGrotha began working for Fed Ex as a part-
time employee in May [*2] 2000. She became a full-
time employee in October 2000 when she was promoted
to an "Administrative Clerk III" position. With this pro-
motion came a $ 1.19 per-hour raise and additional re-
sponsibilities, as well as some added stress. Around this
time, McGrotha claims she approached her supervisor,
Defendant Van Hayes ("Hayes") while he was engaged
in a heated conversation with a driver, and he turned to
her and said: "What the f*** do you want?" (Pl.'s Br.
Supp. Mot. Summ. J., doc. 24, at 12.) Sometime after
this incident, between 2001 and 2002, McGrotha ap-
proached Hayes and asked about being promoted to a
management position. McGrotha told Hayes that she felt
she was doing a manager's work for clerk's pay, and that
she deserved to be promoted. Hayes informed McGrotha
that Fed Ex preferred its managers to either have a col-
lege degree or to be in the pursuit of a college degree.
While McGrotha had taken some college courses at
Macon State College prior to accepting her position at
Fed Ex, she was not, at that point, enrolled in any
classes.

Not long after her conversation with Hayes,
McGrotha encountered the second of a series of alleg-
edly harassing conduct at Fed Ex (with Hayes's October
[*3] 2000 comment being the first such episode).
McGrotha claims that, in 2000 or 2001, a contractor told
her a "sex-related joke." (Pl.'s Br. 12.) Next, in Decem-

ber 2003, services manager Robert Fountain allegedly told McGrotha to "sit down at the d*** desk and do the d*** secretary's job" while "scratching his privates." (*Id.*) In early 2004, "a contractor named Marcus Birt allegedly called McGrotha a "g**d*" b****." (*Id.*) The fifth incident allegedly occurred in June 2004, when Hayes told McGrotha to "get off her motherf***ing a** and cancel the motherf***ing contract." (*Id.*) Roughly two months after the June 2004 incident, McGrotha allegedly suffered a sixth incident of sexual harassment when Skip Lowery, a contractor, told McGrotha that Hayes was "a p***y . . . who didn't know who he [was] f***ing with," and that he would "stuff" and "cuff" Hayes, then "beat that p***y motherf***er's a**." (*Id.*) The final incident of "harassment" McGrotha complains of occurred on January 26, 2005, when Terrence Long, a manager, told McGrotha to "get off her a** and take care of that herself." (*Id.*)

Though McGrotha often resented how she was treated [*4] at Fed Ex, she continued to perform her daily job responsibilities. One of McGrotha's duties as an administrative clerk was to periodically enter the company safe located in Hayes's office to verify that certain funds had been deposited. According to McGrotha, only two supervisory employees, Hayes and Michael Tran ("Tran"), had keys to the safe, and she only entered the safe when directed to do so by Hayes. On January 17, 2005, Hayes reported that money was missing from the safe in his office. Three days later, Tad Fuqua ("Fuqua"), a Fed Ex security specialist, installed a security camera near the office safe. Between January 25 and January 28, 2005, Fed Ex claims the camera recorded McGrotha accessing the safe "without authorization" three times, though McGrotha insists she accessed the safe only at Hayes's direction. (Pl.'s Br. 4; Defs.' Br. Supp. Mot. Summ. J., doc. 22, at 16.) On January 26, 2005, McGrotha filed a complaint with Hayes about "not being promoted to a management position and doing management work for clerk's pay." (Pl.'s Br. 6.) Hayes told no one of McGrotha's complaint. Fuqua called McGrotha in for an interview on February 1, 2005. When McGrotha asked that her attorney [*5] be present during the interview, Fed Ex apparently construed this request as a refusal to cooperate with the investigation. Later that day, Regional Manager Terry Carter instructed Hayes to terminate McGrotha's employment "for the integrity issues that arose from her failure to cooperate with the investigation." (Defs.' Br. 17.)

On October 25, 2005, McGrotha filed the instant Title VII action, asserting claims against Defendant Fed Ex for: (1) failure to promote; (2) hostile work environment; and (3) wrongful and retaliatory discharge. McGrotha's Complaint also includes a defamation claim against Hayes, her former supervisor. (Compl., doc. 1, Counts I-IV.)

## III. SUMMARY JUDGMENT STANDARD

The summary-judgment rule exists "to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Summary judgment must be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c) [*6] (West 2005); *see also Celotex Corp.*, 477 U.S. at 322. A genuine issue of material fact necessary to defeat a properly supported motion for summary judgment arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In reviewing a motion for summary judgment, a court must review all the evidence in the record while "draw[ing] all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves*, 530 U.S. at 150; *see also Maynard v. Williams*, 72 F.3d 848, 851 (11th Cir. 1996).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and entitle it to a judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323 [*7] (internal quotation marks omitted). If the moving party discharges this burden, the burden shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact (i.e., evidence that would support a jury verdict) or that the moving party is not entitled to a judgment as a matter of law. *See Fed. R. Civ. P. 56(e)*; *Celotex Corp.*, 477 U.S. at 324-26. This evidence must consist of more than mere conclusory allegations or legal conclusions. *See Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991). Under this scheme, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

## IV. LEGAL DISCUSSION

McGrotha asserts numerous interrelated claims of sexual harassment against Fed Ex. First, McGrotha claims that, due to her sex, Fed Ex denied her a promo-

2007 U.S. Dist. LEXIS 34047, *; 89 Empl. Prac. Dec. (CCH) P42,865

tion and subjected her to a hostile work environment. [*8] McGrotha further claims that Fed Ex terminated her because of her sex, and in retaliation for the complaints she lodged about the alleged harassment and discrimination she suffered during her employment. Finally, McGrotha asserts a defamation claim against Hayes, her former supervisor, claiming that Hayes spread malicious and false rumors about her.

Title VII prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *42. U.S.C. § 2000e-2(a)(1).* Title VII plaintiffs "bear the burden of proving that the[ir] employer[s] discriminated against them unlawfully." *Hinson v. Clinch County Bd. of Educ., 231 F.3d 821, 827 (11th Cir. 2000).* Proof of discrimination may be established through either direct or circumstantial evidence. Direct evidence, unlike circumstantial evidence, "is that which shows an employer's discriminatory intent 'without any inference or presumption.'" *Id.* (quoting *Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998)).* Here, McGrotha [*9] offers, at best, circumstantial evidence to support her gender-discrimination claims. Accordingly, the Court will evaluate most of her claims under the "circumstantial evidence" framework first applied in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).*

Under the *McDonnell Douglas* framework, McGrotha bears the initial burden of presenting "sufficient evidence to allow a reasonable jury to determine that [s]he has satisfied the elements of h[er] prima facie case of gender discrimination." *See id.* at 802. Once she has done so, the burden shifts to Fed Ex "to articulate some legitimate, nondiscriminatory reason" for its employment decision. *Id.* At that point, Fed Ex must "be afforded a fair opportunity to show" that Fed Ex's reason(s) were pretextual. *Id. at 804.* The Court will first address McGrotha's failure-to-promote claim.

## A. Failure to Promote Claim

McGrotha alleges Fed Ex failed to promote her because of her sex. Fed Ex contends McGrotha's promotion-discrimination claim "cannot survive summary judgment because [she] cannot establish that she qualified for a promotion. [*10] " (Defs.' Br. 3.)

### 1. Prima Facie Case

To establish a prima facie case of promotion discrimination based on sex, the plaintiff must show: (1) she is a member of a protected class; (2) she applied for and was qualified for the promotion; (3) she was rejected in spite of her qualifications; and (4) the employer pro-

moted an individual outside of her protected class. *See Denney v. City of Albany, 247 F.3d 1172, 1183 (11th Cir. 2001).* Fed Ex does not dispute that McGrotha is a member of a protected class who applied for a promotion to a service manager position, or that a male was promoted over her. Fed Ex argues, however, that McGrotha cannot prove her prima facie case because she was not qualified for the manager position for which she applied. The Court disagrees.

To satisfy the second requirement of her prima facie case, a plaintiff usually need only show that she satisfied the employer's objective hiring criteria. In this case, however, Fed Ex has not articulated any objective criteria by which it evaluates its service-manager applicants. Fed Ex states only that it *prefers* service-manager applicants to have "completed a college degree program," but [*11] qualifies this preference by indicating that it will consider employees who are "currently working toward a degree" for part-time manager positions. (Defs.' Br. 4.) Thus, while Fed Ex *preferred* its managerial applicants to have a college degree, such a degree was not, insofar as the Court can tell, a hard-and-fast requirement for these positions. Even taking into account Fed Ex's stated preference for college students or graduates, an applicant's educational background was presumably not Fed Ex's sole means of evaluating managerial candidates. Indeed, the fact that McGrotha had performed duties typically reserved for service managers on an interim basis prior to seeking a promotion indicates that she was at least minimally qualified for a full or part-time management position. In short, Fed Ex's failure to clearly articulate any objective hiring criteria for its service managers forces the Court to assume that, because McGrotha performed managerial tasks on an interim basis, she was at least minimally qualified for a managerial position. *See Walker v. Mortham, 158 F.3d 1177, 1185-93 (11th Cir. 1998); Lee v. Conecuh County Bd. of Educ., 634 F.2d 959, 963 (5th Cir. 1981)* [*12] [1] ("Establishing qualifications is an employer's prerogative . . . but an employer may not utilize wholly subjective standards by which to judge its employees' qualifications and then plead lack of qualification when its promotion process, for example, is challenged as discriminatory."). In light of McGrotha's satisfaction of all the elements of her prima facie case, the Court turns to the next prong of the *McDonnell Douglas* analysis.

---

1 In *Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981),* the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to October 1, 1981.

### 2. Legitimate, Non-Discriminatory Reason

Case 2:07-cv-00314-WHA-TFM    Document 21-11    Filed 03/14/2008    Page 4 of 9

Page 4

2007 U.S. Dist. LEXIS 34047, *; 89 Empl. Prac. Dec. (CCH) P42,865

McGrotha's proof of a prima facie case of gender discrimination creates a presumption that Fed Ex discriminated against her. *See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)*. Fed Ex must now rebut this presumption by offering a legitimate, non-discriminatory reason for its decision [*13] not to promote McGrotha. Fed Ex attempts to meet its burden by asserting that McGrotha was not promoted because she was less qualified than the individuals selected - namely, "the individuals selected for promotion either had a degree or were currently in school," whereas McGrotha did not have a college degree and was not, at the time she applied for these positions, enrolled in college courses. (Defs.' Br. 5.) Fed Ex's enumerated reason for not promoting McGrotha is sufficient to satisfy its burden of producing a legitimate, non-discriminatory reason for its decision.

### 3. Pretext

Because Fed Ex met its burden of production, "'the presumption [of discrimination] raised by the prima facie case is rebutted . . . and drops from the case.'" *Id. at 507* (quoting *Texas Dep't. of Cmty Affairs v. Burdine, 450 U.S. 248, 254, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)*). At this point, McGrotha must produce evidence sufficient to enable a factfinder to conclude that Fed Ex's stated reason is pretextual. *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)* (quoting *Burdine, 450 U.S. at 253*). McGrotha may do this "either directly [*14] by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Jackson v. Ala. State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005)* (quotations and citations omitted).

A reason is not pretextual "'unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.'" *Brooks v. County Comm'n, 446 F.3d 1160, 1163 (11th Cir. 2006)* (quoting *St. Mary's, 509 U.S. at 515*) (emphasis added). In the context of a promotion:

> a plaintiff cannot prove pretext by simply arguing or even by showing that [s]he was better qualified than the [employee] who received the position [s]he coveted. A plaintiff must show not merely that the defendant's employment decisio[n] w[as] mistaken but that [it] w[as] in fact motivated by [sex] . . . a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reasons, at least

not where . . . the reason is one that might motivate a reasonable employer. [*15]

*Id.* (citations omitted). In fact, to rebut an employer's proffered reason, a plaintiff "must show that the disparities between the successful applicant's and her own qualifications were 'of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff." *Id.* (quoting *Cooper v. S. Co., 390 F.3d 695, 732 (11th Cir. 2004)*).

McGrotha has not rebutted Fed Ex's proffered reason for denying her the promotion. McGrotha does not dispute that the individuals whom Fed Ex promoted were all either college graduates or enrolled college students, nor does she offer any evidence, other than her stint as an interim service manager, to counter Fed Ex's contention that McGrotha was not as qualified as her male counterparts. Although McGrotha claims she "had some prior college education," she admits she was not working toward a degree at the time she applied for the promotion. Based on the evidence in the record, then, the Court cannot conclude that the scant evidence McGrotha presented was of such weight and significance that no reasonable person, in the exercise [*16] of impartial judgment, could have chosen the candidates selected over her. Fed Ex's stated preference for its managers to be college graduates or students enrolled in college courses was certainly legitimate, and McGrotha did not have, and was not working toward, a college degree when she applied for a promotion. In short, McGrotha has not pointed to any evidence from which a reasonable factfinder could deduce that Fed Ex's reason for not promoting her was false, or that sexual discrimination was the real reason she was not promoted. Accordingly, Defendants' Motion for Summary Judgment with respect to McGrotha's failure-to-promote claim is hereby **GRANTED.**

### B. Hostile Work Environment Claim

McGrotha also claims that Hayes and other male employees of Fed Ex subjected her to a hostile work environment. Fed Ex contends McGrotha's hostile work environment claim fails because "the actions she alleges are not objectively hostile under controlling law." (Defs.' Br. 6.) The Court agrees.

To prevail on a hostile work environment claim under Title VII, a plaintiff must prove that "the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is [*17] sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)* (internal citations omitted). To sur-

Case 2:07-cv-00314-WHA-TFM    Document 21-11    Filed 03/14/2008    Page 5 of 9

Page 5

2007 U.S. Dist. LEXIS 34047, *; 89 Empl. Prac. Dec. (CCH) P42,865

vive summary judgment, a plaintiff bringing this type of claim must show: (1) that she belongs to a protected group; (2) that she has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee; (4) that the harassment was sufficiently severe or pervasive so as to alter the terms or conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such an environment under a theory of vicarious or direct liability. *Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002).* Defendants do not dispute that McGrotha belongs to a protected group, or that she was subject to unwelcome commentary by her fellow employees. Rather, Defendants assert that McGrotha has not established the third and fourth elements of her prima facie case.

In support of her hostile work environment claim, McGrotha [*18] points to seven discrete incidents of sexual harassment. These incidents were outlined in the facts above, but will be recounted again here. First, McGrotha claims that, in October 2000, she approached Hayes while he was engaged in a heated conversation with a driver, and he turned to her and said: "What the f*** do you want?" (Pl.'s Br. 12.) Second, McGrotha claims that, in 2000 or 2001, a contractor told her a "sex-related joke." (*Id.*) Third, McGrotha alleges that, in December 2003, services manager Robert Fountain told her to "sit down at the d*** desk and do the d*** secretary's job" while "scratching his privates." (*Id.*) Fourth, in early 2004, "a contractor named Marcus Birt allegedly called McGrotha a "g**d*** b****." (*Id.*) The fifth incident allegedly occurred in June 2004, when Hayes told McGrotha to "get off her motherf***ing a** and cancel the motherf***ing contract." (*Id.*) Roughly two months after the June 2004 incident, McGrotha allegedly suffered a sixth incident of sexual harassment when Skip Lowery, a contractor, told McGrotha that Hayes was "a p***y . . . who didn't know who he [was] f***ing with," and that he would "stuff" [*19] and "cuff" Hayes, then "beat that p***y motherf***er's a**." (*Id.*) The final incident of "harassment" McGrotha complains of occurred on January 26, 2005, when a manager named Terrence Long told McGrotha to "get off her a** and take care of that herself." (*Id.*) The Court will first consider whether the harassment alleged by McGrotha was sufficiently severe or pervasive so as to alter the terms or conditions of her employment and create a discriminatorily abusive working environment.

In the words of the Supreme Court, Title VII is not "a general civility code." *Oncale v. Sundowner Offshore Svcs., Inc., 523 U.S. 75, 81, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998).* To be actionable under Title VII, "a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim did perceive to be so." *Faragher v. City of Boca Raton, 524 U.S. 775, 787, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998).* Courts resolve the question of whether an environment is sufficiently hostile or abusive by "looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is [*20] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 787-88 (citations and quotations omitted). "The ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" do not constitute actionable harassment. *Id.* at 788.

The Court does not doubt that McGrotha subjectively perceived the incidents outlined above to be severe and pervasive. The objective evidence in the record, however, does not support her subjective perception. The conduct McGrotha described does not rise to the level of actionable sexual harassment because the incidents that purportedly implicated her sex were, at best, mildly insulting and sporadic, rather than severe and pervasive. McGrotha's complaints of sexual harassment boil down to seven relatively minor incidents that occurred over a three or four year period. These incidents simply do not establish the existence of an environment that was so objectively intolerable that a reasonable person would have been forced to leave. *See Faragher, 524 U.S. at 788* [*21] ("simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment") (internal citations and quotations omitted). Accordingly, Defendants' summary-judgment motion with respect to McGrotha's hostile work environment claim is hereby **GRANTED**. [2]

> 2  Even if the Court characterized the incidents McGrotha described as severe and pervasive, she still would not prevail on her hostile work environment claim because many--if not most--of the statements and conduct McGrotha cited cannot be considered gender-related or sexual in nature. *Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 583 (11th Cir. 2000)* (for purposes of a hostile work environment claim, "statements and conduct must be of a sexual or gender-related nature--'sexual advances, requests for favors, [or] conduct of a sexual nature') (quoting *Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999)).

[*22] **C. Discriminatory Discharge Claim**

Next, McGrotha alleges that Fed Ex terminated her employment because of her sex. Specifically, McGrotha

Case 2:07-cv-00314-WHA-TFM    Document 21-11    Filed 03/14/2008    Page 6 of 9

Page 6

2007 U.S. Dist. LEXIS 34047, *; 89 Empl. Prac. Dec. (CCH) P42,865

claims fellow male employees committed offenses similar to the offense for which she was accused, but were not terminated. Fed Ex contends McGrotha's discriminatory-discharge claim fails because "the actions for which [McGrotha] was terminated were both different and more egregious than the actions of the individuals to which Plaintiff claims she is similarly situated." (Defs.' Br. 13.) Because discriminatory-discharge cases based on circumstantial evidence of gender discrimination are governed by the *McDonnell Douglas* burden-shifting framework, the Court will first address whether McGrotha has established her prima facie case.

## 1. Prima Facie Case

To establish a prima facie case of discriminatory discharge, a plaintiff must show: (1) she is a member of a protected class, (2) she was subjected to an adverse employment action, (3) her employer treated similarly situated employees outside her classification more favorably, and (4) she was qualified to do the job. *Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997).* [*23] McGrotha submits that she has met her prima facie burden. Fed Ex contends, however, that McGrotha's discriminatory-discharge claim fails because she cannot point to a similarly-situated male employee who was treated more favorably than she was treated.

To prove the third element of her prima facie case, McGrotha must show that Fed Ex treated similarly situated employees outside of her classification more favorably than herself. To do so, McGrotha must first show that she and her comparator-employees "are similarly situated in all relevant respects." *Id. at 1562.* "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Id.* "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." *Id.*

Fed Ex asserts that it terminated McGrotha's employment for "integrity issues; specifically, she was terminated after she refused to cooperate with a Company loss [*24] prevention investigation regarding money that was missing from a safe." (Defs.' Br. 13.) Fed Ex further contends that, because none of the employees McGrotha identified as being similarly situated refused to cooperate with an internal investigation, she has no comparators and no prima facie case. McGrotha views the reason for her termination a little differently; she claims she was fired on suspicion of stealing money from a company safe. The Court will assume, for purposes of this analysis, that Fed Ex's decision to fire McGrotha was at least partially based on its belief that McGrotha had "integrity

issues," i.e., that she stole money from a company safe. Accordingly, the Court will address McGrotha's contention that her fellow employees Robert Fountain, Defendant Hayes, and Michael Tran were accused of similar conduct, but were not terminated. The Court will analyze the similarities (or absence thereof) between McGrotha's and each employee's conduct separately, below.

### a. Robert Fountain

The first comparator McGrotha points to is Robert Fountain ("Fountain"). McGrotha claims Fountain "drove a truck for a contractor and allowed the contractor to keep the money instead of returning [*25] any [sic] to the company." (Pl.'s Br. 16.) For this conduct McGrotha claims Fountain "was disciplined, but not terminated." (*Id.*) Fed Ex does not contest McGrotha's foregoing allegations. (Defs.' Br. 14.) Rather, Fed Ex maintains that the conduct of Fountain and McGrotha was not sufficiently similar to warrant comparison under Title VII.

Fountain is not a proper comparator because McGrotha and Fountain were not involved in, or accused of, the same or similar conduct. While Fountain was accused of conduct arguably involving some level of dishonesty, that is the only similarity the Court can see between his conduct and McGrotha's alleged conduct. Fountain was not suspected of stealing money directly from the company; he was accused of, at best, allowing the company to pay a contractor for services that the contractor did not render. Given the differences between these employees' conduct, Fountain and McGrotha were not similarly situated in all relevant respects, and McGrotha cannot base her prima facie case on the claim that Fed Ex treated Fountain less severely than it treated her. *See Holifield, 115 F.3d at 1562.*

### b. Defendant Hayes

McGrotha [*26] also points to Defendant Hayes as a possible comparator. According to McGrotha, Hayes "allowed contractors to rent vehicles while he paid for them with a company credit card." (Pl.'s Br. 16.) McGrotha further alleges Hayes was "only disciplined, but not terminated" for this conduct. (*Id.*) Fed Ex does not challenge McGrotha's foregoing assertions. Fed Ex submits, however, that Hayes's and McGrotha's conduct was not sufficiently similar to warrant comparison under Title VII.

Despite McGrotha's claims to the contrary, Hayes is not an appropriate comparator. Hayes allegedly paid for contractors to rent vehicles with a company credit card. McGrotha's alleged conduct falls within a different category altogether, as she was accused of stealing money from a company safe. Accordingly, the Court finds that McGrotha and Hayes were not similarly situated, and McGrotha cannot base her prima facie case on the claim

that Fed Ex treated Hayes less severely than it treated her.

#### c. Michael Tran

In a final attempt to identify a proper comparator, McGrotha claims fellow employee Michael Tran was also accused of stealing money from Fed Ex; however, Tran "was only required to repay the [*27] money and he was not terminated." (Pl.'s Br. 16.) In response to this allegation, Fed Ex maintains that McGrotha was terminated not for her alleged theft *per se,* but "for her suspicious avoidance of a Company loss prevention interview related to her unauthorized access to a Company safe." (Defs.' Br. 14.)

Of the three potential comparators McGrotha identified, Tran is the employee whose conduct most closely mirrors McGrotha's conduct. Both McGrotha and Tran were accused of stealing money directly from Fed Ex. Fed Ex argues, however, that Tran and McGrotha are not similarly situated because Tran, unlike McGrotha, "cooperated with the Company's loss prevention officer, enduring 90 minutes of questioning without demanding legal representation before it was determined that he was not guilty of any wrongdoing." (Defs.' Br. 14.) McGrotha avers, on the other hand, that she "did not refuse to participate" in the internal investigation--she "merely asked that her attorney be present" during the interview. (Pl.'s Br. 17.) Drawing all reasonable inferences in McGrotha's favor, the Court cannot say at this juncture that McGrotha's request for a lawyer was tantamount to a refusal to cooperate [*28] with the internal investigation. Thus, because McGrotha and Tran were otherwise similarly situated in terms of their conduct, the Court finds that McGrotha has established a prima facie case of discriminatory discharge, and will proceed with the *McDonnell Douglas* analysis.

#### 2. Legitimate, Non-Discriminatory Reason

McGrotha's proof of a prima facie case of gender discrimination creates a presumption that Fed Ex discriminated against her. *See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993).* Fed Ex rebuts this presumption by asserting one nondiscriminatory reason for McGrotha's termination: McGrotha's "refusal" to cooperate with the company's internal investigation. Because this reason, if believed, is one that might have motivated a reasonable employer to discharge an employee, Fed Ex has met its burden of production, and the Court proceeds to the final prong of the *McDonnell Douglas* analysis.

#### 3. Pretext

Because Fed Ex met its burden, "'the presumption raised by the prima facie case is rebutted . . . and drops

from the case.'" *Id. at 507* (quoting *Texas Dep't. of Cmty Affairs v. Burdine, 450 U.S. 248, 254, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)).* [*29] At this point, McGrotha must produce evidence sufficient to enable a factfinder to conclude that Fed Ex's stated reason was not its "'true reaso[n],'" but was "'a pretext for discrimination.'" *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)* (quoting *Burdine, 450 U.S. at 253).* A reason is not pretextual "'unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.'" *Brooks v. County Comm'n, 446 F.3d 1160, 1163 (11th Cir. 2006)* (quoting *St. Mary's, 509 U.S. at 515).* McGrotha may demonstrate pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Jackson v. Ala. State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005)* (quotations and citations omitted).

Here, McGrotha offers sufficient circumstantial evidence from which a reasonable factfinder could conclude that Fed Ex's proffered reason for her termination was false. While Fed Ex claims McGrotha's request [*30] for her attorney's presence during her interview amounted to a refusal to cooperate with the company's investigation, a reasonable jury could find this proffered reason for McGrotha's termination was false, i.e., that McGrotha's request for an attorney did not manifest an unwillingness on her part to participate in the investigation. The record evidence also supports a finding that McGrotha was terminated because of her sex. Though Fed Ex supposedly based its decision to fire McGrotha on her "refusal" to cooperate fully with the investigation, McGrotha's production of evidence that Tran, a similarly situated male employee, was not terminated after being accused of stealing casts doubt upon the reason Fed Ex gave for McGrotha's termination.

In light of the foregoing evidence and drawing all inferences in McGrotha's favor, a reasonable jury could conclude that McGrotha did not refuse to participate in Fed Ex's internal investigation and that Fed Ex's proffer of this reason for her termination is pretextual. Accordingly, Defendants' summary-judgment motion with respect to McGrotha's discriminatory-discharge claim is hereby **DENIED.**

#### D. Retaliatory Discharge

McGrotha also [*31] alleges Fed Ex terminated her employment in retaliation for the January 26, 2005 complaint she filed with Hayes concerning the alleged promotion discrimination and sexual harassment she suffered while at Fed Ex. Fed Ex contends this claim fails as a matter of law because McGrotha cannot establish a

Case 2:07-cv-00314-WHA-TFM    Document 21-11    Filed 03/14/2008    Page 8 of 9

Page 8

2007 U.S. Dist. LEXIS 34047, *; 89 Empl. Prac. Dec. (CCH) P42,865

prima facie case of retaliatory discharge. The Court agrees.

Retaliatory-discharge cases based on circumstantial evidence are governed by the *McDonnell Douglas* burden-shifting framework. To establish a prima facie case of retaliatory discharge, a plaintiff must show: (1) she engaged in statutorily protected expression, (2) she suffered an adverse employment action, and (3) the adverse action was causally related to the protected expression. *Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1454 (11th Cir. 1998).* Fed Ex concedes that McGrotha engaged in statutorily protected activity and that her termination constituted an adverse employment action, but contends that her claim nonetheless fails because she "cannot prove that her complaints motivated the Company's decision to investigate her connection to [the] missing money or that there was a causal link [*32] between her complaint and the decision to terminate her." (Defs.' Br. 15.) The Court will first address whether McGrotha has established a causal link between her protected activity and her termination.

"[T]o establish the requisite 'causal link' required as part of a prima facie case, a plaintiff need only establish that 'the protected activity and the adverse action were not wholly unrelated.'" *Goldsmith v. City of Atmore, 996 F.2d 1155, 1163 (11th Cir. 1993)* (quoting *EEOC v. Reichhold Chems., Inc., 988 F.2d 1564, 1570-71 (11th Cir. 1993)).* At the same time, however, a plaintiff must, at minimum, "establish that the employer was actually aware of the protected expression at the time it took the adverse employment action." *Id.* (citations omitted). To prove a causal connection between an employee's protected activity and the adverse employment action, then, the employee must show that: (a) "the decision-makers were aware of the protected conduct"; and (b) "the protected activity and the adverse employment action were not wholly unrelated." *Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 590 (11th Cir. 2000).* [*33]

The record establishes the following facts relevant to McGrotha's retaliation claim. On January 17, 2005--nine days before McGrotha lodged her complaint with Hayes--Hayes reported that money was missing from the safe in his office. Three days later, Fuqua installed a security camera near the office safe. Between January 25 and January 28, 2005, the camera allegedly recorded McGrotha accessing the safe "without authorization" three times, though McGrotha insists she accessed the safe only at Hayes's direction. (Pl.'s Br. 4; Defs.' Br. 16.) McGrotha filed her complaint with Hayes on January 26, 2005. Hayes did not inform anyone of McGrotha's complaint. Fuqua called McGrotha in for an interview on February 1, 2005. When McGrotha asked that her attorney be present during the interview, Fed Ex apparently construed this request as a refusal to cooperate with the investigation. Later that day, Regional Manager Terry Carter instructed Hayes to terminate McGrotha's employment "for the integrity issues that arose from her failure to cooperate with the investigation." (Defs.' Br. 17.)

McGrotha does not dispute that Carter was the sole decision-maker with respect to her termination, nor does [*34] she contend that Hayes had anything to do with her termination beyond informing her of Carter's decision. However, McGrotha contests the veracity of Carter's assertion that he did not know of McGrotha's January 26 complaint to Hayes when he instructed Hayes to terminate her employment, as well as Hayes's contention that he did not inform anyone about McGrotha's complaint. In support of this allegation, McGrotha offers nothing more than her opinion that, "since Terry Carter is over Hayes, it is likely that Hayes informed him of all job-related matters such as employee complaints." (Pl.'s Br. 19.)

While the close temporal proximity between McGrotha's protected activity and her termination might suggest that the two events were not wholly unrelated, McGrotha's inability to demonstrate that Carter--the sole decision-maker--knew of her complaint to Hayes when Carter terminated her employment is fatal to her prima facie case. Because the current record demonstrates that Carter was unaware of McGrotha's discrimination complaint when she was terminated, McGrotha cannot establish a causal connection between the protected activity (complaint) and the adverse employment action (termination). [*35] Absent a demonstrated causal link between these two events, McGrotha is unable to establish a prima facie case of retaliatory discharge. Accordingly, Defendants' summary-judgment motion with respect to McGrotha's retaliation claim is hereby **GRANTED**.

## E. Defamation

In addition to her numerous federal claims, McGrotha also asserts a state-law claim for defamation against Hayes over which this Court will exercise supplemental jurisdiction. *See 28 U.S.C.A. § 1367(a).* McGrotha seeks to hold Hayes liable for defamation because Hayes allegedly told Glen Patterson, who told McGrotha's friend and former fellow employee Jennifer Boggs, that McGrotha "had been arrested for stealing money and that she spent six weeks in jail" as a result. (Pl.'s Br. 20.) Fed Ex argues that McGrotha's defamation claim fails because the only "evidence" McGrotha offers to support her claim is "inadmissible double hearsay." (Defs.' Br. 19.)

To establish a claim for defamation in Georgia, a plaintiff must prove the existence of: (1) a false and defamatory statement concerning the plaintiff; (2) an un-

Case 2:07-cv-00314-WHA-TFM    Document 21-11    Filed 03/14/2008    Page 9 of 9

Page 9

2007 U.S. Dist. LEXIS 34047, *; 89 Empl. Prac. Dec. (CCH) P42,865

privileged communication to a third party; (3) fault by the defendant amounting [*36] at least to negligence; and (4) special harm or the actionability of the statement irrespective of special harm." *Bollea v. World Championship Wrestling, Inc., 271 Ga. App. 555, 610 S.E.2d 92, 96 (Ga. Ct. App. 2005)* (internal citations and quotations omitted). The Court need not address whether McGrotha has established the elements of her defamation claim because the Court's search for evidence in the record supporting McGrotha's defamation claim revealed nothing more than the inadmissible hearsay testimony of McGrotha herself. This singular piece of "evidence" consists of McGrotha's allegation that she "was told by one of her friends that Hayes had said that she had been arrested for stealing money and that she spent six weeks in jail for this." (Pl.'s Br. 20.) Yet, there is no record evidence that Hayes ever made this comment. The only evidence of this comment is the multi-layered hearsay testimony from McGrotha that another employee, Patterson, told McGrotha's friend (Boggs) what Hayes said about McGrotha, and Boggs relayed this information to McGrotha. Incidentally, Patterson avers in an affidavit that Hayes never told him that McGrotha was caught stealing, or that she was [*37] arrested, or that she spent

time in jail as a result. (Patterson Aff., Defs.' Mot. Summ. J., doc. 22, at P 3.) In sum, the "evidence" McGrotha offers to prove that Hayes made the alleged comment is inadmissible multi-layered hearsay that does not fall within any exception recognized by the Federal Rules of Evidence; thus, the Court cannot consider this information as probative evidence on summary judgment. *See Club Car, Inc. v. Club Car (Quebec) Import, Inc., 362 F.3d 775, 783 (11th Cir. 2004)* ("Inadmissible hearsay generally cannot be considered on a motion for summary judgment."). Accordingly, Defendants' summary-judgment motion with respect to McGrotha's state-law defamation claim is hereby **GRANTED.**

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (doc. 22) is hereby **GRANTED IN PART** and **DENIED IN PART.**

SO ORDERED, this 9th day of May, 2007.

S/ C. ASHLEY ROYAL, JUDGE

UNITED STATES DISTRICT COURT

LEXSEE 2005 U.S. APP. LEXIS 12079

**RODERICK V. MOORE, Plaintiff-Appellant v. ALABAMA DEPARTMENT OF CORRECTIONS, MICHAEL HALEY, individually, DONAL CAMPBELL, in his official capacity as Commissoner of the Department of Corrections, GREG LOVE-LACE, individually and in his capacity as Associate Commissioner of Institutions, MICHAEL A. AUSTIN, EDDIE NAGLE, individually and in his capacity as Warden of Bibb County Correctional Facility, PAUL SIDES, JOHN COPELAND, et al., Defendants-Appellees**

**No. 04-12956 Non-Argument Calendar**

**UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT**

*137 Fed. Appx. 235; 2005 U.S. App. LEXIS 12079*

**June 21, 2005, Decided**
**June 21, 2005, Filed**

**NOTICE:**   [**1] NOT FOR PUBLICATION

**PRIOR HISTORY:**   Appeal from the United States District Court for the Middle District of Alabama. D. C. Docket No. 02-00701-CV-D-N.

**COUNSEL:** For Roderick V. Moore, Appellant: David G. Flack, Attorney at Law, MONTGOMERY, AL

For Alabama Department of Corrections, Union Springs, AL, Appellee: William F. Addison, Alabama Department of Corrections, MONTGOMERY, AL

For Appellee: Michael Haley, Montgomery, AL

For Appellee: Greg Lovelace

For Appellee: Michael A. Austin (157875), LOXLEY, AL, PRO SE

For Appellee: Eddie Nagle

For Appellee: Cheryl Price, BRENT, AL, PRO SE

For Appellee: Donal Campbell, Montgomery, AL

For Appellee: Paul Sides

For John Copeland, Appellee: Robert Austin Huffaker, Jr., Rushton, Stakely, Johnston & Garrett, P.A., Montgomery, AL

**JUDGES:** Before BIRCH, BARKETT and KRAVITCH, Circuit Judges.

**OPINION**

[*236] PER CURIAM:

Plaintiff-Appellant Roderick Moore appeals the district court's grant of summary judgment for Defendants-Appellants. Moore's action alleges employment discrimination under Title VII of the Civil Rights Act of 1964 and under *42 U.S.C. §§ 1981* and *1983*. We affirm the district court's decision to grant [**2] summary judgment because Moore failed to make out a *prima facie* case of employment discrimination under the rule established in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-804, 807, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973).*

*I. Facts*

Moore, a black male, was employed as a corrections officer at the Bibb County Correctional Facility in Brent, Alabama. Before the events of the present case, Moore had the rank of Corrections Officer Supervisor I, or Lieutenant.

In January 2001, Moore's superiors in the Alabama Department of Corrections ("DOC") accused him of violating a number of the department's regulations. The violations occurred during the discipline of an inmate. When one of Moore's subordinate officers used allegedly excessive force against the inmate, Moore failed to intervene. Paul Sides and John Copeland, Director and Assistant Director of the DOC's Intelligence and Investigation

Division ("I & I") respectively, conducted an investigation of the incident. Based on the investigation, Cheryl Price, the deputy warden of the prison and a black female, recommended that Moore be demoted. The evidence shows that within DOC, supervisors have discretion in executing discipline based on [**3] the type of violation, and that Moore's alleged violations rendered him eligible for any punishment from a letter of reprimand to dismissal.

Moore alleged that he had been the victim of a conspiracy among his superiors in DOC to remove black supervisors from their positions. Moore also claimed that the other officers involved in the incident had been threatened and bribed into changing their stories and falsifying documents as part of the conspiracy.

At a DOC hearing presided over by Roy Hightower, a black male, Moore was found guilty of violating five regulations. Based on the hearing, the DOC Commissioner, Michael Haley, and the Associate Commissioner for Institutions, Greg Lovelace, agreed to demote Moore.

[*237] Moore then submitted his case to the State Personnel Director, Tommy Flowers. Flowers remanded the case to Hightower to address certain due process concerns. Once Hightower complied, Flowers reviewed the record, found no evidence of any racial discrimination, and upheld the demotion. Two other officers involved in the incident were also demoted.

Moore then filed the present action in district court in the Middle District of Alabama against the DOC and a number of its senior [**4] officials. [1] The complaint alleged violation of Title VII of the Civil Rights Act of 1964 as well as violation of plaintiff's rights under *42 U.S.C. §§ 1981 and 1983*. [2] After a period of discovery, the DOC and its employees moved for summary judgment, claiming that Moore had failed to satisfy the *prima facie* case for discrimination, and that even if he had, there was a legitimate non-discriminatory reason for his demotion.

   1   The complaint also named as defendants a number of I & I officials and several others who are not supervisory agents within the DOC. Relief under Title VII is only available against employers and supervisory employees in their capacity as agents of the employer. *See Hinson v. Clinch County Bd. of Educ., 231 F.3d 821, 827 (11th Cir. 2000).* As such, none of these other defendants is a proper party before this court. Nor are the DOC officials liable in their individual capacities.

   2   Moore's original complaint contained six counts which listed a smattering of constitutional

and statutory violations. Incidentally, we concur with the district court that these claims are a paradigm example of the evils of "shotgun pleading," and commend the district court for its diligence in untangling these claims. On appeal, however, the appellant's arguments are relevant only to the Title VII employment discrimination claim and the *§ 1981* claim. All of the appellant's other claims are therefore deemed abandoned. *See Rowe v. Schreiber, 139 F.3d 1381, 1382 n.1 (11th Cir. 1998).*

[**5] The district court granted summary judgment in favor of all the defendants on the basis that Moore failed to make out a *prima facie* case of discrimination. Moore failed to do so, said the court, because he could not show that a similarly situated employee was treated more favorably. Moore moved to alter or amend judgment on the basis that the court inappropriately compared Moore with the other employees although the defendants had not raised the issue. The court denied Moore's motion, and he timely filed the instant appeal.

*II. Analysis*

We review a district court's grant of summary judgment *de novo,* viewing the evidence in the light most favorable to the party opposing the motion. *Wilson v. B/E Aerospace, 376 F.3d 1079, 1085 (11th Cir. 2004).* Summary judgment is appropriate where the record shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c); Eberhardt v. Waters, 901 F.2d 1578, 1580 (11th Cir. 1990).*

Moore's arguments on appeal pertain to his employment discrimination claims under Title VII of the Civil [**6] Rights Act of 1964 and under *42 U.S.C. §§ 1981* and *1983*. The analysis of Moore's claims under all these statutes is identical. *See Butts v. County of Volusia, 222 F.3d 891, 893-94 (11th Cir. 2000)* (holding that in a case involving state actors, there is no liability under *§ 1981*, and such claims merge into the *§ 1983* claims); *Standard v. A.B.E.L. Servs., 161 F.3d 1318, 1330 (11th Cir. 1998)* (holding that Title VII and *§ 1981* claims are analyzed in the same manner); *Abel v. Dubberly, 210 F.3d 1334, 1338 (11th Cir. 2000)* (holding that Title VII and *§ 1983* claims have the same [*238] elements where the claims are based on the same set of facts).

Title VII prohibits employment discrimination on the basis of race. *42 U.S.C. § 2000e; McDonnell Douglas, 411 U.S. at 800.* To establish a *prima facie* case of employment discrimination based on his demotion, Moore must show that (1) he belongs to a protected class, (2) he was qualified for the job, and (3) the misconduct for which the employer demoted him was the

137 Fed. Appx. 235, *; 2005 U.S. App. LEXIS 12079, **

same or similar to what a similarly situated employee engaged [**7] in, but that the employer did not discipline the other employee similarly. *Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997)*. In cases involving alleged racial discrimination in the application of work rules to discipline an employee, the plaintiff must show either (a) that he did not violate the work rule, or (b) that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct. *Jones v. Gerwens, 874 F.2d 1534, 1540 (11th Cir. 1998)*. The defendants do not dispute that Moore belongs to a protected class, or that he was qualified for his job. Likewise, Moore does not provide any evidence that he did not violate the work rule.

The gravamen of the parties' dispute is whether a similarly situated white employee was disciplined less severely than Moore. [3] The district court held that Moore failed to produce evidence of a similarly situated employee, and we agree. We have held that "the most important factors in the disciplinary context . . . are the nature of the offenses committed [**8] and the nature of the punishment imposed." *Silvera v. Orange County Sch. Bd., 244 F.3d 1253, 1259 (11th Cir. 2001)*. "The comparator's misconduct must be nearly identical to the plaintiff's in order to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Id.* (internal quotation marks and citation omitted).

> 3    Moore also contends that the district court erred in making a *sua sponte* determination concerning the comparators. The district court considered evidence properly before it, and Moore offers no legal authority to support his contention. We therefore reject this argument.

Moore offered evidence regarding three possible white comparators. One, Capt. Richard Carter, allegedly altered incident reports (or instructed other to do so) in the investigation during the present case. Carter was never disciplined based on any such charges. Moore, however, was never punished for alteration of documents, but rather for other violations. As Moore [**9] cannot prove any misconduct on Carter's part which is "nearly identical" to his own, this comparison fails.

Moore also suggests two possible comparators in another incident at the Saint Clair Correctional Facility. The first, Lt. Joseph Headley, was not punished for his involvement in an incident wherein a subordinate used excessive force on an inmate in Headley's presence.

Unlike the present case, however, Headley took affirmative steps to separate the subordinate from the inmate. Another officer corroborated Headley's version of events. Because Headley's conduct was not similar to Moore's, the two were not similarly situated and this comparison also fails.

The other possible comparator in the Saint Clair incident was the subordinate who used excessive force by putting his hands to the inmate's throat, Sgt. Kenneth Pierce. Pierce was disciplined, but not demoted. The district court held that Sgt. Pierce's and Lt. Moore's different ranks and different supervisors served to distinguish the two. Our prior cases compel the [*239] conclusion that these factors are not alone dispositive of the issue. *See Anderson v. WBMG-42, 253 F.3d 561, 565-66 (11th Cir. 2001)* (different supervisors [**10] not dispositive); *Lathem v. Dep't of Children and Youth Servs., 172 F.3d 786, 793 (11th Cir. 1999)* (different job titles not dispositive).

Nonetheless, the district court was correct in its decision. Title VII does not prevent an employer from interpreting its rules as it chooses and making determinations as it sees fit under such rules. *Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1187 (11th Cir. 1984)*. While Moore was eventually found guilty of five separate regulatory violations, Pierce was disciplined for only a single violation. Under the DOC's regulations, both officers were disciplined within the permitted range of punishments for their violations. We have previously held that a difference in the charged offenses can preclude a comparison for Title VII purposes. *See Maniccia v. Brown, 171 F.3d 1364, 1368-69 (11th Cir. 1999)*. [4] We also bear in mind that one of the "most important factors in the disciplinary context [is] the nature of the offense[] committed." *Silvera, 244 F.3d at 1259*. Furthermore, although the fact that Pierce and Moore had different supervisors and different ranks is not dispositive [**11] by itself, it does serve to further distinguish their situations. Taking all the facts together, the district court was thus correct in concluding that Moore has failed to establish that Pierce was similarly situated.

> 4    We also note that in the case at bar, both Price (the warden who recommended the demotion) and Hightower (the hearing officer) are black. Where decision-makers are also members of a protected class, the plaintiff faces a greater burden. *Elrod v. Sears Roebuck & Co., 939 F.2d 1466, 1467 (11th Cir. 1991)*.

For the foregoing reasons, the judgment of the district court is AFFIRMED.

LEXSEE 2007 U.S. APP. LEXIS 2876

**MARIO WASHINGTON, Plaintiff-Appellant, versus THE KROGER COMPANY, Defendant-Appellee.**

No. 05-16328 Non-Argument Calendar

UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

*218 Fed. Appx. 822; 2007 U.S. App. LEXIS 2876; 100 Fair Empl. Prac. Cas. (BNA) 98*

February 8, 2007, Decided

**NOTICE:** [**1] NOT FOR PUBLICATION

**PRIOR HISTORY:** D. C. Docket No. 03-00503-CV-VEH-NE. Appeal from the United States District Court for the Northern District of Alabama.

**DISPOSITION:** AFFIRMED.

**COUNSEL:** For Mario Washington, Appellant: Heather Newsom Leonard, Heather Leonard, P.C., BIRMINGHAM, AL.

For The Kroger Company, Appellee: Dionysia L. Johnson-Massie, Littler Mendelson, ATLANTA, GA; Charlotte Kaye McClusky, Littler Mendelson, Atlanta, GA.

**JUDGES:** Before TJOFLAT, ANDERSON and BIRCH, Circuit Judges.

**OPINION**

[*823] PER CURIAM:

This is a civil rights action, brought under Title VII of the Civil Rights Act of 1964 (Title VII), *42 U.S.C. §§ 2000e-2, 2000e-3,* and *42 U.S.C. § 1981,* by a former employee of The Kroger Company, Mario Washington, an African American. Washington worked at Kroger Store 508 in Huntsville, Alabama, from May 3, 2000 to August 21, 2002. In his complaint against Kroger, Washington presents claims of racial discrimination, retaliation, and constructive discharge based on the conduct of a co-worker, Randy Dean, in Store 508's meat department between July and September 2001. He alleges that Dean harassed him by (1) threatening to duct [**2] tape his wife and have sex with her while Dean made him watch; (2) calling him "motherfucker;" (3) verbally abusing and belittling him by calling him names such as "boy" and telling him he was "nothing;" (4) telling him

he would chop him up in the meat grinder; (5) holding a knife in the air, pointing it at him; and (6) removing his, Washington's, jacket from the coat rack and threatening to take it. He alleges that on September 1, 2001, Dean hung a plastic figurine, meant to represent him, with a rope. He alleges that despite his complaints about Dean's conduct, Kroger took no action; instead, it demoted him to a lower paying position, moving him from the meat department to the front of the store to bag groceries and collect carts. Kroger also cut his work hours.

Kroger asserts that it had no knowledge of any harassing conduct by Dean prior to the September 1, 2001 incident because Washington never reported any of the prior incidents to management. Washington alleges that he discussed them with his supervisor in the meat department, Gary Hood, who is not considered by Kroger to be part of the management team. On September 1, 2001, upon seeing the figurine, Washington complained to [**3] the assistant manager at the store, Rick Shotts, who immediately removed it. Shotts stated in his deposition testimony that he had a meeting the same day with Dean, Washington, and a union steward during which he told Dean that his actions were "unacceptable." Washington reported no further harassment by Dean after that meeting and twenty days later Dean left Kroger for a medical leave and never returned.

Following discovery, Kroger moved the district court for summary judgment on all of Washington's claims. The court granted its motion. Washington now appeals, contending that the presence of material [*824] issues precluded the court from granting summary judgment. He submits that a jury could reasonably find that discriminatory intimidation, ridicule, and insult pervaded his work environment at Kroger. He points in particular to the hanging of the figurine -- that it communicated racial animus and fear -- and the use of the term "boy," as indicative of racial animus. He says that Kroger offered no evidence to show that such conduct did not oc-

218 Fed. Appx. 822, *; 2007 U.S. App. LEXIS 2876, **;
100 Fair Empl. Prac. Cas. (BNA) 98

cur. To the contrary, Kroger had actual knowledge of the harassment as a result of his reports to Gary Hood, supervisor of the meat department, and [**4] although Kroger asserted that Hood was not the proper person to receive such complaints because he was not a member of management, the company's policy directed employees to report harassment to their immediate supervisor. He submits that a jury could find that Hood was his supervisor, and thus that Kroger had notice of his complaints prior to the September 1, 2001, incident.

We review "a grant of summary judgment de novo, using the same legal standard as the district court." *Merritt v. Dillard Paper Co., 120 F.3d 1181, 1184 (11th Cir. 1997).* Summary judgment is proper if the pleadings, depositions, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986)* (quoting *Fed.R.Civ.P. 56(c)*). The evidence, and all inferences drawn from the facts, must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).* [**5] To defeat a motion for summary judgment, however, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id. at 586, 106 S. Ct. at 1356.* The non-moving party must make a sufficient showing on each essential element of the case for which he has the burden of proof. *Celotex, 477 U.S. at 322, 106 S. Ct. at 2552.*

Title VII provides that it is an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *42 U.S.C. § 2000e-2(a).* Section 1981 prohibits intentional racial discrimination in the making and enforcement of private contracts, including employment contracts. *42 U.S.C. § 1981.* Both Title VII and *§ 1981* have the same requirements of proof and present the same analytical framework. *Standard v. A.B.E.L. Services, 161 F.3d 1318, 1330 (11th Cir. 1998).* As a result, we apply [**6] cases from both bodies of law interchangeably.

"A hostile environment claim under Title VII is established upon proof that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002)* (internal quotations omitted). To establish a hostile work environment

claim, a plaintiff must show: (1) he belongs to a protected group; (2) he has been subject to unwelcome harassment; (3) the harassment has been based on a protected characteristic, such as (in the instant case) race; (4) the harassment is sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive work environment; and (5) the employer is responsible for such environment [*825] under a theory of vicarious liability or a theory of direct liability. *Id.* The requirement that the harassment be severe or pervasive contains an objective and subjective component. *Id. at 1276.* "Thus, to be actionable, this behavior must result [**7] in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceives to be abusive." *Id.* (internal quotations omitted).

In evaluating the objective severity of the harassment, we consider, among other things, (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonable interferes with the employee's job performance. *Miller, 277 F.3d at 1276.* "Although we examine the statements and conduct complained of collectively to determine whether they were sufficiently pervasive or severe to constitute [racial] harassment, the statements and conduct must be of a [racial] nature . . . before they are considered in determining whether the severe or pervasive requirement is met." *Gupta v. Florida Board of Regents, 212 F.3d 571, 583 (11th Cir. 2000).* "Innocuous statements or conduct, or boorish ones that do not relate to the [race] of the actor or of the offended party (the plaintiff), are not counted." *Id.* Additionally, teasing, offhand comments, [**8] and isolated incidents (unless extreme) will not amount to discriminatory changes in the terms and conditions of employment. *Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc).* The word "boy" standing alone may be evidence of racial animus. *Ash v. Tyson Foods, Inc., 546 U.S. 454, 126 S. Ct. 1195, 1197, 163 L. Ed. 2d 1053 (2006).*

We are satisfied that the district court committed no error in granting Kroger summary judgment on Washington's hostile environment claim. The court appropriately considered only the September 1, 2001 incident and Dean's "boy" comments because the other conduct Washington complained of was devoid of any racial content. While the hanging of the figurine may have been severe conduct that was physically threatening, Kroger management took prompt remedial action by both removing the offending object and censuring Dean. Washington also alleges that Dean called him "boy" on multiple occasions. The parties disagree as to Kroger's knowledge of this behavior by Dean; however, Washington

218 Fed. Appx. 822, *; 2007 U.S. App. LEXIS 2876, **;
100 Fair Empl. Prac. Cas. (BNA) 98

does not allege that anyone else at Kroger used racially derogatory speech towards him. Furthermore the record reflects that [**9] Washington only worked with Dean for two to three months, in the summer of 2001, of the approximately two years that he was employed at Kroger. These comments, though demeaning, were not severe or extreme. Nor were they so pervasive that they altered Washington's conditions of employment because Dean was one employee, out of the presumably dozens that worked at the store, who made the comments over a relatively short period of time.

Next, regarding his claim for retaliation, Washington asserts that the district court erred in concluding that he suffered no adverse employment action and, moreover, failed to prove causation. He contends that temporal proximity alone is not dispositive of the issue of causation in this case because the decision makers had prior knowledge of his complaints and his disparate treatment. He asserts that Kroger's reasons for transferring him to a different department were pretextual as evidenced by the fact that a clerk hired after him remained in the meat department.

[*826] We apply the analytical framework established in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d. 668 (1973)*, and *Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)*, [**10] where, as here, a Title VII plaintiff uses circumstantial evidence to prove his case. *Durley v. APAC, Inc., 236 F.3d 651, 655 (11th Cir. 2000)*. Under the *McDonnell Douglas* framework, when circumstantial evidence is used, a plaintiff must first establish a *prima facie* case of discrimination. *McDonnell Douglas, 411 U.S. at 802, 93 S. Ct. at 1824*. The burden then shifts to the employer to state a legitimate, nondiscriminatory reason for the employment decision. *Id. at 802-803, S. Ct. at 1824-1825*. If the employer successfully does so, the burden shifts back to the plaintiff to show that the reason offered by the employer was pretextual. *Id. at 804, S. Ct. at 1825*.

Title VII makes it unlawful for an employee to discriminate against an employee in retaliation for opposing a practice made an unlawful employment practice under Title VII. *42 U.S.C. § 2000e-3(a)*. "To recover for retaliation, the plaintiff need not prove the underlying claim of discrimination which led to [his] protest, so long as [he] had a reasonable good faith belief that the discrimination existed." *Gupta, 212 F.3d at 586*. [**11] To establish a *prima facie* case of retaliation, a plaintiff must prove that (1) he participated in a protected activity; (2) he suffered an adverse employment action; and (3) there was a causal connection between the participation in the protected activity and the adverse employment decision. *Id. at 587*. While temporal proximity between the protected activity and the adverse employment action may

be sufficient to create an inference of causation, "gaps of time, standing alone, do not preclude a plaintiff from producing enough evidence for a reasonable jury to conclude that protected speech was a substantial factor in the [adverse employment decision]." *See Stanley v. City of Dalton, Ga., 219 F.3d 1280, 1291 (11th Cir. 2000)*. "We are not in the business of adjudging whether employment decisions are prudent and fair." *Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir. 2002)*. "Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." *Id.*

We find no error in the court's summary disposition of Washington's retaliation claim because Washington failed to establish causation [**12] or create a genuine issue of fact as to whether Kroger's proffered reasons for his transfer were pretextual. Although the court concluded that he suffered an adverse employment action, a causation inference could not reasonably be drawn because (1) five months passed between his complaints and his transfer, (2) Kroger did not treat him differently during that time period, and (3) he did not experience any further harassment.

Even if Washington established causation, summary judgment was still appropriate because he failed to adduce sufficient evidence that Kroger's proffered reasons for his transfer were pretextual. The record reflects that Kroger transferred him because of the combined effect of its reduction in hours made available to workers, which occurred because of a company reorganization, and his limited availability due to his school schedule. Additionally, although Kroger allowed a less-senior employee to continue working in the meat department, there was no indication that the employee had limitations on his availability similar to Washington's.

Finally, Washington asserts that Kroger's actions of taking an employee such as himself, who had won awards for customer service [**13] and hoped to pursue a management [*827] career, and putting him in a job where he had to bag groceries and collect shopping carts satisfied the criteria for a constructive discharge claim. He submits that resignation resulted from Kroger's failure to answer his complaints of racial harassment and its act of transferring him to a less prestigious position.

To show constructive discharge, Washington had to demonstrate that his working conditions were so intolerable that a reasonable person in his position would be compelled to resign. *Kilgore v. Thompson & Brock Management, Inc., 93 F.3d 752, 754 (11th Cir. 1997)*. Kroger was entitled to summary judgment on the constructive discharge claim because Washington failed to create a material issue of fact that his working conditions were so intolerable that a reasonable person would have been compelled to resign. The harassment he experi-

218 Fed. Appx. 822, *; 2007 U.S. App. LEXIS 2876, **;
100 Fair Empl. Prac. Cas. (BNA) 98

enced only occurred between July and September 2001. Kroger addressed his complaints following the September 2001 incident, and he continued to work with Dean, the sole person who allegedly harassed him, for only 20 more days. Finally, Kroger had a legitimate reason for transferring him and, in any [**14] event, his job title as store clerk remained the same.

We find no basis for disturbing the district court's judgment. It is accordingly

AFFIRMED.

LEXSEE 2007 U.S. DIST. LEXIS 96029

**SONYA RADINA BROWN, Plaintiff, v. GREAT-WEST HEALTHCARE, GREAT-WEST LIFE & ANNUITY INSURANCE CO., KRISTI HOLT, and SHARON HAZELTON, Defendants.**

**CIVIL ACTION FILE NO. 1:05-CV-2676-RWS-GGB**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA, ATLANTA DIVISION**

*2007 U.S. Dist. LEXIS 96029*

**June 8, 2007, Decided**

**PRIOR HISTORY:** *Brown v. Great-West Healthcare, 2006 U.S. Dist. LEXIS 34950 (N.D. Ga., May 30, 2006)*

**COUNSEL:** [*1] For Sonya Radina Brown, Plaintiff: James N. Sadd, LEAD ATTORNEY, Slappey & Sadd, Atlanta, GA; Lia D. Fairless, LEAD ATTORNEY, DiTrapano Law Firm, P.C., Atlanta, GA.

For Great-West Healthcare, Great-West Life & Annuity Insurance Co., Defendants: Darren T. Horvath, LEAD ATTORNEY, Fisher & Phillips, LLP-ATL, Atlanta, GA.

For Kristi Holt, Sharon Hazelton, Defendants: Christopher Garrett Moorman, LEAD ATTORNEY, Office of Christopher G. Moorman, Atlanta, GA; Darren T. Horvath, LEAD ATTORNEY, Fisher & Phillips, LLP-ATL, Atlanta, GA.

**JUDGES:** GERRILYN G. BRILL, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** GERRILYN G. BRILL

**OPINION**

*FINAL REPORT AND RECOMMENDATION*

Plaintiff Sonya Brown ("Brown") brought this action under Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e et seq.* ("Title VII"), *42 U.S.C. § 1981*, and Georgia law, against her employer, Great-West Life & Annuity Insurance Co., and its division Great-West Healthcare ("Great-West"). (Doc. 1, ex. A part 1). Brown alleges disparate treatment on the basis of race in violation of Title VII (Count One) and *§ 1981* (Count Two); negligent retention and supervision under Georgia state law (Count Three); defamation under Georgia state law (Count 4); and intentional [*2] infliction of emotional

distress under Georgia state law (Count 5). [1] (*Id.*) Great-West sells health insurance and health care products to individuals and hospitals. It employs approximately 6,000 people in 115 offices throughout the United States, including an office in Atlanta. (*Id.* at 3-4). This action is now before the court on Great-West's Motion for Summary Judgment. (Doc. 65). For the reasons discussed below, the undersigned **RECOMMENDS** that Great-West's Motion for Summary Judgment (Doc. 65) be **GRANTED**.

1 Brown states in her Response to the Motion for Summary Judgment that she "has dismissed her claims" against individual defendants Kristi Holt ("Holt") and Sharon Hazelton ("Hazelton"). (Doc. 68 at 2 n.2). No such dismissal has been filed with the court in Brown's case. Dismissals have been filed in each of the four related cases brought by other plaintiffs. *See* 1:05-cv-2673, Doc. 60; 1:05-cv-2674, Doc. 59; 1:05-cv-2675, Doc. 62; and 1:05-cv-2677, Doc. 60. The court assumes that Brown intended to dismiss the claims against the individuals in this case as well.

In any event, Brown cannot maintain claims against Hazelton and Holt for the same reasons that she cannot maintain them [*3] against Great-West.

**A. *PLAINTIFF'S SPECIFIC CLAIMS***

On November 14, 2006, the undersigned ordered Brown to file a statement of the specific adverse actions upon which she was claiming relief. In response, she identified the following adverse employment actions: (1) she was denied promotional opportunities ("failure to promote claim"); (2) she was not given a sufficient merit pay increase following her 2003 performance appraisal ("raise claim"); (3) she was paid less than other account

associates ("salary claim"); and (4) her bonus pay decreased in 2006 ("bonus claim"). (Doc. 61).

Brown did not identify a hostile work environment as one of her adverse employment actions (Doc. 61), but she does so in her Response to Great-West's Motion for Summary Judgment (Doc. 68 at 1 n.1).

### B. *FACTUAL BACKGROUND* [2]

> 2  Unless otherwise indicated by citation to the record, the facts stated herein are not disputed by the parties. (*Compare* Doc. 65-2, Def.'s Stm. of Material Facts, *with* Doc. 68-4, Pla.'s Resp. to Def.'s Stm., *and* Doc. 65-5, Pla.'s Stm. of Material Facts *with* Doc. 73-2, Def.'s Resp. to Pla.'s Stm.). Disputed facts are presented in a light most favorable to Brown.

Brown, who is African American, began [*4] work at Great-West as an account associate in the Atlanta sales department on March 17, 2003. (Brown Dep. at 17-18, 26). Account associates, including Brown, are typically assigned to a team with an account manager and client service representative ("CSR"). The teams support sales executives. (German Aff. P 2; Holt Aff. P 2; Brown Dep. at 29). When Brown first began work at Great-West, she primarily supported sales executives Stanley Warren ("Warren"), Sean Mitchell ("Mitchell"), and Robert Gunther ("Gunther"). (Brown Dep. at 29). In July 2003, following an initial 90-day probationary period, Warren gave Brown a performance appraisal. Warren's appraisal rated Brown as "good" in six categories, "superior" in three, and between "good" and "superior" overall. Brown did not disagree with Warren's appraisal of her performance. After the appraisal, Brown received a 6 percent pay increase. (Brown Dep. at 29-30, 36-39, ex. 9).

Hazelton was hired by Great-West in September 2002 and became the office manager for the sales department on May 16, 2003. (Hazelton P 1; Tennant Aff. P 3). As of February 2004, Hazelton was Brown's immediate supervisor, and Stacy Pecht ("Pecht") was the next level manager [*5] above Hazelton. (Brown Dep. ex. 12; *see* Holt Aff. P 3). In November 2004, Hazelton was reassigned to a nonsupervisory account associate position. (Holt Aff. P 3).

In February 2004 Hazelton completed a performance appraisal of Brown for the 2003 calendar year. Hazelton rated Brown as "good" in four categories, "superior" in five, and between "good" and "superior" overall. (Brown Dep. at 126, ex. 12). Brown believes she should have received ratings of "outstanding" in some categories. (Brown Dep. at 133-35).

In May 2004, Brown received a 2.5 percent merit increase, effective April 1, 2004. (Brown Dep. at 137;

Holt Aff. P 5). The total amount available for merit increases for account associates in 2004 was limited. Holt, who was the regional office manager, and Andrew German ("German"), who was the regional sales manager, made a joint decision to give a 3.5 percent increase to account associates with an overall rating of "superior" or higher and a 2.5 percent increase to account associates with an overall rating below "superior." (Holt Aff. PP 1, 5; German Aff. P 1). Hazelton was not involved with the decision of how to determine merit increases. (Hazelton Aff. P 3). Because Brown's overall [*6] rating was below "superior," based upon the appraisal performed by Hazelton, she received a 2.5 percent increase. (Holt Aff. P 5). Account associate Shemetta Daniely ("Daniely"), [3] who is African American, received a 3.5 percent pay increase in 2004. (Holt Aff. P 5).

> 3  Daniely is a plaintiff in a related case.

In addition to their salaries, account associates at Great-West receive quarterly bonuses. The quarterly bonus pool is based on new business generated during the quarter. During 2004, all of the account associates received equal bonuses. Beginning in 2005, Great-West changed the way that the bonus pool is divided. Pursuant to the change, 5 percent of the bonus pool is paid to the executive assistant. Then, each account associate and the receptionist are given a base bonus of 10 percent of the remaining amount. Next, Holt's bonus is subtracted, and the remaining bonus money is distributed among the account associates assigned to a specific team in proportion to the new business generated by their team for the quarter. (Holt Aff. P 6).

In January 2006, Holt transferred Brown from supporting Caucasian account manager Tonia Frady ("Frady") to supporting African American account manager [*7] Lisa Williams ("Williams"). (Brown Aff. P 25). Jennifer Price ("Price"), who is Caucasian, was hired by Great-West in March 2006, and she took Brown's old position supporting Frady. (Brown Aff. P 25; Holt Aff. P 8).

Brown received more in bonuses than Barbara Van Voris ("Van Voris"), who is Caucasian, in both 2005 and 2006. Brown received $ 257 more in bonuses in 2005 than Hazelton and $ 103 more in bonuses in 2006 than Hazelton. From the time that Price was hired until January 2007, Brown received $ 140 more in bonuses than Price. Daniely received more in bonuses than Van Voris during the time that Daniely was employed at Great-West in 2005. [4] (Holt Aff. P 8).

> 4  Daniely resigned in December 2005, and was therefore not eligible for a bonus for the last quarter of the year. (Holt Aff. P 8).

2007 U.S. Dist. LEXIS 96029, *

Brown believes that German, Hazelton, Holt, and Van Voris discriminated against her. (Brown Dep. at 41). She relates the following incidents in connection with her claims of discrimination. On September 24, 2004, Holt offered sales employees leather computer bags that were found during an office cleaning. She sent an e-mail regarding the bags that stated: "If you are interested, please take one." Brown [*8] took one of the bags. Shortly thereafter, Brown overheard Hazelton tell Holt that she (Brown) stole two bags. Holt then asked Brown to return the extra bag if she had more than one. Holt saw that Brown had only one bag and said "okay." Brown complained about the incident to Pecht, and Hazelton later apologized to Brown. (Brown Dep. at 99-107, ex. 11). Brown does not know whether Holt or Hazelton discussed the incident with anyone else. (Brown Dep. at 107-09).

On Brown's first day of work at Great-West, Hazelton mistook her for a Caucasian coworker. Hazelton stated: "I thought you were Christine . . . until I saw the color of your skin." (Brown Dep. at 77-78). In April 2003, Brown wore a hairpiece to work, and Hazelton asked her if the hairpiece was "African hair." (Brown Dep. at 80-82). In October 2003, Brown tripped and fell into Hazelton's work area. Shortly thereafter, Brown heard Hazelton say to some coworkers: "Oh, you just missed[] Sonya. Did you guys see a big black puff ball of smoke, and you guys didn't feel the building shake?" (Brown Dep. at 87-88).

In November 2003, Brown mentioned a "do-rag" during a telephone conversation at work. Hazelton later asked Brown to define an [*9] "African do-rag." (Brown Dep. at 116-17). In December 2003, Brown returned to the office from lunch with Daniely and another coworker, Sheila Hoxie ("Hoxie"), who is Caucasian. Upon their return, Hazelton asked Brown if Hoxie was Brown and Daniely's "honorary black sister." (Brown Dep. at 91-92).

Hazelton referred to Melissa Seldon ("Seldon"), who is African American, as acting "ghetto." Hazelton explained that she used this term because Seldon wore a lot of jewelry and "talked about her bad children." (Brown Dep. at 180-82). In 2003 or 2004, Pecht took Hazelton out to lunch for her birthday, but did not take Brown out for lunch on her birthday or wish Brown a happy birthday although he was her supervisor as well as Hazelton's. (Brown Dep. at 180, 183). Brown lost some weight in October 2003. In November 2003, in response to another employee's comment about Brown's weight loss, Hazelton said that she could not tell that Brown had lost weight and asked whether it is "hard for black women to lose weight." (Brown Aff. P 19). During a staff meeting in October 2004, Holt said that "the office [is] going to go to pieces" after noting that she, Hazelton, and Van

Voris were going on vacation [*10] at the same time. Brown interpreted Holt's statement as a racial comment because only African Americans would be left working at the office. (Brown Dep. at 113-14).

During 2003 and 2004, it was Great-West's policy that to be eligible for a promotion, an employee must first have been employed with Great-West for nine months. Brown become eligible for a promotion on December 17, 2003. (Tennant Aff. P 2; see Brown Dep. at 17).

In July 2003, Great-West posted a job opening for an executive assistant to support Rob Teas ("Teas"), the regional vice president of sales. Great-West employee Sherry Henson ("Henson"), who is Caucasian, applied for the executive assistant position and was hired to begin in August 2003. (Teas Aff. PP 1, 3; German Aff. P 8, exs. D & E; Brown Dep. at 168). Brown did not apply for the executive assistant position, and Teas made the decision to hire Henson. (Teas Aff. P 3; Brown Dep. at 167-68). At some point, in addition to supporting Teas, Henson also began to support Ray Mals ("Mals"), vice president for national accounts. (Teas Aff. P 4). In 2005, Teas and Mals assigned Henson to work as an executive assistant to Mals only. Great-West then posted an open position [*11] for an executive assistant to support Teas. Brown did not apply for that position, and Teas made the decision to hire Kathleen Larkin ("Larkin"). (Teas Aff. P 4; Brown Dep. at 170-71).

In November 2003, Holt was an account associate in the national accounts department at Great-West, and her position was being eliminated. Teas promoted Holt to regional office manager for the Atlanta sales department. As regional office manager, Holt performed the same duties that she had performed as an account associate in national accounts as well as office manager duties for the mid-market team. (Teas Aff. P 5; Brown Dep. at 169-70). Teas did not consider anyone else for the regional office manager position, and the position was not posted. (Teas Aff. P 5).

On March 22, 2004, Great-West posted a job opening for CSRs in the sales department, and then took applications for CSR positions on the select team and the mid-market team. (Tennant Aff. P 4, ex. A; Brown Dep. at 151, 153-55). Brown submitted an application and interviewed with Pecht and Gunther for a select team CSR position. Brown specifically sought a select team CSR position and did not seek a mid-market CSR position. (Brown Dep. at 150 -52, [*12] 154-57). In May 2004, Great-West extended offers for select team CSR positions to two internal applicants from the customer service department, Debra Ganaway ("Ganaway") and Lisa Griffin ("Griffin"), both of whom are African American. (Brown Dep. at 154; Tennant Aff. P 7). Also

in May 2004, Great-West offered a mid-market CSR position to internal applicant Charlene Burns ("Burns"), who is Caucasian. (German Aff. P 4; Tennant Aff. P 5, ex. B).

German states that Burns was better qualified for a CSR position than Brown or any of the other applicants. He states that Burns' most recent position had been "platinum relationship manager" in Great-West's customer service department. The move from platinum relationship manager to CSR was essentially a lateral move. German therefore thought that Burns was qualified for the position based upon her past work experience. He also believed that her personality was well-suited to the position. (German Aff. P 4). If Brown had been hired for the position, it "would have been a true step up in job duties [for her] with a substantially greater learning curve." (German Aff. P 5).

Ganaway, Griffin, and Burns accepted the offers for CSR positions, but their [*13] start dates were delayed. (Tennant Aff. P 7; German Aff. PP 4, 6). Great-West then instituted a "hiring freeze," and the offers to Ganaway and Griffin were rescinded. (German Aff. P 6; Tennant Aff. P 7; Brown Dep. at 155). German states as follows:

> The Company instituted a "hiring freeze" which prevented the Sales Department from adding new positions; we could only replace a person who had actually left the Department. As a result, there was only one position available. Because Ms. Ganaway and Ms. Griffin were still needed in Customer Service and because Charlene Burns was the best qualified person, the offers to Ms. Ganaway and Ms. Griffin were withdrawn, and only [Burns] came over as a [CSR].

(German Aff. P 6).

In May 2004, Burns began work in the mid-market CSR position. (German Aff. PP 4, 6; Brown Dep. at 154; Tennant Aff. P 6, ex. C).

In approximately February 2006, Rachael Fowler ("Fowler"), a CSR who supported Teas, was reassigned to support Mals in the national accounts department. To fill the vacancy created by Fowler's reassignment, Teas posted a job opening for a CSR position. Brown never applied for the CSR position. (Teas Aff. P 6).

In July 2006, Great-West posted a job opening [*14] for an executive assistant to support both Steve White ("White"), who was president for Great-West's southeast region, and Dr. Dean Greeson, ("Greeson"),

who was a vice president and regional medical director. (White Aff. PP 1, 2; Greeson Aff. P 1). Brown applied for the executive assistant position. White and Greeson interviewed Brown and several other candidates and selected Danielle Bagby ("Bagby"), who is Caucasian. (White Aff. P 2; Greeson Aff. P 2; Brown Aff. P 17). White and Greeson concluded that Bagby was better qualified for the position than Brown because she had recent experience as an executive assistant whereas Brown had worked in sales for several years. They also believed that Bagby showed enthusiasm and a desire to make the executive assistant position a long-term career choice. Brown, on the other hand, emphasized that she enjoyed interacting with customers and wanted to advance in sales, and the executive assistant job did not entail customer service or sales duties. Greeson questioned Brown's commitment to the position because she indicated that she applied only because the position was different from what she had been doing. (White Aff. PP 3, 4; Greeson Aff. PP [*15] 3, 4).

On October 12, 2004, while at work, Hazelton forwarded to several other Caucasian employees, including Holt, an e-mail with purported remarks by "60 Minutes" television commentator Andy Rooney. Hazelton added "Amen!!!" to the e-mail before she forwarded it. (Hazelton Dep. at 80). The e-mail quoted Andy Rooney as making the following statements:

> I don't think being a minority makes you a victim of anything except numbers. The only things I can think of that are truly discriminatory are things like the United Negro College Fund, Jet Magazine, Black Entertainment Television, and Miss Black America. Try to have things like the United Caucasian College Fund, Cloud Magazine, White Entertainment Television, or Miss White America; and see what happens. Jesse Jackson will be knocking on your door.
>
> I know a lot of black people, and not a single one of them was born in Africa; so how can they be "African-Americans"?

(Holt Dep., ex. 10).

Brown filed a charge of discrimination with the EEOC on October 21, 2004, and her right-to-sue letter was issued on June 17, 2005. (Doc. 1, ex. A part 2 at 8; Doc. 1, ex. A part 1 at 19). Brown's complaint was filed on September 15, 2005. (Doc. 1).

**C. SUMMARY [*16] JUDGMENT STANDARD**

Summary judgment is appropriate where there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P.56.* The movant carries its burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554, 91 L. Ed. 2d 265 (1986).* "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).* The nonmovant is then required "to go beyond the pleadings" and present competent evidence in the form of affidavits, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex, 477 U.S. at 324.* Generally, "[t]he mere existence of a scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).* Resolving all doubts in favor of the nonmoving [*17] party, the court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Id.*

Although the court must construe the record in plaintiff's favor, it does not have "a duty to sift through the record in search of evidence to support a party's opposition to summary judgment . . . . *Rule 56* allocates that duty to the opponent of the motion, who is required to point out the evidence, albeit evidence that is already in the record, that creates an issue of fact." *Skotak v. Tenneco Resins, Inc., 953 F.2d 909, 915 n.7 (5th Cir.), cert. denied, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992); see also Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116-17 (11th Cir. 1993)*(non-moving party must "show that the record in fact contains supporting evidence or come forward with additional evidence sufficient to withstand a directed verdict motion at trial"); *Comer v. City of Palm Bay, 265 F.3d 1186, 1192 (11th Cir. 2001)*(non-moving party must "specify facts . . . confirmed by affidavits, 'depositions, answers to interrogatories, and admissions on file'"); *Hammer v. Slater, 20 F.3d 1137, 1141 (11th Cir. 1994)*("non-moving party must either point to [*18] evidence in the record or present additional evidence"). Moreover, the local rules of this court require "[a]ll documents and other record materials relied upon by a party moving for or opposing a motion for summary judgment [to] be clearly identified for the court," and where appropriate, for "dates and specific page numbers" to be given. Local Rule 56.1(B)(3), N.D.Ga.

## D. EXHAUSTION OF ADMINISTRATIVE REMEDIES AND FAILURE TO IDENTIFY CLAIMS IN THE COMPLAINT

Great-West initially argues that, as to several of Brown's claims, she failed to exhaust administrative remedies and to properly identify them in her complaint, initial disclosures, joint preliminary planning report, or deposition. (Doc. 65-3 at 14-16). It is true that, until ordered to do so by this court on November 15, 2006 (Doc. 60 at 2), Brown did not identify, either at the EEOC level or in this court, the specific adverse employment actions for which she was seeking relief. Nevertheless, because Brown's complaint is due to be dismissed on the merits, the court will not recommend dismissal on this ground.

## E. RACE DISCRIMINATION CLAIMS

Under Title VII, an employer may not discriminate against any individual with respect to compensation, [*19] terms, conditions, or privileges of employment, because of that individual's race. *42 U.S.C. § 2000e-2(a)(1).* [5] Plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); Combs v. Plantation Patterns, 106 F.3d 1519, 1527-28 (11th Cir. 1997), cert. denied, 522 U.S. 1045, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998).* Once a *prima facie* case is established, a legal presumption of unlawful discrimination arises and the burden of production shifts to defendant to articulate a legitimate, nondiscriminatory reason for the challenged employment action. *McDonnell Douglas, 411 U.S. at 802-04.* If defendant does so, the presumption is eliminated, and plaintiff must be given an opportunity to prove by a preponderance of the evidence that the legitimate reason offered by defendant is pretextual. *Id.* At all times, plaintiff retains the ultimate burden of persuading the finder of fact that defendant acted with discriminatory intent. *Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).*

> 5   *Section 1981 of Title 42*, under which Brown [*20] also brings her race discrimination claim, states that "[a]ll persons . . . shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . ." *42 U.S.C. § 1981(a).* The same analysis is used to evaluate race discrimination claims brought pursuant *§ 1981* as is used for Title VII claims. *Crawford v. Western Elec. Co., 745 F.2d 1373, 1376 (11th Cir. 1984).*

To establish a *prima facie* case of race discrimination using circumstantial evidence, plaintiff must prove: (1) she is a member of a protected class, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) evidence by which a factfinder could reasonably conclude that the employer intended to discriminate on the basis of race, if the em-

ployer's actions were to remain unexplained. *See Furnco Construction Co. v. Waters, 438 U.S. 567, 575-76, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).* To establish a prima facie case for failure to promote in particular, plaintiff must show that: "(1) she belongs to a racial minority; (2) she was qualified for and applied for a position the employer was trying to fill; (3) she was denied the position; and (4) [*21] others who were not members of the protected class were hired, or the employer continued to seek applicants with the plaintiff's qualifications." *Cooper v. Southern Co., 390 F.3d 695, 724 n.16 (11th Cir. 2004).*

Depending on the circumstances of the particular case, the fourth element may require a showing that plaintiff was replaced by an individual outside of her protected class or that a similarly situated individual outside of her protected class was treated more favorably. *See, e.g., Coutu v. Martin County Bd. of County Comm'rs, 47 F.3d 1068, 1073 (11th Cir. 1995); Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1185 (11th Cir. 1984).*

"An adverse employment action is an ultimate employment action, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Gupta v. Florida Bd. of Regents, 212 F.3d 571, 587 (11th Cir. 2000)* (quotations and citation omitted). Change in terms, conditions, or privileges must be "serious and material." *Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1239-41 (11th Cir. 2001).* [*22] "[N]ot everything that makes an employee unhappy is an actionable adverse action. . . ." *Stavropoulos v. Firestone, 361 F.3d 610, 618 (11th Cir. 2004).*

To defeat the presumption of discriminatory intent that arises from plaintiff's *prima facie* case, defendant must articulate a legitimate, non-discriminatory reason for its decision. *See McDonnell-Douglas, 411 U.S. at 802.* Defendant's burden is "exceedingly light" and is "one of production, not proof." *Perryman v. Johnson Prods. Co., 698 F.2d 1138, 1142 (11th Cir. 1983).*

When a defendant has successfully rebutted plaintiff's *prima facie* case, the burden shifts back to plaintiff to raise a genuine factual question as to whether defendant's proffered reasons are a mere pretext for discrimination. *Hairston v. Gainesville Sun Publishing Co., 9 F.3d 913, 921 (11th Cir. 1993).* Plaintiff can prove pretext "either by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine, 450 U.S. at 256; see also Earley v. Champion Int'l Corp., 907*

*F.2d 1077, 1081 (11th Cir. 1990)*("To survive summary judgment, the plaintiff [*23] must . . . present concrete evidence in the form of specific facts which show that the defendant's proffered reason is mere pretext. Mere conclusory allegations and assertions will not suffice.").

### 1. *Failure to Promote Claim*

Brown claims that she was not promoted to the following positions because of her race: (1) the office supervisor position that was filled by Holt in May 2003; (2) the position of executive assistant to Teas that was filled by Henson in July 2003; (3) the position of regional office manager that was filled by Holt in November 2003; (4) a select team CSR position in May 2004; (5) the position of executive assistant to Mals that was filled by Henson in March 2005; (6) the CSR position supporting Mals that was filled by Fowler in February 2006; and (7) the position of executive assistant to White and Greeson that was filled by Bagby in July 2006. (See Doc. 61).

Brown has not set forth a *prima facie* case for failure to promote as to six of the seven positions. As to the only position for which she has set forth a *prima facie* case - the July 2006 executive assistant position that was filled by Bagby - Brown has not shown pretext. Accordingly, it is recommended that summary [*24] judgment be granted as to Brown's failure to promote claim. Each position is discussed in turn.

#### a. Positions in 2003

Brown has not shown that she was qualified for the positions that became available in 2003. To be eligible for a promotion in 2003, an employee must have been employed at Great-West for nine months. Brown had not been employed for nine months by Great-West until December 17, 2003. (*See* Tennant Aff. P 2; Brown Dep. at 17). Therefore, she was not qualified for the May 2003 office supervisor position, the July 2003 executive assistant position, or the November 2003 regional office manager position. Further, Brown does not establish a *prima facie* case because she did not apply for any of these three positions. *See Cooper, 390 F.3d at 724 n.16.* It is therefore recommended that summary judgment be granted on Brown's failure to hire claim as to the positions that were open in 2003.

#### b. *CSR Positions*

In March 2004, CSR positions were available on both the select team and on the mid-market team. Brown applied and interviewed for [6] a select team CSR position only. Specifically, in her deposition, Brown states that she performed some of the duties of a select team CSR in her job as [*25] account associate and therefore wanted a select team CSR position in particular. Brown confirms that Griffin and Ganaway were initially hired for select team CSR positions, and that she applied for a select

team CSR position as well. Finally, when asked whether Burns was hired for the same CSR position for which Brown applied, Brown responds: "No. That was mid-market. I was applying for the select." (Brown Dep. at 151, 156-57; German Aff. P 6).

> 6 Brown states in her deposition that she applied and interviewed for a March 2004 CSR position, and that she kept a copy of her application. (Brown Dep. at 151). Great-West does not have a record of her application. (See Doc. 68-4 P 72; Tennant Aff. P 4; German Aff. P 4). Brown has not provided a copy of her application. For purposes of summary judgment, the court will assume that Brown applied for this position.

Brown did not receive an offer for a select team CSR position, though two other African American employees were offered select team CSR positions. (Brown Dep. at 150-57; German Aff. P 6; Tennant Aff. P 7). Due to a hiring freeze, the offers to the two individuals who were offered the select team CSR positions were rescinded. However, [*26] no one else took the select team CSR positions, and they were never filled by anyone, much less by someone outside of Brown's protected class. (See Brown Dep. at 155). Because Brown does not show that she was denied a position that was filled by someone outside of her protected class, she cannot maintain her failure to promote claim as to the March 2004 select team CSR position.

The only new CSR position that was actually filled was the mid-market CSR position, for which Burns, a Caucasian, was selected. However, as noted above, Brown did not apply for the mid-market CSR position. (See Brown Dep. at 151, 156-57; German Aff. P 6). Thus, although the mid-market CSR position was filled by someone outside of Brown's protected class, because Brown did not apply to be a mid-market CSR, she cannot maintain her failure to promote claim as to that position.

Moreover, even if Brown had established a *prima facie* case by showing that the sole Caucasian applicant was also the only applicant who ultimately became employed as a CSR, Brown has not shown pretext. In its Motion for Summary Judgment, Great-West argues that Brown cannot show pretext as to the March 2004 CSR position. It contends that German's [*27] statement that he thought that Burns was better qualified than Brown, or any of the other candidates who applied, constitutes a legitimate, non-discriminatory reason for choosing Burns. (See Doc. 65-3 at 20). German states that Burns' most recent position as "platinum relationship manager" made her most qualified, and that the CSR position was essentially a lateral move for Burns. He states that if Brown had been hired for the position, it "would have been a true step up in job duties with a substantially

greater learning curve." (German Aff. PP 4, 5). In her Response to the Motion for Summary Judgment, Brown does not address Great-West's argument that it presented a legitimate, non-discriminatory reason, but states that she need not show pretext because she has set forth a *prima facie* case. (See Doc. 68 at 22).

To the extent that German's reasons for concluding that Burns was the most qualified are subjective in nature, "[a] subjective reason can constitute a legally sufficient, legitimate, nondiscriminatory reason under the *McDonnell Douglas/Burdine* analysis. Indeed, subjective evaluations of a job candidate are often critical to the decisionmaking process . . . ." *Chapman v. A.I. Transport, 229 F.3d 1012, 1033 (11th Cir. 2000)(en* [*28] *banc).* "A subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion." *Id.* Here, German's subjective reasons are reasonably specific.

Because Brown has not responded to Great-West's legitimate, nondiscriminatory reasons, she has not even attempted to meet her burden to raise a genuine factual question as to whether the reasons are pretextual. *See Hairston, 9 F.3d at 921.*

### c. *March 2005 Executive Assistant to Mals Position*

As to the March 2005 executive assistant position, Brown has not set forth a *prima facie* case because she has not shown that she applied for an open position that Great-West was seeking to fill. Prior to March 2005, Henson was the executive assistant for both Teas and Mals. In March 2005, her duties were narrowed and she began reporting only to Mals. (Brown Dep. at 170). Teas then posted a new position for an executive assistant to support him, and Brown did not apply. (Brown Dep. at 171; Teas Aff. P 4). Accordingly, there was no open executive assistant position in March 2005 for which Brown applied and was not selected.

### d. *February* [*29] *2006 CSR Position*

Brown has not set forth a *prima facie* case as to the February 2006 position for a CSR to support Teas because she has not shown that she applied for the position. Fowler, who was already employed by Great-West, was reassigned from her position as a CSR supporting Mals to the position of CSR supporting Teas. (See Doc. 68-4 P 98; Teas Aff. P 6). Before Fowler was reassigned, Great-West posted a job opening for the position, and Brown did not apply. (See Doc. 68-4 PP 96, 97; Teas Aff. P 6).

### e. *July 2006 Executive Assistant Position*

Brown establishes a *prima facie* case as to the July 2006 executive assistant position because she applied,

was qualified, and a Caucasian, Bagby, was selected. However, Brown has not shown pretext.

Great-West presents evidence that White and Greeson chose Bagby over Brown because Bagby was more qualified based upon her past job experience as an executive assistant compared to Brown's past experience in sales. (*See* White Aff. P 3; Greeson Aff. P 4). White and Greeson also believed that Bagby, as opposed to Brown, appeared genuinely enthusiastic about making the position a long-term career choice. (*See* White Aff. PP 2, 3, 4, 5; Greeson Aff. PP 2, [*30*] 3, 4).

As with the March 2004 CSR positions discussed above, White and Greeson's reasons for choosing Bagby over Brown are somewhat subjective. However, White and Greeson articulated clear and reasonably specific factual bases for their reasons. (*See* White Aff. PP 2, 4, 5; Greeson Aff. PP 2, 3, 4). Therefore, Great-West has proffered legitimate, nondiscriminatory reasons for choosing Brown over Bagby. *See Chapman*, 229 F.3d at 1033.

In her Response to the Motion for Summary Judgment, Brown makes no specific argument regarding pretext as to the July 2006 executive assistant position. Rather, she states that she need not show pretext as to her failure to promote claims in general because Great-West failed to present legitimate, non-discriminatory reasons for not promoting her. (*See* Doc. 68 at 21-22). However, as set forth above, Great-West has presented legitimate, non-discriminatory reasons as to why it chose Bagby over Brown, and it discusses these reasons in its Motion for Summary Judgment. (*See* Doc. 65-4 at 21). Accordingly, Brown has not met her burden to raise a genuine factual question as to whether Great-West's proffered reasons are pretextual. *See Hairston*, 9 F.3d at 921.

Further, [*31*] even if Brown argued that she was more qualified than Bagby, which she does not, she would have to show that "the difference in qualifications [was] so glaring that no reasonable impartial person could have chosen the candidate selected for the promotion in question over the plaintiff." *Vessels v. Atlanta Independent School System*, 408 F.3d 763, 772 (11th Cir. 2005) (*citing Alexander v. Fulton County*, 207 F.3d 1303, 1340 (11th Cir. 2000)). There is no evidence that Brown could make such a showing.

Based upon the foregoing, summary judgment is appropriate as to Brown's failure to promote claim.

### 2. Raise Claim

Brown contends that she suffered an adverse employment action when she received a raise of 2.5 percent in 2004 based upon a performance evaluation by Hazelton in which Hazelton rated her as "good." (Doc. 61 at 5). Brown believes that she deserved to be rated as "out-standing" and that Hazelton discriminated against her by not giving her the rating she deserved, which would have resulted in a 3.5 percent increase.

Brown's raise claim fails for several reasons. First, Hazelton's only "decision" was to appraise Brown's performance as between "good" and "superior," the same performance [*32*] appraisal given to Brown by her previous supervisor, Warren, who is African American. Thus, there is no evidence that Hazelton was responsible for an adverse employment action. Moreover, Brown's opinion of her own performance is not relevant; Brown's opinion that she deserved a higher rating does not demonstrate that Hazelton's assessment was incorrect. *See, e.g., Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997) ("an employee's assertions of his own good performance are insufficient to defeat summary judgment, in the absence of other evidence"); *Dorrego v. Public Health Trust of Miami Dade County*, 293 F.Supp.2d 1274, 1283-85, 1287 (S.D.Fla. 2003) (finding that previous discriminatory remarks by the decision maker and plaintiff's opinion of his performance and qualifications are insufficient to survive summary judgment); and *Webb v. R&B Holding Co., Inc.*, 992 F.Supp. 1382, 1387 (S.D.Fla. 1998) ("The employee's perception of himself . . . is not relevant. It is the perception of the decision maker which is relevant.") (citations omitted).

Brown attempts to create a *prima facie* case by comparing herself to Van Voris and Hazelton. She states that Hazelton allowed Van Voris to complete [*33*] her own review, in which she rated herself as "outstanding," and that Hazelton, who was reviewed by Pecht, received a raise of 4 percent or more. (Doc. 61 at 5). However, there is no evidence that Van Voris and Hazelton did not deserve the ratings that they received. Moreover, neither Van Voris nor Hazelton was similarly situated to Brown. Hazelton was an office manager, not an account associate; Van Voris' job title was "admin. support II." (Brown Aff. exs. B & E at merit increase memoranda dated May 25, 2004). *See Holifield*, 115 F.3d at 1562 ("To make a comparison of the plaintiff's treatment to that of non-minority employees . . . plaintiff must show that [she] and the employees are similarly situated in all relevant respects.").

To the extent that Brown argues that Holt's reasons for deciding not to give her more than a 2.5 percent pay increase in 2004 were pretextual, this argument fails. Holt states that she and German decided to give Brown a 2.5 percent increase because her overall rating was below "superior," she had only been employed by Great-West for nine months during the 2003 appraisal period, and she had already received a 6 percent pay increase in 2003. (Holt Aff. P 5). [*34*] Brown has not shown that these reasons were not the true reasons.

Because Brown has provided no evidence that Hazelton discriminated against her, or that the reasons given for the amount of her raise were pretextual, she has set forth "no specific facts showing that there is a genuine issue for trial" as to this issue. See Celotex, 477 U.S. at 324. The court recommends that summary judgment be granted as to Brown's raise claim.

### 3. Salary Claim

Brown contends that she is paid between $ 5,000 and $ 10,000 less than other, unidentified account associates. (Doc. 61 at 5). In her Response to the Motion for Summary Judgment, Brown identifies Price and "other [unidentified] Caucasian Account Associates" as earning salaries of $ 5,000 to $ 10,000 more than Brown. (Doc. 68 at 21 citing Brown Aff. P 26).

Brown cannot maintain her salary claim because she does not show that she suffered an adverse employment action or that a similarly situated comparator was treated more favorably. Brown simply presents no evidence to support her assertion that she earned less than Caucasian account associates. See Holifield, 115 F.3d at 1564 n.6 (conclusory assertions, "in the absence of supporting evidence, are [*35] insufficient to withstand summary judgment."); Raney v. Vinson Guard Svc., Inc., 120 F.3d 1192, 1197-98 (11th Cir. 1997) (a plaintiff's "hunches, unsupported with significant probative evidence" are insufficient to avert summary judgment). In fact, Great-West presents evidence that Brown's salary is approximately $ 5,500 more than Price's salary. (Tennant Aff. P 9; Doc. 68-4 P 43).

Because Brown cannot set forth a prima facie case as to her salary claim, summary judgment should be granted as to it.

### 4. Bonus Claim

Brown asserts that she made less in quarterly bonuses [7] than other account associates beginning in January 2006 because she supported Williams, who was assigned less lucrative cases. (Doc. 61 at 4). In her Response to the Motion for Summary Judgment Brown states that Great-West presents "no evidence . . . to refute that Brown would have made more if she and Lisa Williams had been operating with Tonya Frady's account list." (Doc. 68-1 at 26).

> 7 Though Brown states that her "commissions and bonuses" have decreased, it is undisputed that account associates do not earn commissions. (Doc. 68-4 P 30; Holt Aff. P 6).

Brown cannot maintain her bonus claim, first, because she cannot show [*36] an adverse employment action. The assignment of cases, standing alone, does not constitute an adverse employment action. "Work as-

signment claims strike at the very heart of an employer's business judgment and expertise because they challenge an employer's ability to allocate its assets in response to shifting and competing market priorities." Davis, 245 F.3d at 1244. For this reason, a change in an employee's work assignments, if not accompanied by a tangible harm or some unusual circumstance, is generally not sufficient to constitute an adverse employment action.

Brown also cannot show an adverse employment action, or that she was treated less favorably than a similarly situated comparator, because she presents no evidence by which the court can compare her compensation to that of other account associates. She has no evidence of her bonuses or the bonuses of other account associates during the relevant time period. See Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005) ("[U]nsupported speculation . . . does not meet a party's burden of producing some defense to a summary judgment motion."); Davis, 245 F.3d at 1238-39 (To demonstrate an adverse employment action, plaintiff [*37] must show that her job was impacted "in a real and demonstrable way," and "the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment."). Though Brown compares herself to Price, Great-West presents evidence that Brown has received $ 140 more in bonuses than Price since Price replaced her as the account associate supporting Frady. (Holt Aff. P 8; Doc. 68-4 P 42). Thus, Brown has not shown that Price was treated more favorably with respect to bonus pay.

Based upon the foregoing, it is recommended that summary judgment be granted as to Brown's bonus case assignment claim.

### 5. Racially Hostile Work Environment [8]

> 8 Great-West did not address this claim in its Motion for Summary Judgment. Despite the court's instructions to specify her adverse employment actions, Brown did not list a hostile work environment as one of her claims, though she does so in Response to the Motion for Summary Judgment. (Doc. 61; Doc. 68 at 1 n.1, 26-30). This court typically would not consider arguments that were made only in a reply brief; however, under the circumstances presented here, Great-West was justified in assuming that Brown had not raised a claim [*38] of a hostile work environment.

To establish a racially hostile work environment, Brown must show: (1) she belongs to a protected group; (2) she has been subjected to unwelcome harassment; (3) the harassment was based on her race; (4) the harassment was sufficiently severe or pervasive to alter the terms and

conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for employer liability. *Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002).* The alleged harassing conduct must be objectively offensive; comments unrelated to race will not support a finding of a hostile work environment. *Gupta v. Florida Bd. of Regents, 212 F.3d 571, 583-84 (11th Cir. 2000); National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 n. 10, 122 S. Ct. 2061, 2074 n.10, 153 L. Ed. 2d 106 (2002).*

In the argument portion of her Response to the Motion for Summary Judgment, Brown relies upon the following arguably admissible evidence [9] in support of her claim of a hostile work environment: (1) Hazelton stated "that Brown's pony tail color was darker than her skin," apparently in connection with Hazelton asking Brown if her hairpiece was African hair; (2) [*39] Hazelton asked Brown whether it is "hard for black women to lose weight;" and (3) Hazelton told Holt that Brown stole two bags. (*See* Doc. 68-1 at 24-30). Elsewhere in her Response, Brown refers to the following: the Andy Rooney e-mail; Hazelton mistaking Brown for a Caucasian co-worker; Hazelton's comments to coworkers after Brown tripped and fell into Hazelton's work space; Hazelton asking Brown to define an "African do-rag;" Hazelton asking if Hoxie was Brown and Daniely's "honorary black sister;" Hazelton referring to Seldon as "ghetto;" Holt stating that the office was "going to pieces;" and Pecht not taking Brown to lunch or wishing her a happy birthday.

> 9    Brown also relies on racially offensive purported e-mails that she found on her desk chair at Great-West. (Doc. 68-1 at 8-9, 1, 25, 28-32). In a separate order, the undersigned finds that these e-mails cannot be considered because they have not been sufficiently authenticated.

Many of the comments and incidents cited by Brown are not racial. To the extent that the comments are based on race, they are not sufficiently severe to allow her to maintain a claim of racially hostile work environment. Under the applicable standards, a [*40] reasonable jury could not find that these statements created an objectively hostile and abusive work environment. *See Gupta, 212 F.3d at 583* ("[A] plaintiff must establish not only that she subjectively perceived the environment as hostile and abusive, but also that a reasonable person would perceive the environment to be hostile and abusive."); *Edwards v. Wallace Community Coll., 49 F.3d 1517, 1521 (11th Cir. 1995)* (Racial slurs must be "so commonplace, overt and denigrating that they create an atmosphere charged with racial hostility.") (citations omitted); *Faragher v. City of Boca Raton, 524 U.S. 775, 778, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998)* ("[S]imple

teasing . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the `terms and conditions of employment.'") (citations omitted); *Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993)* ("[M]ere utterance of an . . . epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII.") (citations omitted). Therefore, it is recommended that summary judgment [*41] be granted as to Brown's hostile work environment claim as well.

### 6. Negligent Retention and Supervision Claim

Brown alleges that Great-West knew or should have known that her "supervisors and co-workers had the propensity to discriminate" against African Americans on the basis of race, and that this caused her physical and mental suffering. (Doc. 1, ex. A part 1 PP 31, 32, 33, 34).

This claim is derivative of Brown's federal employment claims, and she cannot maintain it for the same reasons that she cannot maintain the underlying claims. *See Pierri v. Cingular Wireless, LLC, 397 F. Supp. 2d 1364, 1384 (N.D.Ga. 2005)* (finding that negligent retention claim was "essentially derivative of Plaintiff's Title VII, intentional infliction of emotional distress, and invasion of privacy claims," and could not be maintained where plaintiff failed to state a claim as to those causes of action). For this reason, it is recommended that summary judgment be granted as to the negligent retention and supervision claim.

### 7. Defamation Claim

Brown claims defamation based upon Hazelton accusing her of stealing a computer bag. (Doc. 1, ex. A part 1 PP 13, 35, 36, 37, 38; Brown Dep. at 109-112). In its Motion for [*42] Summary Judgment Great-West raises four independent arguments upon which it contends that the defamation claim is due to be dismissed. (Doc. 65-3 at 32-33).

In her Response to the Motion for Summary Judgment, Brown fails to address three of Great-West's arguments. (*See* Doc. 73-1). "Failure to respond to the opposing party's summary judgment arguments regarding a claim . . . [is] abandonment of that claim and warrants . . . summary judgment for the opposing party." *Burnette v. Northside Hosp., 342 F. Supp.2d 1128, 1140 (N.D. Ga. 2004).* Accordingly, summary judgment should be awarded to Great-West as to Brown's defamation claim.

### 8. Intentional Infliction of Emotional Distress Claim

In her Response to the Motion for Summary Judgment, Brown fails to address Great-West's argument that her intentional infliction of emotional distress claim is

2007 U.S. Dist. LEXIS 96029, *

due to be dismissed. (*See* Doc. 65-3 at 28-32; Doc. 68-1). She has therefore abandoned the intentional infliction of emotional distress claim such that summary judgment is appropriate. *See Burnette, 342 F. Supp.2d at 1140.*

### F. CONCLUSION

For the foregoing reasons, the undersigned **RECOMMENDS** that Great-West's Motion for Summary Judgment (Doc. 65) be **GRANTED.**

**IT** [*43] **IS SO RECOMMENDED,** this 8th day of June, 2007.

/s/ Gerrilyn G. Brill

GERRILYN G. BRILL

UNITED STATES MAGISTRATE JUDGE

LEXSEE 2006 U.S. APP. LEXIS 24076

**OLEY NJIE, Plaintiff-Appellant, SERING OMAR MBYE, versus REGIONS BANK, RAYMOND WINSTON GROAT, DIANA PENNINGTON, LISA MCCOLLUM, Plaintiff, Defendants-Appellees.**

**No. 05-13061**

**UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT**

*198 Fed. Appx. 878; 2006 U.S. App. LEXIS 24076*

**September 22, 2006, Decided**
**September 22, 2006, Filed**

**NOTICE:**    [**1] NOT FOR PUBLICATION

**PRIOR HISTORY:**    Appeal from the United States District Court for the Northern District of Georgia. D.C. Docket No. 03-01052-CV-WDS-1.

**DISPOSITION:**    AFFIRMED.

**COUNSEL:** For Oley Njie, Appellant: Paula Jeanette McGill, Attorney at Law, WASHINGTON, DC.

For Regions Bank, Raymond Winston Groat, Diana Pennington, Appellees: Timothy R. Newton, Constangy, Brooks & Smith, ATLANTA, GA.

For Lisa McCollum, Appellee: Timothy R. Newton, Constangy, Brooks & Smith, ATLANTA, GA; Glen R. Fagan, Constangy, Brooks & Smith, LLC, ATLANTA, GA.

**JUDGES:** Before ANDERSON, DUBINA and HILL, Circuit Judges.

**OPINION**

[*879] PER CURIAM:

This is an employment action appeal by plaintiff-appellant Oley Njie (Njie) from a grant of summary judgment by the district court in favor of defendants-appellees Regions Bank (Regions), Raymond Winston Groat (Groat), Diana Pennington (Pennington) and Lisa McCollum (McCollum) on Njie's federal claims of disparate treatment under *42 U.S.C. § 1981* and hostile work environment under Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e et seq.* Based upon the following, we affirm the judgment of the district court.

I.

Briefly, we set [**2] forth the facts. [1] Njie is an African-American female who was [*880] hired by Regions in March 2002 as branch manager of its Sandy Springs branch. Njie's direct supervisor was Pennington, group branch manager. Pennington reported to Groat, branch administrator and senior vice-president. McCollum was hired in July 2002, as Njie's assistant branch manager. Problems arose almost immediately. The pertinent time frame of this appeal is the two-month period, August and September, 2002.

> 1    They are detailed thoroughly in the forty-five page report and recommendation of the magistrate judge and adopted by the district court in its judgment.

In her declaration, Njie averred that McCollum referred to her as a 'token' on more than one occasion, stated that she did not want to work for a black manager, and, that she did not respect her. [2] In addition to racial bias, Njie declared that McCollum was insubordinate, refused to follow orders, refused to hold committee meetings or submit reports, and refused to inform Njie of her [**3] lunch or vacation schedule, stating that Njie "could not do anything to her."

> 2    Njie also declared that McCollum harbored racial animus toward Hispanic co-worker, Mery Cooper. When Njie attempted to discuss the issue with McCollum, again McCollum allegedly told Njie that Njie "could not do anything to her." When Njie complained to Pennington, she was allegedly told that she could not do anything about it and to "leave it alone."

198 Fed. Appx. 878, *; 2006 U.S. App. LEXIS 24076, **

Coincidentally, during this same two-month time frame, competing complaints against Njie's management of the branch and her treatment of associates were expressed to Pennington and Groat. Associates complained that Njie was not approachable; that they did not trust her; that she kept her door shut too much; that she either could not or would not answer questions about Regions' financial products and operations; that she reprimanded them without justification; and was inconsistent in her management style, sometimes instructing associates to do something a specific way, and then criticizing [**4] them the next day for doing as instructed.

In her deposition, Njie testified that in September 23, 2002, she sent Pennington and Groat an email stating that she would like to talk to both of them at their earliest convenience. Pennington met with Njie on September 23. At this meeting, Njie told Pennington that she felt that she was being harassed because of her race. In her deposition, Pennington testified that this was the first time that Njie complained to her about alleged racial harassment or discrimination. [3]

> 3    The district court found certain parts of Njie's deposition to be contradictory as to whether Pennington and Groat were made aware of Njie's complaints prior to the September 23 email. In fact, emails sent prior to September 23 contain no indication that Njie made any allegations of race discrimination before that date. There is nothing in the record, other than Njie's declaration, to indicate that Pennington and Groat did not respond to earlier oral complaints made by Njie. The district court concluded that a reasonable jury could not find that Njie complained about McCollum's allegedly discriminatory statements before September 23, 2002. We agree.

[**5]    After the meeting, Pennington informed Groat about Njie's allegations, Groat contacted senior vice president Steve Bickelhaup. Groat and Bickelhaup informed Regional Human Resources Director Michelle Rivers, and Rivers immediately began an investigation on September 24, 2002. Rivers interviewed Njie on the telephone that day and met with her on October 2, 2002. On October 2, Njie told Rivers that McCollum had referred to her as a "token"; that there were racial undertones at the branch; that McCollum's father had been a member of the Ku Klux Klan; and that McCollum had been "raised that way."

On October 2, 2002, Njie told Pennington that she wanted to discipline McCollum regarding her allegations. Pennington testified in her deposition that she told [*881] Njie to refrain from disciplining McCollum while there was an ongoing investigation into her allega-

tions, as it would be better to allow Human Resources to determine what, if any discipline was warranted. [4]

> 4    Although Njie avers in her declaration that Pennington instructed her not to discipline McCollum as early as August 23, 2002, the district court concluded the evidence to be to the contrary.

[**6]    As the investigation continued, Rivers and a member of her staff interviewed nine Sandy Springs associates. The associates' descriptions of Njie's conduct raised serious concerns about Njie's ability to manage the Sandy Springs branch and her treatment of associates. On October 23, 2002, Rivers and Pennington met with Njie and detailed their concerns in a sternly-worded counseling memorandum. [5]

> 5    The counseling memorandum bluntly stated in part:
>
>> The purpose of this memorandum is to outline and address concerns regarding your performance and management style. The following concerns have been identified as "ongoing" and have been repeatedly brought to the attention of Management and Human Resources. Additionally, several employees have requested the assistance of Human Resources in an effort to improve the dysfunctional work environment believed to have been created by your management style . . .
>>
>> Screaming at Associates[;] Referring to Customers and Associates as "Liars"[;] Failure to communicate with confidentiality when dealing with subordinates . . . Creating an Atmosphere of Distrust Amongst Associates[;] Inability to Develop Positive Working Relationships . . . Not able to answer employee questions concerning product knowledge, daily branch operations, and customer accounts . . . Unapproachability and periodic unavailability.

[**7]  Njie reacted. On October 24, 2002, she filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) alleging race dis-

crimination and retaliation. Approximately one week later, on November 1, 2002, Njie took a medical leave of absence and told Pennington she did not know when she would be able to return to work.

A great amount of corporate restructuring and employee transfers by Regions took place in the last two months of 2002, including the acquisition of seven additional branches, effective January 2003. Although neither Bickelhaup nor Groat knew when or if Njie was going to return from leave, Groat intended to make Njie the branch manager of the Buckhead branch, if she did return.

Njie returned to work on January 21, 2003, this time, as the Buckhead branch manager. In this position she received the salary and benefits that she had received as the Sandy Springs branch manager, and her duties, responsibilities and position were identical. [6] Although Njie admitted that no one made any racial remarks to her at the Buckhead location, nevertheless, she resigned two months later on March 10, 2003, and filed this lawsuit in April 2003.

> 6  It is undisputed that, had Njie remained as Buckhead branch manager until the end of 2003, she would have received a larger incentive payout than had she remained as the Sandy Springs branch manager.

[**8] II.

We review a district court's grant of summary judgment *de novo*. *Dees v. Johnson Controls World Servs., Inc., 168 F.3d 417, 421 (11th Cir. 1999)*. After reviewing the evidence and all factual inferences in the light most favorable to the non-moving party, we must determine if genuine issues of material fact exist. *Id.* The same requirements of proof and the same analytical framework apply to Title VII and *Section 1981* claims, so we "explicitly address the Title VII claim with the understanding that the analysis applies to [*882] the *Section 1981* claim as well." *Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998)*.

III.

We first address Njie's contentions that the district court erred in granting summary judgment in favor of Regions, Groat, Pennington and McCollum on her disparate treatment racial discrimination claim. Title VII makes it unlawful for an employer "to discriminate against an individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *42 U.S.C. § 2000e-2(a)(1)*. *Section 1981(a)* [**9] reads, in pertinent part: "All persons . . . shall have

the same right in every State . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws . . . as is enjoyed by white citizens . . . ." *42 U.S.C. § 1981(a)*.

A plaintiff may establish a prima facie case of disparate treatment in a race discrimination case using either direct or circumstantial evidence. *EEOC v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1286 (11th Cir. 2000)*. Direct evidence is that which "establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." *Id.* Pursuant to one of the methods of establishing a prima facie case, a plaintiff may show that: (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside her protected class more favorably than she was treated; and (4) she was qualified to do the job. *Id.* If the plaintiff satisfies these elements, the defendant must show a legitimate, non-discriminatory reasons for its employment action. *Id.* If it does [**10] so, then the plaintiff must offer evidence to support a finding that the reason provided by the defendant is a pretext for unlawful discrimination. *Id.* If the plaintiff does that, she can avoid judgment as a matter of law against her. *See Combs v. Plantation Patterns, 106 F.3d 1519, 1543 (11th Cir. 1997)*.

In this case it is unclear as to whether Njie can present direct evidence or merely circumstantial evidence of race discrimination. In this circuit, at this point in a disparate treatment analysis, Njie must show that an adverse employment action was taken against her regardless of whether she is relying on direct or circumstantial evidence. *See Hipp v. Liberty Nati'l Life Ins. Co., 252 F.3d 1208, 1230 n.34 (11th Cir. 2001)* (citations omitted).

The first argument espoused by Njie on her claim that she suffered an adverse employment action is that she was stripped of her authority as a manager. She claims she lost control of her branch when Pennington instructed her not to discipline subordinates such as McCollum until after the Human Resources investigation was complete. [7] In effect, Njie contends that she suffered a *de facto* demotion. [**11]

> 7  We find no support in the record for Njie's assertion that she complained to Pennington and Groat about McCollum before the September 23 email.

However, Njie does not cite any authority, legal or otherwise, to support her position that this instruction constituted an adverse employment action. We agree with the district court in its finding that no reasonable jury could conclude that Pennington's instruction amounted to a materially adverse change in Njie's em-

198 Fed. Appx. 878, *; 2006 U.S. App. LEXIS 24076, **

ployment. *See Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1241 (11th Cir. 2001)*. Considering the competing complaints and the finger pointing transpiring during this period of time, it would be reasonable for [*883] Pennington to issue such an instruction. *See Davis, 245 F.3d at 1239* ("We therefore hold that, to prove adverse employment action . . ., an employee must show a *serious and material* change in the terms, conditions, or privileges of employment."). [8]

> 8 We do not discuss Njie's second argument is that the counseling memorandum is evidence of an adverse employment action. *See note 5 supra.* In this circuit, criticisms of an employee's job performance that do not result in tangible job consequences are not a proper predicate for a Title VII action. *See Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1241 (11th Cir. 2001).*

[**12] Njie's second argument is that she was subject to an adverse employment action when she was transferred from Sandy Springs to Buckhead as branch manager. Njie claims that the Buckhead branch was a smaller, less profitable branch. However the record is clear, that had she stayed at Buckhead until the end of 2003, her pay incentive would have been greater than had she stayed at the Sandy Springs branch.

In addition, the transfer from Sandy Springs to Buckhead was apples and apples, a lateral career move. Njie received the same salary at Buckhead. She received the same benefits. She retained the same position. Njie retained the same duties and responsibilities. This lateral transfer with full retention of benefits could not be described as an adverse employment action. *See Doe v. DeKalb County School District, 145 F.3d 1441, 1452-53 (11th Cir. 1998)*. Since Njie has failed to show an adverse employment action, the district court did not err in granting summary judgment to the defendants on her disparate treatment claim.

### IV.

Njie's final contention, to the extent we understand it, is Regions subjected her to a racially hostile work environment in Violation of Title [**13] VII. The employee has the burden of proving a hostile work environment. *Edwards v. Wallace Cmty. Coll., 49 F.3d 1517, 1521 (11th Cir. 1995)*. To establish a hostile work environment, Njie must demonstrate: (1) that she belongs to a

protected group; (2) that she has been subjected to unwelcome harassment; (3) that the harassment was based on the protected characteristic, here race; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and thus create a discriminatly abusive work environment; and (5) that the employer is responsible for that environment under a theory of either direct or vicarious liability. *Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002)*. The fourth requirement has both subjective and objective components. *Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir. 1999)*. The employee must personally perceive the harassment as severe or pervasive. *Id.* Additionally, the environment must be one that a reasonable person in the employee's position would find hostile or abusive. *Id.* The factors a court considers in evaluating the objective [**14] component include: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Id.*

In this appeal, Njie is an African-American female. She allegedly heard McCollum make racial slurs on several occasions, using the words "token" and "quota." The question then becomes, was this harassment sufficiently severe and pervasive to affect the terms and conditions of Njie's employment?

[*884] Njie has failed to demonstrate that any unwelcome harassment was objectively so pervasive as to alter the terms and conditions of her employment. While Njie alleged that McCollum made racial comments that she found offensive, these remarks were not frequent or severe enough to constitute a hostile work environment. *See Mendoza, 195 F.3d at 1246.*

In addition, Regions was in the process of conducting a prompt and ongoing investigation of Njie's complaints at the time she chose to leave. It is clear, therefore, as to Njie's hostile work environment claim, that the district court did not err in granting [**15] summary judgment in favor of Regions.

### VI.

The judgment of the district court is affirmed.

AFFIRMED.

LEXSEE 2006 U.S. APP. LEXIS 19470

**CLAUDELL L. MACK, THEODORE CARTHEN, JON KEITH GEORGE, EARL J. MALLORY, CLARENCE MCDONALD, III, DAMON L. WAYNE, Plaintiffs-Appellants, versus ST MOBILE AEROSPACE ENGINEERING, INC., Defendant-Appellee.**

**No. 05-14695**

**UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT**

*195 Fed. Appx. 829; 2006 U.S. App. LEXIS 19470*

**July 31, 2006, Decided**
**July 31, 2006, Filed**

**NOTICE:** [**1] NOT FOR PUBLICATION

**SUBSEQUENT HISTORY:** Rehearing, en banc, denied by *Mack v. St Mobile Aero. Eng'G, 2006 U.S. App. LEXIS 32716 (11th Cir., Sept. 25, 2006)*

**PRIOR HISTORY:**     Appeal from the United States District Court for the Southern District of Alabama. D. C. Docket No. 04-00307-CV-BH-B.
*Mack v. ST Mobile Aero. Eng'g, Inc., 2005 U.S. Dist. LEXIS 45201 (S.D. Ala., July 26, 2005)*

**DISPOSITION:**     AFFIRMED in part, REVERSED and REMANDED in part.

**COUNSEL:** For Claudell L. Mack, Theodore Carthen, Jon Keith George, Earl J. Mallory, Clarence McDonald, III, Appellants: John David Saxon, John D. Saxon, P.C., BIRMINGHAM, AL.

For Damon L. Wayne, Appellant: John David Saxon, John D. Saxon, P.C., BIRMINGHAM, AL; Stephen Jared Austin, John D. Saxon, P.C., BIRMINGHAM, AL; Cecily L. Kaffer, Jackson Myrick, LLP, MOBILE, AL.

For ST Mobile Aerospace Engineering, Inc., Appellee: Paul D. Myrick, Jackson Myrick LLP, MOBILE, AL.

**JUDGES:** Before HULL and WILSON, Circuit Judges, and GOLDBERG, * Judge.

> *     Honorable Richard W. Goldberg, Judge, United States Court of International Trade, sitting by designation.

**OPINION BY:** WILSON

**OPINION**

[*832]  WILSON, Circuit Judge:

Claudell Mack, Theodore Carthen, Jon George, Earl Mallory, Clarence McDonald, and Damon Wayne appeal from the district court's entry of summary judgment in favor of their employer ST Mobile Aerospace Engineering, Inc. ("MAE") on their claims under Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e* [**2] , *et seq.*, and the Civil Rights Act of 1991, *42 U.S.C. § 1981*. They allege that there were issues of material fact as to whether MAE subjected them to a racially hostile work environment and disparate treatment in terms of pay, promotion, demotion, discipline, and other terms and conditions of employment. They also argue that the court abused its discretion in striking certain portions of their opposition to summary judgment as inadmissible. We agree, except as to the claims of disparate treatment.

**I. BACKGROUND**

MAE operates a commercial aircraft maintenance and repair facility in Mobile, Alabama. Its facilities include aircraft runways and ramps, eight aircraft hangars, workshops, storerooms, and administrative offices. MAE has approximately 1,000 employees and 400 contract workers. Most of these employees and contract workers are aircraft mechanics and are classified in progressively higher skill levels: Apprentice, Mechanic I, Mechanic II, and Senior Mechanic. MAE has Lead Mechanics who direct the daily work of their crews, relay instructions from management, evaluate mechanics' job performance, and at times, recommend employment decisions. MAE [**3] also has Acting Leads, who are appointed tempo-

rarily for a particular project, and Relief Leads, who substitute in the Lead Mechanic's absence.

MAE's Policy and Procedure Manual ("PPM ") regulates its operations, including compensation, standards of conduct, discipline, performance evaluations, and skill-level progressions. Under the PPM, a new mechanic receives a skill-level designation based on his or her performance during his first 90 days of work. Mechanics are paid within the pay range for their position based on experience, skill level, and job performance. They receive periodic performance reviews, based on a scoring system from 1 to 7. Mechanics can earn non-competitive, skill-level promotions, i.e., a progression from Mechanic [*833] I to Mechanic II, as well as competitive promotions to "Lead" or "Project Manager" based on their application for the position and performance.

MAE maintains a Equal Employment Opportunity/Harassment Policy that prohibits discrimination and harassment, particularly any managers' or supervisors' harassment of employees under his or her supervision. During most times relevant to the plaintiffs' claims, the Policy's complaint procedure required that [**4] employees report any incident of harassment or discrimination directly to the Manager of Administration George Bell or the Manager of Human Resources Dick Wellington, both white males. MAE encourages employees also to report any violation to his or her manager or supervisor, who has a responsibility to prevent harassment, to stop it if it occurs, and to report any violations directly to Manager Bell. However, "[i]t is essential" under the Policy that an employee notify Bell or Wellington of any violation: "Reporting [] to your manager or supervisor is not sufficient."

Over the years, MAE disseminated and explained the Policy to all employees and trained directors, managers, supervisors, and leads on their obligations under the Policy. MAE established an EEO Council, which did not replace the complaint procedure under the Policy but provided an additional point of contact for employees with concerns about discrimination or harassment. The evidence revealed that, throughout its 14 years as Manager of Administration, Bell received 10 "official" complaints of race discrimination under the Policy, two of which he failed to investigate, according to the plaintiffs.

The six plaintiffs' [**5] claims in this lawsuit arise from their work as aircraft mechanics at MAE. Other than Plaintiff Wayne, each of the plaintiffs continues to work at MAE. On May 11, 2004, the plaintiffs, all black males, collectively filed a complaint against the company, claiming they were subjected to a racially hostile work environment "characterized by the pervasive use of racial slurs and offensive symbols" over a period of sev-

eral years. Each plaintiff also claimed he was subjected to disparate treatment in the terms and conditions of his employment. The district court granted summary judgment on each of the claims.

## II. DISCUSSION

### A. Hostile Work Environment Claim

First, we consider whether genuine issues of material fact remain as to whether the plaintiffs were subjected to a racially hostile work environment. We review the district court's entry of summary judgment de novo, "applying the same legal standards as the district court did and viewing all of the facts in the light most favorable to the non-moving party." *Cooper v. Southern Co., 390 F.3d 695, 723 (11th Cir. 2004).* "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, [**6] and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting *Fed. R. Civ. P. 56(c)).*

A hostile work environment claim is established upon proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295 (1993)* (quotations and citations omitted). The plaintiff must show:

> [*834] (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the [plaintiff]; (4) that the harassment was sufficiently severe or pervasive to alter the terms or conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or [**7] direct liability.

*Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002)* (citing *Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999)* (en banc)). Here, the fourth and fifth elements are at issue.

### 1. Whether the Harassment was Sufficiently Severe or Pervasive

The fourth element has both subjective and objective components. *Mendoza, 195 F.3d at 1246.* "The employee must 'subjectively perceive' the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable. The environment must be one that 'a reasonable person would find hostile or abusive' and that the victim subjectively perceives . . . to be abusive.'" *Id.* (quoting *Harris, 510 U.S. at 21, 114 S. Ct. at 370*).

"[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81, 118 S. Ct. 998, 1003, 140 L. Ed. 2d 201 (1998)* (quoting *Harris, 510 U.S. at 23, 114 S. Ct. at 371*). [**8] The objective component is "fact intensive," and courts consider four factors when determining whether harassment objectively altered the employee's terms and conditions of employment: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza, 195 F.3d at 1246.* Courts consider the alleged conduct "in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive . . . ." *Id.* We recognize that MAE disputes the plaintiffs' version of many events, but at this summary judgment stage, we now outline the facts in the light most favorable to the plaintiffs' version of what has happened and continues to happen in MAE's workplace.

*a. Nooses*

There are extensive facts to support the plaintiffs' argument that they were subjected to severe and pervasive harassing conduct. First, the plaintiffs collectively alleged that they personally witnessed no less than seven nooses on MAE [**9] premises over a two-year period from 2002 to 2003. The evidence showed that, in February 2002, MAE discovered a rope noose suspended from a work stand in Hangar 8. Manager Bell concluded that the noose was not a typical "hangman's noose," but rather was a rope used to suspend air hoses to facilitate work. Bell warned management in the area that even work-related objects could appear to be offensive.

One month later, on March 1, 2002, MAE discovered an actual "hangman's noose." MAE identified two white employees who were responsible for the noose and discharged them. The company also sent all employees a letter to confirm that the perpetrators had been disciplined and to announce that it had created its [*835] EEO Council as another point of contact for employees

with concerns. Around that same time, in February or March 2002, Plaintiff Carthen found an additional noose made of yellow rope on the tail stand of a DC-10 in another hangar. He removed the noose, but did not report it to anyone.

Plaintiff Wayne witnessed yet another noose hanging from a work station in Hangar 8 in November 2002. As he approached the noose, Wayne heard Lead Quinn Holbrook, a white male, say "that's for them . [**10] . . the niggers." Wayne reported the comment to Supervisor David Nemecek, a white male, who failed to report the comment to Managers Bell or Wellington, as the Policy required. When Wellington finally learned of the incident in the process of this litigation in 2003, he counseled Holbrook about the seriousness of the allegation and reminded him of his obligations under MAE's Policy.

The next year, in May 2003, Plaintiff McDonald discovered two small nooses made from safety wire, although he did not report the nooses to management. Finally, Plaintiff Wayne witnessed a small black figurine with a noose around its neck on a toolbox in Hangar 3 or Hangar 5 in September 2003. He immediately reported the noose to Manager Bell. At that time, Wayne also reported to Bell that, in the same hangar with the noose, there were many toolboxes with rebel flags on them in violation of company policy. Bell dismissed him, commented on his impending retirement, and took no action.

*b. Racial Graffiti*

The plaintiffs also alleged that there was a constant presence of racial graffiti on MAE premises. For example, Plaintiff Wayne repeatedly witnessed racial graffiti on restroom walls, toolboxes, tables, [**11] and lockers, including swastikas, "KKK," "black power," and "it's black history month, we ain't going to go to the [Mardi Gras] . . . ball" on a restroom wall with the word "black" scratched out and the word "mooley" substituted. Wayne witnessed the words "wish damn janitors would clean this place up, damn monkeys" written in the restroom outside Manager Wellington's office in approximately September 2004. Wayne reported offensive graffiti to Manager Bell in March 2003, who directed MAE personnel to remove it.

Plaintiff McDonald also witnessed offensive graffiti, including racial slurs and jokes and "KKK" written in the men's restrooms and on a parts rack. He saw the word "nigger" written on restroom walls, picnic tables, and parts tables. When he witnessed this graffiti, he reported it to his leads but not to Managers Bell or Wellington. Plaintiff George witnessed similar racial graffiti on restroom walls in various hangars, as recently as August 2004. Once, when he reported the graffiti to his lead, the graffiti was removed.

Plaintiffs Carthen, Mack, and Mallory also witnessed racial graffiti, although they did not report it. Carthen saw racist symbols on bathroom walls, headbands, [**12] and t-shirts. He observed a large "KKK" symbol spray-painted in the restroom several times, and it remained there for approximately one month before it was removed. Mack saw the letters "KKK," swastikas, and other racial graffiti on restroom walls and on a parts rack. Mallory witnessed the words "nigger go home" written on a restroom wall, the letters "KKK," and other racial graffiti, such as "stick people" with nooses around their necks.

MAE admitted receiving reports of graffiti dating back to 1996. Throughout the years, MAE attempted to prevent graffiti by remodeling the restrooms to make it more difficult for anyone to write on the walls, by routinely inspecting the restrooms, and by sending memoranda to [*836] employees and posting signs warning perpetrators of discipline.

### c. Racially Derogatory Comments

The plaintiffs also allege that both supervisors and co-workers directed racially derogatory comments toward them or used such offensive words in their presence. For instance, in June 2003, when Plaintiff Mack learned that co-worker Joshua Frye, a white male, had been promoted from Apprentice to Mechanic after only six months, he asked Lead Holbrook why Frye and two other white [**13] Apprentices had been promoted so quickly, while it took Mack 18 months to be promoted to the same position. Holbrook responded, "I'll tell you the fucking problem, Mack, you're the wrong fucking color." Mack reported this comment to Manager Bell who reviewed the EEO Policy with Holbrook and warned that the statement was unacceptable in the workplace. The next day, co-workers commented that Mack was "getting all the good jobs now" and that "He's the token guy on our crew." Mack did not report these additional comments.

According to Plaintiff Wayne, white Lead Robert Craft called him "boy" a number of times and Lead Holbrook referred to him as "boy" between 10 and 20 times. In August 2001, Wayne complained to Supervisor Gerald McAdams, a white male, but no action was taken. During a meeting in which Project Manager Sam Mendenhall, a white male, was present, Craft said to Wayne, "Boy, I'll talk to you any kind of way I want to talk to you." Again, no action was taken. In 2002, Wayne complained to Manager Charles Gennaro, a white male, that Supervisor McAdams asked Wayne, "How's my favorite token?" On another occasion, Wayne reported that he heard Acting Supervisor John Shaw, a white [**14] male, call a contract worker a "lazy nigger." MAE permanently demoted Shaw and suspended him for

five days without pay. Later, when Wayne arrived for an interview with MAE's investigator, who was investigating the plaintiffs' EEOC charges, he overheard Manager Bell say, "I'll be glad when we can get rid of all of them," allegedly referring to the plaintiffs. Wayne reported this comment to the investigator several times.

Plaintiff Carthen alleged that racial slurs, such as "your black ass," were so prevalent at MAE that "if you're walking the hangar floor[,] you cannot miss [them]." Carthen testified that a white co-worker said to him, "hey, what's up my nigger?" Carthen asked the co-worker not to use that word, but he did not report the incident. Plaintiff George heard a white co-employee tell a joke that included the word "nigger." Lead Mechanic Bill Barnes, a white male, overheard the joke and reprimanded the employee, but no one reported the incident to Managers Bell or Wellington.

In November 2003, Plaintiffs George and McDonald met with Manager Wellington to express their concern about an incident in which co-worker Lynette Beasley referred to co-worker Millie Williams as [**15] a "nigger." Wellington told George that the incident was "just a case of slip of the tongue." Beasley was suspended for two weeks without pay. In May 2003, Plaintiff Mallory reported to Manager Bell that a white co-worker made a series of racial remarks to him, including: "Have you ever been to a party where everybody has on white sheets and hoods but you;" "I want to take you to a party this weekend where everybody is going to have a white sheet and hood on but you;" and "we'll bring some black pussy there. . . . yea, that's what I want to get me some black pussy." MAE counseled the co-worker on the EEO [*837] Policy and suspended him for one week without pay.

### d. Confederate Flags

Finally, the plaintiffs allege that displays of the Confederate or rebel flag, particularly on t-shirts, hats, toolboxes, bumper stickers, and tattoos, permeated the MAE workplace. They alleged that these symbols were present as recently as the time of their depositions, even after MAE had issued a memorandum regarding offensive racial symbols. Among other allegations, the plaintiffs alleged that they witnessed Confederate flag bumper stickers on vehicles parked in MAE's lot, including one on Manager Bob [**16] Holloway's vehicle in January 2005, a rebel flag tattoo on the left arm of Supervisor Lloyd Hodges, and a Confederate flag decal displayed on a Relief Lead's toolbox. Plaintiff Carthen witnessed toolboxes with rebel flags "every day."

MAE admitted that it received complaints about the Confederate flag over the last two years. Wellington admitted witnessing rebel flags on toolboxes as recently as two weeks before his deposition. The company prohib-

ited Confederate flag decals and license plates on all vehicles parking within the security fence on company premises, required that any Confederate flags be removed from any new toolboxes, and published a memorandum to employees regarding offensive racial symbols.

On April 1, 2003, Plaintiff McDonald placed a complaint titled "Racism" in the suggestion box near Manager Bell's office. He complained that minority employees found it difficult to work productively in MAE's environment. McDonald later visited Bell to discuss the compliant, but Bell said he was too busy and promised to meet later. Bell never did so. Later that year, in October 2003, McDonald made a second written complaint about racism. This time, Bell investigated and found no [**17] EEO violation but failed to inform McDonald of the outcome of his investigation.

The district court ruled that "the plaintiffs . . . failed to produce sufficient evidence to show that the racial 'slurs' and 'symbols' were sufficiently 'severe or pervasive' to alter the terms and conditions of any plaintiffs' employment and create an 'abusive working environment.'" It ruled that the alleged racial slurs and symbols were merely offensive utterances and were not physically threatening. The court found that the plaintiffs relied "in whole or in part on second-hand reports of racially-motivated incidents towards other employees." It ruled that the impact of such "second-hand harassment is obviously not as great as the impact of harassment directed at the plaintiff[s]."

*e. Severe and Pervasive Harassment under the Totality of the Circumstances*

We find that, based on a totality of the circumstances, the plaintiffs produced sufficient evidence to create an issue of fact as to whether the plaintiffs were subjected to a racially hostile work environment. *See Allen v. Tyson Foods, Inc., 121 F.3d 642, 645 (11th Cir. 1997)*. First, there is no doubt that the plaintiffs [**18] subjectively perceived the environment at MAE as hostile, and MAE did not argue this point to the contrary. Turning to the four objective factors, the harassing conduct at MAE was frequent. The plaintiffs testified that racial graffiti and Confederate flags permeated the MAE premises for many years. Although MAE attempted to prevent the graffiti and displays of the Confederate flag, the plaintiffs frequently continued to discover the offensive symbols on restroom walls, toolboxes, baseball caps, and bumper stickers. The conduct was [*838] also severe, physically threatening, and humiliating, as evidenced by the fact that the plaintiffs discovered no less than seven nooses at MAE during a two year period from 2002 to 2003. There was further evidence showing that both employees and management directed racially derogatory words and jokes, such as "boy," "nigger," and

the statement that "you're the wrong fucking color," toward the plaintiffs and others. Finally, there was evidence that the harassing conduct prevented the plaintiffs from effectively performing their jobs. On at least one occasion, Plaintiff McDonald filed a written complaint that minority employees found it difficult to work productively [**19] in MAE's racial environment.

This case differs from cases in which we have determined that the harassment was not severe and pervasive because there were fewer instances of less objectionable conduct over longer periods of time. *See e.g., Mendoza, 195 F.3d at 1247* (ruling that a supervisor's conduct in making one alleged sexual comment toward the plaintiff, once rubbing up against the plaintiff, making a sniffing sound three times in the plaintiff's presence, and constantly following and staring at the plaintiff was insufficient to affect the plaintiff's terms and conditions of employment); *Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 585-86 (11th Cir. 2000)* (ruling that a co-worker's conduct in complimenting the plaintiff's appearance, frequently calling the plaintiff's home, and touching the plaintiff's knee and hem, among other conduct, was not physically threatening, humiliating, or severe). The facts in this case involve much more frequent and severe hostile conduct than *Mendoza* and *Gupta*, and the evidence, in the light most favorable to the plaintiffs, creates an issue of fact for the jury. *See Dees v. Johnson Controls World Servs., Inc., 168 F.3d 417, 418 (11th Cir. 1999)*; [**20] *Allen, 121 F.3d at 647*. There is "not simply some magic number of racial or ethnic insults" that preclude summary judgment, but rather "it is repeated incidents of . . . harassment that continue despite the employee's objections [that] are indicative of a hostile work environment." *Miller, 277 F.3d at 1276* (citation and quotation omitted).

The district court evidently viewed the plaintiffs' allegations in isolation, discounting each, to conclude that the conduct was not sufficiently severe or pervasive. Our well-established precedent requires a court to evaluate the evidence "in context, [and] not as isolated acts, and . . . under the totality of the circumstances." *Mendoza, 195 F.3d at 1246*. We disagree with the district court's characterization of the plaintiffs' case as one based largely on comments directed at third parties, or incidents that the plaintiffs only learned about from third parties. "The prima facie showing in a hostile work environment case is likely to consist of evidence of many *or very few* acts or statements . . . which, taken together, constitute harassment. . . . [T]he jury does not necessarily examine [**21] each alleged incident of harassment in a vacuum." *Vance v. Southern Bell Tel. & Tel. Co., 863 F.2d 1503, 1510-11 (11th Cir. 1989)*, overruled on other grounds, *Harris, 510 U.S. at 22, 114 S. Ct. at 371* (emphasis added) (ruling that the evidence, viewed as a

whole, established racial harassment, when a noose was twice hung at the plaintiff's work station). Viewing the evidence in its entirety, in the light most favorable to the plaintiffs, we rule that there is a genuine issue of material fact as to whether MAE was "permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of . . . employment and create an abusive working environment." *Harris, 510 U.S. at 21, 114 S. Ct. at 370* (quotations and citations omitted).

[*839]  **2. Whether MAE Was Liable for the Conduct**

Whether MAE is liable for this harassing conduct depends on whether it was committed by supervisors or by co-workers. An employer is strictly liable for harassment committed by supervisors that "culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment. [**22]  " *Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765, 118 S. Ct. 2257, 2270, 141 L. Ed. 2d 633 (1998)*. However, where no tangible employment action is taken, the employer may raise as an affirmative defense to liability "(a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer . . . ." *Faragher v. City of Boca Raton, 524 U.S. 775, 807, 118 S. Ct. 2275, 2293, 141 L. Ed. 2d 662 (1998)*. With regard to the first element of the *Faragher* affirmative defense, an employer's anti-harassment policy fulfills its obligation unless the policy was administered "in bad faith" or the policy was otherwise "defective or dysfunctional." *Madray, 208 F.3d at 1299 (11th Cir. 2000)* (quotations and citations omitted). Furthermore, "while proof that an employee failed to fulfill [his] obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the [**23]  employer, demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense." *Faragher, 524 U.S. at 807-08, 118 S. Ct. at 2293.*

An employer is directly liable for co-worker harassment if it "knew [actual notice] or should have known [constructive notice] of the harassing conduct but failed to take prompt remedial action." *Miller, 277 F.3d at 1278.* "Actual notice is established by proof that management knew of the harassment, whereas constructive notice can be shown where the harassment was so severe and pervasive that management should have known of it." *Id.* We consider the following factors to be relevant in determining whether harassment was so pervasive as to provide constructive notice: "the remoteness of the location of the harassment as compared to the location of

management; whether the harassment occurs intermittently over a long period of time; whether the victims were employed on a part-time or full-time basis; and whether there were only a few, discrete instances of harassment." *Allen, 121 F.3d at 647.*

Here, the court ruled that MAE satisfied its obligation [**24]  under the *Faragher* defense to exercise reasonable care by implementing and disseminating an anti-harassment policy. With regard to co-worker harassment, the court ruled that MAE did not have actual notice of the alleged harassment because many of the incidents were never reported to the company. Moreover, MAE promptly investigated the few incidents that the plaintiffs reported. The court further concluded that reports to lower-level supervisors, managers, or leads were insufficient to put MAE on constructive notice. However, the district court once again failed to examine all of the evidence in the record and erred by considering incidents and pieces of the evidence in isolation.

There is no "uniform test" for determining whether an employer's anti-harassment policy demonstrates that the employer exercised reasonable care. *Madray, 208 F.3d at 1298.* Rather, "[t]he employer's size, location, geographic scope, organizational structure, and industry segment are just some of the characteristics that [*840]  impact the analysis of whether the complaint procedures of an employer's anti-harassment policy adequately fulfill Title VII's deterrent purpose. *Id.* Here, the plaintiffs [**25]  raised a genuine issue of material fact as to MAE's liability. There was evidence that MAE's EEO Policy did not adequately fulfill Title VII's deterrent purpose because it did not provide employees "alternative avenues for lodging a complaint other than a harassing supervisor." *Id.* Under the complaint procedure, Managers Bell and Wellington were the only designated company representatives who could properly receive complaints, yet the evidence arguably revealed both managers' insensitivity to harassment. Manager Bell was the alleged offender on at least one occasion when he commented that "[he'll] be glad when we get rid of [the plaintiffs]," an incident which the district court failed to address. Manager Wellington allegedly characterized an incident in which one employee called another a "nigger," as a mere "slip of the tongue."

Furthermore, viewed in the light most favorable to the plaintiffs, there was considerable evidence that the complaint procedure was "defective" and "dysfunctional." *Id. at 1299* (quotations and citations omitted). On two occasions, Manager Bell failed to respond to the plaintiffs' official complaints: when Plaintiff McDonald filed [**26]  a written complaint titled "Racism" with Bell, and when Plaintiff Wayne reported to Bell that he discovered a small black figurine with a noose around its neck in Hangar 3. On another occasion, Bell investigated

McDonald's complaint, but failed to inform McDonald of the outcome of the investigation. The record also revealed that, on at least five occasions, supervisors, managers, and leads failed to fulfill their obligation under the Policy to report complaints they received to Manager Bell, thus raising factual issues as to the Policy's ineffectiveness. For example, Lead Barnes did not report the racial joke he overheard; Supervisor Nemecek never reported Lead Holbrook's statement that a noose was "for them . . . the niggers;" Supervisor McAdams did not report the incident in which Leads Craft and Holbrook called Plaintiff Wayne "boy;" Manager Mendenhall did not report another incident in which Holbrook called Wayne "boy;" nor did Manager Gennaro report the incident in which McAdams asked Wayne "How's my favorite token?" Therefore, we conclude that the plaintiffs raised a genuine issue as to whether MAE failed to exercise reasonable care to prevent and promptly correct harassment [**27] because there were inherent defects in the company's complaint procedures.

Moreover, there is an issue of fact as to whether MAE had actual knowledge of co-worker harassment and failed to take prompt remedial action. MAE admitted actual knowledge of ongoing racial graffiti and displays of the Confederate flag. The record reflects that MAE took remedial action by inspecting for graffiti and prohibiting the Confederate flag; but the company's action was largely ineffective because even supervisors continued to display the flag after it was prohibited. In fact, Wellington testified that he took no action against Supervisor Hodges for openly displaying his rebel flag tattoo, despite the fact that his tattoo arguably violated the company's dress code, which prohibited "[v]isible tattoos that . . . advocate sexual, racial, ethnic or religious discrimination." A company's "policy must be found ineffective when company practice indicates a tolerance towards harassment or discrimination." Miller, 277 F.3d at 1280.

The plaintiffs also established an issue of fact as to whether the racial harassment was so severe and pervasive that MAE should have known of it. There was sufficient [**28] [*841] evidence that incidents of racial harassment, in the form of nooses, graffiti, racial slurs and jokes, and displays of the Confederate flag, permeated the open workplace at MAE. Under the facts in this case, the plaintiffs' failure to report every incident of harassment does not insulate MAE from liability. Cf. Farley v. Am. Cast Iron Pipe Co., 115 F.3d 1548, 1554-55 (11th Cir. 1997) (ruling that an employee's failure to utilize an employer's effective and comprehensive anti-harassment policy that was "aggressively and thoroughly disseminated" will prevent constructive knowledge of such harassment from adhering to the employer). Under the totality of the circumstances, we cannot conclude that

MAE's anti-harassment Policy would prevent a reasonable jury as a matter of law from charging the company with constructive notice of the harassment. See Miller, 277 F.3d at 1280.

In conclusion, at the summary judgment stage, the court has the duty to examine all of the offensive conduct "collectively," Gupta, 212 F.3d at 586, and "cumulatively," Mendoza, 195 F.3d at 1242, and to construe all evidence and inferences in the light [**29] most favorable to the nonmoving party. Allen, 121 F.3d at 646. Here, evidence was presented that demonstrated a genuine issue of fact concerning whether the plaintiffs were subjected to a racially hostile work environment. Whether there was in fact a racially hostile work environment at MAE is for the trier of fact to decide. See id. at 648. In addition, the record presents issues of fact as to: (1) whether "[MAE] exercised reasonable care to prevent and correct promptly any . . . harassing behavior"; (2) whether MAE's anti-harassment policy was sufficiently and effectively enforced; and (3) whether the plaintiffs "unreasonably failed to take advantage of any preventive or corrective opportunities provided by [MAE]." Faragher, 524 U.S. at 807, 118 S. Ct. at 2275; Frederick v. Sprint/United Mgmt. Co., 246 F.3d 1305, 1316 (11th Cir. 2001); see also Clegg v. Falcon Plastics, Inc., 174 Fed. Appx. 18, 2006 U.S. App. LEXIS 8576, No. 05-1826 (3d Cir. Apr. 6, 2006); White v. BFI Waste Servs., LLC, 375 F.3d 288, 299-300 (4th Cir. 2004). Accordingly, summary judgment was improper on this claim.

## B. Motion to Strike Claim

Next, we review the [**30] district court's decision to strike 50 passages from the plaintiffs' response in opposition to summary judgment. Generally, the passages referenced portions of the plaintiffs' deposition testimony during which they attributed certain damaging facts and statements to other MAE employees. In its motion to strike, MAE argued-in many instances, in a conclusory fashion-that the passages misstated the deposition testimony and consisted of inadmissible hearsay, double hearsay, opinion, speculation, and conjecture. Without identifying any particular passage, the plaintiffs generally responded that each could be considered at summary judgment because they could be reduced to admissible form at trial or could be admissible under a hearsay exception, such as an admission by a party-opponent. The court summarily granted the motion for the reasons MAE put forth.

At the summary judgment stage, we must reverse the district court's ruling, despite the discretion we afford district courts on evidentiary issues. See Hall v. United Ins. Co. of Am., 367 F.3d 1255, 1259 (11th Cir. 2004) (ruling that we reverse the district court's evidentiary

rulings only when substantial prejudice exists). [**31] We have serious doubts as to the merits of many of MAE's objections. For instance, MAE moved to strike the passage in which the plaintiffs wrote, "Though Mack has been employed at MAE for four years, he has never been selected to go to a systems educational course to learn the [*842] systems of an aircraft. In Mack's opinion, this hampers his ability to receive promotions and raises." MAE argued that "this passage contains Mack's speculation about the application of promotion policies to him." Presumably, MAE was attempting to argue that Mack's opinion was false and that his lack of education had not, in fact, affected his ability to be promoted.

We cannot affirm the striking of this passage in the plaintiffs' responsive pleading on this ground. Mack was permitted to testify as to his opinion because his testimony was "(a) rationally based on [his] perception . . ., (b) helpful to a clear understanding of the issue, and (c) not based on scientific, technical, or other specialized knowledge . . . ." *Fed. R. Evid. 701.* Mack's opinion testimony was "predicated upon [his experience at MAE, which] he observed personally" and is "[an opinion] that a normal [**32] person might draw from those observations." *Agro Air Assocs. v. Houston Casualty Co., 128 F.3d 1452, 1456 (11th Cir. 1997)* (citations and quotations omitted) (affirming the admission of lay witnesses' opinion testimony). MAE's objection was not appropriate at the summary judgment stage because it "went to the weight of the [testimony], not to its admissibility." [1] *See id.*

> 1 MAE also moved to strike the following passage: "[I]n late 2003 McDonald was shown by Jimmy Jones, a former MAE inspector, three photographs of nooses on MAE property. . . . In McDonald's opinion, such graffiti is overt and prevalent throughout the facility." MAE argued that this passage was inadmissible opinion testimony that "invades the province of the jury." We cannot affirm the striking of this passage because it, too, constitutes opinion testimony based on personal observation and experience.

Furthermore, we cannot affirm the striking of any passage on the basis that it constitutes inadmissible hearsay evidence [**33] because the passages are not evidence at all-they are the plaintiffs' *arguments* in their responsive pleading. For example, MAE objected to the passage in which the plaintiffs wrote that "Charles Gennaro, a supervisor, did not inform Wayne that he was required to see Bell or Wellington per MAE's harassment policy," on the grounds that it was inadmissible hearsay evidence. This objection lacks merit for two reasons. First, the passage is the plaintiffs' argument. It is not evidence. If MAE wanted to object to portions of the plain-

tiffs' testimony as inadmissible hearsay, it should have moved to strike the depositions themselves-not the plaintiffs' opposition to summary judgment. Second, Wayne's testimony that Gennaro did not tell him that the company's EEO Policy required him to report harassment to Managers Bell or Wellington is not hearsay. At his deposition, Wayne was asked, "[w]hen you complained to . . . Charlie Gennaro about Robert Craft, did [he] say to you, 'Hey, wait a minute, you can't complain to [me], you've got to go to George Bell or Dick Wellington?'" Wayne replied, "No, sir, never." Wayne's testimony is not "a statement . . . offered in evidence to prove the [**34] truth of the matter asserted," *Fed. R. Evid. 801(c),* because it is not a "statement" at all. A "statement" for purposes of the hearsay rule is "an oral or written assertion." *Fed. R. Evid. 801(a)(1).* Wayne did not testify as to any "oral or written assertion" by Gennaro.

The problem with the court's ruling on this motion was the parties' failure to argue fully the merits of MAE's objections, coupled with the court's summary striking of each passage in the plaintiffs' responsive pleading. Many of MAE's objections were to lengthy passages, which referenced multiple statements by the plaintiffs. The court should have analyzed and ruled on each particularized objection [*843] as to each statement. The court's failure to do so leaves us with an inadequate basis upon which to judge the court's ruling. We refuse to affirm the striking of a significant portion of the plaintiffs' argument in their responsive pleading without a proper understanding of the basis upon which the district court ruled and without any underlying motions to strike portions of the depositions. Accordingly, the district court's blanket declaration that "the [**35] statements at issue are inadmissible hearsay, double hearsay, opinion, speculation and/or conjecture" was an abuse of discretion.

### C. Disparate Treatment Claims

Finally, we consider whether the district court erred in entering summary judgment on each of the plaintiff's claims of disparate treatment in the terms and conditions of their employment. We use the traditional *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)* burden-shifting analysis to evaluate these claims. First, the plaintiff must raise an inference of discrimination through his prima facie case. *Id. at 802, 93 S. Ct. at 1824.* To establish a prima facie case of disparate treatment, the plaintiff must show that: (1) he belongs to a racial minority; (2) he was subjected to an adverse job action; (3) his employer treated similarly situated employees outside his classification more favorably; and (4) he was qualified to do the job. *Id.* The burden then shifts to the defendant to "articulate some legitimate nondiscriminatory reason" for the alleged discrimination. *Id.* Once the defendant produces such a rea-

son, the plaintiff must then prove [**36] that the legitimate reason was a mere pretext for discrimination. *Id. at 804, 93 S. Ct. at 1826.* To avoid summary judgment, the plaintiff must produce sufficient evidence to show "that the employer intentionally discriminated against him because of his race." *Holifield v. Reno, 115 F.3d 1555, 1565 (11th Cir. 1997)* (per curiam).

### 1. Mack's Disparate Pay Claim

Plaintiff Mack alleged that his starting pay at MAE was less than similarly-situated white employees, Joshua Frye, Matthew Wicks, Larry Givens, and Michael Musante. He argued that he was hired at $ 9.50 per hour as an Apprentice, while the others were hired at $ 10.50 or $ 11 per hour for the same position. To establish a prima facie case, Mack must demonstrate that "similarly situated comparators outside the protected class received higher compensation." *Cooper, 390 F.3d at 735.*

We affirm the court's entry of summary judgment as to this claim because MAE produced uncontroverted evidence that Frye and Wicks were paid more than Mack because each had specialized experience and training in aeronautics and avionics, while Mack had only general electronic training. Consequently, [**37] Mack failed to show that they were "similarly situated in all relevant respects." *Knight v. Baptist Hosp., Inc., 330 F.3d 1313, 1316 (11th Cir. 2003)* (per curiam) (citations and quotations omitted). Nor did Mack demonstrate that Givens was a similarly situated comparator because he failed to present any admissible evidence as to Givens's salary. Mack's third comparator, Musante, was hired as a Mechanic I-not as an Apprentice-based on MAE's initial evaluation of his experience. Musante's 90-day skill level evaluation revealed that he was not performing at the requisite skill level of a Mechanic I, so MAE reclassified him as an Apprentice but did not lower his pay, consistent with the company's PPM. The fact that MAE initially misjudged Musante's qualifications does not show intentional race discrimination. *Silvera v. Orange County Sch. Bd., 244 F.3d 1253, 1261 [*844] (11th Cir. 2001)* (ruling that an employer's actions based on a mistaken, non-discriminatory belief do not violate Title VII). Mack's "opinion [that he was discriminated against], without more, is not enough to establish a prima facie case of race discrimination." *Holifield, 115 F.3d at 1564.* [**38]

### 2. Mack's Failure to Promote Claim

Plaintiff Mack also alleged that he was denied a skill-level promotion from Apprentice to Mechanic I because of his race, while three white Apprentices (Frye, Wicks, and Givens) were promoted after their initial six-month evaluation. To establish a prima facie case, Mack must show that he was qualified for the skill level pro-

motion by demonstrating that he satisfied MAE's reasonable qualifications for the position. *See Cooper, 390 F.3d at 741-43* (ruling that the plaintiff's own opinion of her qualifications for progression, without more, was insufficient to overcome the employer's judgment that she was not qualified).

We affirm the court's entry of summary judgment on this claim because the record revealed that Mack was not eligible for a promotion at six months under MAE's PPM because he did not have the required average performance evaluation score of at least 5.0. Mack's average was 4.9, while the alleged comparators' averages were all 5.0 or higher. Therefore, Mack failed to demonstrate that he was qualified for the skill-level promotion.

Mack also argued that he once again was denied a promotion from Apprentice to Mechanic [**39] I after one year of employment because of his race. Mack offered as evidence of discrimination Lead Holbrook's statement that the reason why his promotion had been delayed was because "you're the wrong fucking color."

Here, Mack established a prima facie case of failure to promote. However, Mack did not offer sufficient evidence of pretext to rebut MAE's legitimate, non-discriminatory reason for its failure to promote him-that MAE mistakenly failed to perform his one-year evaluation, and that after it discovered the mistake, it promoted Mack to Mechanic and paid him full back pay to account for the missing evaluation. Holbrook's statement is insufficient to show pretext because there was no evidence that Holbrook was involved in any decisionmaking regarding Mack's promotion, that Holbrook was Mack's supervisor at the time of the evaluation, or that Holbrook's statement was based on his knowledge of discrimination by any other supervisor. Standing alone, this statement is insufficient to raise a genuine issue of fact on pretext. Therefore, we affirm the district court's entry of summary judgment on this claim.

### 3. George's Claim of Disparate Discipline

Plaintiff George claimed [**40] that he was demoted from Acting Lead to Mechanic because of his race. He alleges that white Acting Leads, including Elliot Lambert, Jeremy Lewis, and Scott Schnoes, were involved in the same kind of incidents that led to his demotion, but they were not similarly demoted. In this context, we consider "whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Maynard v. Bd. of Regents of the Univ. of Fla. Dep't of Educ., 342 F.3d 1281, 1289 (11th Cir. 2003)* (citations and quotations omitted). "We require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and

confusing apples with oranges." *Maniccia v.* [*845] *Brown, 171 F.3d 1364, 1368 (11th Cir. 1999).*

We affirm summary judgment on this claim. George was not similarly situated to Acting Leads Lambert and Lewis because, although all three were involved in an incident causing aircraft damage, Lambert and Lewis were working under the supervision of a different Program Manager-not the Program Manager who decided to demote George. *See Silvera, 244 F.3d at 1261 n.5* [**41] (ruling that "differences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination"). Moreover, George's Program Manager demoted him for the additional reasons that he was dissatisfied with the work pace of George's crew and that George did not supervise his crew closely enough. Accordingly, George was not similarly situated to Lambert and Lewis because the "quantity and quality of [their] misconduct [was] [not] nearly identical." *Maniccia, 171 F.3d at 1368.* George was not similarly situated to Schnoes either because the two were not subject to the same standards of conduct. *See Holifield, 115 F.3d at 1562* (ruling that comparators must be "similarly situated in all relevant aspects"). Although both George and Schnoes worked under the same Program Manager, Schnoes was a Permanent Lead-not an Acting Lead. MAE presented uncontroverted evidence that the same considerations do not dictate removal of a Permanent Lead, and that removal of an Acting Lead is a fairly common occurrence.

#### 4. George's Failure to Promote Claim

Plaintiff George claimed that he was denied a competitive promotion [**42] to Project Manager because of his race and that Darren Macip, a white male, was selected despite his inferior qualifications. MAE did not consider George for the promotion because it had no record of him ever applying for the position and did not receive his application.

We affirm summary judgment as to this claim because George did not present evidence that MAE's legitimate, non-discriminatory reason for not selecting him was pretextual. George did not present any evidence that MAE intentionally misplaced or discarded George's application for Project Manager because of his race, or for any other reason. "A plaintiff must show not merely that the defendant's employment decisions were mistaken, but that they were in fact motivated by [race]." *Lee v. GTE Fla., Inc., 226 F.3d 1249, 1253 (11th Cir. 2000)* (per curiam).

#### 5. Mallory's Claims of Disparate Treatment regarding OJT Records and Failure to Train

Plaintiff Mallory alleged that white leads in his department, Scott Palmer and Jim Walsh, hampered his

promotional opportunities at MAE by intentionally losing or manipulating his "on-the-job training" ("OJT") records. OJT records are company forms on which employees [**43] record the type of work that they perform on a particular project and are used for determining promotions. Mallory also alleged that Walsh refused to train him on the computer, while he trained white employees.

We affirm the district court's entry of summary judgment on these claims because Mallory failed to put forth evidence of any similarly-situated white employee who was treated more favorably in terms of managing OJT records or training. Moreover, Mallory failed to establish that he suffered an adverse employment action. An adverse employment action must involve "an ultimate employment decision . . . or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him . . . of employment opportunities, or adversely [*846] affects his . . . status as an employee." *Gupta, 212 F.3d at 587* (citation and quotation omitted). Mallory did not produce any evidence that MAE's mismanagement of his OJT records or its failure to train him on the computer had any adverse affect on his employment.

#### 6. McDonald's Claim of Disparate Discipline

Plaintiff McDonald alleged that he was suspended for three days without pay for his [**44] role in an incident that resulted in substantial damage to an aircraft, while white employees who were also involved in the incident were not disciplined. McDonald also alleged that he received a written disciplinary report for insubordination when white employees who engaged in the same conduct were not similarly disciplined. Here, we consider the "nature of the offenses committed and the nature of the punishments imposed." *Silvera, 244 F.3d at 1259* (citations and quotations omitted).

We affirm the district court's entry of summary judgment regarding McDonald's three-day suspension because MAE's investigation concluded that both McDonald and Program Manager James Winkler, a white male, were partially at fault and both received a three-day suspension. McDonald failed to show that a similarly-situated white employee was treated more favorably. We also affirm as to McDonald's claim regarding the disciplinary report he received for insubordination. MAE presented uncontroverted evidence that it investigated McDonald's complaint that the discipline was unfair and rescinded the discipline. A disciplinary report does not rise to the level of an adverse employment action [**45] where the employer rescinds its decision to take action before the employee suffers a tangible harm. *See Pennington v. City of Huntsville, 261 F.3d 1262, 1267 (11th Cir. 2001).*

### 7. Wayne's Claim of Disparate Treatment regarding Work Opportunities and OJT Records

Plaintiff Wayne alleged that two white supervisors lost or otherwise mismanaged his OJT records, which resulted in lost promotional opportunities for him. Wayne does not identify the white employees who were treated more favorably than him, nor does he identify which promotions he believes he was denied. Accordingly, we affirm the court's entry of summary judgment on this claim because he has failed to show that similarly-situated white employees were treated more favorably than him. He has also failed to show that he suffered an adverse employment action as a result of the mismanagement of his OJT records.

Wayne also alleges that he was required to take "credit time" off when work was slow, while similarly-situated white employees were assigned to perform jobs elsewhere. For example, he alleges that he was denied the opportunity to work on the new "sink lock" 747 project, while a white crew was assigned [**46] the job. We affirm summary judgment on this claim because Wayne provided no evidence to support his claim other than his speculation. To avoid summary judgment, Wayne "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,* *586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).* Meanwhile, MAE provided uncontroverted evidence that a significant number of white employees were required to take "credit time" off during the same time frame when work was slow. Therefore, Wayne failed to show that similarly-situated white employees were treated more favorably.

### III. CONCLUSION

In conclusion, we reverse the entry of summary judgment on the plaintiffs' hostile [*847] work environment claim and MAE's *Faragher* defense because, viewing the entirety of the record, in the light most favorable to the plaintiffs, there remain genuine issues of material fact. We remand the hostile work environment claim and the *Faragher* defense for trial. We reverse the district court's ruling granting MAE's motion to strike portions of the plaintiffs' responsive pleading opposing summary judgment. [**47] At trial, the district court will need to address separately each portion of the disputed testimony if and when the plaintiffs present such testimony and if and when MAE objects to the admission of such testimony. Finally, we affirm the entry of summary judgment on each of the plaintiffs' disparate treatment claims for the reasons stated.

**AFFIRMED in part, REVERSED and REMANDED in part.**