**RECEIVED**

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA

APR - 8 2008

CLERK
U.S. DISTRICT COURT
MIDDLE DIST. OF ALA.

| | | |
|---|---|---|
| CYNTHIA QUINNIE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 12302 AT 06 |
| vs. | ) | 2:07-CV-314-WHA |
| | ) | |
| DIALYSIS CLINIC, INC., | ) | |
| | ) | |
| Defendant. | ) | |

### PLAINTIFF'S BRIEF IN SUPPORT OF RESPONSE TO
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW, the Plaintiff, by and through undersigned counsel, and respectfully submits its Brief in Support of Response to Defendant's Motion for Summary Judgment.  The Plaintiff states as follows:

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Castleberry v. Goldome Credit Corp., 408 F.3d 773, 785-786 (11th Cir. 2005)(Quoting Fed.R.Civ.P. 56(c)).  The United States Court of Appeals for the Eleventh Circuit stated in Burke-Fowler v. Orange County, Fla as follows:

"To establish a prima facie case ... in a race discrimination case, the

plaintiff must show that: (1) she is a member of a protected class; (2) she

was subjected to an adverse employment action; (3) her employer treated

similarly situated employees outside of her protected class more favorably

than she was treated; and (4) she was qualified to do the job." 447 F.3d

1319, 1323 (11th Cir. 2006)(Quoting EEOC v. Joe's Stone Crab, Inc., 220

F.3d 1263, 1286 (11th Cir.2000)).

"If the party moving for summary judgment fails to discharge the initial burden, then the

motion must be denied and the court need not consider what, if any, showing the non

movant has made." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th

Cir.1993)(Quoting Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir.1991)).  "If,

however, the movant carries the initial summary judgment burden in one of the ways

discussed above, responsibility then devolves upon the non-movant to show the existence

of a genuine issue as to the material fact." Id.  Summary judgment motions shall be

viewed in a light most favorable to the nonmoving party.  Huff v. DeKalb County, Ga.,

516 F.3d 1273, 1277 (11th Cir.2008).

Here, the Plaintiff testified in her deposition that she was caused to endure daily

racial slurs spoken by Caucasian employees in positions of authority with the Defendant.

Further, the Plaintiff testified that she placed the Defendant on notice of these wrongful

acts by informing her direct supervisor and other persons of authority. The Plaintiff

testified that the Defendant treated African American employees differently than their

Caucasian employees in rehire practices, in clocking in and out, and the availability to see

personnel files.  Specifically, Caucasian employees were allowed to view their personnel

file without dispute while the Plaintiff and other African American employees were

denied access to their personnel files and fired.  The Plaintiff testified in her deposition

that Caucasian employees were allowed to participate in nepotistic hiring practices while

the African American employees were held strict compliance with the ban in the

Defendant's Policies and Procedures.

The Defendant has failed to meet its burden, in filing this Summary Judgment Motion, that there are no genuine issues as to any material fact and that the Defendant is entitled to a judgment as a matter of law. The Plaintiff, by and through her testimony in her deposition and other exhibits filed with this Court, has shown that the genuine issues of material fact that are in dispute are as follows: 1) Whether the Plaintiff reasonably cooperated with the internal investigation (See letter from Plaintiff's attorney to Defendant); 2) Whether Plaintiff was fired because she is African American (See testimony in Plaintiff's deposition); 3) Whether the Plaintiff suffered racial harassment (See testimony in Plaintiff's deposition); 4) Whether the Plaintiff notified the Defendant pursuant to DCI's Policies and Procedures (See testimony in Plaintiff's deposition); 5) Whether DCI properly followed its Policies and Procedures in the treatment of the Plaintiff (See testimony in Plaintiff's deposition and Defendant's Policies and Procedures); 6) Whether the Defendant treated similarly situated Caucasian employees more favorably than the Plaintiff (See testimony in Plaintiff's deposition); 7) Whether the assertion of the Defendant that the Plaintiff was fired because she failed to cooperate with an internal investigation is a pretext for unlawful discrimination (See testimony in Plaintiff's deposition).

The Plaintiff clearly establishes the prima facie case of racial discrimination laid out in the Court's ruling in Burke-Fowler. The Plaintiff is an African American which is a protected class. The Defendant terminated the Plaintiff from her employment. The Plaintiff has presented unrebutted evidence in her deposition that the Defendant treated similarly situated employees outside her protected class more favorably than that of the Plaintiff. The Plaintiff is clearly qualified to perform her job.

WHEREFORE, because the Defendant has failed to meet its burden in filing this Summary Judgment Motion pursuant to the Eleventh Circuit Court of Appeals rulings in Burke-Fowler, Huff, Fitzpatrick, and Castleberry, this Court should deny the Defendant's Motion.

Respectfully submitted this the 8th day of April, 2008.

Jackson B. Harrison (HAR285)
Attorney for the Plaintiff

OF COUNSEL:
The Harrison Firm, LLC
8425 Crossland Loop
Montgomery, AL 36117
(334) 819-8920 phone
(334) 819-8923 fax

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing upon the following persons by means of delivery shown below and to the location designated, properly addressed and delivery charges prepaid on this the 8th day of April, 2008, viz:

Hon. Leslie Sanders
AmSouth Center
315 Deaderick Street, Suite 2700
Nashville, TN 37238

[xx]  U.S. MAIL  [ ]HAND DELIVERY [ ]FACSIMILE  [ ]FEDEX

Of Counsel

# EXHIBIT

# A



# HARRISON FIRM, LLC

August 15, 2006

Mr. Dan Watson
Associate Director of Human Resources
1633 Church St # 500
Nashville, TN 37203

RE: Cynthia Quinnie

Mr. Dan Watson:

I am in receipt of the letter you sent to my client, Cynthia Quinnie, dated August 14, 2006. The characterization that the letter described as to the events of August 14, 2006 at 1:30 pm is utterly and completely wrong.

My client and I came to the office of the Dialysis Clinic, Inc. at 1:25 to meet with Glenda Gary concerning Ms. Quinnie placement on administrative leave without pay. We were placed in a small office by a lady I came to understand was Rose Smith. After several minutes, you entered the office and explained that you were Dan Watson and that this investigation was not to be conducted with an attorney present. You further explained that the legal office of Dialysis Clinic, Inc. was not present and I was not welcome in the meeting. Further, you told Ms. Quinnie that her employment would be considered voluntarily dismissed if she did not surrender to your demand to meet with her without an attorney present. Ms. Quinnie and I promptly denied your claim of voluntary dismissal and left the office.

The tactics of investigation that were attempted by Dialysis Clinic, Inc. by and through their agent, you Mr. Dan Watson, could only be described as strong arm procedures. Your company obviously is operating a Gestapo style investigation performing stated investigation in the dark and behind closed doors. The certified letter that was received by my client Cynthia Quinnie implied that you attempted to discern my status as Cynthia Quinnie's representative. This assertion is completely wrong and without merit. Neither you nor any other agent of Dialysis Clinic, Inc. attempted to learn my identity. This letter is just further proof that Dialysis Clinic, Inc. is conducting a shoddy investigation designed to intimidate Cynthia Quinnie. My client was willing on August 14, 2006 and is willing today to meet with Dialysis Clinic, Inc. concerning the investigation. We have tried repeatedly to gain possession of Cynthia Quinnie's personnel file and have been repeatedly told that other processes and procedures must be followed to gain possession of the file. These processes and procedures have changed on multiple occasions. Cynthia

---



Quinnie asked Glenda Gary on August 3rd to review her personnel file. The failure of Dialysis Clinic, Inc. to allow this review is clearly against Dialysis Clinic, Inc.'s Employee Handbook, page 66.

Cynthia Quinnie is ready at your earliest convenience to meet with Dialysis Clinic, Inc. about the investigation as long as I, her attorney am present. Cynthia Quinnie is also ready to start back to work immediately because the administrative leave without pay was executed without justification.

If the investigation is not complete and Cynthia Quinnie restored to employment within seven (7) days we will file litigation to pursue this matter and litigate this incident to the fullest extent of the law.

Any further correspondence to Cynthia Quinnie should be forwarded to my office. If you have any questions feel free to call.

Sincerely;

Jackson B. Harrison
Attorney at Law

# EXHIBIT

# B

**American Court Reporting**
**toll-free (877) 320-1050**

Page 1

1   IN THE UNITED STATES DISTRICT COURT
2   MIDDLE DISTRICT OF ALABAMA
3
4   CASE NUMBER
5   12302 AT06 2:07-CV-314-WHA
6
7   CYNTHIA QUINNIE,
8     Plaintiff,
9   vs.
10   DIALYSIS CLINIC, INC.
11     Defendant.
12
13   DEPOSITION TESTIMONY OF:
14     CYNTHIA QUINNIE
15
16   (TRANSCRIPT CONTAINS
17   CONFIDENTIAL INFORMATION.)
18
19   February 6, 2008
20   9:50 a.m.
21
22   COURT REPORTER:
23   JENNIFER DAVIS

Page 2

1    STIPULATIONS
2     IT IS STIPULATED AND AGREED by and
3   between the parties through their
4   respective counsel that the deposition of
5   CYNTHIA QUINNIE, may be taken before
6   Jennifer Davis, Court Reporter and Notary
7   Public, State at Large, at the offices of
8   The Harrison Law Firm, 8425 Crossland
9   Loop, Montgomery, Alabama, on February 6,
10   2008, commencing at approximately 9:50
11   a.m.
12     IT IS FURTHER STIPULATED AND
13   AGREED that the signature to and the
14   reading of the deposition by the witness
15   is waived, the deposition to have the same
16   force and effect as if full compliance had
17   been had with all laws and rules of Court
18   relating to the taking of depositions.
19     IT IS FURTHER STIPULATED AND
20   AGREED that it shall not be necessary for
21   any objections to be made by counsel to
22   any questions, except as to form or
23   leading questions, and that counsel for

Page 3

1   the parties may make objections and assign
2   grounds at the time of trial or at the
3   time said deposition is offered in
4   evidence, or prior thereto.
5     I, Jennifer Davis, am hereby
6   delivering to Leslie Goff Sanders the
7   original transcript of the oral testimony
8   taken February 6, 2008, along with
9   exhibits.
10     Please be advised that this is
11   the same and not retained by the Court
12   Reporter, nor filed with the Court.

Page 4

1    INDEX
2
3   EXAMINATION BY:      PAGE NO.
4   Ms. Sanders     6-258
5   Mr. Harrison     258-300
6   Certificate     321
7    INDEX OF EXHIBITS
8   EXHIBITS      PAGE NO.
9   Plaintiff's 1 - 8/15/06 letter    272
10   Defendant's 1 - employment
    application     15
11
    Defendant's 2 - interrogatory
12   responses and request for production   50
13   Defendant's 3 - job description    78
14   Defendant's 4 - receipt for benefits
    package     84
15
    Defendant's 5 - 8/14/06 letter    101
16
    Defendant's 6 - authorization form   120
17
    Defendant's 7 - employee handbook
18   portion of benefits pack    123
19   Defendant's 8 - complaint for damages 136
20   Defendant's 9 - charge of
    discrimination     235
21
    Defendant's 10 - letter to EEOC    235
22
    Defendant's 11 - patient statements   249
23

**American Court Reporting**
**February 6, 2008**



# American Court Reporting
## toll-free (877) 320-1050

Page 5

```
 1      A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFF:
 4       Brett Harrison, Esquire
 5       THE HARRISON LAW FIRM
 6       8425 Crossland Loop
 7       Montgomery, Alabama  36117
 8
 9
10
11   FOR THE DEFENDANT:
12       Leslie Goff Sanders, Esquire
13       BASS, BERRY & SIMS
14       315 Deaderick Street
15       Suite 2700
16       Nashville, Tennessee  37238-6200
17
18
19
20   ALSO PRESENT:
21
22       DAVID HAGEWOOD
23
```

Page 7

```
 1      A.   My name is Cynthia Quinnie.
 2      Q.   And, Ms. Quinnie, my name is
 3   Leslie Sanders.  I represent Dialysis
 4   Clinic, Inc., in the lawsuit that you've
 5   filed.  I'm going to take your deposition
 6   today.  I'm sure Mr. Harrison has told you
 7   about a deposition, but just a few ground
 8   rules.  If I ask you a question and you
 9   don't understand it or it doesn't make
10   sense, let me know.  Because if you answer
11   it, I'm going to assume that you
12   understood it.  Okay?
13      A.   Okay.
14      Q.   So if you need any
15   clarification, that would be great, just
16   tell me.  For the court reporter's
17   benefit, she can't take down uh-huh and
18   huh-uh.  So if you could, say yes or no.
19   And, also, she can't take down if you just
20   nod your head.
21      A.   Okay.
22      Q.   So if you would try to be clear
23   for the record, that would be great.
```

Page 6

```
 1      I, Jennifer Davis, a Court
 2   Reporter of Millbrook, Alabama, and a
 3   Notary Public for the State of Alabama at
 4   Large, acting as Commissioner, certify
 5   that on this date, pursuant to the Federal
 6   Rules of Civil Procedure, and the
 7   foregoing stipulation of counsel, there
 8   came before me at the offices of The
 9   Harrison Law Firm, 8425 Crossland Loop,
10   Montgomery, Alabama, commencing at
11   approximately 9:50 a.m., on February 6,
12   2008, CYNTHIA QUINNIE, witness in the
13   above cause, for oral examination,
14   whereupon the following proceedings were
15   had:
16
17          CYNTHIA QUINNIE,
18   having been first duly sworn, was examined
19   and testified as follows:
20          EXAMINATION
21   BY MS. SANDERS:
22      Q.   Would you state your name for
23   the record, please?
```

Page 8

```
 1   Ms. Quinnie, what is your date of birth?
 2      A.   My date of birth is December
 3   10, 1960.
 4      Q.   And where do you currently
 5   live?
 6      A.   I currently live here in
 7   Montgomery.
 8      Q.   What's your current address?
 9      A.   1601 Limestone Court.
10      Q.   How long have you lived here in
11   Montgomery?
12      A.   Since 1990.
13      Q.   How long have you lived at
14   Limestone Court?
15      A.   Since 2005.
16      Q.   And are you currently married?
17      A.   No.
18      Q.   Do you have adult children?
19      A.   Yes.
20      Q.   Do they live here in
21   Montgomery?
22      A.   Three does.
23      Q.   What are their names?
```

2 (Pages 5 to 8)

## American Court Reporting
## February 6, 2008

**American Court Reporting**
**toll-free (877) 320-1050**

Page 9

1    A.  Elrico (phonetic) Washington,
2  Elmore Washington, Jeremica (phonetic)
3  Washington.
4    Q.  And they all live here in
5  Montgomery?
6    A.  Yes.  I have four children.
7    Q.  Who is the other one?
8    A.  Demetrius Washington.
9    Q.  Does she live here, also?
10    A.  He's --
11    Q.  I'm sorry.
12    A.  He's currently right now in
13  Iraq.
14    Q.  So have you -- you've been
15  married before?
16    A.  Yes.
17    Q.  Who is your ex-husband?
18    A.  Elmore Quinnie.
19    Q.  Had you been married prior to
20  Mr. Quinnie?
21    A.  No.
22    Q.  Does Mr. Quinnie still live
23  here in Montgomery?

Page 10

1    A.  Yes.
2    Q.  And do any of your children
3  still live with you?
4    A.  No.
5    Q.  Ms. Quinnie, I want to talk a
6  little bit about your background, and I
7  know sometimes you may wonder why we ask
8  all of these questions.  But there is a
9  purpose, and Mr. Harrison can certainly
10  explain all of this to you.  You graduated
11  from high school; correct?
12    A.  Yes.
13    Q.  Where did you graduate?
14    A.  Linden High School in Linden,
15  Alabama.
16    Q.  Have you always lived in
17  Alabama?
18    A.  No.
19    Q.  When did you graduate from high
20  school?
21    A.  1979.
22    Q.  Now, did you go on to college
23  after high school?

Page 11

1    A.  Trade school.
2    Q.  Trade school.  Okay.  Where was
3  that?
4    A.  I attended Hobson State in
5  Thomasville, Alabama, and I attended
6  Coastal Training Institute in Montgomery.
7    Q.  What did you do at Hobson
8  State?  What was your course of study?
9    A.  It was commercial sewing.
10    Q.  When was that that you were
11  there?
12    A.  It was '86.
13    Q.  What about the Coastal Training
14  Institute?
15    A.  Yes.  That was in 1990.
16    Q.  And where is that?
17    A.  That's here in Montgomery.  It
18  was.  I think it's closed now.  I'm not
19  sure.
20    Q.  What was your course of study
21  there?
22    A.  Medical assistant.
23    Q.  Any other schools between high

Page 12

1  school -- you said you went to Hobson
2  State in '86.  What did you do between
3  high school and Hobson State?
4    A.  Worked.
5    Q.  Worked.  Okay.
6    A.  I did attend Nassau Community
7  College in New York, but I did not
8  graduate.
9    Q.  Okay.
10    A.  Because I moved back to
11  Alabama.
12    Q.  When was that?
13    A.  I moved back to Alabama in
14  1990.
15    Q.  That's when you were -- is that
16  when you were at Nassau Community College?
17    A.  Nassau Community College was
18  from '89 to '90.  I didn't graduate.
19    Q.  So when you left -- when you
20  got out of high school, did you leave
21  Alabama and go to New York?
22    A.  No, not right away.  It was
23  after a while.

3  (Pages  9 to 12)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 13

1    Q.   Tell me what you did. When you
2  graduated from high school, what kind of
3  jobs did you get?
4    A.   Being that I had taken
5  commercial sewing at Hobson State, I
6  worked at a sewing factory. I also worked
7  at a nursing home.
8    Q.   What did you do at the nursing
9  home?
10    A.   Patient care assistant.
11    Q.   Where was that?
12    A.   That's in Linden, Alabama.
13    Q.   What's the name of it?
14    A.   Marengo County Nursing Home.
15    Q.   What did you do after the
16  nursing home?
17    A.   After the nursing home, I moved
18  to New York in the latter year of '86.
19    Q.   And stayed there until 1990?
20    A.   Yes.
21    Q.   What did you do in New York,
22  other than Nassau Community College?
23    A.   I worked at Connecticut General

Page 14

1  Life Insurance. It's CIGNA.
2    Q.   What did you do at CIGNA?
3    A.   I was supervisor of the mail
4  room.
5    Q.   Any other jobs in New York?
6    A.   No.
7    Q.   Any other education other than
8  the three post-high-school colleges that
9  you told me about and high school?
10    A.   No.
11    Q.   Any military training?
12    A.   No.
13    Q.   I'd like to show you,
14  Ms. Quinnie, a document which we'll mark
15  as the first exhibit. This is what I
16  believe to be a copy of your employment
17  application that you completed for
18  Dialysis Clinic, Inc. Do you recall when
19  you began working there, completing an
20  employment application?
21    A.   Yes.
22    Q.   If you would just take a minute
23  and take a look at that document and see

Page 15

1  if that appears to be the application you
2  completed.
3    A.   (Witness reviews document.)
4    Q.   Is that a correct copy of your
5  application now?
6    A.   Yes.
7    MS. SANDERS:  Would you mark
8  that as the first exhibit?
9    (Whereupon, a document was
10  marked as Defendant's Exhibit 1 and is
11  attached to the original transcript.)
12    Q.   Ms. Quinnie, if you would turn
13  over to about the third page of that
14  application, in the middle of the page it
15  says license or certifications. If you
16  would, read up above there where it says
17  you performed EKG's, chest x-rays, and
18  draw lab work on patients as well as basic
19  nursing assistant duties. Did you write
20  that?
21    A.   Yes.
22    Q.   And where did you do those --
23    A.   This was at Jackson Hospital.

Page 16

1    Q.   Where was that?
2    A.   It's here in Montgomery.
3    Q.   And then in the next section
4  there, you talk about -- where it says, I
5  assist physicians with procedures such
6  as --
7    A.   Bronchoscopy, endoscopy
8  procedures. Jackson Hospital.
9    Q.   Any other places where you had
10  done those functions?
11    A.   No, not those particular
12  functions.
13    Q.   Okay. Down at the bottom, you
14  list three references.
15    A.   Yes.
16    Q.   Tell me who they are. Who is
17  Dr. Joseph Jackson?
18    A.   Dr. Joseph Jackson is a GI
19  specialist who work in the endoscopy
20  department at Jackson Hospital.
21    Q.   Okay.
22    A.   Marie Graves is an RN that
23  worked in the endoscopy department. And

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 17

1   Patricia Jackson is an RN that is a high
2   school classmate as well.
3       Q.   So all of those people worked
4   with you at Jackson Hospital?
5       A.   All but Patricia Jackson. She
6   was a high school --
7       Q.   Personal friend?
8       A.   Yes.
9       Q.   All right. Then on the next
10  page, you'll see where you listed your
11  employers -- some of your employers. The
12  first one you have listed there is Jackson
13  Hospital and Clinic. At the time that you
14  applied at DCI, were you still employed at
15  Jackson Hospital and Clinic?
16      A.   I had left Jackson Hospital a
17  week prior to employment at DCI.
18      Q.   What about at the time you
19  filled out this application? Were you
20  still employed at Jackson Hospital?
21      A.   No. I had left there a week
22  prior to employment.
23      Q.   Why did you leave Jackson

Page 18

1   Hospital?
2       A.   I left Jackson Hospital because
3   I was burnt out with working. I was also
4   working as school patrol officer at the
5   Montgomery Police Department, and I was
6   working, also, as a night auditor at the
7   Marriott Spring Hill Suites.
8       Q.   Did you continue to work at the
9   Montgomery Police Department or the
10  Marriott when you went to work for DCI?
11      A.   No.
12      Q.   So at the time you applied for
13  DCI, were you still working at the
14  Montgomery Police Department?
15      A.   No.
16      Q.   When did you --
17      A.   I stopped all of those jobs in
18  May.
19      Q.   Okay. When did you apply at
20  DCI?
21      A.   I applied at DCI in May.
22      Q.   You see there on your
23  application -- first let's look at Jackson

Page 19

1   Hospital -- where it says date left and
2   you wrote still employed. Was that
3   accurate?
4       A.   That was an error on my part.
5       Q.   But it's your testimony that
6   you voluntarily quit Jackson Hospital?
7       A.   Yes, I did.
8       Q.   What about the Montgomery
9   Police Department? Do you see there where
10  it says date left and you wrote still
11  employed? Were you still employed at that
12  time?
13      A.   It was in May of that year, the
14  same month that I applied. When I filled
15  out this application, I was employed.
16      Q.   Okay.
17      A.   I left these jobs a week prior
18  to being employed -- or two weeks prior.
19  Please forgive me. You have to give them
20  two weeks notice.
21      Q.   What about the Montgomery
22  Police Department? Did you quit?
23      A.   Yes.

Page 20

1       Q.   You weren't terminated?
2       A.   No.
3       Q.   I notice that the Marriott is
4   not listed on here. Any reason why you
5   didn't list the Marriott?
6       A.   No.
7       Q.   Had you just -- it says start
8   with the most recent employers. Did you
9   work at Marriott after you worked at
10  CIGNA?
11      A.   Yes. Like I said, I was
12  working three jobs at one time.
13      Q.   What about the Marriott? How
14  long did you work there?
15      A.   I didn't work at the Marriott
16  long. I worked at the Marriott -- it was
17  not even six months, because I was doing
18  school patrol and Jackson Hospital at the
19  same time.
20      Q.   And what were you doing at the
21  Marriott? I think you said night auditor.
22      A.   Night auditor.
23      Q.   What did you do as the night

5 (Pages 17 to 20)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 21

1  auditor?
2      A.   As well as front desk clerk,
3  checking in patients and verifying
4  reservations, I would also do the
5  balancing of the -- the night auditor was
6  balancing -- you run a computer and you
7  balance the -- how much money was taken in
8  and who used credit cards and who paid
9  cash.
10     Q.   Now, when you said the
11 Marriott, I assumed you were talking about
12 the hotel?
13     A.   Yes, Spring Hill Suites.
14     Q.   Okay. Just now, I thought you
15 said something about checking in patients.
16     A.   I'm sorry. Customers.
17     Q.   So you were talking about a
18 hotel?
19     A.   Yes.
20     Q.   And then at the Marriott Hotel,
21 do you remember when you were employed?
22 You said it was only about six months, but
23 do you remember the dates of that?

Page 22

1      A.   I left the Marriott -- I left
2  all of those jobs at once. It was in May
3  when I left there. May of 2001 when I
4  left there.
5      Q.   Did you quit, or were you
6  terminated?
7      A.   No, I was not terminated. I
8  quit.
9      Q.   That's here in Montgomery as
10 well?
11     A.   Yes, on Carmichael Road.
12     Q.   So why were you working all
13 three of these jobs at once?
14     A.   Because I needed the money.
15 And Jackson Hospital, even though it was a
16 good place to work, they do not pay. If
17 you're unlicensed personnel, you do not
18 get paid.
19     Q.   It looks like you were actually
20 making more at the police department?
21     A.   Yes.
22     Q.   How about the Marriott?
23     A.   At the Marriott, I was making

Page 23

1  more money, but it was only part-time.
2      Q.   Do you remember what you made
3  at the Marriott?
4      A.   It was $10 an hour.
5      Q.   Just so I've got this right, it
6  looks like when you left New York, you had
7  been working at CIGNA; correct?
8      A.   Yes.
9      Q.   And then when you came back to
10 Alabama -- you came back to Montgomery,
11 what was your first place of employment
12 when you came back to Montgomery?
13     A.   Jackson Hospital.
14     Q.   So you had six or seven
15 months -- when you came back from New York
16 to Montgomery, there were about six or
17 seven months where you were not employed?
18     A.   Well, I was going to school. I
19 was going to Coastal Training Institute
20 where I got the medical assistant diploma.
21     Q.   Now, at Jackson Hospital, did
22 you do any type of office work or patient
23 records work, or was it purely patient

Page 24

1  care?
2      A.   Patient care.
3      Q.   Had you worked at any other
4  medical facilities other than Jackson
5  Hospital before you came to DCI?
6      A.   No.
7      Q.   Well, you said a nursing home.
8      A.   That was back in high school in
9  Marengo County.
10     Q.   Other than that, any others?
11     A.   No. I only did patient care
12 there as well.
13     Q.   Okay. Ms. Quinnie, we're going
14 to talk more about your employment at DCI
15 and your subsequent employment. But let
16 me ask you just a few questions. You have
17 filed a charge of discrimination in this
18 case with the Equal Employment Opportunity
19 Commission; is that right?
20     A.   Yes.
21     Q.   Have you ever filed a charge of
22 discrimination other than this one?
23     A.   No.

6  (Pages 21 to 24)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 25

1    Q.   Have you ever been involved in
2   any lawsuits other than this one?
3    A.   No.
4    Q.   Have you ever been a witness in
5   another lawsuit?
6    A.   No.
7    Q.   So you've never testified in
8   court?
9    A.   No.
10    Q.   Have you ever given a
11   deposition before today?
12    A.   No.
13    Q.   You understand that today you
14   are under oath?
15    A.   Yes.
16    Q.   Just as if you were in court;
17   right?
18    A.   Yes.
19    Q.   Have you ever filed bankruptcy?
20    A.   Yes.
21    Q.   When was that?
22    A.   That was in -- it was either
23   2002 or 2003.

Page 26

1    Q.   Have you ever been in a
2   criminal court?  In other words, have you
3   ever been convicted of a crime?
4    A.   No.
5    Q.   So other than the bankruptcy,
6   no litigation or involvement in the legal
7   system?
8    A.   Other than my divorce back with
9   my ex-husband.
10    Q.   When was the divorce?
11    A.   The divorce was in December of
12   2004.  It was finalized in January of
13   2005.
14    Q.   Now, we talked about jobs that
15   you've had.  Have you ever been
16   self-employed or owned your own business?
17    A.   No.
18    Q.   Ever work out of your home?
19    A.   No.
20    Q.   Since you left DCI -- and I
21   promise we're going to get to DCI.  But
22   since you left DCI, have you sought
23   employment anywhere else?

Page 27

1    A.   Yes.
2    Q.   Tell me where all you've looked
3   for jobs.
4    A.   I have looked for jobs at
5   Hillview Terrace, which is an assisted
6   living home here in Montgomery.  I have
7   sought employment at --
8    Q.   Let's talk about Hillview
9   Terrace just a minute.  It will probably
10   make it go faster if we talk about them
11   one at a time.  Did you get a job at
12   Hillview Terrace?
13    A.   No.
14    Q.   Did they have any openings at
15   the time?
16    A.   Yes.
17    Q.   Where did you find out about
18   Hillview Terrace?
19    A.   Internet, newspapers.
20    Q.   So there was an ad?
21    A.   Yes.
22    Q.   What was the position they had
23   open?

Page 28

1    A.   It was for a CNA, certified
2   nursing assistant.
3    Q.   Are you a certified nursing
4   assistant?
5    A.   I'm a medical assistant.
6    Q.   Did you apply for that job, the
7   CNA job?
8    A.   Yes, I did.
9    Q.   Were you interviewed?
10    A.   Yes, I was.
11    Q.   Did they offer you a position?
12    A.   No, they didn't.
13    Q.   Did they tell you why they
14   didn't offer you a position?
15    A.   No, they didn't.
16    Q.   Do you know why they didn't
17   offer you a position?
18    A.   Well, I was told why, but...
19    Q.   By whom?
20    A.   By an employee that worked
21   there that recommended me.
22    Q.   Okay.  What did that employee
23   tell you?

7  (Pages 25 to 28)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 29

1      A.   She said that they had talked
2   with Glenda Gary, and Glenda Gary had told
3   them things about me.
4      Q.   Who was that employee?
5      A.   Bernice Johnson.
6      Q.   Ms. Johnson is an employee at
7   Hillview Terrace?
8      A.   Yes.
9      Q.   Do you have any idea what
10  Hillview Terrace was paying for the CNA
11  position at that time?
12     A.   No, I don't.
13     Q.   When did you apply for that
14  position?
15     A.   That was in August, September
16  of 2006.
17     Q.   So very soon after you were --
18  your employment at DCI ended?
19     A.   Yes.
20     Q.   Okay.  Now, where else did you
21  apply for work after you left DCI?
22     A.   I applied at Odyssey Home
23  Health.

Page 30

1      Q.   Tell me about Odyssey Home
2   Health.  What is that?
3      A.   It's a home health agency where
4   they send you out to different homes.
5      Q.   Is that here in Montgomery?
6      A.   Yes.
7      Q.   Was there an opening?
8      A.   Yes.
9      Q.   Where did you find out about
10  the opening?
11     A.   An employee that worked there.
12     Q.   Were they advertising an
13  opening that you saw, or did you just have
14  an employee that worked there --
15     A.   It was just an employee that
16  worked there.
17     Q.   A friend of yours or just an
18  acquaintance --
19     A.   Actually, she was a friend of
20  my lawn -- the man that does my lawn.
21     Q.   Okay.  So she told you about an
22  opening they had?
23     A.   Yes.

Page 31

1      Q.   Did you fill out an
2   application?
3      A.   Yes, I did.
4      Q.   Did you give that application
5   to --
6      A.   You have to go there and fill
7   it out on the computer.
8      Q.   Okay.  When was that?
9      A.   This was in -- I didn't lay on
10  this.  This was September, October.
11     Q.   What was the position?
12     A.   It was for a home health aide.
13     Q.   Had you had any experience as a
14  home health aide?
15     A.   No.
16     Q.   Did you get the job?
17     A.   No, I didn't.
18     Q.   Were you told why you didn't
19  get the job?
20     A.   No.
21     Q.   Did anybody -- an employee
22  there --
23     A.   I called to inquire, and they

Page 32

1   said the person was going to give me a
2   call.  She never gave me a call.  I called
3   constantly.  She was either out to lunch
4   or she wasn't there.
5      Q.   So you just never talked to
6   anybody?
7      A.   No.
8      Q.   Do you know what it was paying?
9      A.   No, I don't.
10     Q.   Where else did you apply?
11     A.   I applied at Snelling.  It's a
12  temp agency.
13     Q.   Where is that, here in
14  Montgomery?
15     A.   Here in Montgomery.
16     Q.   Did you get a job there?
17     A.   Yes.
18     Q.   Tell me what job you got.
19     A.   They sent me on -- the first
20  case I had was in Dr. Tom Wool's office.
21  It was a six-week assignment.
22     Q.   Let me ask you about Snelling.
23  Is it a staffing agency just for medical?

**American Court Reporting**
**February 6, 2008**

# American Court Reporting
## toll-free (877) 320-1050

Page 33

1    A.  No.
2    Q.  For anything?
3    A.  Yes.
4    Q.  So but they sent you to a
5  six-week assignment at a physician's
6  office; is that right?
7    A.  Yes.
8    Q.  What did you do there?
9    A.  I did pro time. I was pro
10  time, and I also did pacemaker hookups for
11  Dr. Wool. I did vital signs, basic
12  nursing assistant duties.
13    Q.  So you were working as a
14  nursing assistant?
15    A.  Yes.
16    Q.  When did you get that job?
17    A.  This was in May of 2007.
18    Q.  So you got sent on a six-week
19  assignment. Anything else?
20    A.  They also sent me on an
21  assignment with Alacare. It's a hospice
22  home health agency.
23    Q.  Okay. How long was that

Page 34

1  assignment?
2    A.  That assignment was supposed to
3  have been for eight weeks -- eight to
4  twelve weeks, but I found a full-time job
5  in the process.
6    Q.  Okay. So how long did you
7  actually work with Alacare?
8    A.  I worked with Alacare five
9  weeks. At Alacare, I was only responsible
10  for answering the phone and filing.
11    Q.  Then you got a full-time job?
12    A.  Yes.
13    Q.  So at Snelling Staffing, is it
14  fair to say you had two assignments? One
15  was the six-week assignment in the
16  physician's office, and the other one
17  would have been eight to twelve, but you
18  worked five at Alacare?
19    A.  Yes.
20    Q.  Any other assignments through
21  Snelling?
22    A.  No.
23    Q.  All right. What other places

Page 35

1  did you apply for work after you left DCI?
2    A.  I applied at Montgomery
3  Cardiovascular.
4    Q.  Okay.
5    A.  I applied at Baptist Hospital,
6  Baptist South.
7    Q.  Let's talk about Montgomery
8  Cardiovascular. Did you get a job there?
9    A.  No.
10    Q.  Was there a position?
11    A.  Yes.
12    Q.  How did you know about the
13  position?
14    A.  Internet.
15    Q.  There was an ad?
16    A.  I went on the Internet job
17  hunting.
18    Q.  Did there -- was there like an
19  ad on the Internet?
20    A.  Yes.
21    Q.  What was the position?
22    A.  It was for a medical assistant.
23    Q.  Did you apply?

Page 36

1    A.  Yes, I did.
2    Q.  Tell me, what did you do to
3  apply? Did you fill out an application?
4    A.  Yes, I did.
5    Q.  Who did you give it to?
6    A.  I filled out an application
7  online, and I also went there and picked
8  up a paper application and took it back.
9    Q.  Who did you give it to?
10    A.  I give it to the receptionist
11  at the desk.
12    Q.  Did you interview with anybody?
13    A.  No.
14    Q.  Did you ever hear from anybody?
15    A.  No.
16    Q.  Did you ever talk to anybody
17  that worked at Montgomery Cardiovascular
18  to find out why you weren't hired?
19    A.  When you call these people,
20  they are in meetings or they are busy, and
21  you can't talk to anyone until they were
22  ready to talk to you.
23    Q.  So you didn't talk to anybody

## American Court Reporting
## February 6, 2008

# American Court Reporting
## toll-free (877) 320-1050

Page 37

1  at Montgomery Cardiovascular?
2     A.   No.
3     Q.   Now, what was the next place
4  you said? It was a hospital, I think.
5     A.   Baptist Hospital South.
6     Q.   Is that here in Montgomery?
7     A.   Yes.
8     Q.   And was there an open position?
9     A.   Yes.
10    Q.   How did you find out about
11 that?
12    A.   You go in and they have a board
13 at the hospital, and you can also go
14 online.
15    Q.   And you saw an opening for
16 what?
17    A.   It was for a CNA, certified
18 nursing assistant.
19    Q.   Let me ask you this, backing up
20 just a minute. On Montgomery
21 Cardiovascular, do you remember when that
22 was that you applied?
23    A.   It was in November of 2007.

Page 38

1     Q.   How about Baptist?
2     A.   Same time. I did them all
3  around the same time.
4     Q.   Odyssey Home Health? You might
5  have said this earlier, but I didn't write
6  it down.
7     A.   Odyssey Home Health was around
8  August -- around September or October.
9     Q.   In '06?
10    A.   Same time, yes.
11    Q.   Baptist Hospital South, were
12 you employed there? Did they hire you?
13    A.   No.
14    Q.   Did you ever do an interview?
15    A.   No.
16    Q.   Did you fill out an online
17 application?
18    A.   Yes.
19    Q.   Did you do a paper application
20 also?
21    A.   No.
22    Q.   Did you ever hear from anybody?
23    A.   No.

Page 39

1     Q.   Do you know anybody that works
2  at Baptist Hospital South?
3     A.   No.
4     Q.   Any other places that you
5  applied?
6     A.   I even went as far as Atlanta,
7  Georgia.
8     Q.   Where was that? I mean, where
9  did you apply? I know where Atlanta is.
10 But what places did you apply in Atlanta?
11    A.   It was this hospital. It's
12 not -- I also applied at Grady Hospital.
13 I applied at another hospital there. I've
14 got to think of the name.
15    Q.   Was that in Atlanta?
16    A.   Yes, Grady Hospital in Atlanta.
17    Q.   Was there an opening at Grady?
18    A.   Yes.
19    Q.   How did you find out about
20 that?
21    A.   Online.
22    Q.   What was the position?
23    A.   I applied for everything. I

Page 40

1  applied for receptionist. I applied for
2  CNA. I applied for medical assistant. I
3  even applied for housekeeping.
4     Q.   Were you hired at Grady
5  Hospital?
6     A.   No.
7     Q.   Did you ever hear from anybody
8  at Grady Hospital?
9     A.   No.
10    Q.   Did you know anybody at
11 Grady --
12    A.   No.
13    Q.   Did you just do sort of a cold
14 search on the Internet?
15    A.   Yes, for anything that was
16 available, because I have a mortgage to
17 pay.
18    Q.   When was that, at Grady
19 Hospital?
20    A.   Grady Hospital. It was in
21 2006, I know.
22    Q.   Any other places in Atlanta?
23    A.   It was other hospitals that I

## American Court Reporting
## February 6, 2008

**American Court Reporting**
**toll-free (877) 320-1050**

Page 41

1 applied, and there was also one hospital
2 that closed.
3    Q.   What were the names of the
4 other hospitals?
5    A.   I can't think of the name of
6 that other hospital. I also applied on
7 career.com for anybody that had -- you
8 know, for finding jobs. I was also on
9 Atlanta Journal to get anybody that had a
10 job available.
11    Q.   Was it career.com or
12 careerbuilders.com?
13    A.   Careerbuilders.com, and
14 atlantajournal.com.
15    Q.   When was that, in '06?
16    A.   Yes. I'm still on there
17 because I haven't discontinued it.
18    Q.   You're still looking for a job?
19    A.   No, not now, because I have a
20 full-time job.
21    Q.   You mean you're still on Career
22 Builders?
23    A.   Yes. And Atlanta Journal.

Page 42

1    Q.   What's Atlanta Journal?
2    A.   It's kind of like Career
3 Builders. You go on and they find jobs --
4 they have jobs in Atlanta and surrounding
5 areas. That's anywhere in Atlanta.
6    Q.   Would you have moved to
7 Atlanta?
8    A.   Yes.
9    Q.   Did you ever hear back from
10 anybody in your search in Atlanta?
11    A.   I heard back from one person,
12 but at the time, I was working.
13    Q.   When was that?
14    A.   This was when I was working
15 with Snelling, one of the assignments I
16 had. I was working at the time, and I
17 didn't really want to move to Atlanta.
18 But I would have done anything to be
19 employed at the time.
20    Q.   So you had one of your
21 temporary assignments at Snelling, but did
22 you -- who called you from Atlanta?
23    A.   It was a doctor's office that I

Page 43

1 had applied for, also, there, but from
2 Atlanta Journal. They got my resume off
3 line, and they called me.
4    Q.   Did you -- did they --
5    A.   They offered me a job, yes, but
6 at the time I was working.
7    Q.   But you were working at the
8 temporary assignment?
9    A.   Yes.
10    Q.   So instead of quitting the
11 temporary job and moving to Atlanta, you
12 stayed at the temporary job?
13    A.   Yes. And trying to sell my
14 house -- which I just picked up a mortgage
15 in 2005. I'm not going to get anything
16 out of it.
17    Q.   Did you not have a mortgage
18 prior to 2005?
19    A.   Yes, I did, but I also had a
20 husband.
21    Q.   Okay. So when you divorced,
22 then you had the mortgage? You were
23 responsible?

Page 44

1    A.   Yes.
2    Q.   All right. Tell me where else
3 you applied after you left DCI.
4    A.   Well, the temp agency was the
5 last place that I worked. They sent me on
6 those two assignments. Like I said, in
7 the middle of that last assignment was
8 when I got employed.
9    Q.   Did you ever apply at Waterford
10 Assisted Living?
11    A.   Yes. That's over on -- I think
12 that's over on -- I also applied at Carol
13 Villa. But I also applied on Waterford.
14 That's over on Rudolph.
15    Q.   In Montgomery?
16    A.   Yes.
17    Q.   What position was available at
18 Waterford?
19    A.   I just applied there because of
20 word of ear.
21    Q.   So you didn't know of an open
22 position necessarily?
23    A.   No.

11 (Pages 41 to 44)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 45

1    Q.   Did you know somebody that
2  worked there?
3    A.   No.
4    Q.   Did you ever hear back from
5  Waterford?
6    A.   No.
7    Q.   So I take it you didn't get a
8  job offer?
9    A.   No.
10    Q.   What about City Gear?
11    A.   City Gear, I worked there a
12  little while, very little.
13    Q.   What is City Gear?
14    A.   City Gear is a clothing store.
15    Q.   When did you apply there?
16    A.   It was in 2006.
17    Q.   After you left DCI?
18    A.   Yes.
19    Q.   And you did actually work
20  there?
21    A.   I only worked there for like a
22  week. They needed -- one girl was out on
23  vacation, and I knew the manager there.

Page 46

1  She gave me that chance.
2    Q.   How about when that week was
3  over?
4    A.   No.
5    Q.   Did she offer to let you keep
6  working there?
7    A.   She didn't have an opening.
8    Q.   Had you ever worked in retail
9  prior to that?
10    A.   No.
11    Q.   City Gear is here in
12  Montgomery?
13    A.   Yes.
14    Q.   What about the Hilton? Did you
15  apply at the Hilton?
16    A.   Yes, I did.
17    Q.   When did you apply at the
18  Hilton?
19    A.   I applied at the Hilton -- it
20  was in 2006.
21    Q.   Any other place where you
22  applied for work?
23    A.   I applied so many places, I

Page 47

1  really can't think of them all right now.
2  But I did apply.
3    Q.   Can you tell me when you
4  started working at Snelling Staffing?
5    A.   I started working at Snelling
6  Staffing when my unemployment was
7  terminated, and I think that was in May.
8    Q.   Had you applied at Snelling
9  Staffing prior to that?
10    A.   No.
11    Q.   So you didn't apply at Snelling
12  Staffing until after your unemployment ran
13  out?
14    A.   Yes.
15    Q.   So that would have been about
16  May '07?
17    A.   Yes.
18    Q.   Other than City Gear, did you
19  work anyplace else while you were
20  collecting unemployment?
21    A.   I didn't collect unemployment
22  right away.
23    Q.   Okay.  But other than City --

Page 48

1  well, you may not have been collecting
2  unemployment when you worked at City Gear.
3    A.   No.
4    Q.   Okay.  Did you work anyplace
5  while you were collecting unemployment?
6    A.   No.  I was applying and not
7  hearing anything.
8    Q.   Let me show you another
9  document.  These are the plaintiff's
10  responses to the defendant's first set of
11  interrogatories and request for production
12  of documents.  If you would, take a look
13  down there at number seven.
14    A.   Okay.
15    Q.   Number seven is a response to
16  an interrogatory asking about places
17  you've applied for employment.  You listed
18  Hillview Terrace, and you say at Hillview
19  Terrace you applied in November of 2006.
20  Does that sound right?
21    A.   Yes.
22    Q.   Waterford Assisted Living is on
23  there as well, and it says --

12  (Pages 45 to 48)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 49

1    A.  April.
2    Q.  Of 2007?
3    A.  Yes.
4    Q.  If you would, turn to the next
5  one.  Then you've got City Gear, and you
6  applied for employment there in August of
7  2006; is that correct?
8    A.  Yes.  That was when I was
9  terminated from DCI.
10   Q.  Now, what about the Hilton?
11 You said that you -- that may be a typo,
12 but that may be accurate.  Did you apply
13 at the Hilton in August of 2007, or was it
14 2006?
15   A.  It was 2006.
16   Q.  Where is the Hilton?
17   A.  The Hilton is in Montgomery.
18 It's over off Perry Hill Road.
19   Q.  Perry Hill Road?
20   A.  Yes.
21   Q.  There's no other employers
22 listed there.  Why didn't you list on
23 there -- on those interrogatories -- all

Page 50

1  of these employers you just told me about
2  today?
3    A.  I have no answer.
4    Q.  At the time -- did you help
5  fill out these interrogatories and respond
6  to these questions?
7    A.  Yes.
8    Q.  At the time, did you recall
9  that you had applied at Montgomery
10 Cardiovascular, Baptist Hospital South,
11 Odyssey Home Health, Grady Hospital?  Did
12 you recall that you had applied at all of
13 those places at the time that you were
14 completing these interrogatory responses?
15   A.  I'm not sure.
16   Q.  But sitting here today, you
17 remember applying at all these places you
18 told me about today?
19   A.  Yes, I do.
20     MS. SANDERS:  Let's go ahead
21 and mark that as the next exhibit.
22     (Whereupon, a document was
23 marked as Defendant's Exhibit 2 and is

Page 51

1  attached to the original transcript.)
2    Q.  Ms. Quinnie, any other places
3  that you applied other than the ones we
4  have talked about?
5    A.  Not to my knowledge.
6    Q.  How about Twin Cities?
7    A.  Twin Cities was in October of
8  -- I'm not sure whether it was 2006 --
9  2006, and it ended November 2, 2006.
10   Q.  What is Twin Cities?
11   A.  Twin Cities was a security
12 officer.
13   Q.  And what is Twin Cities?  Is it
14 a security company?
15   A.  Yes.
16   Q.  Is it here in Montgomery?
17   A.  The check was from Opelika.
18   Q.  From where?
19   A.  Opelika.  It's in Alabama.
20   Q.  But the check came from Twin
21 Cities Security in Opelika, Alabama?
22   A.  Yes.
23   Q.  What were you doing for the

Page 52

1  month that you worked for them?
2    A.  I worked at -- Tutwiler is a
3  women's prison.  And where the women are
4  on work release, I worked there from
5  twelve midnight until eight in the
6  morning.  Securing that they're there; did
7  bed checks every hour; made sure all the
8  doors were locked so there would be no
9  escapes; made sure everybody got up at a
10 reasonable time that had to be somewhere
11 that morning.
12   Q.  You said your employment ended
13 there in November of 2006.  Why did that
14 end?
15   A.  It ended because I was working
16 for Twin Cities.  Vinson Security bought
17 out Twin Cities.  They underbid at Twin
18 Cities.  I was already working for $6.50
19 an hour, and I was not going to work for
20 $5 an hour.
21   Q.  Is that what Vinson Security
22 was going to --
23   A.  Yes.

13 (Pages 49 to 52)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 53

1    Q.   Is that V-I-N-C-E-N-T or
2  V-I-N-S-O-N?
3    A.   V-I-N-S-O-N.
4    Q.   Okay.  Now, do you know if Twin
5  Cities Security still exists, or is it --
6    A.   Yes, they do.
7    Q.   All right.  I wasn't sure from
8  your answer.  I thought maybe Vinson
9  bought Twin Cities.
10    A.   No.  They underbid it.  At
11  Tutwiler -- the place I worked is called
12  Tarwater -- they underbid Twin Cities.
13  Therefore, Twin Cities is no longer
14  employing security officers there.  It's
15  Vinson Security now.
16    Q.   Did you get any employment
17  after you left --
18    A.   That's when I applied for my
19  unemployment again.
20    Q.   Let's just make sure I've got
21  this right.  You left DCI in August of
22  2006.  Did you get unemployment --
23    A.   No.

Page 54

1    Q.   Did you have any income between
2  August and September of 2006?
3    A.   Well, I had my -- I got my
4  valid -- my 401(k) checks from DCI.
5    Q.   Okay.
6    A.   I also had paychecks.
7    Q.   Right.  From where you had
8  worked?
9    A.   Yes.  So that paid my mortgage
10  and my bills, and I budgeted myself with
11  the money I had.
12    Q.   When did you start working --
13  was Twin Cities the first job you had
14  after --
15    A.   Yes.
16    Q.   Okay.  And when did you start
17  working there?
18    A.   It was in October.
19    Q.   Let me show you this document
20  again which we've marked as Exhibit 2.  In
21  response to number eight on the
22  interrogatories where I asked you about
23  your employment since DCI, you indicated

Page 55

1  that you worked at Twin Cities and that
2  you started working in September.
3    A.   It was October.
4    Q.   Okay.  So it's your testimony
5  that that's just incorrect on the
6  interrogatories?
7    A.   Yes.
8    Q.   Did you work anywhere in
9  September of '06?
10    A.   No.
11    Q.   Did you collect unemployment in
12  September of '06?
13    A.   No.
14    Q.   Did you apply for unemployment?
15    A.   No, not at that time, because I
16  was looking for jobs.
17    Q.   So when you quit working at the
18  security company, Twin Cities Security,
19  did you then apply for unemployment?
20    A.   Yes.
21    Q.   And did you receive it?
22    A.   Yes.
23    Q.   How long did you receive

Page 56

1  unemployment?
2    A.   I received unemployment from
3  November until May.  The last check was
4  the last -- I think it was the ending part
5  of April or, like, the first week part of
6  May, not the whole month of May.
7    Q.   So let me ask you this:  When
8  you applied for unemployment, did you tell
9  the unemployment office that you had quit
10  Twin Cities Security?
11    A.   I did not quit Twin Cities
12  Security.  Twin Cities Security was
13  underbidded by Vinson Security where I
14  worked.
15    Q.   So Twin Cities didn't offer you
16  any other type of employment?
17    A.   No.
18    Q.   Did Vinson offer you
19  employment?
20    A.   No.  They had a post up that
21  anybody that wanted to stay could stay.
22    Q.   So you could have stayed at
23  Vinson?

14  (Pages 53 to 56)

**American Court Reporting**
**February 6, 2008**

# American Court Reporting
## toll-free (877) 320-1050

Page 57

1   A.  Yes.
2   Q.  For less money?
3   A.  Yes.
4   Q.  Do you know whether Twin Cities
5   operates any other security -- that's not
6   really -- strike that.  Do you know
7   whether Twin Cities provides security to
8   any other places in Montgomery?
9   A.  Yes.
10  Q.  Did you inquire about going to
11  work at any of those places?
12  A.  Yes, I did, but they did not
13  have any openings here in Montgomery.
14  Tarwater is in Wetumpka.
15  Q.  So you received unemployment
16  from November '06 until May '07; correct?
17  A.  The ending of April to the
18  first -- I don't even think it was the
19  first week of May.
20  Q.  And do you -- during the time
21  you were receiving unemployment, did you
22  work anyplace?
23  A.  No.

Page 58

1   Q.  Did you apply at some of these
2   places --
3   A.  Yes.
4   Q.  -- that you talked about while
5   you were receiving unemployment?
6   A.  Yes.  And I also went back to
7   make phone calls to some of those places
8   that I had applied.
9   Q.  And were you offered any jobs
10  while you were receiving unemployment?
11  A.  No.  I went down to the
12  unemployment office, and the lady there
13  gave me a slip to take to the Hyundai
14  plant.  When I went to the Hyundai plant,
15  they told me they were no longer hiring
16  for that position.
17  Q.  That was another place you
18  applied.  When was that?
19  A.  That was at the unemployment
20  office.  That was during the unemployment.
21  Q.  When was that?  Do you know?
22  A.  This was -- it had to have been
23  March.

Page 59

1   Q.  Of '07?
2   A.  Yes.
3   Q.  Now, when your unemployment
4   ended, did you --
5   A.  When my unemployment ended, it
6   was only a week before Snelling called me
7   because they got my resume off line.
8   Q.  And Snelling Staffing is here
9   in Montgomery; right?
10  A.  Yes.
11  Q.  So Snelling Staffing got your
12  resume online.  Where did they get it?  Do
13  you know?  Was it Career Builders?
14  A.  Yes.  It was either Career
15  Builders or the Atlanta Journal.  I'm not
16  sure which one.
17  Q.  So you didn't --
18  A.  And, also, you have to go --
19  when you're drawing unemployment, you have
20  to put an online resume there as well.
21  Q.  So they may have gotten it
22  there?
23  A.  Yes.

Page 60

1   Q.  Some of these places, you
2   actually sought them out --
3   A.  Yes.
4   Q.  -- filled out an application?
5   A.  Yes.
6   Q.  But Snelling actually found
7   you --
8   A.  Yes.
9   Q.  Okay.  You never applied
10  directly at Snelling?
11  A.  No.  No, I didn't.
12  Q.  So you worked at Snelling from,
13  what, about May to September of '07; is
14  that --
15  A.  Yes.
16  Q.  And then what did you do?  You
17  indicated that your Alacare Hospice was
18  going to be an eight- to twelve-week
19  assignment, but you cut it short because
20  you got a job.
21  A.  Yes.
22  Q.  Tell me about that job.
23  A.  I know work at Fresenius

15  (Pages 57 to 60)

## American Court Reporting
## February 6, 2008

**American Court Reporting**
**toll-free (877) 320-1050**

Page 61

1  Dialysis Clinic.
2     Q.  How long have you been at
3  Fresenius?
4     A.  Since September.
5     Q.  Of '07?
6     A.  Yes.
7     Q.  What do you do at Fresenius?
8     A.  I am a dialysis tech.
9     Q.  Had you ever been a dialysis
10 tech before?
11    A.  No.
12    Q.  At DCI, did you ever do tech?
13    A.  No. I went out and fooled with
14 the machines a lot.
15    Q.  Where is Fresenius located?
16    A.  The one I'm employed at is on
17 Narrow Lane Road here in Montgomery.
18    Q.  Who is your supervisor?
19    A.  Stacy Matthews.
20    Q.  Is Stacy an RN?
21    A.  Yes.
22    Q.  What is she, like the nurse
23 manager?

Page 62

1     A.  She's the clinical manager.
2     Q.  Okay. Any places that you've
3  worked since DCI other than the brief City
4  Gear, Twin Cities Security, your
5  assignments at Snelling Staffing, and
6  Fresenius?
7     A.  No.
8     Q.  Now, Ms. Quinnie, do you have
9  your -- like your tax papers from 2006 and
10 2007 where you filed for your taxes?
11    A.  No, I don't.
12    Q.  Well, you may not have done it
13 for 2007 yet.
14    A.  No, I haven't done it for 2007
15 yet.
16    Q.  Do you have records from 2006
17 of the income you received? I know you
18 got a W-2, I'm sure, from DCI. But do you
19 have any records of your Social
20 Security -- I'm sorry -- your unemployment
21 that you received or the money you
22 received from City Gear or any other
23 income you may have received in 2006?

Page 63

1     A.  Not with me, no.
2     Q.  Okay. Do you still have
3  your -- the forms that you sent to the
4  IRS? Your tax forms when you filed for
5  your income taxes?
6     A.  2006, I did Turbo Tax.
7     Q.  Do you still have your
8  documentation from Turbo Tax?
9     A.  I was in Atlanta at the time
10 when I did it, but I can call and try to
11 get those for you.
12      MS. SANDERS: Brett, do you
13 want me to do a follow-up request?
14      MR. HARRISON: Yes.
15    Q.  (By Ms. Sanders) Did you live
16 in Atlanta?
17    A.  No.
18    Q.  You were just in Atlanta at the
19 time you did your taxes?
20    A.  Yes. Went seeking employment
21 and did my taxes while I was there.
22    Q.  At any of these places that
23 you've applied, do you have any

Page 64

1  documentation? In other words, did you
2  keep any copies of applications?
3     A.  No. Most of them were done
4  online.
5     Q.  Okay. And you never printed
6  them off and saved them for your records?
7     A.  No.
8     Q.  Are you still on
9  careerbuilders.com and Atlanta Journal?
10    A.  Yes.
11    Q.  I take it you're no longer on
12 the Montgomery -- whatever you did through
13 the unemployment?
14    A.  I don't think I am, no.
15    Q.  Any other websites that you
16 might be on that you're aware of other
17 than Career Builders and Atlanta Journal?
18    A.  No.
19    Q.  You didn't put yourself on any
20 others?
21    A.  No.
22    Q.  What are you making at
23 Fresenius?

16 (Pages 61 to 64)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 65

1   A.   Hourly?
2   Q.   Right.
3   A.   $11.
4   Q.   Do you work full-time?
5   A.   Yes.
6   Q.   40 hours a week?
7   A.   Yes.
8   Q.   Do you ever work overtime?
9   A.   No.
10  Q.   What about when you did your
11  six-week assignment with Snelling
12  Staffing?  Do you recall what your wages
13  were?
14  A.   $11 an hour.
15  Q.   Did you work overtime?
16  A.   No.
17  Q.   Did you work 40 hours?
18  A.   Yes.
19  Q.   How about at Alacare Hospice
20  for those five weeks?
21  A.   Alacare was only $9 an hour.
22  Q.   Did you work 40 hours?
23  A.   Yes.

Page 66

1   Q.   Did you ever work overtime?
2   A.   No.
3   Q.   Do you remember what you were
4   receiving from unemployment, what your
5   unemployment wages were?
6   A.   It was 237 weekly.
7   Q.   Okay.  Now, let's talk about
8   DCI.  When did you start working at DCI?
9   A.   When did I stop?
10  Q.   Start.
11  A.   I started working for DCI in
12  May.  May 23, 2001.
13  Q.   And who was your employer just
14  prior to that?
15  A.   Jackson Hospital and the police
16  department and --
17  Q.   Right.  That's when you were
18  working for all three?
19  A.   Yes.
20  Q.   And that was in Montgomery?
21  A.   Yes.
22  Q.   How did you find out about DCI?
23  Did they have a position open?

Page 67

1   A.   No.  Patricia Jackson was
2   working there at the time.
3   Q.   Who's Patricia Jackson?
4   A.   She's an RN.  She was charge
5   nurse at DCI at the time.
6   Q.   And are you friends with
7   Patricia?
8   A.   Yes.
9   Q.   And she told you about a job?
10  A.   Yes.
11  Q.   What was the job opening at the
12  time?
13  A.   I started at DCI as unit clerk,
14  and I did that for two weeks before they
15  changed the position to land
16  administrator, medical records.
17  Q.   What was that?
18  A.   Land administrator.  I was
19  responsible for computer problems for four
20  clinics, which was Georgiana, Union
21  Springs, Thomasville, as well as
22  Montgomery.
23  Q.   So it was land administrator

Page 68

1   and medical records, and that was for four
2   clinics?
3   A.   Yes.
4   Q.   Did you work at one clinic?
5   A.   Montgomery.
6   Q.   Did you ever have to go to the
7   other clinics?
8   A.   Yes.
9   Q.   How often?
10  A.   I went there a lot.  Because at
11  one time, we had a storm here and it tore
12  up all the computers in every clinic.  At
13  one time -- Benjamin -- I don't know his
14  last name, but he came from Chicago.  We
15  went to the clinics, and, also, Jason have
16  come down and gone with me, and one other
17  guy.
18  Q.   Was that -- is it safe to say
19  that that was more sporadic?  In other
20  words, were you regularly at Montgomery?
21  A.   If they had a change made on
22  the computers, then I was responsible for
23  making sure that all four clinics'

17 (Pages 65 to 68)

**American Court Reporting**
**February 6, 2008**

## American Court Reporting
## toll-free (877) 320-1050

Page 69

1  computers worked. Not as much as worked,
2  but was advanced to those changes. I also
3  was responsible for getting everyone's
4  passwords and setting up home drives and
5  all for RNs on the computers.
6      Q.  But you didn't have a regular
7  schedule where you would regularly go
8  to --
9      A.  No. I only went to the other
10 clinics if they had a major problem --
11     Q.  Kind of like an as-needed
12 thing?
13     A.  -- that I couldn't do over the
14 computer in Montgomery.
15     Q.  Let me ask you this: Did you
16 have any training in computers?
17     A.  No.
18     Q.  So working at DCI, was that
19 your only job that you've had working with
20 computers?
21     A.  Yes.
22     Q.  Did you get any training at
23 DCI?

Page 70

1      A.  Yes.
2      Q.  Who trained you?
3      A.  Benjamin from Chicago was the
4  first RNA that I had.
5      Q.  Do you know his last name?
6      A.  I'm thinking it was Johnson.
7      Q.  Anybody else train you?
8      A.  Jason Alevich, A-L-E-V-I-C-H.
9  And it was one other male. I can't think
10 of his name. I'm not sure what his name
11 was. And William Cross helped me out a
12 lot in calling him. His home office is
13 Nashville, Tennessee.
14     Q.  Let me ask you this just to
15 make sure I understand. When you say you
16 were the land administrator, were you
17 responsible for programming computers?
18 You didn't do computer programming, did
19 you?
20     A.  They would send a disk from
21 Chicago, and I had to go to every computer
22 and set those computers up.
23     Q.  Now, you said that you were the

Page 71

1  land administrator and medical records?
2      A.  Yes.
3      Q.  Did you do one -- in other
4  words, did you work on computers more than
5  you worked on medical records or --
6      A.  Yes.
7      Q.  Okay. So can you give me some
8  idea of what percentage of your time you
9  spent on computers and what percentage of
10 your time you spent on medical records,
11 just on average, just to give me an idea
12 of what you were doing on a day-to-day
13 basis?
14     A.  The computers was, if anything
15 happened to the computers, if they went
16 down, if the server went down, the mini
17 server in one of the other satellite
18 units, then I was responsible for finding
19 out that problem, getting those computers
20 up, because you cannot work without the
21 server or the mini servers.
22     Q.  Let me ask you this just real
23 quick. With the servers, did you know how

Page 72

1  to get them back up, or were you
2  responsible for finding somebody to help
3  you --
4      A.  I was responsible for getting
5  them back up to a point. If I got to a
6  point, that's when I called my RNA.
7      Q.  How did you know how to do it?
8      A.  On the job, from Benjamin
9  yelling and screaming at me. He was
10 foreign. He yell and scream at you over
11 the phone, and you had to learn it. You
12 had to get it.
13     Q.  All right. So go on. I'm
14 sorry.
15     A.  If they had -- our server went
16 down, so I had people talking to me over
17 the phone telling me what to do --
18     Q.  Right.
19     A.  -- how to do it. At that
20 point, we put the new server in. We
21 rebuilt the new mini servers for the other
22 clinics if they went down. A lot of my
23 job was also -- like I said, a lot of the

18 (Pages 69 to 72)

## American Court Reporting
## February 6, 2008

Page 73

1 RNs, even though they had RN behind their
2 name, they didn't know how to use a
3 computer. They would get upset with it
4 and bang on it or whatever, and I was the
5 one that had to go out and fix it.
6    Q.   How would you fix it? I mean,
7 would you take it apart and rebuild it?
8    A.   No. I would -- I knew how to
9 go in and -- if I had a problem with going
10 into the computer, sometime I did have to
11 take it off and look at the mother board.
12 But if I had a problem, I would also call
13 my RNA.
14    Q.   RNA stands for?
15    A.   Regional -- I have no idea.
16    Q.   It's some kind of computer
17 person?
18    A.   Yeah.
19    Q.   Not a nurse? Something --
20    A.   No, no, no. I also was
21 responsible for medical records. I had --
22 I got caught up in the medical records
23 thing because I didn't know -- I'd never

Page 74

1 done that before, and those medical
2 records were in the worst shape. I also
3 was responsible for admitting and
4 discharge and transient patients.
5    Q.   Okay.
6    A.   Admitting patients into the
7 clinic. I was also responsible for
8 discharging patients. I was also
9 responsible for -- if a patient wanted to
10 go out of town, it was my responsibility
11 to call and try to find a clinic for them
12 to be dialyzed at. As well as if someone
13 was coming to Alabama and needed to be
14 dialyzed, I was responsible for getting
15 their paperwork and doing all that to get
16 them situated into DCI.
17    Q.   Let me ask you a couple of
18 questions about the admitting and
19 discharging. As I understand it, at your
20 clinic in particular, you have really
21 regular patients that come on a very
22 frequent basis; is that correct?
23    A.   Yes.

Page 75

1    Q.   Once they're admitted, do you
2 have to admit them every time they come
3 or --
4    A.   Yes.
5    Q.   -- they just sign in?
6    A.   No. You have to admit them
7 every time they come.
8    Q.   What does that entail?
9    A.   You have to get them to sign
10 consent forms for hemodialysis. You have
11 to get them to sign consent forms for
12 tuberculosis. You have to get them to
13 sign numerous consent forms.
14    Q.   Every time?
15    A.   Yes. You have to get copies of
16 their insurance cards, copies of their
17 driver's license or ID cards.
18    Q.   And what about discharging?
19 What does that involve?
20    A.   Discharging was if someone --
21 even if they died or they left the clinic,
22 you had to make sure they had a -- it's a
23 HIPPA form, 2728 form. You have to make

Page 76

1 sure why they have discharged. You have
2 to have the correct reason why they were
3 discharged. If they expired, you have to
4 give a diagnostic code for why they died.
5 You have to make sure that's correct. You
6 have to disperse their chart. Part of
7 that, you have to make sure that parts of
8 that chart went different places.
9    Q.   So what about transient
10 patients? Would you do the same thing for
11 them, or did that involve more?
12    A.   A transient patient, you only
13 get certain consent forms signed. You
14 still have to get their insurance cards.
15 You still have to get -- it was pretty
16 much like an admission.
17    Q.   About the same?
18    A.   Yes. And, also, I was
19 responsible for backing up the unit
20 secretary, doing -- entering flow sheets.
21    Q.   And what would that be? What's
22 a flow sheet?
23    A.   The flow sheet's what they

19 (Pages 73 to 76)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 77

1  write the vital signs on. Everything they
2  use for that patient that day, they will
3  document. And at the end of the day, you
4  make copies of the flow sheet -- the nurse
5  will make copies of the flow sheet, and
6  you have to enter them into the system.
7      Q.  Into a computer?
8      A.  Yes.
9      Q.  So the nurses didn't enter the
10 flow sheets into the computer?
11     A.  No.
12     Q.  You did that?
13     A.  I was backup to the unit
14 secretary. Mostly I did it.
15     Q.  So the secretary was there to
16 do it, and you backed her up?
17     A.  Yes.
18     Q.  Let me show you another
19 document, Ms. Quinnie. If you would just
20 take a second and look at that document
21 and review it.
22     A.  (Witness reviews document.)
23     Q.  Ms. Quinnie, did you get a

Page 78

1  chance to review that document?
2      A.  Yes. This is the job
3  description.
4      Q.  Is that an accurate description
5  of the job that you performed at DCI?
6      A.  No, because there is a
7  statement in there that says it is subject
8  to change, and it did change.
9      Q.  Okay. Well, let's talk about
10 it before it changed. Did you ever
11 perform --
12         MS. SANDERS: Let's go ahead
13 and mark it so we'll know what we're
14 talking about.
15         (Whereupon, a document was
16 marked as Defendant's Exhibit 3 and is
17 attached to the original transcript.)
18     Q.  (By Ms. Sanders) Ms. Quinnie,
19 did you ever perform the functions in that
20 job description?
21     A.  Yes, I did.
22     Q.  Okay. Now, you indicated that
23 it wasn't an accurate description because

Page 79

1  it was subject to change.
2      A.  Yes.
3      Q.  But you did do the functions
4  that were in that description?
5      A.  Yes.
6      Q.  Correct?
7      A.  Yes.
8      Q.  So what changed?
9      A.  If Mr. Ashbury or someone asked
10 me to do something, I couldn't say no. I
11 had to do it.
12     Q.  Okay. So in other words --
13     A.  What I'm saying is, with doing
14 these duties, nothing was taken away from
15 me. I still had to do this as well as
16 flow sheets when the secretary got behind
17 or when she wasn't there. I also had to
18 stop in the middle of doing whatever was
19 on here to sign up patients or discharge
20 patients or -- and that is not in here.
21     Q.  So the flow sheets is not on
22 the job description?
23     A.  No.

Page 80

1      Q.  And the discharging and
2  admitting patients are not on the job
3  description?
4      A.  No.
5      Q.  But those are things that you
6  had to do?
7      A.  Yes.
8      Q.  What other types of things did
9  you have to do that aren't on the job
10 description?
11     A.  I was also responsible at one
12 time for doing the nurses' payroll.
13     Q.  Okay. Tell me about that.
14 What did you do with the nurses' payroll?
15     A.  I was responsible for making
16 corrections for their time. If someone
17 didn't clock in, then they would come to
18 me and say, Cynthia, I didn't clock in.
19 This is for nursing staff only. Sherry
20 Pereira (phonetic) was the nurse manager.
21     Q.  Who was the nurse manager?
22     A.  Sherry Pereira.
23     Q.  And was Mr. Ashbury still the

20  (Pages 77 to 80)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 81

1  clinic administrator at the time?
2     A.  Yes.
3     Q.  Who gave you that assignment?
4     A.  Mr. Ashbury.
5     Q.  How long did you do that
6  particular function?
7     A.  We went to the computer clock
8  in January of '04, if I'm not mistaken.
9     Q.  And you were just doing the
10 payroll corrections for nurses?
11    A.  Yes.
12    Q.  You didn't do it for the techs?
13    A.  The techs are -- the nursing
14 staff.
15    Q.  I see.  So would you have done
16 it for, like, the administrative staff?
17    A.  No.
18    Q.  Like the secretary --
19    A.  No.
20    Q.  So you only did it for the
21 nursing staff?
22    A.  The nursing staff.
23    Q.  Tell me, just for the record,

Page 82

1  what does the nursing staff include?
2     A.  The RNs, LPNs, and techs.
3     Q.  What about the equipment techs?
4  Because I understand --
5     A.  No.
6     Q.  Just the patient care techs?
7     A.  Yes.
8     Q.  People who took care of
9  patients?
10    A.  Yes.
11    Q.  Now, in that, is there anything
12 else that's not in that job description
13 that you did during your employment at
14 DCI?
15    A.  No.
16    Q.  Does that include -- does that
17 job description include your duties as the
18 land administrator?
19    A.  Yes.
20    MS. SANDERS:  And just for the
21 record, we've been referring to Exhibit 3,
22 what's been marked as Defendant's Exhibit
23 3.

Page 83

1     Q.  So any other positions that you
2  held at DCI other than what's in Exhibit 3
3  and the things that you told us about in
4  addition to Exhibit 3?
5     A.  No.
6     Q.  Let me ask you about this.
7  When you applied at DCI, who hired you?
8     A.  Pam Heverman (phonetic).
9     Q.  Who was Ms. Heverman?
10    A.  She was acting as administrator
11 at the time.
12    Q.  Was Mr. Ashbury there?
13    A.  No.
14    Q.  Do you recall when Mr. Ashbury
15 came to DCI?
16    A.  I was there in May of '01.  He
17 came in August of '01.
18    Q.  Okay.  Do you recall -- strike
19 that.  I want to show you one more
20 document -- well, that was misleading.
21 I'm going to show you a lot more
22 documents.  But right now, I want to show
23 you this document and ask you if that's

Page 84

1  your signature.
2     A.  Yes.
3     Q.  Do you recall receiving the DCI
4  handbook?  It would have been like in a
5  blue binder.
6     MR. HARRISON:  Is that it?
7     Q.  So you received it, and you
8  signed this?
9     A.  Yes.
10    MS. SANDERS:  Okay.  Let's mark
11 that as the next exhibit.  It'll be
12 Exhibit 4.
13    (Whereupon, a document was
14 marked as Defendant's Exhibit 4 and is
15 attached to the original transcript.)
16    Q.  (By Ms. Sanders)  When you came
17 to DCI, did you receive that blue benefits
18 package --
19    A.  Yes.
20    Q.  -- as soon as you were hired?
21    A.  No, not as soon as.
22    Q.  Or shortly thereafter?
23    A.  This was in December.  I was

21  (Pages 81 to 84)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 85

1 hired in May.
2     Q.   Did you have some sort of
3 training?
4     A.   No. It was on-the-job train --
5 well, as far as unit secretary, I was
6 taught by Pat Jackson how to go in and
7 thin the charts on the floor.
8     Q.   Let me ask you this: Did
9 anybody ever give you any training on that
10 particular book, what's in it?
11     A.   No.
12     Q.   Personnel policies, that sort
13 of thing?
14     A.   No. You were given that book
15 and signed that you received that book,
16 and you read that back at your leisure.
17     Q.   Okay. So you kept a copy of
18 the book?
19     A.   Yes.
20     Q.   You had your own copy?
21     A.   Yes.
22     Q.   Ms. Quinnie, just so I
23 understand, did you receive that handbook,

Page 86

1 or some version of that handbook, after
2 you -- soon after you were employed at
3 DCI?
4     A.   Yes.
5     Q.   And then did you receive an
6 updated handbook?
7     A.   No. That's the handbook that
8 I've got.
9     Q.   Look at the date on that
10 document that's marked Exhibit 4?
11     A.   Yes. 12/05.
12     Q.   Right. When did you start
13 working at DCI?
14     A.   I started working there in May
15 of '01.
16     Q.   Okay. So did you receive any
17 handbook prior to '05?
18     A.   This is the handbook that I've
19 always had.
20     Q.   Did you receive it in 2001 or
21 2005?
22     A.   I received it in 2005.
23     Q.   Okay. So you did not --

Page 87

1     A.   Because I -- you had to ask for
2 it.
3     Q.   So nobody gave it to you?
4     A.   No. After I asked for it.
5     Q.   Who did you ask for it?
6     A.   Lee Ashbury.
7     Q.   How did you know about its
8 existence?
9     A.   Because of other staff members
10 talking about it and other staff members
11 having them, and I wanted to know where
12 they got it from.
13     Q.   And you didn't have one --
14     A.   No.
15     Q.   -- until you asked Mr. Ashbury
16 in 2005?
17     A.   Yes.
18     Q.   And then he gave you that one;
19 is that correct?
20     A.   Yes.
21         MS. SANDERS: For the record,
22 would you -- I know this hasn't been made
23 an exhibit, that blue book. But just to

Page 88

1 identify it, this is the blue book that
2 the plaintiff brought to the deposition
3 which she has identified as the original
4 copy that she received.
5     Q.   (By Ms. Sanders) Is that
6 correct?
7     A.   Uh-huh.
8     Q.   Ms. Quinnie, would you tell me
9 the date on the bottom of the page? Just
10 any page. Just open the handbook and look
11 at the bottom of the page and tell me what
12 the date is.
13     A.   It's March of '01.
14     Q.   Okay. Did you ever start your
15 employment at DCI, leave your employment,
16 and come back to DCI?
17     A.   No.
18     Q.   So it was continuous
19 employment?
20     A.   Yes.
21     Q.   All right. Now, Ms. Quinnie, I
22 want to talk about the lawsuit that you've
23 filed against DCI. Can you tell me what

22 (Pages 85 to 88)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 89

1　is the basis of your allegation against
2　DCI? What are you claiming that DCI did
3　wrong?
4　　A. I've worked at DCI five years.
5　I have never been presented with a
6　write-up. I have never been written up.
7　DCI -- on August 7, 2006, at 3:30 when I'm
8　about to go out the door to go home,
9　Ms. Gary comes into my office and asks for
10　my keys. I asked her what was going on,
11　and she said she couldn't tell me. She
12　asked me did I want to talk with Rose
13　Smith. I spoke with Rose Smith on the
14　phone. She said that there were some
15　accusations brought up against me, but
16　they had no proof. They were
17　investigating, and I was being placed on
18　administrative leave without pay.
19　　　I tried numerous times to call
20　Glenda Gary to see what was going on, when
21　do I come back to work. She did not talk
22　to me. At one time, Glenda Gary called me
23　and asked me to be in her office that

Page 90

1　morning. I said yes, but then I called my
2　attorney. He told me to call her back and
3　ask can we come at 1:30. When I came into
4　that building that particular day, they
5　would not talk with me.
6　　Q. What day was that?
7　　A. This was in -- do you remember
8　the date? It was in August of '06.
9　　Q. Let's back up just a minute.
10　You said that you were -- do you remember
11　the date on which you were asked to leave
12　and told --
13　　A. It was August 7th.
14　　Q. Okay. So based on that date,
15　does that help you remember what date it
16　was that you went in at 1:30?
17　　A. It was August 10th or 11th.
18　I'm not sure.
19　　Q. Was Mr. Harrison your attorney
20　at the time?
21　　A. Yes.
22　　Q. All right. So then you --
23　we'll get into the details of that with

Page 91

1　more particularity. But for the time
2　being, is that the basis for your claim
3　against DCI?
4　　A. And the fact that it was a lot
5　of discrimination going on there.
6　　Q. Against you?
7　　A. Against me and other black
8　employees.
9　　Q. Now, did you quit your
10　employment, or were you terminated?
11　　A. I was terminated. When they
12　came in and would not talk with me and my
13　attorney, Dan Watson -- he is in
14　Nashville -- made the statement that if he
15　could not talk with me without my
16　attorney, that I voluntarily quit. I did
17　not voluntarily quit.
18　　Q. Was anybody around to witness
19　that statement from Mr. Watson?
20　　A. My attorney.
21　　Q. Anyone else?
22　　A. It was Rose Smith.
23　　Q. Rose was there at the time?

Page 92

1　　A. Yes.
2　　Q. Anyone else?
3　　A. Glenda Gary was in the break
4　room right across from the room where we
5　talked. I don't know if she -- I'm quite
6　sure she heard it.
7　　Q. But she wasn't in the room?
8　　A. She was not in the room.
9　　Q. Anybody else in the room?
10　　A. No.
11　　Q. Let's talk about that. You
12　testified that Ms. Gary asked you for your
13　keys; told you that she couldn't tell you
14　why; but that then you called Rose; is
15　that correct?
16　　A. No. Rose was on the phone with
17　someone --
18　　Q. So you talked to Rose?
19　　A. -- and she asked me did I want
20　to talk to Rose. I said, yes, somebody
21　needs to tell me what's going on.
22　　Q. All right. And what did Rose
23　tell you?

23　(Pages 89 to 92)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 93

1    A.   Rose told me that some
2  accusations had been brought up against me
3  of falsifying time; that they had no
4  proof, but they were investigating. And
5  in due time, I was being placed on
6  administrative leave without pay.
7    Q.   Did you get paid while you were
8  off?
9    A.   No.
10    Q.   Did you ask Rose what she was
11  talking about?
12    A.   She said some accusations had
13  been brought up against me about
14  falsifying time. I asked her, how do you
15  falsify time; what are you talking about?
16    Q.   Okay.
17    A.   And at that point she said,
18  Cynthia, if you haven't done anything,
19  then you have nothing to worry about.
20    Q.   Okay.
21    A.   And I said, okay, fine.
22    Q.   Any other conversations --
23    A.   No.

Page 94

1    Q.   Any other conversation that day
2  with Rose?
3    A.   No. It was 3:30. It was time
4  for me to go home.
5    Q.   So you went home and you did
6  not come back to work the next day?
7    A.   No. I was told not to come
8  back until I heard from Glenda Gary.
9    Q.   When she told you that there
10  was some accusations about you falsifying
11  time, did you have any idea what she was
12  talking about?
13    A.   No, I didn't, and I still
14  don't.
15    Q.   Did you ever talk to any
16  employees at DCI about what she might have
17  been talking about falsifying time?
18    A.   No. I did call LaTonya
19  Buchanan, and I asked her what was going
20  on. I asked her what is going on, what --
21  did you hear anything downstairs, because
22  she works downstairs with Glenda Gary.
23    Q.   Okay. What did she tell you?

Page 95

1    A.   She said she didn't know what
2  was going on. She said, I don't believe
3  they did this to you; I don't know what's
4  going on; I don't know what you're talking
5  about.
6    Q.   Had you ever had any
7  conversation with LaTonya Buchanan before
8  that time about falsifying time?
9    A.   No.
10    Q.   So you talked with Rose, and
11  then what was the next -- and you talked
12  to LaTonya Buchanan. What was the next
13  conversation you had with somebody at DCI?
14    A.   I haven't had a conversation
15  with anybody else other than LaTonya
16  Buchanan.
17    Q.   Well, somebody had to tell you
18  to come back for the meeting.
19    A.   Well, Glenda Gary called me and
20  told me to come back to the meeting.
21    Q.   Okay. So tell me about that
22  conversation.
23    A.   She said, hey, how are you

Page 96

1  doing. I said, I'm fine. She said, can
2  you be in my office. It was a Monday
3  morning. She said, can you be in my
4  office Monday at eight o'clock. She said,
5  don't go to your office, just come
6  straight to my office; we're going to
7  talk. I said, okay, what's going on. She
8  said, we'll talk Monday.
9    Q.   Okay.
10    A.   So I called my attorney after
11  the conversation with Glenda Gary. He
12  said he had to be in court. He said to
13  call her back and ask her could we come at
14  one. I called her back. She said, if
15  that's good for you, that's fine; I'll see
16  you at one o'clock.
17    Q.   Was it one o'clock or 1:30?
18    A.   1:30.
19    Q.   Why did you call your attorney?
20    A.   Because he was going to go with
21  me. I'm not going to -- you've already
22  accused me of doing something I didn't do.
23  You're not going to talk to me by myself

24  (Pages 93 to 96)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 97

1  and say that I said something I didn't.
2  So my attorney needs to be present.
3      Q.   Did you understand it was an
4  internal investigation by DCI --
5      A.   No, I didn't. At the time,
6  Glenda Gary never told me anybody would be
7  there. I was under the assumption that we
8  were going to be in her office in a
9  meeting with her. I did not know until we
10  got to the clinic that day that Dan Watson
11  and Rose Smith was even there.
12      Q.   Do you know whether DCI had an
13  attorney there?
14      A.   I have no idea.
15      Q.   When you got there and it was
16  Dan and Rose and Glenda and you and your
17  attorney, did DCI tell you, this is our
18  attorney? I mean, did they introduce you
19  to anybody as their attorney?
20      A.   No, they didn't.
21      Q.   Tell me about that. You show
22  up at one or 1:30 with your attorney.
23  What kind of conversation took place?

Page 98

1  Tell me about it.
2      A.   Well, we stood in the hallway
3  for a little while, and then Rose Smith
4  came and asked us did we want to have a
5  seat. We sat in an office. A few minutes
6  after we got in the office, Dan Watson
7  came in, introduced himself, and we
8  introduced ourselves. And he said that --
9  Dan Watson made the statement that he
10  wanted to talk with me alone, that he
11  would not -- he asked my attorney to
12  leave. He said, at this point, I need to
13  ask you to leave. That's what he said to
14  my attorney.
15      Q.   And then what happened?
16      A.   And he said if he could not
17  talk with me without my attorney present,
18  then my attorney needed to advise me to
19  voluntarily quit.
20      Q.   That's what Dan said?
21      A.   Yes.
22      Q.   Did Rose --
23      THE WITNESS: Did I make a

Page 99

1  mistake in anything?
2      MR. HARRISON: You have to
3  testify.
4      THE WITNESS: I'm sorry.
5      Q.   (By Ms. Sanders) Did Rose or
6  Glenda say anything?
7      A.   No.
8      Q.   You said Glenda was in the
9  office across the hall?
10      A.   She was in the break room
11  across the hall. She was not in the
12  office.
13      Q.   And so, at that point, when
14  Mr. Watson said that, what did you do?
15      A.   My attorney and I left.
16      Q.   Did you have any further
17  conversations with Mr. Watson after that
18  point?
19      A.   No.
20      Q.   Did you have any communication
21  or correspondence with Mr. Watson?
22      A.   No, I didn't.
23      Q.   Was it your understanding that

Page 100

1  Mr. Watson wanted to talk to you about
2  this falsification of time issue?
3      A.   After I got there and saw that
4  he was there, I assumed so.
5      Q.   Did anybody ever tell you that
6  that's what we are going to talk about
7  today?
8      A.   No.
9      Q.   And Glenda Gary, when she
10  called to tell you to come to her office,
11  did she tell you what you all were going
12  to talk about?
13      A.   No. She just said we were
14  going to talk, and not to go to my office
15  and go directly to her office.
16      Q.   Up until that time, had you had
17  any conversation with anybody at DCI about
18  the falsification of time issue other than
19  LaTonya Buchanan?
20      A.   No.
21      Q.   I'd like to show you a letter,
22  Ms. Quinnie, and see if you ever received
23  that letter.

25  (Pages 97 to 100)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 101

1    A.  Yes.  We received this letter
2  after the conversation with Dan Watson.
3    Q.  Okay.  Did you receive it in
4  the mail?
5    A.  Yes.
6      MS. SANDERS:  Let's go off the
7  record just a minute.
8      (A discussion was held off the
9  record.)
10      MS. SANDERS:  Let's mark this
11  as the next exhibit, Plaintiff's Exhibit
12  5.
13      (Whereupon, a document was
14  marked as Defendant's Exhibit 5 and is
15  attached to the original transcript.)
16    Q.  (By Ms. Sanders)  Now,
17  Ms. Quinnie, I would like for you to look
18  up here.  We talked earlier about dates.
19  You said you knew that you had gone to DCI
20  on a Monday.  Mr. Watson's letter says:
21  This will confirm our conversation on
22  Monday, August 14th.  Do you believe
23  that's the right date?

Page 102

1    A.  Uh-huh.
2    Q.  Now, I would like to go through
3  this letter by Mr. Watson.  If you'll
4  notice in the first paragraph, he says
5  that you were placed on administrative
6  leave on August 7, 2006.  Does that sound
7  about right, about a week between?
8    A.  Yes.
9    Q.  Okay.  And then he indicates
10  that it was pending an investigation into
11  serious allegations about time records.
12  Is that the falsification of time as you
13  understood it?
14    A.  Yes.
15    Q.  Okay.  Now, he indicates here
16  in his letter that, "It is our
17  understanding that the same afternoon you
18  called a coworker."  Would that be LaTonya
19  Buchanan?
20    A.  Yes.
21    Q.  Did you call her that
22  afternoon?
23    A.  Yes.

Page 103

1    Q.  Look what else he says here,
2  "called a coworker indicating that you had
3  been placed on administrative leave for
4  stealing time and you asked the coworker
5  to not" --
6    A.  No.
7    Q.  Let me finish the sentence --
8  "to not share any information with any
9  company representative as part of the
10  investigation."
11    A.  No, because I didn't know
12  anything about the investigation with Dan
13  Watson.
14    Q.  But you did talk to LaTonya
15  Buchanan?
16    A.  Yes.
17    Q.  And you told her you were
18  placed on --
19    A.  Administrative leave without
20  pay for stealing time.
21    Q.  You told her that much?
22    A.  Yes.
23    Q.  But your testimony today is

Page 104

1  that you did not ask her this part: "You
2  asked the coworker not to share any
3  investigation with any company
4  representative as part of the
5  investigation."  You did not ask her that?
6    A.  No, I did not.
7    Q.  Tell me about LaTonya Buchanan.
8  Did you work with her at DCI?
9    A.  LaTonya Buchanan was in
10  billing.
11    Q.  Okay.
12    A.  Her office was downstairs where
13  Glenda Gary's office is.  She worked with
14  Cindy Phillips and Carol Holley Vega
15  (phonetic).
16    Q.  Did you ever work with her?
17    A.  LaTonya was getting married.
18    Q.  Okay.
19    A.  And I was behind on medical
20  records.  On that Saturday, Glenda Gary
21  had approved her to work overtime to help
22  me with medical records.
23    Q.  Would that Saturday be August

26  (Pages 101 to 104)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 105

1  5th?
2    A.   August 5th.
3    Q.   So did she come in and help you
4  work on medical records?
5    A.   Yes, she did.
6    Q.   All right. Is that the only
7  time you ever worked with her?
8    A.   Yes.
9    Q.   I understand you worked in the
10  same building, but I'm talking about
11  working together.
12    A.   Yes.
13    Q.   Did LaTonya work on medical
14  records normally?
15    A.   No.
16    Q.   Who was the secretary that was
17  responsible for medical -- I'm sorry --
18  not medical records, but putting in the
19  flow charts?
20    A.   Debra Goodnoe.
21    Q.   Not LaTonya?
22    A.   No.
23    Q.   Let me ask you about this

Page 106

1  second paragraph. Mr. Watson says, "on
2  Thursday of last week" -- so we can figure
3  out that was probably around the 10th of
4  August, since this was August 14th, and it
5  was Monday. So approximately the 10th?
6  Does that sound right? "On Thursday of
7  last week, I received a call from a person
8  claiming to be your lawyer demanding
9  employment records." Do you know what
10  Mr. Watson is talking about there?
11    A.   Mr. Harrison -- I signed a
12  consent form, and Mr. Harrison asked for
13  my personnel file.
14    Q.   Do you think that's what
15  Mr. Watson is talking about?
16    A.   I would assume so.
17    Q.   Did you have any other attorney
18  working on your behalf?
19    A.   No.
20    Q.   Did you ever provide DCI with
21  any kind of letter or anything that said
22  Mr. Harrison is my attorney?
23    A.   No, not prior to the meeting.

Page 107

1    Q.   Let's read this third paragraph
2  in Mr. Watson's letter. "Today I was in
3  Montgomery for the purpose of completing
4  the investigation. You arrived at the
5  clinic, as requested by Ms. Gary, with the
6  person claiming to be your lawyer."
7  Again, that was Mr. Harrison; correct?
8    A.   Yes.
9    Q.   "He did not have a letter of
10  representation and no such letter was
11  presented." Is that true? Was there any
12  kind of letter of representation exchanged
13  between Mr. Watson and Mr. Harrison that
14  you recall?
15    A.   Not that I recall. He had a
16  card, one of his cards.
17    Q.   He had a business card?
18    A.   Yes.
19    Q.   Well, here Mr. Watson says, "He
20  did not present any business card or any
21  other written information indicating that
22  he was a lawyer, much less that he
23  represented you." Do you recall whether

Page 108

1  Mr. Harrison gave Mr. Watson a business
2  card?
3    A.   Mr. Harrison presented the
4  business card.
5    Q.   To Mr. Watson?
6    A.   After Mr. Watson came in, and
7  he introduced himself as my attorney, he
8  presented a card.
9    Q.   And you saw him give that to
10  Dan Watson?
11    A.   I saw him present it, yes.
12    Q.   Then he says, "As I explained,
13  I was hoping to meet with you as part of
14  an internal investigation without any
15  company lawyer present to understand your
16  reaction to the allegations made." Did
17  you all have that conversation where he
18  said, I want to meet with you without your
19  lawyer?
20    A.   No. Well, he did say he would
21  not talk with me -- when he came in and
22  introduced himself, he asked my attorney
23  to leave. He said, at this point, I need

27 (Pages 105 to 108)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 109

1 to ask you to leave.
2    Q.   Did you -- had you ever met
3 Mr. Watson before this day?
4    A.   No.
5    Q.   Did you even know there was a
6 Dan Watson that worked at DCI?
7    A.   Yes, I did know there was a Dan
8 Watson.
9    Q.   How did you know that?
10    A.   Because at one time we had an
11 employee there -- my grandmother had died,
12 and she didn't want to give me my three
13 funeral days leave.  At the time Glenda
14 Striker was the Rose Smith.
15    Q.   Okay.
16    A.   And I called Glenda, and I
17 talked to Glenda because Mr. Ashbury was
18 not there.  She gave me Dan Watson's name
19 and number, and I called him.  He, at that
20 point, asked me was it all right for him
21 to call Lee Ashbury when he returned to
22 work, and I said yes.
23    Q.   Okay.  So did you get the three

Page 110

1 days off?
2    A.   Yes, I did.
3    Q.   Other than that, had you ever
4 had any interaction with Dan Watson?
5    A.   No.
6    Q.   So you knew he was in human
7 resources?
8    A.   Yes.
9    Q.   And in Nashville?
10    A.   Yes.
11    Q.   Had you met him personally
12 before that day?
13    A.   No.
14    Q.   Then he says, "You refused to
15 meet with me without the person who was
16 accompanying you present."  Is that
17 correct?
18    A.   Uh-huh.
19    Q.   You wouldn't meet with him
20 without Mr. Harrison?
21    A.   No.
22    Q.   That was a bad question.  Let's
23 start over.  Mr. Watson says, "You refused

Page 111

1 to meet with me without the person who was
2 accompanying you present."  Is that a true
3 statement?
4    A.   Yes.
5    Q.   Then he says, "I would consider
6 your actions as voluntary quit."  And
7 that's consistent with what you --
8    A.   That's not exactly what he
9 said.  It's consistent, but it is not
10 exactly what -- he told my attorney at
11 that point, you need to advise your client
12 that she is a voluntary quit.
13    Q.   Okay.  Then he says, "You
14 continued in your refusal to meet with
15 me."
16    A.   It wasn't a continual -- at
17 that point, he said that if he did not
18 leave -- if he could not talk to me
19 without my attorney, we could not have a
20 conversation.  So at that point, my
21 attorney and I left.
22    Q.   Here Dan Watson says, "This
23 letter presents our understanding of these

Page 112

1 developments.  If you believe our
2 understanding is not accurate, you must
3 contact me immediately to clarify.  If you
4 wish to reconsider your position and meet
5 with me as part of this internal
6 investigation, you must contact me at
7 615-342-0427 by Friday, August 18th at
8 noon to arrange a mutually convenient time
9 to meet."  Did you ever call Mr. Watson?
10    A.   I did not call Mr. Watson.  But
11 I got the letter, and my attorney also had
12 a copy of that letter.  My attorney called
13 Mr. Watson.
14    Q.   Okay.  And, again, you know,
15 you don't have to tell me what you told
16 your attorney.  But you brought -- did you
17 bring a copy of this letter to your
18 attorney?
19    A.   Yes.  And I also -- yes, I
20 brought that copy of that letter to him
21 because it was certified mail.
22    Q.   To you?
23    A.   Yes.  And I brought it prior to

28 (Pages 109 to 112)

**American Court Reporting**
**February 6, 2008**

# American Court Reporting
## toll-free (877) 320-1050

---

Page 113

1 Friday the 18th.
2    Q.   And do you know whether your
3 attorney ever contacted --
4    A.   Yes, I know he did.
5    Q.   Then he says here in last
6 paragraph, "Otherwise, we will complete
7 the investigation without your input,
8 accepting as true the statements made by
9 others about your conduct and continue to
10 view your action as a voluntary quit."
11 Did you understand that paragraph?
12    A.   Yes.
13    Q.   Do you know whether your
14 attorney provided him information about
15 your side of the story, or --
16    A.   Yes.
17    Q.   -- your response to these
18 allegations?
19    A.   Yes.
20    Q.   Your attorney did provide that
21 information?
22    A.   Yes, he did.
23    Q.   Okay.  Tell me what you believe

Page 114

1 your attorney told Mr. Watson.
2    A.   My attorney told Mr. Watson, as
3 far as I know, that I did not voluntarily
4 quit.  And he asked for the meeting -- for
5 another meeting with Mr. Watson.  I never
6 had another meeting with Mr. Watson, nor
7 with anyone else from DCI.
8    Q.   Do you know whether your
9 attorney told Mr. Watson that he wanted to
10 have a meeting with him present or that
11 you would meet by yourself?
12    A.   No.  With him present.
13    Q.   Now, what about the underlying
14 allegations, this investigation that he's
15 talking about into the falsification of
16 time?  Do you know if your attorney ever
17 told Mr. Watson your side of that story,
18 the falsification of time story?
19    A.   Yes.
20    Q.   What do you believe your
21 attorney talked with Mr. Watson about?
22       MR. HARRISON:  Object.  You can
23 answer, though.

Page 115

1    A.   I was not present at the
2 conversation, and my attorney had
3 otherwise evidence that I know my attorney
4 said to Mr. Watson.
5    Q.   You believe that your attorney
6 told Mr. Watson that you could meet as
7 long as your attorney was present?
8    A.   Yes.
9    Q.   Do you know about whether your
10 attorney said anything about whether you
11 did or did not falsify time?
12    A.   He said I didn't falsify time.
13    Q.   Okay.  Now, were you present to
14 hear that conversation?
15    A.   No.
16    Q.   But that's your understanding?
17    A.   Yes, that's my understanding.
18    Q.   See, this is why it gets
19 complicated when there's an attorney
20 involved in an internal investigation.
21 Did you ever have any kind of a
22 conversation or direct your attorney to
23 have a conversation with Daniel Watson or

Page 116

1 anybody at DCI about the specific
2 allegations that were being made against
3 you?
4    A.   Yes.
5    Q.   Did you ever get, from those
6 conversations, information about the
7 specific allegations that were made
8 against you, either through you or through
9 your attorney?  In other words, did DCI
10 provide to you the specific allegations?
11    A.   No, not to me.
12    Q.   Do you understand that you had
13 an opportunity to respond to those
14 specific allegations in this meeting that
15 was held on August 14th?
16    A.   No.  Because when he wouldn't
17 talk to me without my attorney present, I
18 just assumed that -- and then when I
19 received this letter and I brought the
20 letter to my attorney, it was prior to
21 Friday the 18th, and my attorney handled
22 it.
23    Q.   But I think you testified

## American Court Reporting
## February 6, 2008

**American Court Reporting**
**toll-free (877) 320-1050**

Page 117

1  earlier when we read through this letter
2  that on August 14th -- that meeting that
3  was set for August 14th, it was your
4  understanding that the point of that was
5  to talk about this falsification of time
6  issue?
7      A.  Like I said, the only person
8  that I was aware that I was meeting with
9  at that point, prior to even getting to
10  that clinic, was Glenda Gary.
11     Q.  Let me ask you about Ms. Gary.
12  Was she the clinic administrator at that
13  time?
14     A.  Yes.
15     Q.  Where was Mr. -- had -- I know
16  Mr. Ashbury died.
17     A.  Mr. Ashbury died in February.
18     Q.  Okay.  So from February until
19  August, who was the clinic administrator?
20     A.  It took a while.  I think
21  Glenda Gary got the administrator position
22  in June or July, because Rose Smith was
23  coming back and forth.

Page 118

1      Q.  And who was Rose?  Do you know?
2      A.  She works in corporate.
3      Q.  Okay.  So it's your
4  understanding that she works in Nashville?
5      A.  Yes.
6      Q.  And she was responsible for the
7  clinic in that interim period?
8      A.  Yes.
9      Q.  Or that is your understanding?
10     A.  Yes, that's my understanding.
11     Q.  When you were working there
12  during that time, was Mr. Ashbury your
13  boss?
14     A.  Mr. Ashbury was my direct boss.
15     Q.  And then was Glenda Gary your
16  boss --
17         (Brief interruption.)
18         (Brief recess.)
19     Q.  (By Ms. Sanders) Ms. Quinnie,
20  we left off talking about this letter that
21  we marked as Exhibit 5, and it was a
22  letter from Daniel Watson.  Let me ask you
23  this, Ms. Quinnie.  Why did you think that

Page 119

1  you had a right to have an attorney
2  present at this internal investigation?
3      A.  As I stated earlier, I did not
4  know this was an internal investigation.
5  I was under the assumption that we were
6  meeting with Glenda Gary.  I only found
7  that Dan Watson and Rose Smith was there
8  when we arrived at the office.
9      Q.  Okay.  Well, let me ask you
10  this:  Why did you think you had a right
11  to an attorney to meet with Glenda Gary?
12     A.  Because, like I stated earlier,
13  if you've made accusations against me,
14  you're not going to talk to me alone and
15  say that I said this and I didn't say that
16  without my attorney present.
17     Q.  Let me show you another
18  document.  Do you recognize that document?
19     A.  Yes.
20     Q.  What is that document?
21     A.  Authorization to furnish
22  personnel records.
23     Q.  Is that a document that you

Page 120

1  signed?
2      A.  Yes.
3         MS. SANDERS:  All right.  Let's
4  make that the next exhibit.
5         (Whereupon, a document was
6  marked as Defendant's Exhibit 6 and is
7  attached to the original transcript.)
8      Q.  Ms. Quinnie, we've marked this
9  document as Exhibit 6.  What was the
10  purpose for you signing that document?  I
11  realize you didn't prepare it.  I know Mr.
12  Harrison did.  But what was the point of
13  that?
14     A.  Because we needed my personnel
15  file.
16     Q.  Why did you want your personnel
17  file?
18     A.  On August 4th -- August 3rd, I
19  asked Glenda Gary just out of the blue if
20  I could see my personnel file because this
21  policy reads I could read my personnel
22  file any time I wanted to as long as I
23  gave you notice.  At that point, she told

30 (Pages 117 to 120)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 121

1   me, no, that it was not done. I did not
2   ask her about it again on that Friday,
3   which was the 4th, because I left early.
4   And Monday the 7th, that a.m., Monday
5   morning was -- when I asked her, she said
6   that it was not done and she had to talk
7   with Rose Smith. So Monday morning I
8   asked her had she talked with Rose Smith,
9   and she acted like she didn't know what I
10  was talking about. I reminded her of my
11  personnel file, and she said, get with me
12  before you leave.
13      Q.  Okay.
14      A.  I got busy. I did not go by
15  and see Glenda Gary that Monday prior to
16  leaving early. I left 30 minutes early
17  that Friday because I wasn't feeling well.
18  That Monday at 3:30, she came in and asked
19  for my keys.
20      Q.  Why did you ask to see your
21  personnel file on Friday, August 3rd?
22      A.  Thursday was August 3rd.
23      Q.  Okay. Right, because Saturday

Page 122

1   was the 5th. I'm sorry. Why did you ask
2   to see it?
3       A.  I just asked to see my
4   personnel file.
5       Q.  And you referenced a policy in
6   the manual. I think that we probably
7   ought to go ahead, since we're probably
8   going to refer to it again -- I'm asking
9   you to take a look at this. I don't
10  expect you to look at every page. But you
11  can compare it to your book, in
12  particular, the employee handbook portion.
13  That's not that entire book. That's not a
14  copy of that entire book, but that is a
15  copy of the employee handbook portion. If
16  you would just identify that as an
17  accurate copy.
18      A.  (Witness reviews document.)
19      Q.  Ms. Quinnie, does that appear
20  to be an accurate copy of the first
21  section in the blue book that you
22  received?
23      A.  Yes.

Page 123

1       MS. SANDERS:  Just for the
2   record, that's the employee handbook
3   portion of the DCI benefit pack and
4   booklet that Ms. Quinnie received.
5       MR. HARRISON:  It's a 96- to
6   100-page document.
7       MS. SANDERS:  It's about 96
8   pages. But it's front and back.
9       MR. HARRISON:  Is that going to
10  be Exhibit 7?
11      MS. SANDERS:  Yes. We'll just
12  make that the next collective exhibit.
13      (Whereupon, a document was
14  marked as Defendant's Exhibit 7 and is
15  attached to the original transcript.)
16      Q.  (By Ms. Sanders) Ms. Quinnie,
17  just for the record, if you'll look back
18  at Exhibit 4. When you signed Exhibit 4,
19  which you've already identified, were you
20  signing that you received this?
21      A.  Yes, you this book.
22      Q.  What's now been marked Exhibit
23  7?

Page 124

1       A.  Yes.
2       Q.  All right. Now, you indicated
3   that there was a policy in the handbook
4   that allowed you to see your personnel
5   file? Can you identify that policy?
6       A.  It's on page 66.
7       Q.  Is this the policy you were
8   referring to when you asked Ms. Gary about
9   your personnel file?
10      A.  Yes.
11      Q.  And did you have any reason to
12  suspect that there was something in your
13  personnel file that you disagreed with --
14      A.  No. I'm sorry to cut you off.
15  I have never asked to see my personnel
16  file since 2001 that I was hired there. I
17  had never asked for it.
18      Q.  What prompted you to ask for
19  it?
20      A.  I don't know. Because I was
21  talking to the unit secretary, and she
22  made the statement that you can be written
23  up and it will go in your personnel file

31 (Pages 121 to 124)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 125

1  even if you don't see it or even if you
2  don't sign it. And I wanted to know what
3  was in my personnel file, because I know
4  that I had never been presented with a
5  write-up.
6      Q.  Did you think that you had ever
7  been disciplined?
8      A.  No.
9      Q.  Tell me again.  You asked
10 Ms. Gary for a copy of your personnel
11 file?
12     A.  No.  I asked to see my
13 personnel file.
14     Q.  Okay.  And Ms. Gary's response?
15     A.  Was, no, it's never been done.
16 Then she said she had to talk with Rose
17 Smith.
18     Q.  Okay.  So it's your
19 understanding that she did talk with Rose
20 Smith, or do you know?
21     A.  When I asked that Monday
22 morning, which was August 7th, had she
23 talked with Rose Smith, she acted like she

Page 126

1  didn't know what I was talking about.
2      Q.  Did she ever get back to you
3  about it?
4      A.  She said, see me before you
5  leave.
6      Q.  Okay.
7      A.  But I got busy that day, and I
8  did not mention it again on that Monday
9  the 7th.  And, like I said, at 3:30 as I'm
10 getting my purse and keys together to go
11 out the door, she stepped in my office and
12 said she wanted my keys.
13     Q.  Okay.  So that conversation you
14 had Monday morning was the last time you
15 and Glenda Gary talked about the personnel
16 file?
17     A.  Yes.
18     Q.  And then, at some point, this
19 letter came or form came that you signed
20 from the Harrison Firm.  Was this sent to
21 Ms. Gary?  Do you know?
22     A.  Yes.
23     Q.  At this point, did you want to

Page 127

1  see the personnel file because of the
2  accusation about the falsification of
3  time?
4      A.  No.  We needed my personnel
5  file.
6      Q.  Why did you need it?
7      A.  I still wanted to see it.
8      Q.  From your previous request?
9      A.  Yes.
10     Q.  Have you ever looked at it?
11 Have you seen it?
12     A.  No.  I signed a consent form,
13 and we still didn't get it.
14     Q.  Let's look at that policy that
15 you, I think, identified as being on page
16 66.  Look at that second paragraph where
17 it says personnel files are the property
18 of DCI and access to the information
19 that's contained is restricted.  Is that
20 your understanding, that the file belonged
21 to DCI and not to the individual employee
22 like you?
23     A.  I didn't ask for the file.  I

Page 128

1  asked to see the file.  I didn't want to
2  take ownership of the file.  I just wanted
3  to look at it.
4      Q.  So you understood that it was
5  owned by DCI?
6      A.  Yes.
7      Q.  Now, in the third paragraph it
8  says, "Employees who wish to review their
9  own file should contact the facility
10 administrator."  And you testified you did
11 that?
12     A.  I did.
13     Q.  With reasonable advance notice,
14 employees may review their own personnel
15 file in DCI's office and in the presence
16 of an individual appointed by DCI to
17 maintain the files.  When you sent this,
18 is that what you were asking for was to
19 come and view your personnel file or for a
20 copy of it?
21     A.  At that point, I asked for a
22 copy of it.
23     Q.  Okay.  And why was that?  Why

32  (Pages 125 to 128)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 129

1  were you asking for a copy as opposed to
2  the policy, which says going and viewing
3  it?
4     A.  Because she didn't let me see
5  it.  If my attorney can request it, then I
6  can take a look at it.
7     Q.  Why did you think your attorney
8  had the right to request it?
9     A.  Because I asked him to request
10 it.
11    Q.  But I guess what I'm saying is,
12 there's nothing in that policy that says
13 you get a copy of your personnel file, so
14 why --
15    A.  There's nothing in this policy
16 that says I can't see my personnel file.
17    Q.  Correct.  So why didn't you ask
18 for you and your attorney to come view it?
19 Why were you asking for a copy of it?
20    A.  She didn't let me view it when
21 I was employed there.  She's not going to
22 let me view it after my -- the discarding
23 of my job.

Page 130

1     Q.  Okay.  Now, Ms. Quinnie, I can
2  tell by the choice of your words, you do
3  not believe that you quit.  You believe
4  that you were terminated.
5     A.  I was terminated.
6     Q.  All right.  Why do you think
7  you were terminated?
8     A.  I was terminated because they
9  -- DCI placed me on administrative leave
10 without pay, pending an investigation.
11 When I came there, you asked for the
12 meeting -- Glenda Gary asked for the
13 meeting.  I came to the meeting.  You did
14 not talk to me.  I did not voluntarily
15 quit.  I was not going to ask -- he asked
16 my attorney to leave.  At that point, you
17 gave me the option, either I tell my
18 attorney to leave or I voluntarily quit.
19 That's not an option.  I don't voluntarily
20 quit.
21    Q.  Let me ask you this:  Did you
22 say to Glenda Gary on the phone, I'll be
23 there for the meeting but I'm bringing my

Page 131

1  attorney?
2     A.  No.  Glenda Gary at no point
3  said to me that Dan Watson and Rose Smith
4  would be there, either.
5     Q.  Right.  And she didn't tell you
6  they would have an attorney there, because
7  they didn't --
8     A.  No, she didn't.
9     Q.  Correct?
10    A.  No.
11    Q.  All right.  So you never
12 informed Glenda Gary that you would have
13 an attorney there, and you came with an
14 attorney.  Was it your understanding that
15 if you had talked to them that day without
16 your attorney present that you wouldn't
17 have voluntarily quit?  They wouldn't have
18 considered you to have voluntarily
19 resigned?
20          MR. HARRISON:  Objection to the
21 form.
22    Q.  Let me rephrase.  Is it your
23 understanding that if you had talked to

Page 132

1  them that day, they wouldn't have
2  considered that a voluntarily resignation?
3          MR. HARRISON:  Objection.
4  Speculation.
5     Q.  Okay.  I'll rephrase it.  I'll
6  have to ask you a few different questions.
7  You indicated earlier, and you testified,
8  that Mr. Watson said for your attorney to
9  direct you to voluntarily quit; is that
10 correct?
11    A.  Yes.
12          MR. HARRISON:  Objection.
13          MS. SANDERS:  Well, she already
14 testified --
15          MR. HARRISON:  I know that.
16 But just for the record, let me just state
17 this.  When I object, you still answer.
18 I'm just doing this for the record.
19          THE WITNESS:  Okay.
20    Q.  (By Ms. Sanders)  You testified
21 earlier to that effect; is that correct?
22    A.  Yes.
23    Q.  Now, did Mr. Watson say whether

**American Court Reporting**
**February 6, 2008**

# American Court Reporting
## toll-free (877) 320-1050

Page 133

1  the attorney's here or not, we're
2  considering you to have voluntarily quit?
3          MR. HARRISON: Objection.
4          MS. SANDERS: What's that
5  objection?
6          MR. HARRISON: Hearsay.
7          MS. SANDERS: I'm asking her
8  what a party at DCI said to her.
9          MR. HARRISON: Party-opponent
10  admission can only be offered by the
11  opponent.
12          MS. SANDERS: Well, she's been
13  testifying all day about what Mr. Watson
14  said to her.
15          MR. HARRISON: I still object.
16      Q.  (By Ms. Sanders) Tell me, did
17  Mr. Watson say to you: Whether your
18  attorney is here or not, we will consider
19  you to have voluntarily resigned?
20          MR. HARRISON: Objection.
21      A.  Whether he's here or not?
22      Q.  Right.
23      A.  No. He said that if my

Page 134

1  attorney would not leave, that if he could
2  not talk with me without my attorney, that
3  he needed to -- my attorney needed to
4  advise me to voluntarily quit.
5      Q.  And there, in front of
6  Mr. Watson, did your attorney advise you
7  to voluntarily quit?
8      A.  No.
9          MR. HARRISON: Objection.
10          MS. SANDERS: That would have
11  been something you said in front of
12  Mr. Watson, so wouldn't be privileged.
13      Q.  (By Ms. Sanders) But he didn't
14  say that in front of Mr. Watson; correct?
15          MR. HARRISON: Objection.
16      Q.  Did your attorney say there in
17  front of Mr. Watson or to Mr. Watson,
18  Cynthia, you need to quit?
19      A.  No.
20          MR. HARRISON: Object to the
21  form.
22      Q.  Did your attorney say to you or
23  to Mr. Watson or any other representative

Page 135

1  of DCI, you don't need to quit?
2          MR. HARRISON: Objection.
3      A.  No.
4      Q.  So there was no conversation
5  about whether you did or didn't quit from
6  your attorney?
7      A.  I didn't quit.
8      Q.  But that's not my question. My
9  question is: Was there any conversation
10  or discussion from Mr. Harrison in front
11  of the DCI representatives as to whether
12  you quit or not?
13      A.  Mr. Harrison made the statement
14  at that point that I did not voluntarily
15  quit; you all need to fire her.
16      Q.  Okay. Now, you testified
17  earlier -- and I believe you said this in
18  paragraph nine of your complaint.
19          MS. SANDERS: Let's go ahead
20  and make the complaint an exhibit because
21  we are going to refer to it. We'll go
22  ahead and make it an exhibit. Off the
23  record just a minute.

Page 136

1          (A discussion was held off the
2  record.)
3          (Lunch recess.)
4      Q.  (By Ms. Sanders) Ms. Quinnie,
5  we are back on the record. We have taken
6  a lunch break, and we are back. Just so
7  you know, you are still under oath. The
8  oath you took this morning still applies.
9  So as we broke for lunch, we were talking
10  about your complaint, and we're going to
11  make that the next exhibit to your
12  deposition. If you would take a look at
13  that, it says complaint for damages. I
14  believe that to be a true copy of the
15  complaint that you've filed in this action
16  against DCI. Would you just look at that
17  and confirm that that is a correct copy?
18      A.  (Witness reviews document.)
19  Yes.
20          MS. SANDERS: Let's mark that
21  as the next exhibit.
22          (Whereupon, a document was
23  marked as Defendant's Exhibit 8 and is

34  (Pages 133 to 136)

## American Court Reporting
## February 6, 2008

**American Court Reporting**
**toll-free (877) 320-1050**

Page 137

1  attached to the original transcript.)
2      Q.   Ms. Quinnie, in paragraph nine
3  of that complaint, you allege that
4  African-Americans were put on leave or
5  fired for asking to see their personnel
6  files. Who are you referring to when you
7  say African-Americans were put on leave or
8  fired?
9      A.   A couple of employees. Do you
10  want names?
11      Q.   Yes.
12      A.   Regina Chapman.
13      Q.   Tell me about Ms. Chapman. Did
14  you witness her ask for her personnel
15  file?
16      A.   Yes. But that was Mr. Ashbury.
17      Q.   So Ms. Chapman asked
18  Mr. Ashbury for her personnel file?
19      A.   Yes.
20      Q.   And was Ms. Chapman fired?
21      A.   Yes, she was fired.
22      Q.   Okay. Who fired her?
23      A.   Mr. Ashbury.

Page 138

1      Q.   How do you know she was fired?
2      A.   Because she told me, and I was
3  there that day that she was fired.
4      Q.   Okay. And was she fired -- do
5  you know why she was fired? What was the
6  reason?
7      A.   They stated that she made a
8  statement to a patient that the reason her
9  leg was cut off was because of one of the
10  RNs there. The patient happened to be in
11  the clinic that day and stated that she
12  did not tell her that.
13      Q.   What makes you think she was
14  fired for asking to see her personnel
15  file?
16      A.   There was no other complaints
17  against her, other than the one that was
18  made up.
19      Q.   How do you know there were no
20  other complaints? Had you seen her
21  personnel file?
22      A.   No.
23      Q.   How do you know there weren't

Page 139

1  any other complaints?
2      A.   She hadn't signed any
3  complaints.
4      Q.   So she told you?
5      A.   Yes.
6      Q.   Ms. Chapman told you?
7      A.   Yes.
8      Q.   Who else? Any other
9  African-Americans who asked to see their
10  personnel files and were fired?
11      A.   I don't know if it was because
12  they didn't see their personnel file, but
13  I know they were fired.
14      Q.   Okay. Well, is Regina Chapman
15  the only African-American that you contend
16  was fired for asking to see her personnel
17  file?
18      A.   Yes.
19      Q.   Were there any white employees
20  who you believe asked to see their
21  personnel file and were not fired?
22      A.   Yes.
23      Q.   Who?

Page 140

1      A.   Rachel Thompson.
2      Q.   Who else?
3      A.   Mandy Martin Bowen.
4      Q.   Okay. Anyone else?
5      A.   A couple that's not there
6  anymore that wasn't fired. They quit.
7      Q.   How do you know that Rachel
8  Thompson and Mandy Martin Bowen --
9      A.   Because they stated to
10  everybody that they saw their personnel
11  file. They asked to see it, and they saw
12  it.
13      Q.   Do you know of any
14  African-Americans who saw their personnel
15  file and were not fired?
16      A.   No.
17      Q.   Did you ever hear any
18  African-American employees ask to see
19  their personnel file?
20      A.   Other than Regina Chapman, no.
21      Q.   Are you still in contact with
22  Regina Chapman?
23      A.   Yes, I am.

35 (Pages 137 to 140)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 141

1    Q.  Do you know where she currently
2 works?
3    A.  She works at Fresenius where I
4 work.
5    Q.  Now, if you will look at
6 paragraph ten of your complaint, in there
7 you claim that you were subjected to a
8 hostile work environment when you worked
9 at DCI.  What do you mean by that?
10    A.  Hostile work environment is
11 where I'm being put in a position where I
12 have to -- you're timing me, giving me a
13 deadline to get my work done, but you're
14 putting -- wanting me to put my work on
15 hold.  I can't very well do my job and
16 somebody else's, too.
17    Q.  Who else's were you --
18    A.  And if I didn't do what it was
19 asked for me to do, you were going to
20 reprimand me anyway.
21    Q.  Who else's job were you asked
22 to do?
23    A.  I played backup to a lot of

Page 142

1 people in that clinic.
2    Q.  Who?
3    A.  The clinical manager.
4    Q.  Who was that?
5    A.  Sherry Pereira.  Debra Goodnoe,
6 the secretary.  When the social workers
7 were out, they'd come to me.
8    Q.  Just so I understand this.  You
9 think the fact that you were backup to
10 other people and that you were in a
11 position of having to meet deadlines,
12 that's the basis of your hostile work
13 environment claim?
14    A.  Not only that.  When people are
15 talking to you any way they want to.  But
16 the minute I say something back, then I
17 have an attitude.  That's hostile to me
18 when you're talking to me in a tone of
19 voice, and when I give it back to you,
20 then I'm reprimanded for it.
21    Q.  Okay.  Let's talk about that.
22 Tell me about the times you were
23 reprimanded at DCI.

Page 143

1    A.  I was reprimanded because it
2 was an employee that told me after Regina
3 was fired -- Rachel Thompson, to be
4 exact -- she said, Cynthia, I'm not going
5 to tell you who said it, but you're going
6 to be the next one.  When I told her okay,
7 that's fine, but fire me because of a
8 reason, for something I did; you better
9 not fire me for something I didn't do.
10 Okay.  With me making that statement, she
11 went to Glenda Gary.  Glenda Gary came and
12 told me, she said, Cynthia, I heard that
13 you have a problem with Regina being
14 fired.  No, that was not even the
15 conversation.  I don't have a problem with
16 anybody being fired.  I have nothing to do
17 with Regina being fired.  I work for me.
18 I don't work for Regina, and I don't work
19 for anybody else.  Regina don't make my
20 mortgage payments, and I don't make hers.
21    Q.  So, then, did -- is it your
22 testimony that Glenda Gary reprimanded you
23 for having that conversation with Rachel--

Page 144

1    A.  Yes, but she didn't reprimand
2 Rachel for telling me that.
3    Q.  And you think she should have
4 reprimanded Rachel?
5    A.  Yes.  If you're going to
6 reprimand me for responding to a statement
7 that was made to me, why not reprimand the
8 person that made the statement.
9    Q.  Do you know whether she ever
10 documented that and put it in your
11 personnel file?
12    A.  I have no idea, because I have
13 never seen my personnel file.
14    Q.  Did anybody present you a
15 document to that effect or write-up to
16 that effect?
17    A.  No.
18    Q.  Do you know whether Rachel was,
19 in fact, disciplined or reprimanded?
20    A.  Rachel was not.
21    Q.  How do you know?
22    A.  If anything happened with
23 Rachel or Mandy around that clinic,

36 (Pages 141 to 144)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 145

1 everybody would know about it.
2    Q. Why is that?
3    A. Because they were very
4 outspoken. They didn't care what they
5 said or who they said it to.
6    Q. Did they ever say to people --
7 did you ever hear them say they had been
8 reprimanded for anything else?
9    A. No.
10    Q. So you never heard them talk
11 about being reprimanded?
12    A. No.
13    Q. Now, anything else that's the
14 basis of your hostile work environment
15 allegation?
16    A. If you say -- if you go to
17 Ms. Gary and make a complaint, then what
18 it boils down to is you're being
19 blackballed. You're put on the blacklist.
20 Because if you go to her and complain
21 about another employee, which I have
22 complained to her on numerous occasions --
23 we had an RN there that I know for a fact

Page 146

1 go to her AA meetings and she don't clock
2 out.
3    Q. Who is that?
4    A. Debbie Tullier. I went to
5 Glenda Gary and I told her, I said, when
6 does going to an AA meeting have anything
7 to do with your job description. She said
8 it didn't. I said, well, Debbie Tullier
9 did not clock out, and she -- her meetings
10 was on Tuesdays, and she would be gone for
11 two hours. You're still on the clock.
12 They always told me when you leave the
13 premises, you're supposed to clock out,
14 anything could happen.
15    Q. So why did you report that to
16 Ms. Gary?
17    A. Because when you leave the
18 premises you're supposed to clock out.
19 When I left the premises, I had to clock
20 out. So what makes her better than me?
21 Why did I have to clock out and she
22 didn't?
23    Q. I'm just curious because

Page 147

1 earlier you testified you weren't really
2 concerned with what happened with Rachel's
3 work and how she worked. Why is it that
4 you were concerned about Debbie Tullier?
5    A. What you mean about how Rachel
6 works?
7    Q. Well, earlier I asked you about
8 Rachel Thompson, and you said -- Regina.
9 I'm sorry. It was about Regina. You said
10 you don't pay her mortgage, and she
11 doesn't pay yours. You're not worried
12 about --
13    A. That's about Regina being
14 fired.
15    Q. Right. So I'm just asking you
16 now why did you care about Debbie
17 Tullier's employment? Why did you care if
18 she clocked in or not?
19    A. I was responsible for clocking
20 out. They told me if you didn't clock out
21 when you leave the premises that was
22 grounds for termination.
23    Q. Were you responsible for the

Page 148

1 nurses clocking in and out?
2    A. I was doing their time at the
3 time. That's why I reported it to her.
4    Q. And when was that? Do you know
5 when you reported that to Glenda Gary?
6    A. No, I don't know an exact date.
7    Q. Was Glenda Gary the clinic
8 administrator at the time?
9    A. Yes, she was.
10    Q. You said if you complained, you
11 got on the blacklist. What do you mean by
12 that?
13    A. Because if you complained to
14 Glenda Gary, then Glenda Gary would tell
15 the person that -- if you go in there and
16 say, Glenda, I have a complaint, then
17 Glenda would get with that person -- not
18 to reprimand them -- and the next thing
19 you know, that person is not speaking to
20 you, or they're in a corner talking and
21 laughing. And Glenda is acting strange
22 with you, and that person is also acting
23 strange with you. So it didn't help to go

37 (Pages 145 to 148)

**American Court Reporting**
**February 6, 2008**

Page 149

1 and complain to anybody about anything.
2     Q.   Do you know if Debbie Tullier
3 was reprimanded?
4     A.   I have no idea. Obviously not,
5 because she kept doing it.
6     Q.   Now, just out of curiosity,
7 what makes you think that -- do you know
8 of anybody else -- strike that. Do you
9 know of anybody else that complained to
10 Glenda Gary and got on what you've
11 referred to as her blacklist?
12     A.   Yes.
13     Q.   Who is that?
14     A.   Arthur Taylor, Regina Chapman.
15     Q.   Tell me about Arthur Taylor.
16 What did he do?
17     A.   Arthur was -- first he was a
18 patient care tech on the floor, and then
19 he went to reuse.
20     Q.   How did he get on the, quote,
21 blacklist, unquote?
22     A.   If you complained about certain
23 employees. Like I said, Glenda was not a

Page 150

1 very professional administrator.
2     Q.   Well, who did Arthur complain
3 about?
4     A.   Arthur complained about Tammy
5 Griswold.
6     Q.   How do you know this?
7     A.   Because Arthur told me.
8     Q.   What did he say about Tammy?
9     A.   He was saying how Tammy would
10 call in and not -- if she had to work a
11 holiday, she would call in, but she didn't
12 have to make up that holiday; how she
13 would leave and not do her work, but she
14 stayed there to get overtime but was not
15 doing her job. So then it got back to
16 Tammy in a different way, and that started
17 a problem with Tammy and Arthur.
18     Q.   And your testimony is Arthur
19 complained to Glenda about this?
20     A.   Yes.
21     Q.   And you think from that point
22 on, Glenda -- how did she put Arthur on
23 her blacklist, or how did she treat Arthur

Page 151

1 differently?
2     A.   Glenda never liked Arthur. She
3 made that very clear.
4     Q.   All right. How did she make
5 that clear?
6     A.   She told him.
7     Q.   She told Arthur she didn't like
8 him?
9     A.   She told other employees. She
10 stated it in front of other employees.
11 She criticized his work.
12     Q.   Was this before or after he
13 complained about Tammy?
14     A.   Before and after.
15     Q.   So his complaining about Tammy
16 didn't necessarily make Glenda change the
17 way she treated Arthur?
18     A.   Well, no, not in a sense.
19     Q.   What about Regina Chapman?
20 What did she -- did she ever complain to
21 Glenda?
22     A.   When Regina was there, Glenda
23 was not actually the administrator.

Page 152

1 Glenda was education coordinator.
2     Q.   Okay. So then, I guess, Glenda
3 wasn't her boss?
4     A.   No.
5     Q.   Any other incidents that you
6 can think of that support your claim that
7 there was a hostile work environment?
8     A.   I've seen people literally go
9 at it. Not throw blows, but they were
10 told if they were going to throw blows to
11 clock out and go in the next parking lot.
12 They have gone at each other, and nothing
13 was done about it.
14     Q.   Who was that?
15     A.   Rachel Thompson and Marshekia
16 Pitts.
17     Q.   Can you tell me when that
18 happened, when they went at it? Was it
19 more than once?
20     A.   It was more than once, but one
21 particular time when I witnessed it.
22     Q.   When did you witness it?
23     A.   They were on the stairs.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 153

1    Rachel had come up the stairs and
2    Marshekia was going down the stairs.
3    Rachel invited Marshekia to one of the
4    most disgusting parts of her body. When
5    it was told to the administrator, Glenda,
6    what had happened, and that she had
7    witnessed this, Glenda just brushed it off
8    like it was nothing. She didn't reprimand
9    Rachel. She didn't say anything to
10   Rachel. All that was said was, the next
11   time you two get into it, I'm going to
12   write both of you up. That was it.
13       Q.   And you witnessed this incident
14   between Rachel and Marshekia?
15       A.   Yes, I did.
16       Q.   Did you tell Glenda about it?
17       A.   Yes.
18       Q.   Were you there when Glenda told
19   them next time they would be written up?
20       A.   Glenda actually passed the buck
21   to Sherry Pereira.
22       Q.   Who's Sherry Pereira?
23       A.   She was nurse manager.

Page 154

1    Q.   How do you know that? How do
2    you know that Glenda passed the buck, so
3    to speak, to Sherry Pereira?
4        A.   Because Sherry Pereira was the
5    one that told Rachel and Marshekia, the
6    next time y'all do this, I'm going to
7    write y'all up per Glenda Gary.
8        Q.   So did Glenda Gary say that, or
9    Sherry --
10       A.   She didn't say it. It was per
11   Glenda Gary when Sherry Pereira said it.
12       Q.   But how do you know that?
13       A.   Sherry Pereira did not call
14   them into an office. Sherry Pereira
15   talked to them out on the treatment floor.
16       Q.   Well, how do you know? That's
17   all I care about, Ms. Quinnie, is what you
18   know. How do you know that Glenda Gary
19   told Sherry Pereira to tell those two
20   people, next time take it outside?
21       A.   Why would she say per Glenda
22   Gary?
23       Q.   I'm asking you. Did you hear

Page 155

1    her say per Glenda Gary?
2        A.   Yes, I did.
3        Q.   So you were there when Sherry
4    Pereira reprimanded --
5        A.   Yes, out on the treatment
6    floor.
7        Q.   And you were there and heard
8    her say per Glenda Gary?
9        A.   Yes.
10       Q.   But you did not hear Glenda
11   Gary talk to Sherry Pereira; correct?
12       A.   No.
13       Q.   All right. Any other incidents
14   that support this claim of hostile work
15   environment?
16       A.   No.
17       Q.   Why do you believe that -- I
18   think you've mentioned Arthur Taylor, your
19   complaint against Debbie Tullier, the
20   Rachel Thompson/Marshekia Pitts, and
21   Regina Chapman, although that didn't
22   happen while Glenda Gary was there. Why
23   do you think Glenda Gary behaved in the

Page 156

1    way that you have just described?
2        MR. HARRISON: Objection.
3    Speculation.
4        A.   I can't think for Glenda Gary.
5        Q.   Well, you said it was the basis
6    of a hostile work environment claim. Are
7    you just saying that you didn't like the
8    way things happened there; it was
9    uncomfortable to be there? What's the
10   basis --
11       A.   No, I didn't like the way
12   things were going on there.
13       Q.   Okay. And do you believe that
14   things were happening that way for any
15   particular reason, or was it just a bad
16   place to be, you just didn't like being
17   there?
18       A.   What do you mean, didn't like
19   being there?
20       Q.   Let's start over. Tell me what
21   you mean by hostile work environment.
22       MR. HARRISON: Again, now, she
23   didn't draft that; I did.

39 (Pages 153 to 156)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 157

1    MS. SANDERS: I understand.
2  But it's her complaint, and I want to know
3  what she means by hostile work
4  environment.
5    Q.  (By Ms. Sanders) You've given
6  me the examples. We've gone through the
7  examples. You have given me an exhaustive
8  list of things that you claim to be -- to
9  create a hostile work environment;
10  correct?
11    A.  Uh-huh.
12    MR. HARRISON: Again, Leslie, I
13  just want to tell you, that is my wording.
14  She is a layperson. Me and you are
15  attorneys.
16    MS. SANDERS: Right.
17    MR. HARRISON: So that is more
18  of a term of art to fit the statute, and I
19  don't think she quite understands what
20  you're questioning. But being that, go
21  ahead.
22    Q.  (By Ms. Sanders) Let me ask
23  you this: We've talked a lot about Glenda

Page 158

1  Gary, with the one exception of Regina
2  Chapman when Glenda Gary wasn't the clinic
3  administrator. Any other administrator or
4  supervisory personnel at DCI that you
5  think created or added to this hostile
6  work environment?
7    A.  No.
8    Q.  Mr. Ashbury?
9    A.  No.
10    Q.  So, really, it's only Glenda
11  Gary?
12    A.  To me, yes.
13    Q.  Okay. Why do you think Glenda
14  Gary created this hostile work
15  environment? Do you think --
16    A.  I didn't say she created it.
17    Q.  All right. Is there anybody
18  else at DCI that you think contributed to
19  this hostile work environment other than
20  Glenda Gary?
21    A.  Let me just say this -- make
22  this statement to that question or to
23  answer that question. I feel that it was

Page 159

1  Glenda Gary's responsibility because
2  Glenda Gary, at that time, was the
3  administrator, and she did nothing to
4  alleviate this problem. To me, her
5  actions were -- she added more to the
6  problem than solving the problem.
7    Q.  I guess, Ms. Quinnie, I'm still
8  trying to figure out exactly what the
9  problem is. So let's just break this down
10  so I can figure out exactly what the
11  problem is. Did you ever complain to
12  Glenda Gary that you thought there was a
13  hostile work environment at DCI?
14    A.  I went to Glenda Gary on
15  numerous occasions. Not so much as a
16  hostile environment, but just to let her
17  know how I felt about things that were
18  going on around there.
19    Q.  Okay. Tell me exactly what you
20  said to Glenda Gary, the best you can
21  remember.
22    A.  It was on more than one
23  occasion about more than one thing.

Page 160

1    Q.  That's okay. Tell me all of
2  it. Everything you can remember that you
3  ever said to Glenda Gary that you would
4  classify as a complaint. And keep in
5  mind, we're talking about a very short
6  time frame, because she wasn't your clinic
7  administrator very long; correct?
8    A.  No. Like I said, she took over
9  June or July.
10    Q.  Right. And you left in August.
11    A.  But she was also -- Rose Smith
12  would let us know that if we had any
13  complaints -- the time she was acting as
14  administrator, that if she was not there,
15  when she was in Nashville, we should
16  report to Glenda Gary.
17    Q.  Okay. So, now, when did you
18  say that Mr. Ashbury passed away?
19    A.  February or March. February, I
20  think.
21    Q.  Okay. So we're talking about a
22  time frame from approximately March to
23  August of 2006; is that right? When you

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 161

1  might have made complaints to Glenda Gary?
2      A.   Yes.
3      Q.   So in that time frame, I need
4  you to tell me about every complaint that
5  you can think of that you made to Glenda
6  Gary.
7      A.   I complained to Glenda Gary
8  about, first of all, the flow sheet issue
9  with Debra Goodnoe. Debra Goodnoe stated
10  that she's been there ten or eleven years
11  and she had DCI in her back pocket. So
12  she would do what she wanted to do. If
13  she wanted to come in and do flow sheets
14  that day, she would -- Debbie was the
15  fastest typist in that building. There
16  was no reason why she couldn't do her flow
17  sheets. Why did I always have to put my
18  medical records on hold to enter flow
19  sheets.
20      Q.   Let me ask you this: How
21  long -- was Debbie Goodnoe -- did you have
22  to be backup to Debbie Goodnoe prior to
23  Glenda Gary being the administrator, like

Page 162

1  when Mr. Ashbury was there?
2      A.   Yes. And I complained to him,
3  too.
4      Q.   All right. Anything else you
5  complained about to Glenda Gary?
6      A.   I complained to Glenda Gary --
7  when I was responsible for correcting the
8  nursing staff time, I complained to her
9  about people not clocking out. I
10  complained to her about why is people
11  always making mistakes on their time. I
12  complained to her numerous times, as well
13  as Lee Ashbury, why am I the one
14  responsible for correcting these people
15  time. I was nobody's boss. They were not
16  responsible for answering to me. I
17  complained to her when I found out that
18  people left the building and didn't clock
19  out, because I was responsible for
20  correcting their time.
21      Q.   Debbie Tullier?
22      A.   Not only Debbie Tullier. It
23  was numerous people.

Page 163

1      Q.   Okay. Who else?
2      A.   Mandy Martin Bowen, Rachel
3  Thompson, Tabitha Mack. It was a whole
4  lot of employees that did not clock out
5  every time they left that building.
6      Q.   And you complained to Glenda
7  Gary about that?
8      A.   Yes.
9      Q.   Did you complain to Lee Ashbury
10  about that?
11      A.   Yes, I did.
12      Q.   Did you make any other kind of
13  complaints to Glenda Gary or Lee Ashbury?
14      A.   Yes, because we had had another
15  -- it was -- finally, they made -- when
16  Lee Ashbury -- before Lee Ashbury died,
17  they started this service support. I
18  still had the same job duties that I was
19  responsible for, plus I was still having
20  to go to other clinics. At one time, they
21  had taken flow sheets away from Debra and
22  given them to me. So I was responsible
23  for entering flow sheets, but I still

Page 164

1  hadn't -- they hadn't alleviated anything
2  from me. So Debra at that point was
3  supposed to have been my backup. I was
4  responsible -- it was either Georgiana or
5  Union Springs, they had problems with
6  their mini server, and also they
7  changed -- we had Telecom at one time, and
8  they switched over. I had to go down and
9  do that work on the mini server, on the
10  routers. And when I came back to the
11  clinic, the flow sheets for the day prior
12  to me going there were not entered. So
13  why am I having to run all over
14  Montgomery -- all over everywhere -- and
15  then come back and do flow sheets when
16  Debra was there and she could have done
17  them.
18      Q.   And you complained about that?
19      A.   Yes, I did. Because when she
20  was out, it was my responsibility to do
21  them as her backup. But as my backup, she
22  was not responsible for doing them.
23  Nobody made her responsible for them.

**American Court Reporting**
**February 6, 2008**

## American Court Reporting
### toll-free (877) 320-1050

Page 165

1    Q.   Any other kind of complaints
2  that you made?
3    A.   They had another employee
4  there, Sharon Sankey.  She was a sweet
5  person.  But she was also a backup for
6  myself and Debra Goodnoe.  But when stuff
7  was not done, it would point back to me.
8  She was responsible for thinning the
9  charts on the floor.  Certain charts on
10  the floor, she was taking certain things
11  out.  And she was responsible for filing.
12  But when Sharon didn't do the filing
13  correctly, they would bring that back to
14  me.
15    Q.   Was that part of your job
16  duties?
17    A.   No, it was not.
18    Q.   In medical records?
19    A.   Medical records is part of my
20  job duty, but not filing.
21    Q.   Did you ever express a
22  complaint about that?
23    A.   Yes, I did.

Page 166

1    Q.   Were you ever reprimanded for
2  these complaints?
3    A.   Reprimanded how?
4    Q.   Well, that's what I'm asking.
5  When you would make these complaints,
6  would either Glenda Gary or Lee Ashbury,
7  or really anybody at DCI, for that matter,
8  reprimand you for making these complaints?
9    A.   The word reprimanded, what do
10  you -- did they do anything about it?
11    Q.   No.  Did you get in trouble for
12  making these complaints?
13    A.   The trouble I got was saying
14  that it was my responsibility, I should do
15  it.
16    Q.   Right.  But you didn't get a
17  write-up --
18    A.   No, not that I know of.
19    Q.   Was this one of your superiors
20  telling you you should do the work, like
21  Lee Ashbury or Glenda Gary?
22    A.   Sherry Pereira.  Because the
23  filing -- they would just put things in

Page 167

1  the filing.
2    Q.   Let me ask you this:  Do you
3  think that, as you've described it -- and
4  I don't want to put words in your mouth,
5  so you tell me if this is true.  It sounds
6  like some of these complaints that you
7  made were based on the fact that you felt
8  like you were being given additional job
9  duties; is that correct?
10    A.   Yes.
11    Q.   Did you think that anybody at
12  DCI was giving you additional job duties
13  because of your race?
14    A.   No, I don't think it was
15  because of my race.
16    Q.   I mean, do you have an opinion
17  as to why -- did you have an opinion as to
18  why you were getting these extra job
19  duties?
20    A.   Because I would do it.  I would
21  fuss about it, but I would do it.  Like I
22  told her, I was also responsible for doing
23  Dr. Krothapalli's unstables.  He does

Page 168

1  those once a month.
2    Q.   What's that?
3    A.   Where he -- they would come
4  in -- he and the social worker and the
5  nurse manager and the dietitian would make
6  rounds at each patient's chair, and he
7  needed a specific packet for that patient.
8  And I was responsible for getting those
9  packets together.  I was responsible for
10  doing those packets.  Lee Ashbury would
11  tell you -- Lee Ashbury, Glenda Gary, and
12  Sherry Pereira would tell you, I was the
13  one doing the RN and LPN's work.  They
14  would just sign what I had done.
15    Q.   Did you work overtime when you
16  were at DCI?
17    A.   Yes, I did.
18    Q.   How often?
19    A.   I worked overtime prior to
20  unstables, to get all that stuff together,
21  get it ready.
22    Q.   I guess you were there about
23  five years; is that right?

42 (Pages 165 to 168)

## American Court Reporting
### February 6, 2008

# American Court Reporting
## toll-free (877) 320-1050

Page 169

1    A.  Yes.
2    Q.  In the five years you worked
3  there, can you give me an idea of how many
4  weeks you would work overtime?
5    A.  I would work overtime at least
6  one week out of the month.
7    Q.  Would that be the case for the
8  whole five years?
9    A.  Well, one week out of the month
10  prior to unstables.
11    Q.  When would the unstables start?
12    A.  The unstables were done -- say
13  they were done -- I'm just giving some
14  estimate dates here.
15    Q.  Sure.
16    A.  Say they were done on the 16th
17  and 17th, the following week. The week
18  prior to that, I would work late to get
19  all of those packages together. The
20  diagnostic tests, all of that stuff was to
21  be done.
22    Q.  Was that during your entire
23  employment, all five years?

Page 170

1    A.  No.
2    Q.  When was that?
3    A.  I took over unstables in
4  2004 -- 2003, 2004.
5    Q.  So prior to the unstables, was
6  it common for you to work overtime?
7    A.  No.
8    Q.  Did you do the unstables
9  through the end of your employment?
10    A.  Yes.
11    Q.  Any other times that you had to
12  work overtime other than, obviously,
13  preparing for the unstables?
14    A.  If I had a problem with
15  computers and I was at another clinic to
16  get them up running again.
17    Q.  Were you paid extra money for
18  working overtime?
19    A.  Yes.
20    Q.  Like time and a half?
21    A.  I guess.
22    Q.  Did you make any other
23  complaints to Glenda Gary or Lee Ashbury

Page 171

1  or Dan Watson or anybody else at DCI about
2  hostile environment?
3    A.  I never talked to Dan Watson
4  again other than the time for my funeral
5  leave and that Monday.
6    Q.  Right. You've told me --
7    A.  I had no reason to talk to Dan
8  Watson.
9    Q.  You've already told us about
10  the funeral leave. Was that Sherry
11  Pereira that wouldn't -- that didn't --
12    A.  No. That was Roni DeBusk.
13    Q.  Who is that?
14    A.  She was accounts payable or
15  accounts something. She was there at the
16  time. She's not there anymore.
17    Q.  Now, you also say in paragraph
18  ten of your complaint that
19  African-Americans are strictly held to DCI
20  policy and procedure while Caucasians are
21  not. Is that what you -- the incident
22  that you just described, is that what
23  you're talking about?

Page 172

1    A.  Yes.
2    Q.  Any others?
3    A.  No.
4    Q.  Let me ask you that just for
5  clarification, since you raised the issue
6  of African-Americans. I need to know,
7  Debbie Tullier, what's her race? Do you
8  know?
9    A.  She's white, as far as I know.
10    Q.  What about Arthur Taylor?
11    A.  Black.
12    Q.  Regina Chapman?
13    A.  Black.
14    Q.  Marshekia Pitts?
15    A.  Black.
16    Q.  Rachel Thompson?
17    A.  White.
18    Q.  Debbie Goodnoe?
19    A.  White.
20    Q.  Tabitha Mack?
21    A.  Black.
22    Q.  Sharon -- what's Sharon's last
23  name?

43 (Pages 169 to 172)

# American Court Reporting
## February 6, 2008

**American Court Reporting**
**toll-free (877) 320-1050**

Page 173

| | |
|---|---|
| 1 | A.  Sankey. |
| 2 | Q.  Sankey. |
| 3 | A.  She's white. |
| 4 | Q.  Sherry Pereira? |
| 5 | A.  She's white. |
| 6 | Q.  Rose -- what's Rose's last |
| 7 | name? |
| 8 | A.  Smith. |
| 9 | Q.  Rose Smith. |
| 10 | A.  She is black. |
| 11 | Q.  Lee Ashbury? |
| 12 | A.  He was white. |
| 13 | Q.  And Glenda Gary? |
| 14 | A.  White. |
| 15 | Q.  Tammy Griswold? |
| 16 | A.  White. |
| 17 | Q.  In paragraph 11 of your |
| 18 | complaint, you indicate that |
| 19 | African-Americans are -- actually, I think |
| 20 | you allege that Caucasians are rehired and |
| 21 | African-Americans are not; is that |
| 22 | correct?  You might want to take a look at |
| 23 | paragraph eleven. |

Page 174

| | |
|---|---|
| 1 | A.  Yes. |
| 2 | Q.  What is the basis of that? |
| 3 | Give me some examples. |
| 4 | A.  For example, I had asked Glenda |
| 5 | Gary if I can move out of medical records |
| 6 | and go to the treatment floor.  She told |
| 7 | me DCI had a freeze on hiring. |
| 8 | Q.  Okay. |
| 9 | A.  Well, Rachel Thompson had left |
| 10 | DCI and moved to Mississippi, decided she |
| 11 | didn't like it.  At the same time that you |
| 12 | got a freeze on hiring, you let this woman |
| 13 | come back to work. |
| 14 | Q.  What was Rachel Thompson's job? |
| 15 | A.  She's a patient care tech. |
| 16 | Q.  A tech.  And that's the |
| 17 | position that you wanted, patient care |
| 18 | tech? |
| 19 | A.  Yes. |
| 20 | Q.  Do you know when that was? |
| 21 | A.  This was just prior to me being |
| 22 | terminated. |
| 23 | Q.  Any other examples? |

Page 175

| | |
|---|---|
| 1 | A.  No. |
| 2 | Q.  In your complaint, you talk |
| 3 | about African-Americans not being rehired. |
| 4 | You were -- |
| 5 | A.  I'm sorry.  My mistake.  There |
| 6 | was Marshekia Pitts.  She also left the |
| 7 | clinic.  She didn't get terminated.  But |
| 8 | she asked to come back, and Glenda Gary |
| 9 | was telling her that they had a freeze on |
| 10 | hiring. |
| 11 | Q.  Do you know when that was? |
| 12 | A.  This was around the same time, |
| 13 | August. |
| 14 | Q.  How did you -- did Ms. Pitts |
| 15 | tell you this? |
| 16 | A.  Yes. |
| 17 | Q.  All right.  Any other examples? |
| 18 | A.  Kimberly Reeves, also. |
| 19 | Q.  Tell me about her. |
| 20 | A.  She left, found another job, |
| 21 | but she decided to come back.  She |
| 22 | couldn't come back. |
| 23 | Q.  How do you know that? |

Page 176

| | |
|---|---|
| 1 | A.  She told me. |
| 2 | Q.  Anybody else? |
| 3 | A.  No. |
| 4 | Q.  What about Tabitha Mack? |
| 5 | A.  Tabitha Mack was just recently |
| 6 | rehired. |
| 7 | Q.  What is Tabitha Mack?  Is she a |
| 8 | nurse or patient care -- |
| 9 | A.  LPN. |
| 10 | Q.  Kimberly Reeves, what was she? |
| 11 | A.  She's a patient care tech. |
| 12 | Q.  How about Marshekia? |
| 13 | A.  Patient care tech. |
| 14 | Q.  Other than Rachel Thompson, do |
| 15 | you know of any Caucasians that have been |
| 16 | rehired? |
| 17 | A.  Not at this time. |
| 18 | Q.  Do you know of any |
| 19 | African-Americans that have been rehired? |
| 20 | A.  Other than Tabitha Mack? |
| 21 | Q.  Other than Tabitha. |
| 22 | A.  Anybody besides Tabitha, no. |
| 23 | Q.  In paragraph 12 of your |

44  (Pages 173 to 176)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 177

1  complaint, you allege that DCI has
2  disregarded its policy of not hiring
3  related people in two instances regarding
4  Caucasians. Can you tell me about those
5  two instances? Which were the two --
6      A.  Rachel Thompson and Mandy
7  Martin Bowen are two sisters' children.
8      Q.  So cousins?
9      A.  Yes.
10     Q.  And --
11     A.  And I was getting ready to
12  refer someone to work there, and I
13  couldn't because she was my cousin.
14     Q.  Who were you going to refer?
15     A.  I was going to refer Phyllis
16  Glover.
17     Q.  And who told you that you could
18  not refer her?
19     A.  They said that we were cousins
20  and they could not hire her. We were
21  family members.
22     Q.  But who told you that?
23     A.  This was Sherry Pereira. And

Page 178

1  also an incident with Regina Chapman. At
2  one time, Vivian Tolliver was employed
3  there. She tried to come back, and they
4  told her she couldn't come back because
5  she and Regina were cousins.
6      Q.  What was her name? Vivian --
7      A.  Vivian Tolliver.
8      Q.  Who told Regina that? Do you
9  know?
10     A.  This is Lee Ashbury.
11     Q.  And who told you that? Regina?
12     A.  It was all over the clinic.
13  For number one fact was, Regina and Vivian
14  had to get paperwork proving that they
15  were not related, that they were not
16  sisters and they were not cousins.
17     Q.  So let me make sure I've got
18  this right. Regina and Vivian both worked
19  there?
20     A.  At one time. Vivian left.
21  Vivian wanted to return there. They were
22  close friends, and they used to tell
23  everybody they were sisters or they were

Page 179

1  cousins.
2      Q.  Okay.
3      A.  Lee Ashbury said that Vivian
4  could not come back because she and Regina
5  were related. When they tried to tell him
6  differently, he made them go get paperwork
7  proving that they were not related.
8      Q.  So did they do that?
9      A.  Yes, they did.
10     Q.  Did Vivian get to come back?
11     A.  No, she didn't.
12     Q.  How do you know that? How do
13  you know that they brought him the
14  paperwork?
15     A.  Because I saw the paperwork.
16     Q.  How did you see it?
17     A.  Regina showed it to me. Vivian
18  showed it to me. Like I said, anything
19  that happen at DCI is not secret.
20     Q.  You've said that a couple of
21  times. You mean people just talk?
22     A.  Yes. It's like a soap opera
23  around there.

Page 180

1      Q.  Would Regina and Vivian talk
2  about it?
3      A.  Everybody talked about it, yes.
4      Q.  And they could talk about it,
5  Regina and Vivian?
6      A.  Yes.
7      Q.  Now, you also say in paragraph
8  13 of your complaint that DCI has
9  repeatedly fired African-Americans for
10  whistle blowing, but that it never fires
11  Caucasians. Tell me what you mean --
12  first of all, what are you talking about
13  by whistle blowing?
14     A.  That goes back to
15  complaining -- going to complain to Glenda
16  Gary about anything. If you go and tell
17  Glenda Gary something, she will go and
18  tell that person. It starts a problem
19  with you and that person. You're the one
20  that's going to get fired. You're the one
21  that's going to get terminated because you
22  are the troublemaker.
23     Q.  Tell me about Arthur Taylor

45 (Pages 177 to 180)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 181

1  again. Why was he fired?
2      A.   I have no idea why Arthur was
3  fired. He was fired after I left there.
4      Q.   But you know he was fired?
5      A.   Yes.
6      Q.   Who told you he was fired?
7      A.   It was word -- everybody talks
8  at DCI.
9      Q.   Right. But you weren't at DCI.
10  So somebody had to talk to you outside of
11  DCI. So who told you that Arthur was
12  fired?
13     A.   Employees that are still there.
14     Q.   Okay. Who?
15     A.   Why do you need to know their
16  names?
17         MR. HARRISON: Just answer the
18  question.
19         THE WITNESS: Okay. Fine.
20     A.   Melissa Hill, Charlie Jenkins,
21  Ronesha Brown Burton.
22     Q.   So you've talked to these three
23  employees, and they've told you that

Page 182

1  Arthur was fired?
2      A.   Yes.
3      Q.   How about Regina Chapman?
4      A.   Regina was fired before I was.
5      Q.   She told you she was fired?
6      A.   Yes. I was there the day that
7  she was fired.
8      Q.   Do you still talk to Regina?
9      A.   Yes, I do.
10     Q.   How about Rachel Thompson?
11  Because in your interrogatories, you
12  indicated that Rachel Thompson is an
13  example of a Caucasian employee who
14  apparently complained or blew the whistle
15  and was not fired.
16     A.   She was not fired.
17     Q.   What did Rachel complain of?
18     A.   Rachel constantly complained
19  about Marshekia. They were always at each
20  other. She constantly complained about
21  her. But Marshekia did not get fired.
22  Marshekia found another job.
23     Q.   And Rachel, did she get fired?

Page 183

1  Is she still there? Do you know?
2      A.   No, she's not still there. I
3  don't know if she got fired or not, but
4  she's not still there.
5      Q.   Who told you she's not there
6  anymore? Do you talk to Rachel?
7      A.   No, I don't.
8      Q.   Who told you Rachel is no
9  longer there?
10     A.   The same people that tells me
11  everything else.
12     Q.   Melissa, Charlie, and Ronesha?
13     A.   Yes.
14     Q.   How about Mandy Martin Bowen?
15  Tell me about her, because you also gave
16  her as an example as a Caucasian who blows
17  the whistle or complains and was never
18  fired.
19     A.   Mandy gets out on the floor and
20  talks about what she's not going to do,
21  what she's going to do, what she's not
22  going to do. She will go down and talk to
23  Glenda, and she gets what she wants.

Page 184

1      Q.   Do you know whether she's still
2  working there?
3      A.   Yes, she does.
4      Q.   How about Brenda Haire? You
5  also listed her as an example.
6      A.   Brenda Haire was one that would
7  make racial comments. She didn't care
8  what it was, and she would talk loud. She
9  was the one that I saw for myself, as well
10  as other employees, that hit a patient.
11  And when he complained about her, he and
12  her ended up in a meeting. She said she
13  didn't care if she broke his foot when she
14  hit him.
15     Q.   When did she say that?
16     A.   This was the day that she hit
17  him.
18     Q.   She said that to you?
19     A.   She said that to the patient.
20     Q.   Did you hear it?
21     A.   Yes. Everybody heard her that
22  was working out there on that floor that
23  day.

**American Court Reporting**
**February 6, 2008**

Page 185

1      Q.   Do you know if Brenda was
2   fired?
3      A.   No, Brenda is not fired.
4   Brenda still works there.
5      Q.   Do you know if she was
6   disciplined?
7      A.   No.
8      Q.   That's a bad question.  You
9   don't know?
10     A.   No, I don't know.
11     Q.   All right.  How about Debbie
12  Tullier?  Is that the incident you already
13  told me about, her not clocking out to go
14  to AA?
15     A.   Yes.
16     Q.   Anything else about Debbie
17  Tullier that fits into that category that
18  we've been talking about?
19     A.   No.
20     Q.   Do you know whether Debbie
21  Tullier is still there?
22     A.   I have no idea.
23     Q.   So you don't know if she's been

Page 186

1   fired or is still there?
2      A.   No.
3      Q.   Now, in paragraph 14 of your
4   complaint, you talk about nurses that have
5   made racial slurs.  You just mentioned
6   Brenda Haire.  Tell me about that.  What
7   did she say?
8      A.   Brenda Haire is always talking
9   about black people's hair.  She's always
10  talking about how nappy it is, and how
11  black people are always complaining;
12  everything's got to be prejudiced; I
13  thought they overcame.
14     Q.   Okay.  Anything else Brenda --
15  any other slurs?
16     A.   No.
17     Q.   Did you overhear -- I'm sorry.
18  I didn't mean to cut you off.
19     A.   No.
20     Q.   Did you overhear Brenda make
21  these comments?
22     A.   Yes, I did.
23     Q.   Both of these comments?

Page 187

1      A.   Yes.
2      Q.   When did you hear that, if you
3   recall?
4      A.   This was -- I have to go out on
5   the floor a lot.  Because working with
6   medical records, you have to go out and
7   mend the charts.  So I'm out there, and I
8   hear Brenda talk a lot.
9      Q.   Do you know whether anybody was
10  around to overhear these comments that you
11  heard about black people's hair and about
12  blacks always complaining about prejudice?
13     A.   Yes.
14     Q.   Who would have overheard that?
15     A.   Everyone that was working.
16     Q.   Well, who?  Can you tell me
17  specifically some people that might be
18  witnesses to those comments?
19     A.   They will not witness to it,
20  because they know -- I don't think they
21  will witness to it.
22     Q.   That was probably not a good
23  question.  They may not talk about it.  I

Page 188

1   understand what you're saying.  But can
2   you tell me people who would have heard
3   it, who were there with you?
4      A.   Yes.  I could even tell you
5   patients that heard it.  Jennifer
6   Cheatham, she's a patient.
7      Q.   Is she African-American?
8      A.   Yes.
9          MS. SANDERS:  And just for --
10  you know what, we better put this part of
11  the deposition under seal when she's
12  telling me patients' names.  Go back to
13  the patient names, which Jennifer Cheatham
14  was the first one.  All of this part where
15  we're talking about patients, you need to
16  put that under seal.
17     Q.   Go ahead.
18     A.   Betty Smith, patient.
19     Q.   Is she African-American?
20     A.   Yes.  In that section, you have
21  Alizaber Thomas.
22     Q.   Elizabeth?
23     A.   Alizaber.  It's A. Alizaber.

47 (Pages 185 to 188)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 189

```
 1    Q.  Okay. A-L-I-Z --
 2         MR. HARRISON: A-B-E-R.
 3    Q.  Is that a man or woman?
 4    A.  That's a woman.
 5    Q.  What's her last name?
 6    A.  Thomas.
 7    Q.  African-American --
 8    A.  Yes.
 9    Q.  -- or white? Any other
10  patients that might have overheard Brenda
11  Haire? I want to know people that you
12  know were present when she made these
13  comments that you referred to. Not just
14  people that might have heard. That was a
15  bad question on my part.
16    A.  There's a lot of people that
17  sleep or pretend as though they're asleep
18  when they're there. That blocks out the
19  four hours that they have to sit there.
20    Q.  Okay.
21    A.  But employees, you have --
22         MS. SANDERS: Now, this goes
23  back on -- the employees are -- we're not
```

Page 190

```
 1  confidential now.
 2    A.  You have Melissa Hill. You
 3  have Ronesha Brown Burton.
 4    Q.  And they were around when
 5  Brenda made these comments?
 6    A.  Yes. She was at the nurses'
 7  station at the time.
 8    Q.  Ronesha, do you know how she
 9  spells her name?
10    A.  No.
11    Q.  Burton. That's fine. We'll
12  figure that out.
13    A.  Dottie Chamberlain.
14    Q.  And Melissa, Ronesha, and
15  Dottie were around when Brenda made these
16  comments that you heard?
17    A.  Yes.
18    Q.  Okay. Any other employees that
19  might have overheard?
20    A.  Mandy was there.
21    Q.  Mandy Bowen?
22    A.  Yes.
23    Q.  Any others that you can think
```

Page 191

```
 1  of?
 2    A.  Rachel was there as well.
 3    Q.  Did you ever complain to --
 4  well, let me back up. Do you recall
 5  during your employment when these comments
 6  were made?
 7    A.  No.
 8    Q.  Was it when Lee Ashbury was the
 9  clinic administrator?
10    A.  No, no.
11    Q.  Was it when Glenda Gary --
12    A.  This was when Glenda Gary was
13  acting as the administrator. We didn't
14  actually have an administrator.
15    Q.  Did you ever hear Brenda make
16  these comments when Lee Ashbury was the
17  administrator?
18    A.  Brenda always -- I mean, Brenda
19  always made those comments. That was just
20  Brenda's way of talking. That was Brenda.
21    Q.  Okay. So did you ever complain
22  to either Lee Ashbury, Rose, or Glenda
23  Gary about these comments?
```

Page 192

```
 1    A.  I also complained to Brenda.
 2    Q.  Well --
 3    A.  Yes.
 4    Q.  So tell me who you complained
 5  to.
 6    A.  I complained to Lee.
 7    Q.  Anybody else?
 8    A.  I have told Rose Smith about
 9  them.
10    Q.  Anybody else?
11    A.  And I have also talked to
12  Brenda Haire herself.
13    Q.  What did you tell Brenda?
14    A.  I asked her why she's always
15  making snide comments about black
16  people --
17    Q.  What did she say --
18    A.  -- and what is the problem.
19    Q.  What was her response?
20    A.  And she said, ain't no problem;
21  it's just that y'all get around here and
22  y'all complain about this; it's not
23  slavery time anymore. And she said, you
```

48 (Pages 189 to 192)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 193

1  wasn't back in that time anyway; why is it
2  bothering you. It bothers me because I'm
3  a black person.
4      Q.   So this is a conversation you
5  had with Brenda?
6      A.   Yes.
7      Q.   What about Lee Ashbury? When
8  you told Lee about Brenda?
9      A.   If it didn't bother Lee, Lee
10  didn't bother it.
11      Q.   How about Rose? What about
12  Rose when you complained to her?
13      A.   She wrote it down.
14      Q.   Do you know whether she did
15  anything about it?
16      A.   No, I don't.
17      Q.   But you didn't complain to
18  Glenda Gary about Brenda Haire?
19      A.   No. Like I said, Glenda Gary
20  was not administrator at the time.
21      Q.   Anybody other than Brenda Haire
22  who made -- you say several nurses. Any
23  other nurses that made racial slurs, or

Page 194

1  was that Brenda Haire? Actually, that
2  several may have been my word. Can you
3  think of any other nurses that made racial
4  slurs?
5      A.   Debbie Tullier would every now
6  and then.
7      Q.   What would Debbie --
8      A.   Debbie would get mad with
9  certain techs, and she would say, it don't
10  do any good to complain about them because
11  black people are known to beat you up.
12      Q.   Did you hear Debbie say that?
13      A.   Yes, I did.
14      Q.   Did you complain to anybody?
15      A.   No.
16      Q.   Do you know if anybody else
17  ever heard Debbie say that? Was anybody
18  around you at the time you heard her make
19  that comment?
20      A.   Debbie was talking about Regina
21  Chapman at the time. And Regina heard
22  her, and her and Regina had a
23  confrontation.

Page 195

1      Q.   So Regina was the one she was
2  referring to?
3      A.   Yes.
4      Q.   And Regina heard it?
5      A.   Yes.
6      Q.   Any other comments? Any other
7  racial slurs?
8      A.   No.
9      Q.   Let me ask you this, because
10  you indicated in your discovery responses
11  that Melissa Hill has knowledge regarding
12  your claims. You've already told me about
13  Ms. Hill, that you've talked to Ms. Hill.
14  You indicated that she is the one that
15  told you about Arthur Taylor being
16  terminated. Anything else that Ms.
17  Hill -- any other information that you
18  think Ms. Hill has? Any other reason you
19  listed her as having knowledge of your
20  claims?
21      A.   Melissa works there. Melissa
22  knows what's going on around there. Not
23  only Melissa Hill, I also gave you Charlie

Page 196

1  Jenkins.
2      Q.   Right. Does he still work
3  there? Is that a man?
4      A.   Yes. I guess. I have no idea
5  who works there now, but I know Melissa
6  works there.
7      Q.   Has Charlie indicated whether
8  he still works there or not?
9      A.   I haven't talked to Charlie in
10  a few months.
11      Q.   How about Ronesha? Does she
12  still work there?
13      A.   I haven't talked to Ronesha in
14  a couple months.
15      Q.   Other than Melissa, are there
16  any other employees of DCI that you've
17  talked to about this lawsuit?
18      A.   No.
19      Q.   I guess I should say have you
20  talked to Melissa about the lawsuit?
21      A.   I told her that I had given her
22  name to my attorney.
23      Q.   Right. Anybody else that

49 (Pages 193 to 196)

**American Court Reporting**
**February 6, 2008**

## American Court Reporting
### toll-free (877) 320-1050

Page 197

1  you've talked to that works at DCI?
2      A.  No.
3      Q.  How about any former employee
4  of DCI?
5      A.  Marshekia Pitts.
6      Q.  Okay.  Anybody else you've
7  talked to about the lawsuit?
8      A.  And Regina Chapman.  Not about
9  their lawsuit, but I have given their
10  names to my attorney.
11      Q.  Do you know if they're still in
12  Montgomery?
13      A.  Regina lives in Wetumpka, and
14  Marshekia was living in Auburn.
15      Q.  Okay.  How about Melissa?
16      A.  Melissa lives in Montgomery.
17      Q.  What about Charlie?
18      A.  Charlie lives in Montgomery.
19      Q.  And Ronesha?
20      A.  Montgomery.
21      Q.  Ms. Quinnie, do you have -- and
22  I know some of these questions seem
23  random.  Do you have a cellular telephone?

Page 198

1      A.  Yes, I do.
2      Q.  What's your telephone number?
3      A.  430-2134.
4      Q.  Have you ever had a cell phone
5  number 334 -- is that the area code in
6  Montgomery?
7      A.  Yes.
8      Q.  799-8496?
9      A.  Yes.
10      Q.  Was that your cell phone?
11      A.  Yes.
12      Q.  Would that have been your cell
13  phone in 2005 -- I'm sorry.  2006.
14      A.  Yes.
15      Q.  When you worked at DCI?
16      A.  Uh-huh.
17      Q.  Let me ask you this:  If you
18  were actually at work -- if you were at
19  DCI and you needed to call somebody, would
20  you use the phone at DCI or your cell
21  phone?
22      A.  It all depended on who I was
23  calling and what I was calling about.

Page 199

1      Q.  Well, let's say it was a local
2  call to another DCI employee about work.
3  Just any DCI employee.  If you were
4  calling a DCI employee about work, would
5  you use the DCI phone or your cell phone
6  for that?
7      MR. HARRISON:  Objection to
8  that.  Speculation.
9      Q.  Well, I'm just asking, did you
10  ever call -- let's say that you were at
11  work.  Did you ever call other employees
12  about business -- I'm not talking about
13  personal stuff.  Would you call other DCI
14  employees using your cell phone?
15      A.  No, not unless I knew them.
16      Q.  Okay.  What do you mean by
17  that?
18      A.  If I knew them outside of work.
19      Q.  Right.  Or if you were going to
20  call them about something personal or --
21      A.  Yes.  I would use my cell
22  phone.
23      Q.  But if you were calling about

Page 200

1  business --
2      A.  I would use the DCI phone.
3      MR. HARRISON:  Objection to
4  that.
5      Q.  Let me ask you this:  Did you
6  ever call Lisa Daniels from your cell
7  phone about getting a key to get into your
8  office?
9      A.  Yes.  That was the Saturday
10  that LaTonya and I came in to work.
11      Q.  Okay.
12      A.  And that Friday, like I said, I
13  wasn't feeling well.
14      Q.  Right.
15      A.  I left 30 minutes early, and I
16  left my keys in my desk drawer.  So that
17  Saturday morning when I got to work, I
18  couldn't get into my office.
19      Q.  Okay.
20      A.  So Lisa Daniels has a master
21  key.
22      Q.  I see.
23      A.  So she was the one that let me

50  (Pages 197 to 200)

## American Court Reporting
### February 6, 2008

**American Court Reporting**
**toll-free (877) 320-1050**

Page 201

1  in my office to get my key.
2       Q.   But you could get into the
3  building?
4       A.   Yes, because the door was open
5  when I got there. Patients go on at five
6  o'clock.
7       Q.   Okay. But you couldn't get
8  into your office?
9       A.   No.
10      Q.   So tell me about that. When
11  you got to work that day -- and you
12  testified earlier you left early the day
13  before because you weren't feeling well;
14  right?
15      A.   Uh-huh.
16      Q.   And you left your keys at work.
17  Did you call Lisa when you got to work?
18      A.   Yes.
19      Q.   Did you call her like right
20  when you got there?
21      A.   No. When I got there, it was
22  5:15, 5:30.
23      Q.   Okay.

Page 202

1       A.   But I did not clock in until
2  six o'clock, because that was the time
3  that LaTonya and I agreed to be there.
4  And they had already talked to us about
5  overtime.
6       Q.   Okay. And so when did you call
7  her about your keys?
8       A.   I had to call her -- I don't
9  know if it was about 6:30, seven. I'm not
10  sure.
11      Q.   Okay. Why did you wait?
12      A.   Because I didn't need to get
13  into my office. The charts was out on the
14  treatment floor.
15      Q.   Okay. Did you call her from
16  DCI's phone?
17      A.   I called her from my cell
18  phone, I think.
19      Q.   And why was that?
20      A.   Because I had my cell phone at
21  the time. I was downstairs in the
22  conference room.
23      Q.   Why didn't you just call her

Page 203

1  from a DCI phone?
2       A.   I had my cell phone at the
3  time. It was a Saturday.
4       Q.   I guess I just don't
5  understand. Because you said earlier if
6  you were at DCI calling about DCI
7  business, you would use a DCI phone.
8       A.   I said if I knew that person
9  outside of DCI, I would call them on my
10  cell phone.
11      Q.   And Lisa is somebody you know
12  outside of DCI?
13           MR. HARRISON:  Object to the
14  form.
15      A.   Yes.
16      Q.   Well, is Lisa somebody you knew
17  outside of DCI?
18      A.   Lisa is somebody that I
19  frequently talk to outside of DCI.
20      Q.   Something I need to ask you,
21  Ms. Quinnie, before I forget, this is
22  going back to something we talked about
23  before. When you worked at the temp

Page 204

1  agency, the name I can't pronounce very
2  well --
3       A.   Snelling Staffing.
4       Q.   Snelling Staffing. Did you get
5  benefits there or just wages?
6       A.   I had benefits.
7       Q.   So you got $11 an hour, plus
8  what were your benefits?
9       A.   I had signed up for Blue Cross
10  Blue Shield.
11      Q.   Did you have to pay for health
12  insurance?
13      A.   Yes.
14      Q.   Did you pay the full amount, or
15  did your employer pay part and you pay
16  part?
17      A.   No. They had a packet, and you
18  picked the packet that you wanted.
19      Q.   Okay. Did you have to pay for
20  that out of your paycheck?
21      A.   Yes.
22      Q.   How much was it?
23      A.   I was paying $25 a week.

51 (Pages 201 to 204)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 205

1    Q.   Okay.  For the health
2  insurance?
3    A.   Yes.
4    Q.   Was it your understanding that
5  the company paid for some of the health
6  insurance?
7    A.   I'm not sure how the temp
8  agency worked.  All I know is I picked out
9  the packet that I wanted and they took out
10  the money.
11    Q.   How about a retirement plan?
12  Did you have any kind of retirement plan?
13    A.   No.
14    Q.   What about at -- when you were
15  working at the security company, did you
16  have health insurance?
17    A.   No.
18    Q.   Did you have any other benefits
19  other than your wages?
20    A.   No.
21    Q.   What about Fresenius now?
22    A.   Yes.
23    Q.   How much do you have to pay for

Page 206

1  health insurance?
2    A.   I'm not sure.  It's taken out
3  of my paycheck.
4    Q.   Do you have a paycheck stub
5  that would show how much --
6    A.   Not with me.
7    Q.   But have you got one somewhere?
8    A.   Yes.
9    Q.   I'm going to ask your attorney
10  for a copy of that just so I can see what
11  you're having to pay for insurance.
12    A.   Okay.
13    Q.   How about at Alacare?
14    A.   Alacare was with Snelling.
15    Q.   Sorry.  Do you have any kind of
16  retirement at Fresenius?
17    A.   No, I haven't yet.
18    Q.   You have that option to pay
19  into a 401(k)?
20    A.   Yes.
21    Q.   I want to ask you, Ms. Quinnie,
22  about your time-keeping policies at DCI
23  and how you kept time.  Tell me how you

Page 207

1  would keep your time at DCI.  Did you have
2  a time card that you punched?
3    A.   No.  We logged onto the
4  computer.  At first, we did have a time
5  card, I think, until January of '04.
6    Q.   So you would go into the
7  computer, log in when you got there.  When
8  you left, would you log off?
9    A.   Yes.
10    Q.   Did you have to log off for
11  lunch?
12    A.   Yes.
13    Q.   How about for breaks?
14    A.   No.
15    Q.   I think you testified earlier
16  on that Saturday, August 5th, what time --
17  you indicated you came to work around
18  5:15, 5:30 --
19    A.   5:30.
20    Q.   When did you clock in?
21    A.   I think it was six, 6:01.
22    Q.   I'm curious.  How do you
23  remember that?

Page 208

1    A.   Because I remember we agreed to
2  be there at six o'clock, LaTonya and I.
3  We could not clock in -- if I had clocked
4  in earlier than six o'clock, that would
5  have threw me into overtime.
6    Q.   How did you -- did you normally
7  work on Saturday?
8    A.   No.
9    Q.   So it was unusual to come in on
10  a Saturday for you?
11    A.   The only time I worked on
12  Saturday was if I was doing the unstable
13  packages.  I would come in that full week
14  and stay late.  Sometimes I would come in
15  at five in the morning and stay until the
16  last patient left at night.
17    Q.   Was the clinic open on
18  Saturdays?
19    A.   Yes.
20    Q.   Regularly?
21    A.   Yes.
22    Q.   Let me ask you this:  You said
23  that if you had clocked in earlier on that

52  (Pages 205 to 208)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 209

1 Saturday it would have kicked you into
2 overtime?
3   A.  Yes.
4   Q.  Did that mean you had not
5 worked one day that week?
6   A.  No.  They had reprimanded
7 everybody about overtime.
8   Q.  Right.  But it seems to me if
9 you're working on a Saturday and you have
10 just worked a full week, you're going to
11 be working overtime anyway.
12   A.  Well, that would have been
13 overtime.  But me clocking in prior to six
14 o'clock would have shown that I worked
15 more hours than LaTonya.  I was not
16 actually working.  So we agreed to be
17 there at six o'clock, and that's when I
18 clocked in.
19   Q.  So were you going to get
20 overtime for that week anyway?
21   A.  Yes.  But I was only going to
22 get overtime for the time that she and I
23 were going to get it together.

Page 210

1   Q.  Was that all you had been
2 authorized to work?
3   A.  Yes.
4   Q.  Who had authorized you to work?
5   A.  Glenda Gary.
6   Q.  On that Saturday, August 5th
7 beginning at six o'clock?
8   A.  Yes.  She said come in that
9 Saturday.  She did not tell us what time
10 to come in.  LaTonya and I agreed to meet
11 there at six o'clock.
12   Q.  Okay.  So why would it have
13 been a problem to clock in at 5:15?
14   A.  Because if we agreed to be
15 there at six o'clock, if she would have
16 looked at the time and said, well,
17 LaTonya, you all got here at six o'clock,
18 why is Cynthia here prior to this.  And I
19 was not working.
20   Q.  Okay.  So what were you doing?
21   A.  I talked with patients.  The
22 patients -- some of the patients hadn't
23 gotten on the machine yet.  I was talking

Page 211

1 to patients.
2   Q.  Okay.
3   A.  But I was coming there because
4 I thought that I had left my keys -- I
5 checked my mailbox at the end of the day.
6 I thought I had left my keys there.  They
7 were not there.  I left my keys in my desk
8 drawer, which was locked in my office.
9     MS. SANDERS:  Back under seal
10 for a minute.
11   Q.  Who were the patients that you
12 were talking to that morning?
13   A.  I talked to a lot of patients
14 that morning.  I talked to Alizaber
15 Thomas.  I talked to Willie Murray.  I
16 talked to -- last name Brown.  I can't
17 think of his first name.  I talked to
18 Jennifer Cheatham, Betty Smith.  I talked
19 to a lot of patients that morning.
20   Q.  And have you talked to any of
21 those patients since you've left DCI?
22   A.  No.  Other than Alizaber
23 Thomas, no.

Page 212

1   Q.  Do you know Ms. Thomas
2 socially?
3   A.  Yes.
4   Q.  Outside of DCI?
5   A.  Yes.
6   Q.  Did you know her before she was
7 a patient at DCI?
8   A.  Yes.
9     MS. SANDERS:  Back not under
10 seal.
11   Q.  So what time did LaTonya get
12 there that day?  Do you remember?
13   A.  LaTonya showed up on the floor,
14 it had to have been about six, a little
15 after six.
16   Q.  So you said that when you come
17 into work you log on on a computer; right?
18   A.  Yes.
19   Q.  Did you log on on your computer
20 that day?
21   A.  No, because I couldn't get into
22 my office at that time.
23   Q.  Right.  So whose computer did

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 213

1  you log in on?
2      A.   I was out on the treatment
3  floor, and that's where I clocked in at.
4      Q.   Do you know whose computer that
5  was?
6      A.   It was the nurses' station. It
7  was nobody's computer.
8      Q.   Tell me who Irlene is.
9      A.   Irlene Phillips?
10     Q.   Yes.
11     A.   She's accounts payable.
12     Q.   Did you use her computer to log
13  on?
14     A.   No. I used her computer to
15  clock out -- log out, because that's where
16  we worked at, down in the conference room.
17     Q.   Okay. So you didn't clock out
18  on your computer that day?
19     A.   No. I went into my office. I
20  got my keys, and that was it.
21     Q.   So you didn't work in your
22  office that day?
23     A.   No. We worked in the

Page 214

1  conference room.
2      Q.   Now, the day that you came in,
3  did you log in under your ID and password?
4      A.   Yes.
5      Q.   Did you ever use Lee Ashbury's
6  ID and password to log in?
7      A.   No.
8      Q.   Did you know Lee Ashbury's
9  password?
10     A.   No. I never did anything
11  with -- Lee Ashbury was responsible for
12  the office staff time, which would have
13  been my time. I never had that access. I
14  only had Sherry Pereira's access.
15     Q.   Did you have Sherry's log in ID
16  and password?
17     A.   Yes, to do the nursing staff's
18  time.
19     Q.   Did you have Lee's log in ID
20  and password?
21     A.   No.
22     Q.   Let me ask you this: Did you
23  ever come in and log in at the wrong time

Page 215

1  and ask somebody to correct it?
2      A.   No.
3      Q.   So you never forgot to log in,
4  I should say?
5      A.   I have forgotten to clock in,
6  yes.
7      Q.   Did you ask somebody to fix it?
8      A.   Ms. Irlene Phillips.
9      Q.   What about clocking out? Did
10  you ever forget to clock out?
11     A.   Yes, I have.
12     Q.   What was the process? I'm sure
13  that happens, people forget to clock in
14  and clock out.
15     A.   If you don't clock out, then
16  the next morning it's going to carry over
17  and you're going to have too many hours
18  showing.
19     Q.   So what's the process? If you
20  forget to clock in or clock out, who do
21  you go to?
22     A.   I always went to Ms. Irlene
23  Phillips.

Page 216

1      Q.   She had the ability to fix
2  that?
3      A.   If she couldn't fix it, then
4  she would call somebody at corporate.
5      Q.   On August 5th, this day we've
6  been talking about, what time did you
7  leave? Do you remember what time you all
8  quit?
9      A.   It was either at two or before
10  two.
11     Q.   What time did you actually
12  clock out?
13     A.   It was before two or right at
14  two. I'm not quite sure.
15     Q.   Now, earlier when we talked
16  about the accusation of falsification of
17  time -- you were told that that was an
18  accusation that had been made; correct?
19     A.   Correct.
20     Q.   And you told me -- well, tell
21  me again and make sure I've got it right.
22  Did you ever alter your time improperly?
23     A.   Me, myself?

54 (Pages 213 to 216)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 217

1    Q.    Yes.
2    A.    No, I cannot alter my time.
3    Q.    Did you ever falsify anybody
4    else's time?
5    A.    No.
6    Q.    Did you ever tell anybody at
7    DCI that you knew how to falsify time?
8    A.    No.
9    Q.    So if you never did any of
10    that, then when they indicated to you that
11    they wanted to talk to you about
12    falsification of time, why did you think
13    that it was necessary to have an attorney?
14    A.    I asked them at that time when
15    they told me that I was being placed on
16    administrative leave because I falsified
17    time, I asked the question, how do you
18    falsify time.
19    Q.    Right.
20    A.    And like I said earlier, if
21    that lie was told on me, you're not going
22    to sit up in a room with me and talk to me
23    without my attorney present, because

Page 218

1    you're not going to say I stated something
2    I didn't state.
3    Q.    But if you knew you didn't do
4    anything wrong --
5    A.    No, I didn't do anything wrong.
6    Q.    Then why would you think you
7    needed an attorney?
8    MR. HARRISON:    Objection.
9    Asked and answered.
10    MS. SANDERS:    Well, she really
11    didn't answer.
12    Q.    (By Ms. Sanders) I don't
13    understand why you thought you needed an
14    attorney.
15    MR. HARRISON:    Again,
16    objection.  Asked and answered.
17    A.    I felt I needed an attorney
18    because of the lies that had been told on
19    me, and I didn't know what to expect
20    coming into that meeting with Glenda Gary.
21    I assumed the meeting was just with Glenda
22    Gary at the time.
23    Q.    Do you have some reason to

Page 219

1    think that a particular employee at DCI
2    told a lie about your falsifying time?
3    MR. HARRISON:    Objection.
4    Speculation.
5    MS. SANDERS:    Well, she just
6    indicated that lies had been told about
7    her.  I'm curious to know why --
8    A.    Obviously, lies had been told
9    on me, because she said that accusations
10    had been brought up against me for
11    falsifying time.
12    Q.    How do you know Glenda Gary
13    wasn't just making it up?
14    A.    Glenda Gary was not the one
15    that told me that.  Glenda Gary didn't
16    tell me anything.  Rose Smith told me
17    that.
18    Q.    Okay.  Did you have any reason
19    to believe Rose was making it up?
20    MR. HARRISON:    Objection.
21    A.    I didn't know what was going
22    on, and I still to this day don't know
23    what was going on.  I don't know whether

Page 220

1    they were saying I was giving myself time
2    or I was giving someone else time or
3    taking time away from someone else.  This
4    has never been explained to me.
5    Q.    Do you believe that you had a
6    right to have an attorney present?
7    A.    Yes, I do.
8    Q.    Tell me what right you had.
9    Why do you believe you had a right to have
10    an attorney present at that meeting?
11    A.    I felt that I had a right to
12    have an attorney present because I needed
13    to know -- my attorney can ask questions
14    that I cannot.  And I needed to know what
15    was going on; why was this even happening
16    to me.
17    Q.    Have you ever had any kind of
18    disciplinary action at any other employer,
19    where an employer called you in and talked
20    to you about, you know, something that
21    they don't think you're doing right or
22    something you need to improve on?
23    A.    Yes.  I worked at Jackson ten

55 (Pages 217 to 220)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 221

1  years.
2      Q.   Did you have an attorney
3  present when you had those kind of
4  meetings?
5      A.   No.
6      Q.   Why not?
7      A.   Because they were -- the
8  complaints that I got there was for
9  something that I actually did.
10     Q.   Like what?
11     A.   My attitude, for one.
12     Q.   So let's see if I get this
13 right. At your former employer, they
14 might call you in -- or basically wanted
15 to call you in and talk to you about your
16 attitude; correct?
17     A.   Uh-huh.
18     Q.   And you did not insist on
19 having an attorney present during that
20 conversation?
21     A.   No.
22     Q.   Did you ever tell LaTonya
23 Buchanan that you knew how to fix the time

Page 222

1  or alter the time?
2          MR. HARRISON:  Objection.
3  Asked and answered.
4      A.   No, I did not.
5          MS. SANDERS:  No, she didn't
6  answer. I know I didn't ask that. That's
7  a brand new question.
8          MR. HARRISON:  You asked had
9  she ever told anybody that she knew how to
10 falsify time. She said no.
11     Q.   How about LaTonya?
12         MR. HARRISON:  Objection.
13 Asked and answered.
14     A.   No, I did not.
15     Q.   Any other reasons you were
16 called in at Jackson for disciplinary
17 action?
18     A.   No.
19     Q.   Ms. Quinnie, were you aware
20 that DCI has a policy prohibiting
21 discrimination in the workplace?
22     A.   Yes, I was aware of that.
23     Q.   Have you ever seen that policy

Page 223

1  that's in what's been marked as Exhibit 7?
2  Have you ever read that policy about equal
3  opportunity?
4      A.   Yes.
5      Q.   Now, I need to ask you,
6  Ms. Quinnie -- you have sued DCI -- what
7  do you want from DCI out of this lawsuit?
8      A.   What do you mean, what do I
9  want?
10     Q.   Well, you've sued them. Do you
11 want money?
12     A.   This was not about money.
13     Q.   Okay.
14     A.   I worked for DCI five years. I
15 devoted myself to my job. Anything my
16 name went out on, I took the time to make
17 sure it was done properly. Nobody had to
18 beg me to do my job. Nobody had to beg me
19 to do anybody else's job. I was there
20 doing people's job that they didn't even
21 want to do themselves, but I did it. As
22 far as me falsifying time, either I was
23 there or I was not there. Glenda Gary --

Page 224

1  and I brought my attorney a copy of the
2  doctor's excuse. I was out sick for two
3  weeks with the flu. I'm responsible for
4  transients and admissions. Glenda Gary
5  called me in to send information off on a
6  patient that nobody else would take the
7  time to do. I came up there, I did that,
8  and I didn't even clock in to do that. So
9  I have no reason to falsify time. This is
10 not about me wanting money. This is about
11 me busting my butt at DCI, doing the best
12 job that I can do, and this is a slap in
13 the face to me.
14     Q.   So what do you want? Do you
15 want your job back?
16     A.   No. Because if you can lie and
17 get me out of there one time, what is it
18 going to be next time? It's a moral
19 thing. You're not going to get away with
20 doing this to me.
21     Q.   What remedy do you want?
22         MR. HARRISON:  How have you
23 been damaged?

56  (Pages 221 to 224)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 225

1    A.   I have been damaged from the
2  time -- I have a mortgage to pay.  I had
3  just bought my house in 2005 after my
4  divorce.  I was afraid of losing my home.
5  Everywhere I went to apply for a job, I
6  was not getting them because I know that
7  they had to call DCI, and somebody there
8  was talking about something.  I had the
9  qualifications.  I didn't put in for a job
10  that I was not qualified to get.  I
11  deserved better than this from DCI.
12    Q.   Other than the lady that
13  worked -- that you worked with at, I
14  believe it was, Montgomery
15  Cardiovascular -- is that the place where
16  you had a friend?  It might have been
17  another place.
18    A.   No.
19    Q.   It might have been the assisted
20  living place.
21    A.   Yes.
22    Q.   Other than the friend there --
23  I think it was Bernice Johnson that told

Page 226

1  you that DCI had said bad things about
2  you.
3    A.   Uh-huh.
4    Q.   Anybody else ever say that -- a
5  prospective employer -- DCI said something
6  bad about you?
7    A.   No.
8    Q.   So if you never falsified the
9  time, then why not tell DCI that?  Why not
10  give them your side of the story?
11    A.   When Glenda Gary came to me, it
12  was 3:30.  I had my purse and my keys in
13  my hand to go home.  She asked for my
14  keys.  I asked her what was going on.  She
15  said, I can't explain anything to you;
16  would you like to speak to Rose Smith.
17  Rose Smith, at that time, told me some
18  accusations had been brought up against me
19  about falsifying time.  They had no proof,
20  but pending, I would be placed on
21  administrative leave without pay.
22    Q.   But you understand they never
23  got your side of the story; correct?

Page 227

1    A.   They never got my side of the
2  story because he would not talk to me
3  without my attorney present.
4    Q.   Right.  But he indicated he
5  would talk to you if your attorney wasn't
6  there; correct?
7    A.   Yes.
8    Q.   So you never had a conversation
9  with him to tell him your side of the
10  story in the absence of your attorney; is
11  that correct?
12    A.   No.
13    Q.   Well --
14    A.   That's correct.
15    Q.   I'm sorry.  That was a bad
16  question.  Thank you for correcting that.
17  So then I think, as I understand it, your
18  damages are you had a hard time getting a
19  job?
20    A.   Yes.  And I wouldn't have this
21  job.  Stacy Matthews, my clinical manager,
22  worked at DCI, and she knew me.
23    Q.   She's your clinical manager

Page 228

1  now?
2    A.   Yes.
3    Q.   You do not want your job back
4  at DCI; is that correct?
5    A.   No.  Because if they can find a
6  reason to get rid of me one time, what's
7  it going to be next?  You've still got the
8  same administrator there.  You've still
9  got some of the same staff members there.
10    Q.   Let me ask you this:  Did you
11  ever experience any kind of emotional
12  damages when you left DCI?
13    A.   Yes.  I am on Effexor.
14    Q.   I don't know what that is.
15    A.   That's a depression medication.
16    Q.   When did you go on Effexor?
17    A.   I went on Effexor in -- it was
18  in October or November of 2006.
19    Q.   Had you ever been on it before?
20    A.   No, never had a reason to be on
21  it before.
22    Q.   Have you ever been treated for
23  depression before?

57 (Pages 225 to 228)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 229

1     A.   No.  Not as far as sitting in a
2  psychiatrist office or anything, no.
3     Q.   Have you ever been on any kind
4  of medication for depression?
5     A.   No.
6     Q.   Have you ever gone to see a
7  family physician or OB/GYN or any kind of
8  doctor for treatment of depression?
9     A.   My physician gave me the
10  prescription for the Effexor.
11     Q.   Was that in October or November
12  of 2006?
13     A.   Yes.
14     Q.   Are you continuing to take
15  Effexor?
16     A.   Yes.
17     Q.   When was your divorce?  2005?
18     A.   Yes.
19     Q.   Any other events going on in
20  your life in 2006 that might have
21  contributed to depression?
22     A.   No.
23     Q.   Any other treatment you sought

Page 230

1  as a result of what you have identified as
2  depression?
3     A.   Other than being worried, can't
4  sleep because I didn't know whether I was
5  going to find a job, whether I was going
6  to lose my home, how my bills was going to
7  be paid.
8     Q.   Is there a doctor today
9  treating you for depression?
10     A.   She's not treating me for
11  depression in general.  She is my primary
12  doctor, my primary physician.
13     Q.   Okay.  What's her name?
14     A.   Gina Bajaj, B-A-J-A-J.
15     Q.   And she is the one that
16  prescribed the Effexor?
17     A.   Yes.
18     Q.   Is she here in Montgomery?
19     A.   Yes.
20     Q.   Do you know where her office
21  is?
22         Is it a hospital or a clinic?
23     A.   She's over -- it's not in

Page 231

1  Jackson Hospital, but she's affiliated
2  with Jackson Hospital.
3     Q.   What kind of doctor is she?  I
4  don't mean opinion.  Is she a family
5  physician?
6     A.   Internal medicine, I think.
7  I'm not sure.
8     Q.   I think you just said you have
9  not been treated by psychiatrist,
10  psychologist, counselor?
11     A.   No, just my pastor at church.
12     Q.   Where is that?  Where do you go
13  to church?
14     A.   North Star Missionary Baptist
15  Church.
16     Q.   Is that here in Montgomery?
17     A.   Montgomery.
18     Q.   What's your pastor's name?
19     A.   At the time, it was Billy
20  Marshall.
21     Q.   Other than Pastor Marshall,
22  have you had any counseling from anybody
23  else?

Page 232

1     A.   No.
2         MS. SANDERS:  All right.  If
3  you'll give us just a second, we may be
4  done.
5         (Brief recess.)
6     Q.   (By Ms. Sanders)  Ms. Quinnie,
7  back to the issue about damages that we've
8  been talking about.  You said it wasn't
9  about money.  You don't want your job
10  back.  What do you think will make me
11  whole?
12     A.   Make me whole?
13     Q.   Well, what do you want from
14  DCI?  You said it wasn't about the money.
15  You indicated that this caused you some
16  emotional damages.  You indicated you
17  don't want your job back, and you
18  indicated you had a difficult time finding
19  a job; correct?
20     A.   I did.
21     Q.   Do you want money to make you
22  whole for that?
23     A.   I want to be compensated, yes,

58  (Pages 229 to 232)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 233

1 for the time lost.
2 Q. Anything else you want from
3 DCI?
4 A. I want an apology from the ones
5 that lied on me.
6 Q. And who is that?
7 A. You called LaTonya Buchanan's
8 name. When we were talking with the EEOC
9 when this first started, they said the
10 statement they had was from LaTonya
11 Buchanan saying that I showed her how I
12 falsified time, or I told her, and that's
13 a lie.
14 Q. Anybody else through that
15 process that you think might have lied?
16 A. Not to my knowledge. I have no
17 idea. Like I said, I don't even know
18 where this started from. I don't know
19 what happened.
20 Q. I'm going to show you just a
21 couple more documents. This is a copy of
22 a charge of discrimination. If you would
23 just take a look at that, and this is an

Page 234

1 exhibit that was filed with it. I believe
2 that's your signature at the bottom;
3 correct?
4 A. Uh-huh.
5 Q. Is that correct?
6 A. Yes.
7 Q. And, then, if you would look at
8 this exhibit.
9 A. Before I was placed on
10 administrative leave -- I was out sick in
11 December. I was placed on administrative
12 leave in August.
13 Q. Okay. I'm sorry. Which part
14 are you referring to?
15 A. The first sentence. And I did
16 provide a doctor's excuse.
17 Q. So -- oh, I see what you're
18 saying. This doctor's excuse that's in
19 the first bullet point of Exhibit A to
20 your charge of discrimination, which we
21 are going to mark as the next exhibit --
22 MS. SANDERS: Let's go ahead
23 and do that so we can refer to it.

Page 235

1 (Whereupon, a document was
2 marked as Defendant's Exhibit 9 and is
3 attached to the original transcript.)
4 Q. (By Ms. Sanders) So that first
5 bullet point on the exhibit to what's now
6 been marked as Defendant's Exhibit 9,
7 where it talks about you called in sick to
8 work, that happened in December of 2005
9 that you called in sick to work. Is that
10 what you're saying today?
11 A. Yes.
12 Q. Okay. Go ahead. I just wanted
13 to make sure I understood what you were
14 saying. Is that a correct statement?
15 A. Yes.
16 Q. Then one more document I want
17 to show you, which we will mark as Exhibit
18 10.
19 (Whereupon, a document was
20 marked as Defendant's Exhibit 10 and is
21 attached to the original transcript.)
22 Q. Ms. Quinnie, what I'm showing
23 you that's been marked as Exhibit 10 is a

Page 236

1 letter from your attorney to the Equal
2 Employment Opportunity Commission. Have
3 you reviewed this letter before today?
4 A. Yes.
5 Q. You're familiar with this
6 letter?
7 A. Yes.
8 Q. Is everything in this letter
9 correct?
10 A. Yes.
11 Q. In this letter to the EEOC,
12 your attorney references statements of the
13 patients that we referred to earlier,
14 which we're not going to call their names
15 right now. Do you have written statements
16 from those patients?
17 A. Yes. My attorney has them.
18 Q. And, Ms. Quinnie, tell me what
19 you did today to prepare -- strike that.
20 Tell me what you did to prepare for your
21 deposition today? Did you meet with your
22 attorney.
23 A. No.

59 (Pages 233 to 236)

**American Court Reporting**
**February 6, 2008**

# American Court Reporting
## toll-free (877) 320-1050

Page 237

1      MR. HARRISON: Objection.
2      Q.   Did you review any documents in
3  preparation for this deposition?
4      A.   No.
5      MS. SANDERS: Okay. That's
6  it -- wait. That's not it.
7      Q.   (By Ms. Sanders) Okay.
8  Ms. Quinnie, I had not seen the statements
9  that you received from patients. They
10  were not included with this letter, and
11  they weren't produced to me in discovery.
12      MR. HARRISON: I thought I did.
13      MS. SANDERS: I didn't get --
14      MR. HARRISON: I can get you a
15  copy of them before you leave, or do you
16  want to do them now?
17      MS. SANDERS: That would
18  probably be good. I need to deal with
19  voir dire on the statements. If you've
20  got it and I can look at them, that will
21  be fine. I can ask her questions while
22  you're looking for them.
23      Q.   (By Ms. Sanders) Ms. Quinnie,

Page 238

1  in this letter you refer to statements by
2  patients for DCI, and you testified that
3  you had provided those to your attorney.
4  When did you get those statements from the
5  patients? Were you employed at DCI at the
6  time?
7      A.   No.
8      Q.   So after you left DCI, you got
9  statements from the patients?
10      A.   Yes. I got the statements from
11  the patients when it was said to me that
12  LaTonya said that she arrived at the
13  clinic before I did, and I got those
14  statements to prove that she did not
15  arrive at the clinic before I did.
16      Q.   When was that? Do you know
17  time wise when that was, a date?
18      A.   I am not sure. It was after --
19  I don't know if it was before the meeting
20  or after the meeting.
21      Q.   Which meeting?
22      A.   With Dan Watson.
23      Q.   You would have still been

Page 239

1  employed then; right?
2      A.   But I was not working. That's
3  when I was placed on administrative leave.
4      Q.   All right. Let's back up.
5  Let's take one patient at a time.
6      MS. SANDERS: And this will be
7  under seal.
8      Q.   Mr. Willie Murray, when did you
9  get a statement from Mr. Murray? Did you
10  go to Mr. Murray and ask him for a
11  statement?
12      A.   Yes, I did.
13      Q.   And when was that?
14      A.   This was -- I am not sure if it
15  was before that meeting on the 14th or
16  after. I'm sure it was after -- I'm not
17  sure.
18      Q.   Was Mr. Murray at the clinic at
19  the time you got the statement from him?
20      A.   No. No, he was not.
21      Q.   Did you contact him?
22      A.   Yes, I did.
23      Q.   Where did you contact him?

Page 240

1      A.   By phone.
2      Q.   At home -- at his home?
3      A.   Yes.
4      Q.   Where did you get his home
5  number?
6      A.   His sister is also a patient at
7  that clinic.
8      Q.   Okay. Who's his sister?
9      A.   Annie Harvey.
10      Q.   Did you talk to Ms. Harvey?
11      A.   Yes, I did. I talked to her
12  outside of the clinic as well.
13      Q.   And when was that? When did
14  you talk with Ms. Harvey?
15      A.   I talked to Ms. Harvey all the
16  time.
17      Q.   Did you call her at home?
18      A.   Yes.
19      Q.   And you asked her for Mr.
20  Murray's phone number?
21      A.   Yes.
22      Q.   How did you have her phone
23  number?

60  (Pages 237 to 240)

# American Court Reporting
## February 6, 2008

**American Court Reporting**
**toll-free (877) 320-1050**

Page 241

1    A.  I knew Ms. Harvey prior to
2  coming to DCI, prior to my employment with
3  DCI.
4    Q.  What about Ms. Alizaber Thomas?
5    A.  I knew her prior to her being a
6  patient at DCI.
7    Q.  Did you call her at home to get
8  a statement?
9    A.  I did.
10    Q.  Were either Mr. Murray or Ms.
11  Thomas at DCI when you talked to them
12  about this incident of Saturday, August 5,
13  2006?
14    A.  No.
15    Q.  When you talked to them, how
16  did you know that it was Saturday, August
17  5, 2006, that was in question?
18    A.  Because that was the Saturday
19  that LaTonya and I had worked.  I asked
20  that because LaTonya had made the
21  statement that she got there prior to me
22  being there, and I know she didn't.
23    Q.  When did you know LaTonya made

Page 242

1  that statement?
2    A.  I knew LaTonya made that
3  statement the Tuesday after DCI had let me
4  go.
5    Q.  How did you know that?
6    A.  Because, like I said, people
7  talk at DCI.
8    Q.  But who told you that?  Who
9  told you that LaTonya made that statement?
10    A.  Patients told me that LaTonya
11  made that statement.  Ms. Annie Harvey
12  told me and a lot of other patients told
13  me that.
14    Q.  Okay.  Who were the other
15  patients?
16    A.  Jennifer Cheatham.  Patients
17  talk to each other.  Jennifer Cheatham.
18  Alizaber even said LaTonya -- staff is
19  saying that LaTonya said that you did not
20  come to the clinic; that she beat you to
21  the clinic; that you were not there when
22  she got there; that you were late.
23    Q.  Did any employee of DCI tell

Page 243

1  you that LaTonya had made that statement?
2    A.  No.
3    Q.  Did you call LaTonya and ask
4  her about it?
5    A.  Yes, I did.
6    Q.  Tell me about that
7  conversation.
8    A.  I asked LaTonya why did she say
9  she got to the clinic before me when she
10  didn't.  In order for LaTonya to get into
11  the door where she worked, she had to pass
12  my truck.  Because on Saturdays --
13  normally Lee Ashbury would park in the
14  door.  But he was not there on
15  Saturdays -- he was not there at the time,
16  anyway, because he had died.  But I parked
17  right there.  It's a door that leads -- if
18  you go into that door, you have the office
19  that Glenda Gary used to work in, which is
20  now Cindy Phillips' office.  Well, it was
21  before I left there.  And you have a wall
22  here, and Lee Ashbury office is right
23  there.  That's the office that LaTonya

Page 244

1  usually come in, because she works down
2  there in that -- on the first floor.  And
3  she had to come in that door.  So she had
4  to pass my truck in order to get in that
5  door.
6    Q.  But the time you were going to
7  go talk to Dan Watson -- well, you thought
8  you were going to talk to Glenda Gary --
9    A.  Yes.
10    Q.  And you showed up and Dan
11  Watson was there?
12    A.  Yes.
13    Q.  And at that time, you knew
14  about the allegations that LaTonya
15  Buchanan had made?
16    A.  Yes.  Also from Ms. McGehee at
17  the EEOC.
18    Q.  But I'm talking about
19  specifically when you went to meet with
20  Glenda Gary and Dan Watson was there.  I'm
21  talking about at that specific time.  You
22  just testified that the day after they
23  suspended you, you found out about

61 (Pages 241 to 244)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 245

1    LaTonya's statement.
2        A.   Yes.
3        Q.   Because patients told you and
4    employees had talked; right?
5        A.   Yes.
6        Q.   And you identified specific
7    patients that called you and told you what
8    LaTonya was saying?
9        A.   Yes.
10       Q.   Any employees call you and tell
11   you what LaTonya was saying?
12       A.   No.
13       Q.   Did you call any employees and
14   ask them what LaTonya was saying?
15       A.   No.
16       Q.   But you called LaTonya?
17       A.   I called LaTonya.
18       Q.   Why did you never tell Glenda
19   Gary, Dan Watson, or Rose --
20       A.   I never talked to them after
21   that.
22       Q.   You did.
23           MR. HARRISON:  Objection.

Page 246

1    Asked and answered.
2        A.   No, I did not.  I talked to --
3    when we went there to the meeting, they
4    did not talk to us.
5            MS. SANDERS:  Just a minute.  I
6    want to respond to his objection.  Earlier
7    she testified when she went to meet Glenda
8    Gary, all she knew was that there was this
9    allegation.  She did not say she knew
10   about LaTonya Buchanan.  Now she's
11   saying --
12       A.   Yes, I did.
13           MS. SANDERS:  -- she knows
14   about LaTonya Buchanan.  So I need to ask
15   her questions about it.  She has not
16   answered those questions.
17       Q.   (By Ms. Sanders)  So you went
18   to talk to Glenda Gary, to Dan Watson, to
19   Rose, but you never told anybody at DCI
20   about LaTonya Buchanan and how you had
21   talked to LaTonya and that was a false
22   statement.  You never told anybody at DCI
23   that?

Page 247

1        A.   No.  We didn't actually have a
2    meeting that day when we went there.
3        Q.   I understand.  But you knew
4    Glenda Gary's phone number.  You knew how
5    to call Dan Watson.
6        A.   When I called Glenda Gary,
7    Glenda Gary was either in a meeting or she
8    didn't have time to talk.  She said she
9    would call me back.
10       Q.   You could have called Dan
11   Watson; right?  You could have called Dan
12   Watson?
13       A.   At that point, I had an
14   attorney.  Why would I call anybody?  I
15   let my attorney speak for me.
16       Q.   But you never gave them that
17   information, that you knew about LaTonya
18   Buchanan's statement --
19           MR. HARRISON:  Objection.
20   Asked and answered.
21       Q.   -- and you didn't explain to
22   anybody at DCI your side of that story.
23           MR. HARRISON:  She's already

Page 248

1    answered the question.
2        A.   I don't know what you're asking
3    me.
4        Q.   I'm asking if you ever talked
5    to anybody at DCI and said what LaTonya
6    Buchanan said was a lie.  Did you ever
7    tell them that?
8        A.   No.  At that point, I had an
9    attorney.  I didn't talk to anybody at
10   DCI.
11       Q.   Okay.  Ms. Quinnie, I have just
12   been presented these statements --
13           MS. SANDERS:  These two will
14   need to be under seal.  We will make it a
15   collective exhibit.  These will be under
16   seal.
17       Q.   (By Ms. Sanders)  I'm showing
18   you what has been marked as Defendant's
19   Exhibit 11.  There are two pages to that
20   document.  Did these two people -- we'll
21   start with Ms. Alizaber.  Did she give you
22   this statement?
23           (Whereupon, a document was

62  (Pages 245 to 248)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 249

1   marked as Defendant's Exhibit 11 and is
2   attached to the original transcript.)
3       A.   Yes.
4       Q.   And you brought it to your
5   attorney?
6       A.   Yes.
7       Q.   How about Willie Murray?
8       A.   Yes.
9       Q.   And you called Mr. Murray at
10  home to get it, I think you testified to?
11      A.   Yes.
12      Q.   And Alizaber, you called her at
13  home?
14      A.   Yes.
15      Q.   Let me ask you about Alizaber's
16  statement, the first one. I guess she is
17  referring to you. It looks like she says
18  Cynthia Guiness?
19      A.   Yes.
20      Q.   But she's referring to you?
21      A.   Yes.
22      Q.   She says, I asked why she was
23  here at this time. She then explained

Page 250

1   that she had come to key in some records,
2   but she couldn't do it at that time
3   because she had locked herself out of her
4   office. Earlier you testified,
5   Ms. Quinnie, that you didn't need to be in
6   your office --
7       A.   I didn't.
8       Q.   -- for the job y'all were
9   doing. Is this something that you told
10  Ms. Alizaber?
11      A.   Yes.
12      Q.   So you told Ms. Alizaber you
13  couldn't do your work because you --
14      A.   I couldn't -- I didn't come
15  there to key in anything. I told her
16  that. I don't have to explain to a
17  patient why I'm there to do my job.
18      Q.   Wait a minute. Let me ask the
19  question. I'm trying to find out if
20  Alizaber is saying an accurate statement.
21  Because what she says is, "She then
22  explained that she had come to key in some
23  records." Did you say that to Alizaber?

Page 251

1       A.   Yes.
2       Q.   I don't understand -- strike
3   that. The next one says, "But she
4   couldn't do it at that time because she
5   had locked herself out of her office."
6   Did you say that to Alizaber?
7       A.   Yes.
8       Q.   She goes on to say, "She said
9   she was waiting for someone to come and
10  let her in." Did you say that to
11  Alizaber?
12      A.   Yes.
13      Q.   Why did you tell her that you'd
14  come to key in some records but you
15  couldn't do it because you couldn't get in
16  your office because that's not true, is
17  it?
18      A.   I couldn't get into my office.
19      Q.   I understand that. But you
20  told me earlier you didn't need to be in
21  your office that day.
22      A.   I didn't need to be in my
23  office. The medical records are out on

Page 252

1   the floor.
2       Q.   So why did you need to tell
3   Alizaber that you needed to be in your
4   office.
5       A.   I didn't tell her that I needed
6   to be in my office. I told her that I
7   could not key in records at that time
8   because I didn't have my key to get into
9   my office.
10      Q.   Why did you tell her that?
11      A.   She shouldn't have even asked
12  me why I was there.
13      Q.   Well, why did you tell her
14  that? I'm not asking what she should have
15  done or shouldn't. I'm asking you why did
16  you tell her that, because that's not
17  true?
18      A.   I told her that because I don't
19  have to explain to a patient why I'm there
20  to do my job.
21      Q.   I understand that. But you
22  don't have to tell the patient a lie,
23  either. So why did you tell her that if

63 (Pages 249 to 252)

**American Court Reporting**
**February 6, 2008**

Page 253

1    it's not true? You apparently gave her --
2    you just said that that's what you told
3    Alizabar, and I'm asking why did you tell
4    her that? It's not true.
5        A.    I was there to do records, but
6    not key them in.
7        Q.    Okay. So why did you tell her
8    that?
9        A.    Because some certain patients,
10   you have to talk to on their level. If I
11   told her I was there to do medical
12   records, she would have asked me about
13   medical records. She don't have to know
14   about anybody else's records other than
15   her own if she want anything out of it.
16       Q.    So you told Ms. Alizabar that
17   because you didn't think she would
18   understand the real reason you were there,
19   or --
20       A.    I tell her I'm there to thin
21   charts, then she want to know what you
22   mean by thinning charts.
23       Q.    So you told her that -- and,

Page 254

1    again, see, this doesn't make sense to me.
2    I don't understand. Tell me why you got
3    there at five o'clock.
4        A.    I didn't get there at five. I
5    got there about 5:15 or 5:30.
6        Q.    Okay. Why'd you get there at
7    5:15 or 5:30?
8        A.    Because I was up. I couldn't
9    sleep, so I got dressed and went on to
10   work.
11       Q.    Why didn't you start doing the
12   job?
13       MR. HARRISON: Objection.
14   Asked and answered.
15       MS SANDERS: No, she didn't
16   answer that.
17       MR. HARRISON: She's already
18   stated that she couldn't clock in until
19   LaTonya Buchanan was there at six o'clock.
20       MS. SANDERS: That doesn't make
21   any sense.
22       MR. HARRISON: Well, that's
23   her --

Page 255

1        A.    We agreed to be there at six
2    o'clock. And if Glenda Gary asked
3    LaTonya, why were you here at six and why
4    was Cynthia here at this time and you all
5    are working together, I was not going to
6    put myself in a situation. We agreed to
7    be there at six, and that's when I clocked
8    in.
9        Q.    So you came to the clinic and
10   hung out with patients or talked to
11   patients from 5:30 until whenever time --
12       A.    I started gathering up charts
13   on a cart, but I did not take them
14   downstairs. I did not do anything with
15   the charts, but I did start gathering
16   charts. It's the big, red binders.
17       Q.    Everything else in that
18   statement to Alizabar, is that true? Did
19   you tell her to pass the time away you
20   came out to the floor to greet certain
21   patients?
22       A.    Yes.
23       Q.    Did you tell her that once you

Page 256

1    finished you'd go home and get some rest?
2        A.    Yes.
3        Q.    Did you also tell her that you
4    were going to her house later so she could
5    show you how to make dressing?
6        A.    Yes.
7        Q.    All right. Let's look at
8    Willie Murray's statement. Mr. Murray
9    says he spoke with and observed you
10   approximately at five o'clock.
11       A.    That was not true. I got there
12   at 5:15, 5:30.
13       Q.    What time did you talk to
14   Mr. Murray?
15       A.    It was before he went on the
16   machine. Had to have been about 5:30 or
17   in between 5:30 and 5:45.
18       Q.    Did you tell Alizabar what to
19   say in this statement?
20       A.    No, I did not.
21       Q.    Did you tell Willie Murray what
22   to say?
23       A.    No, I did not.

64  (Pages 253 to 256)

## American Court Reporting
## toll-free (877) 320-1050

Page 257

1   Q.   Did you tell them why you were
2   asking for this statement?
3   A.   I told them because it was said
4   that I was not there when I was there, and
5   I needed the statements proving that I was
6   there. That's what I told them.
7   Q.   Now, other than the monetary
8   damages related to the length of time you
9   were unemployed -- you testified to that,
10  that you had a hard time finding a job and
11  you were unemployed for a while. Other
12  than those monetary damages, which you
13  testified you wanted, how much money do
14  you want from DCI?
15  A.   I haven't really thought about
16  how much money I want from DCI. Like I
17  said, this was not about money. I was
18  actually hurt.
19  Q.   So you want the apology from
20  LaTonya Buchanan --
21  A.   Yes, I do.
22  Q.   -- and the money from the time
23  that you didn't have a job. And other

Page 258

1   than that, you haven't thought about the
2   amount of damages you want; is that
3   correct?
4   MR. HARRISON: Objection.
5   She's already answered that.
6   A.   I've thought about it a lot.
7   That's all I've thought about. I want to
8   know where this started from, who started
9   this, why me.
10  Q.   Have you ever asked anybody at
11  DCI that question?
12  A.   No, because I have not talked
13  with anyone at DCI. And I didn't want to
14  call DCI and talk with anybody there so
15  that they can say, well, Cynthia called
16  and said this or Cynthia is harassing me.
17  No. That's why I have an attorney. I let
18  him talk for me.
19  MS. SANDERS: Nothing further.
20  That's it.
21  EXAMINATION
22  BY MR. HARRISON:
23  Q.   Ms. Quinnie, I've just got a

Page 259

1   few questions to go through here. Again,
2   my name is Brett Harrison for the record.
3   All right. And I'll just try to go
4   through as Ms. Sanders did. Let's see.
5   Let's go back to Exhibit 1 here. On
6   Exhibit 1 here, Defendant's Exhibit 1, she
7   brought your attention to having three
8   jobs prior to coming to employment with
9   DCI; is that correct?
10  A.   Yes.
11  Q.   Now, on your statement here,
12  you really only stated that you had two
13  jobs that you had worked prior to coming
14  on to DCI; isn't that correct?
15  A.   Yes.
16  Q.   And the third job you had was
17  with Marriott; correct?
18  A.   Yes, sir. That's right.
19  Q.   But that was just a part-time
20  job; right?
21  A.   Yes.
22  Q.   Your two main jobs were with
23  Jackson Hospital --

Page 260

1   A.   Yes, and school patrol with the
2   police department.
3   Q.   -- and school patrol; right?
4   A.   Yes.
5   Q.   You didn't feel like that you
6   had to put an exhaustive list down --
7   A.   No.
8   Q.   -- especially when you had two
9   or three -- multiple jobs, did you?
10  A.   What I was doing was putting
11  the jobs down that I spent the longest
12  time.
13  Q.   Uh-huh. You didn't perceive
14  this to be that you needed to -- if
15  somebody hired you to go clean their house
16  on the weekend, that you needed to put
17  that down, too?
18  A.   No.
19  Q.   All part-time -- did you do any
20  other part-time jobs that you necessarily
21  got paid for that you haven't put on an
22  employment application before?
23  A.   Yes.

65 (Pages 257 to 260)

## American Court Reporting
## February 6, 2008

## American Court Reporting
## toll-free (877) 320-1050

Page 261

1    Q.    All right.  Let's go back to
2  damages.  Okay.  When you left -- when you
3  were fired by DCI in August of '07 by Dan
4  Watson --
5    A.    '06.
6    Q.    '06.  I'm sorry.  How long from
7  August of '06 until what point were you
8  out of work without a paycheck?
9    A.    I started at Twin Cities
10  Security in October of '06.
11    Q.    Of '06.
12    A.    And it only lasted two months.
13    Q.    Okay.  Now, how much were you
14  making at DCI?
15    A.    If I'm not mistaken, 11.85.
16    Q.    How much were you making at
17  Twin Cities?
18    A.    $6.50.
19    Q.    You not only -- you got
20  rehired, but you were willing to take a
21  job at less pay just to try to survive;
22  right?
23    A.    Yes.

Page 262

1    Q.    Now, did you also -- you say
2  you only worked there how long?
3    A.    Two months.  The job ended in
4  November.
5    Q.    Okay.  And, then, where did you
6  go then?
7    A.    That's when I applied for
8  unemployment.
9    Q.    Unemployment.  Then you got
10  with Snelling temp agency?
11    A.    Yes.
12    Q.    And they hired you in May of
13  '07; correct?
14    A.    Yes.
15    Q.    And you basically worked there
16  for six weeks; right?
17    A.    Six weeks on one assignment and
18  five weeks on the next assignment.
19    Q.    How much did you make at that
20  job?  That was $11 an hour; right?
21    A.    On the six-week assignment.
22    Q.    That's still 85 cents an hour
23  less than what you were making with DCI;

Page 263

1  correct?
2    A.    Yes.
3    Q.    And when you got hired on with
4  Alacare, you were making $9 an hour;
5  right?
6    A.    Yes.
7    Q.    Which is $2.85 less an hour;
8  correct?
9    A.    Yes.
10    Q.    You worked there for, roughly,
11  five weeks?  You were hired on to do it
12  for eight to twelve, but you worked five
13  weeks?
14    A.    Yes.
15    Q.    And that's when you got your --
16  where did you go after there?
17    A.    I got a job at Fresenius.
18    Q.    Fresenius, where you're working
19  now; right?
20    A.    Yes.
21    Q.    And what's your pay now?
22    A.    $11.
23    Q.    So you're still, even today,

Page 264

1  making less money today than you were at
2  DCI?
3    A.    Yes.
4    Q.    Now, was it a customary
5  practice at DCI to give you cost-of-living
6  raises as -- I mean, did y'all get
7  cost-of-living raises on a yearly basis?
8  Did y'all get raises on a yearly basis?
9    A.    We got annual raises.
10    Q.    And I know they vary, but what
11  was a general raise that you would get
12  with DCI?
13    A.    50 cent most.
14    Q.    So basically you'd get about 50
15  cents?
16    A.    Yes.
17    Q.    Would it vary depending on how
18  much money you made?  Like, if somebody
19  else you worked with made $15 an hour,
20  would they get a little bit more?  Was it
21  on a percentage basis is what I'm asking,
22  or did they just give you a flat rate pay
23  increase?

66 (Pages 261 to 264)

## American Court Reporting
## February 6, 2008

**American Court Reporting**
**toll-free (877) 320-1050**

---

Page 265

1    A.   I have no idea how they did
2   that. I know --
3    Q.   Okay. Let me ask you this:
4   You worked there five years; correct?
5    A.   Yes.
6    Q.   In '01, did you get a 50 cent
7   pay raise?
8    A.   I started in '01.
9    Q.   Okay. So in '02, did you get a
10  50 cent pay raise?
11   A.   No. I started working there, I
12  was making $9 an hour.
13   Q.   And so in five years, you
14  jumped $2.85 an hour?
15   A.   Yes.
16   Q.   So it wasn't a variable term,
17  then. It wasn't a constant term. It was
18  variable as far as what your pay rate was?
19   A.   Yes.
20   Q.   Let's go to Exhibit Number 2.
21  Let's see. Exhibit Number 2 here, what
22  I'm showing you here, is your answers to
23  the discovery questions, your

Page 266

1   interrogatory responses. Did -- are the
2   answers here, to the best of your
3   knowledge, true and correct; correct?
4    A.   Yes, to the best of my
5   knowledge.
6    Q.   Okay. Really, the only change
7   that needs to be made was here with
8   Hilton, the '06; correct? That you
9   started working August of '06; is that
10  right?
11   A.   I didn't work at the Hilton. I
12  applied at the Hilton.
13   Q.   You applied there. Right.
14  August of '06?
15   A.   Yes.
16   Q.   All right. Let's go back to
17  when you applied for unemployment. Do you
18  remember doing that?
19   A.   Yes.
20   Q.   Do you remember whether or not
21  DCI fought your unemployment benefits?
22   A.   Yes, they did.
23   Q.   What did they base fighting the

Page 267

1   unemployment benefits on?
2    A.   The falsification of time.
3    Q.   They also -- did they also
4   assert that you voluntarily quit?
5    A.   Yes.
6    Q.   Did we have a hearing with the
7   unemployment commission?
8    A.   Yes.
9    Q.   And did they make a
10  determination as to whether you
11  voluntarily quit?
12   A.   Yes, they did.
13   Q.   What was their determination?
14   A.   That I did not voluntarily
15  quit.
16   Q.   And DCI had an opportunity to
17  make their argument to the unemployment
18  commission?
19   A.   Yes, they did.
20   Q.   Did you make your argument?
21   A.   Yes.
22   Q.   All right. Who made your
23  argument for you?

Page 268

1    A.   My attorney, Mr. Brett
2   Harrison.
3    Q.   All right. Now, let's go with
4   your training here. Let's see. One of
5   the elements to meet your case that you
6   have to have is that you have to be
7   trained in the field that you're employed
8   in. And you stated that you were -- and
9   on direct, Ms. Sanders questioned you a
10  good bit about your training in computers.
11  How long had you been working with
12  computers at DCI on the day you were
13  fired? Had you been working with
14  computers the whole time you were there?
15   A.   I was hired as unit secretary
16  on the floor, and two weeks later I was --
17  my title changed to land administrator.
18   Q.   Did that encompass working with
19  the computers and things of that nature?
20   A.   Yes.
21   Q.   Were you immediately given
22  training on computers by Benjamin Johnson,
23  Jason Alevich, and William Cross?

67 (Pages 265 to 268)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 269

1  A.  My training with Benjamin --
2  Benjamin was my first RNA; that's what
3  they call them -- was when we had a major
4  problem with a server.  And Benjamin
5  called yelling and screaming on the phone
6  because I didn't know what the plug-in for
7  this was for.  But we overcame that.
8  Q.  But the -- on the day you were
9  fired, would you call yourself very
10  proficient?  Were you very good at what
11  you did, as far as the computers?
12  A.  Yes.  I'd say I was very good.
13  Q.  Most problems that you
14  encountered you corrected quickly and
15  efficiently?
16  A.  Yes.
17  Q.  Okay.  So would you say that
18  you were highly trained in the job that
19  you were conducting from the day you were
20  hired?
21  A.  Highly trained?
22  Q.  Let me rephrase that.  Were you
23  thoroughly trained in the job you had,

Page 270

1  being in the sense that you were working
2  there for five years?
3  A.  Well, you get to memorize a lot
4  of problems.  A lot of the computer
5  problems are the same.  The -- you can
6  memorize --
7  Q.  So were you good at what you
8  were doing?
9  A.  You familiarize yourself with
10  the problems and how to work the computers
11  out.
12  Q.  So were you good at what you
13  did as far as your job?
14  A.  Yes, I was.
15  Q.  Okay.  Let's see.  Exhibit 4,
16  which is the DCI handbook.  In this
17  exhibit here, you -- basically, this
18  exhibit is a small part of a larger book,
19  the blue book --
20  A.  Yes.
21  Q.  -- that you were given in 2005;
22  isn't that correct?
23  A.  Yes.

Page 271

1  Q.  Now, is there a reason why
2  they -- although they had policies and
3  procedures, that they didn't give you one
4  in '01?
5  MS. SANDERS:  Object.
6  Speculation.  Go ahead.
7  A.  I have no idea why I wasn't
8  given one.  But I asked for one, and
9  that's when I received it.
10  Q.  Okay.  But you never received
11  this in '01?
12  A.  No.
13  Q.  Did anybody ever go over this
14  with you at any time prior to -- from '01
15  to '05?
16  A.  No.
17  Q.  Did you even know it existed
18  prior to '05?
19  A.  I knew it existed prior to '05
20  from seeing it in other people's offices
21  and looking through it.
22  Q.  All right.  But the first time
23  you ever got it was December of '05?

Page 272

1  A.  Yes.
2  Q.  Roughly eight, nine months
3  before you were terminated?
4  A.  Yes.
5  Q.  Exhibit 5 is the letter that
6  you received from Mr. Watson.  Do you
7  remember that?
8  A.  Yes, I do.
9  Q.  Do you remember bringing that
10  to my office?
11  A.  Yes.
12  Q.  Do you remember me drafting a
13  letter in response?
14  A.  Yes.
15  Q.  Look at this document here that
16  I'm going to propose to be marked
17  Plaintiff's Exhibit 1.  This is a two-page
18  letter, is it not?
19  (Whereupon, a document was
20  marked as Plaintiff's Exhibit 1 and is
21  attached to the original transcript.)
22  A.  Yes.
23  Q.  And we don't want to go through

68  (Pages 269 to 272)

**American Court Reporting**
**February 6, 2008**

## American Court Reporting
## toll-free (877) 320-1050

Page 273

1  the whole thing, but I just want to go
2  through a few things with you. In the
3  first paragraph, do I -- on behalf of you,
4  do I acknowledge receipt of the letter
5  dated August 14th from Dan Watson?
6      A.  Yes.
7      Q.   And the second paragraph here,
8  is that a -- if you would, read it,
9  please, and then tell me if that's a true
10 and accurate description of the events
11 that took place on August 14, 2006 at DCI
12 here in Montgomery.
13     A.  (Witness reviews document.)
14 Yes.
15     Q.   Now, let's pinpoint here
16 specifically what we're talking about
17 here. In this letter -- the letter states
18 that you -- "After several minutes, you
19 entered the office and explained that you
20 were Dan Watson and that this
21 investigation was not to be conducted with
22 an attorney present. You further
23 explained that the legal office of

Page 274

1  Dialysis Clinic, Inc., was not present,
2  and I" -- meaning your attorney -- "was
3  not welcome in the meeting. Further, you
4  told Ms. Quinnie that her employment would
5  be considered voluntarily dismissed if she
6  did not surrender to your demand to meet
7  with her without an attorney present."
8  Okay. The last sentence in this paragraph
9  says, "Ms. Quinnie and I promptly denied
10 your claim of voluntary dismissal and left
11 there." Okay?
12     A.  Yes.
13     Q.   Now, what do you remember about
14 that, about denying that you had
15 voluntarily dismissed -- that you were
16 voluntarily quitting?
17     MS. SANDERS:  Objection to
18 that. She's answered that question.
19     Q.   Go ahead.
20     A.  I did not voluntarily quit.
21     Q.   And you told him that?
22     A.  Yes, I did.
23     Q.   Did I tell him that?

Page 275

1      A.  Yes, you did.
2      Q.   All right. In the third
3  paragraph, it states that you were willing
4  to meet with him on August 14th. Were
5  you?
6      A.  Yes.
7      Q.   Were you willing to discuss the
8  investigation?
9      A.  Yes.
10     Q.   Were you willing to continue --
11 to get off administrative leave without
12 pay and go back to work?
13     A.  Yes.
14     Q.   Did you deny the claims -- were
15 you in a position to deny the claims of
16 falsifying time?
17     A.  I denied the claims, yes. But
18 we did not talk.
19     Q.   Right. You didn't talk about
20 them, but you were prepared to deny the
21 claims; right?
22     A.  Yes.
23     Q.   Why were you prepared to deny

Page 276

1  the claims?
2      A.  Because they're not true.
3      Q.   Okay. Let's see. Now, I also
4  directed Mr. Watson to page 66 in the
5  handbook and informed him in this letter,
6  is it true, in the fourth from the last
7  paragraph, that he was not following his
8  policies and procedures as it relates to
9  you reviewing your personnel file;
10 correct?
11     A.  Yes.
12     Q.   And to this day, this is now a
13 year -- over a year later, have you ever
14 viewed your personnel file?
15     A.  No.
16     Q.   Do you think that you have
17 given him reasonable advance notice to
18 review your personnel file?
19     A.  Yes.
20     Q.   Is it not true on page 66 that
21 the only requirement that you have to
22 review your personnel file --
23     MS. SANDERS:  Objection to the

69 (Pages 273 to 276)

## American Court Reporting
## February 6, 2008

# American Court Reporting
## toll-free (877) 320-1050

Page 277

1  leading.
2      Q.   What is the requirement on the
3  personnel file on page 66? We'll just
4  pull it out here.
5      A.   That I can see my personnel
6  file, but I have to give them an advance
7  notice.
8      Q.   What kind of advance notice?
9  What does that say here on page 66 of
10 Exhibit 7?
11     A.   That I need to talk to my
12 administrator, and I did.
13     Q.   Read that whole paragraph for
14 me, please.
15     A.   "Employees who wish to review
16 their own file should contact the facility
17 administrator. With reasonable advance
18 notice, employees may review their own
19 personnel file in DCI's office in the
20 presence of an individual appointed by DCI
21 to maintain the file."
22     Q.   All right. So, again, just to
23 follow up, do you feel like you've given

Page 278

1  them sufficient advance notice?
2      A.   Yes.
3      Q.   In the last -- in the second to
4  last paragraph here, did we -- me on
5  behalf of you write that you were willing
6  to be restored to your employment at that
7  time on August 15, '06?
8      A.   Yes.
9      Q.   Did they ever offer you your
10 job back?
11     A.   No.
12     Q.   Did Mr. Watson ever ask me was
13 I an attorney in his office?
14     A.   No.
15     Q.   Did I tell him I was your
16 attorney?
17     A.   Yes, you did.
18     Q.   Was I willing to prove that I
19 was your attorney?
20     A.   Yes.
21     Q.   How?
22     A.   You had a business card.
23     Q.   Okay. Let's get to the

Page 279

1  handbook here again, Exhibit 7.
2          MR. HARRISON:  If you'll excuse
3  me, I have the bigger book. Just wait one
4  second, please.
5          (Off-the-record.)
6      Q.   (By Mr. Harrison)  Now, I
7  purport to the record here that this book
8  here is the handbook that you were given
9  upon signing the benefits package Exhibit
10 4. The document in Exhibit 4, they gave
11 you this book upon signing that; correct?
12     A.   Yes.
13     Q.   Now, have you read through this
14 book?
15     A.   Yes.
16     Q.   Does this book state at all,
17 have any clause or any provision that
18 deals with internal investigations? Have
19 you ever read an internal investigation
20 thing in this book?
21     A.   No, I haven't.
22     Q.   Are there any policies and
23 procedures as it relates to internal

Page 280

1  investigations in this book?
2      A.   Not to my knowledge.
3      Q.   Is there anywhere in this book
4  where you -- by signing that document, you
5  waived your right to be represented by
6  counsel?
7      A.   No.
8      Q.   Did you ever sign any document
9  that explicitly waived your right to be
10 represented by counsel?
11     A.   No.
12     Q.   Okay.  Is there any policy or
13 provision in this book that discusses the
14 policies and procedures as it relates to
15 being placed on leave without pay?
16     A.   No, not to my knowledge.
17     Q.   Okay. Have you ever seen any
18 policy or procedure with DCI that
19 described how -- what the procedure would
20 be for an employee being placed on leave
21 without pay?
22     A.   No.
23         MR. HARRISON:  I don't

70 (Pages 277 to 280)

# American Court Reporting
## February 6, 2008

**American Court Reporting**
**toll-free (877) 320-1050**

Page 281

1  necessarily know that we need to put --
2      MS. SANDERS: Let's just let
3  the record reflect that he's referring to
4  the blue DCI benefits package, the first
5  portion of which has been marked as
6  Exhibit 7. He is referring to the full
7  book. I think we all know what he's
8  talking about.
9      Q.  (By Mr. Harrison) Let's see.
10  All right. Let's get to kind of the meat
11  and potatoes of this. Okay? In your
12  complaint, it is alleged, on your behalf,
13  that you had to work or were forced to
14  work in a hostile work environment.
15  Included in that hostile work environment,
16  did you ever hear anybody use racial
17  slurs?
18      A.  Yes.
19      Q.  Did you ever hear anybody use
20  the N word?
21      A.  Yes.
22      Q.  Who used the N word?
23      A.  Brenda Haire.

Page 282

1      Q.  What did she say?
2      A.  She was always talking about
3  black people this, and she had made the
4  statement, oh, nigger, please.
5      Q.  And who is Brenda Haire?
6      A.  Brenda Haire is an RN.
7      Q.  She's a nurse; right?
8      A.  Yes.
9      Q.  She is kind of up the ladder
10  from you, although she is probably not
11  your boss?
12      A.  Yes.
13      Q.  She's got a higher stature in
14  DCI than you do; correct?
15      A.  Yes. She's a registered nurse.
16      Q.  Did Glenda Gary ever hear her
17  say that?
18      A.  Yes.
19      Q.  So Glenda Gary, your boss,
20  heard Brenda Haire use the N word at DCI;
21  correct?
22      A.  Yes.
23      Q.  Did you ever hear Glenda Gary

Page 283

1  correct Brenda Haire?
2      A.  No.
3      Q.  Did Glenda Gary ever apologize
4  to the black employees at DCI for other
5  employees using the N word?
6      A.  No.
7      Q.  Is there a policy and procedure
8  as it relates to harassment in the
9  policies and procedures book or employee
10  handbook?
11      A.  Yes. And you don't have to
12  look for it. It's on page 12.
13      Q.  Page 12. Okay. Again, reading
14  from page 12 of the employee handbook
15  here, it -- all right. Read the last
16  paragraph -- I mean, the last sentence of
17  the first paragraph under unlawful
18  harassment there.
19      A.  "Anyone engaging in unlawful
20  harassment will be subject to severe
21  discipline up to and including termination
22  of employment."
23      Q.  How many times have you heard

Page 284

1  Brenda Haire use the N word or typical or
2  common racial slurs like that?
3      A.  Numerous times. I can't count.
4      Q.  Okay. Did you ever witness or
5  see that she was severely disciplined at
6  all?
7      A.  No, I didn't.
8      Q.  Do you have any knowledge that
9  she was severely disciplined in the least?
10      A.  No.
11      Q.  Did she get fired for saying
12  that?
13      A.  No.
14      Q.  Did Glenda Gary ever say, we're
15  not going to allow that to be said at DCI?
16      A.  No.
17      Q.  All right. Have you heard
18  anybody else use the N word?
19      A.  Rachel Thompson.
20      Q.  All right. Now, who is Rachel
21  Thompson?
22      A.  She was a patient care tech.
23      Q.  Did Glenda Gary hear her say

71 (Pages 281 to 284)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 285

1  the N word?
2  A. Yes. It was just -- to them,
3  it was casual conversation.
4  Q. Okay. How would she say or use
5  the N word?
6  A. She bragged about having three
7  different babies from three different
8  black men and said, the niggers ain't
9  taking care of my babies, and this, this,
10  and that.
11  Q. Did that -- did you feel
12  threatened or hurt by people using that
13  word?
14  A. The only reason I was upset
15  about it was because it was used in front
16  of patients. Elderly black people, being
17  brought up in the time that they came up
18  in, I didn't think that was very
19  professional. And I felt --
20  Q. Did you feel humiliated by
21  that?
22  A. I felt bad for the patients.
23  Q. Did you feel --

Page 286

1  A. Not only black patients, but
2  white patients as well, because that was
3  disrespectful. I was always brought up to
4  respect my elders, and certain things you
5  don't say in front of old people.
6  Q. So did you feel like that
7  created a hostile work environment?
8  A. For me it did, yes.
9  Q. And Glenda Gary heard her say
10  that; correct?
11  A. Yes.
12  Q. Did you ever see Glenda Gary
13  ever apologize for that?
14  A. No.
15  Q. Reprimand Rachel Thompson for
16  that?
17  A. No.
18  Q. Did she let the other black
19  employees know that she wouldn't tolerate
20  that?
21  A. No.
22  Q. Did Glenda Gary ever use racial
23  slurs such as that?

Page 287

1  A. She would only ask about the
2  hair, and she said that black people can
3  sing better than white people because of
4  something with the nose thing up in here.
5  I don't know. I'm not an RN. I don't
6  know.
7  Q. Did you feel that her
8  terminology and verbiage kind of fell in
9  line with that of Rachel and Brenda
10  Haire's, as far as talking about black
11  people in a negative way?
12  A. When Rachel did it, it was
13  discriminating. It was just outright...
14  Q. Hateful?
15  A. Yes. But like Glenda Gary
16  would just talk about -- you know, we wear
17  weave in our hair and different color
18  hair, and is that your real hair and stuff
19  like that.
20  Q. Did you ever hear anybody else
21  use the N word or racial slurs?
22  A. No.
23  Q. Are you sure about that? Do

Page 288

1  you remember --
2  MS. SANDERS: Objection.
3  A. Not anybody -- no. I'm sorry.
4  Tullier would get mad. She got mad once
5  or twice.
6  Q. Do you remember a lady by the
7  name of Mandy Bowen? Did she ever do
8  that?
9  A. Mandy and Rachel would talk
10  across the room. One was on one side in
11  one section and the other was on this
12  side, and they talked.
13  Q. When you say talked, did you
14  ever hear Mandy use racial slurs?
15  A. She would say stuff like,
16  nigger, your mammy, and all this kind of
17  stuff. To me -- you know, maybe I was
18  taking it the wrong way. But to me a
19  mammy is a black person taking care of a
20  white child. I remember seeing that in
21  the movie once, Imitation to Life. When
22  this girl said that her mother -- the
23  black mother was her mammy. And I don't

72 (Pages 285 to 288)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 289

1  like that.
2      Q.   Did you feel like that created
3  a hostile work environment?
4      A.   I felt that it should not have
5  been said.
6      Q.   Did you feel that Glenda Gary
7  should have acted pursuant to the policies
8  and procedures and corrected that,
9  prevented that from happening again?
10      A.   I felt Glenda Gary should have
11  done it.  Not only Glenda Gary, but Sherry
12  Pereira was nurse manager.
13      Q.   And she never took any steps,
14  either?
15      A.   No.
16      Q.   So nobody in DCI took any steps
17  to correct the racial tension in the air?
18      MS. SANDERS:  Object to the
19  form of that.
20      A.   No.
21      Q.   All right.  Let's get to the
22  rehiring procedures here.  So it's your
23  testimony on direct from Ms. Sanders that

Page 290

1  Rachel Thompson was allowed to be rehired
2  during a freeze time while Marshekia Pitts
3  and Kimberly Reeves were prevented from
4  being rehired; true?
5      A.   Yes.
6      Q.   And Marshekia Pitts and
7  Kimberly Reese are black; correct?
8      A.   Yes.
9      Q.   And Rachel Thompson is white?
10      A.   Yes.
11      Q.   Did you feel like that was just
12  an outshoot of the whole racial tension in
13  DCI?
14      MS. SANDERS:  Object to the
15  form.  She never testified about racial
16  tension.
17      Q.   Answer that.  Racial hostility.
18      MS. SANDERS:  Objection.
19      A.   I felt that it was wrong for
20  the simple fact that I had asked to be
21  hired as a patient care tech, and it was a
22  freeze on hiring.  So how can this person
23  come back again and get their job.

Page 291

1      Q.   Did you look at that as being a
2  racial decision?
3      A.   Yes, I did.
4      Q.   And that being because the one
5  that they allowed to break the rules was
6  white; right?
7      MS. SANDERS:  Object to the
8  leading.  Rephrase.
9      Q.   Answer.
10      A.   Yes.
11      Q.   And what were the color of the
12  people who were denied to be rehired?
13      A.   They were black.
14      Q.   And that affected you
15  personally, correct, because you wanted
16  that job?
17      MS. SANDERS:  Object to the
18  leading.
19      A.   Yes, I did.
20      Q.   As far as hiring people who are
21  related to employees as it's referred to
22  in the direct -- paragraph 12 of the
23  complaint.  There were two -- what

Page 292

1  instances do you recall -- and you
2  testified on direct that it was Rachel
3  Thompson and Mandy Bowen were first
4  cousins, and Vivian Tolliver and Regina
5  Chapman were first cousins as well;
6  correct?
7      A.   They were friends, best of
8  friends, Regina and Vivian were.
9      Q.   Okay.  Were they first cousins?
10      A.   They called each other sisters.
11  They called each other cousins.  Lee
12  Ashbury would not hire Vivian Tolliver
13  back because he said that Regina and
14  Vivian were related.
15      Q.   Okay.  Did you feel there were
16  any racial overtones in that decision?
17      A.   Yes.
18      Q.   Why?
19      A.   Because Rachel and Mandy are
20  there, and they are two sisters' children.
21  They're related.
22      Q.   Let's move to whistle blowing,
23  paragraph 13.  You testified on direct

73 (Pages 289 to 292)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 293

1 that Rachel Thompson would go and make
2 complaints about other employees on a
3 regular basis; true?
4     A.    Yes.
5     Q.    And she was never disciplined
6 or fired at all; right?
7     A.    No.
8     Q.    And do you recall who was
9 fired? Anybody else that might have been
10 fired by making whistle-blowing actions to
11 the management of DCI?
12     A.    They wasn't fired. They were,
13 I'll say, labeled as a troublemaker.
14     Q.    Labeled as a troublemaker.
15     A.    They were given a hard time.
16     Q.    Given a hard time. How were
17 they given a hard time?
18     A.    As I stated earlier, if you go
19 and complain to Glenda Gary, you will see
20 Glenda Gary talking to the person that you
21 complained about, not so much as
22 reprimanding them but telling them what
23 you said. That person would start

Page 294

1 treating you -- would start freezing up on
2 you, and she would start treating you
3 differently as well.
4     Q.    Just a couple of other things
5 and we'll be done. On direct, Ms. Sanders
6 kind of brought to your attention your
7 actions as it related to bringing an
8 attorney when you were under disciplinary
9 action at Jackson Hospital. Do you
10 remember her talking to you about that?
11     A.    Uh-huh, yes.
12     Q.    That situation was different
13 from this one, was it not?
14     A.    Yes.
15     Q.    Were you placed on leave at
16 Jackson Hospital without pay?
17     A.    No.
18     Q.    Were you placed on leave
19 without pay at DCI?
20     A.    Yes.
21     Q.    Did that cause you to feel
22 differently about the two situations?
23     A.    I was --

Page 295

1     Q.    As far as it relates to having
2 an attorney present with your employer?
3     A.    No, because it was not related.
4     Q.    Okay. Maybe I'm not asking the
5 question correctly. Were you -- did you
6 feel threatened at Jackson Hospital by
7 having to go and talk to them about
8 disciplinary action?
9     A.    No.
10     Q.    Why?
11     A.    Because it was a complaint
12 about me having a bad attitude.
13     Q.    Did you feel like you were
14 going to lose your job at Jackson
15 Hospital?
16     A.    No.
17     Q.    Now, at DCI, did you feel like
18 you were fixing to lose your job?
19     A.    The day I was placed on
20 administrative leave, I already knew that
21 I had lost my job.
22     Q.    Would that not trigger in you
23 to act differently?

Page 296

1         MS. SANDERS: Object.
2     Q.    Did that cause you to do
3 anything differently?
4     A.    I hired an attorney, yes.
5     Q.    And why did you hire an
6 attorney?
7     A.    Because I felt that I was being
8 lied on. I felt that I was being picked
9 on, and I don't know why. At the time, I
10 just felt hurt. I felt -- because I -- I
11 actually don't know what I felt. I know I
12 felt hurt. I felt as though I wasn't
13 appreciated. I felt I'd worked there five
14 years. I did my job. I did more than my
15 job, and I deserve better.
16     Q.    Okay. Now let's go to -- go
17 back just for a second to damages. We've
18 talked about monetary damages, how you
19 lost hourly wages. But you mentioned on
20 direct that you spent many nights where
21 you couldn't sleep.
22     A.    No, I couldn't.
23     Q.    Why could you not sleep?

74 (Pages 293 to 296)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 297

1    A.  Because I had to -- to me,
2  sleeping was a waste of time, when I could
3  have been on the Internet filling out
4  applications or I could be preparing where
5  I was going next to fill out an
6  application to find a job.  I needed a
7  job.
8    Q.  What was your feeling as it
9  relates to not having a job and having all
10  of those bills to pay?
11    A.  It was scary, really scary, and
12  it was depressing.
13    Q.  And it's your testimony today
14  that that caused you to have to take
15  Effexor; correct?
16    A.  Yes.
17    Q.  Are there any other things that
18  you were prevented from doing, such as any
19  hobbies that you normally do that -- or
20  activities that you do that you have not
21  been able to do since you have been fired
22  at DCI?
23    A.  Hobby wise, I -- well, I can't

Page 298

1  shop because I was budgeted.  I was really
2  budgeted with getting $237 a week from
3  unemployment.  That money I saved up to
4  make sure my mortgage payment was paid for
5  that month.  My children did without a lot
6  in their own home lives to help me.
7    Q.  Did it affect your relationship
8  with your family at all?
9    A.  Yes.
10    Q.  How?
11    A.  I'm not as active as I was with
12  my grandchildren.  I can't do with my
13  grandchildren what I used to be able to
14  do.
15    Q.  Why?
16    A.  Because I'm budgeted -- I was
17  budgeted.  I didn't have any money to
18  spend on my grandchildren.  I didn't have
19  any money to do for them what a
20  grandmother should do.  I used to spend
21  time with my grandchildren.  We used to go
22  out of town on weekends.  That was -- the
23  weekends was my time with my

Page 299

1  grandchildren, but I can't pretty much
2  have my grandchildren over -- excuse me.
3  I'm so sorry.  I can't have my
4  grandchildren over to see me in the state
5  that I was in, because it wasn't healthy
6  for me, and it wouldn't have been healthy
7  for them.
8    Q.  What caused the state you were
9  in?
10    A.  I was unemployed.
11    Q.  And why were you unemployed?
12    A.  I was fired from my job.
13  That's why I was unemployed.
14    Q.  Okay.  One last thing and then
15  we'll be done.  I know you testified to
16  this on direct, but I just wanted to
17  reaffirm it.  Did you either direct or
18  quote to Alizaber Thomas or Willie Murray
19  what to say in their documents that they
20  gave to you?
21    A.  No.  I did tell them that I
22  needed a statement saying that they saw me
23  there that morning, but I did not tell

Page 300

1  them what to say.
2    MR. HARRISON:  Okay.  Nothing
3  further.
4    FURTHER EXAMINATION
5  BY MS. SANDERS:
6    Q.  Okay.  A few new things came
7  up, so I have to ask you about them.
8  First of all, this Plaintiff's Exhibit 1,
9  did you review that before Mr. Harrison
10  sent that to Dan Watson, Ms. Quinnie?
11    A.  Yes, I did.
12    Q.  And then earlier I asked you
13  about things that created a hostile
14  environment.  You told me about Debbie
15  Tullier talking about black people's hair,
16  and you told me about Debbie making
17  another reference to blacks.  I asked
18  you -- we went through that.  We talked
19  about everything that created a hostile
20  environment.  You never mentioned anybody
21  using the word nigger.
22    A.  You never asked me.
23    Q.  I asked you about any racial

75 (Pages 297 to 300)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 301

1  slur, anything that created a hostile
2  environment. All you told me about was
3  the comment about the black hair from
4  Debbie Tullier, and black people always
5  complaining -- actually, I think it was
6  Brenda Haire. It wasn't Debbie Tullier.
7      A.  It was Brenda Haire.
8      Q.  Right. You talked about Brenda
9  Haire making comments about black people's
10 hair and blacks always complaining. Why
11 didn't you tell me when I asked you about
12 people using the N word?
13     A.  You didn't ask me about people
14 using the N word.
15     Q.  What --
16     A.  When she made the statement, it
17 was like oh, nigger, please.
18     Q.  When I asked you about racial
19 slurs, you talked about black people's
20 hair and black people complaining. Did
21 you not consider her use of the N word a
22 racial slur? Is that why you didn't tell
23 me about it?

Page 302

1      A.  If you had asked me had anybody
2  used the N word, I would have told you
3  that.
4      Q.  Well, I didn't ask you if
5  anybody referred to black people's hair,
6  and you told me about that.
7      A.  Yes.
8      Q.  I didn't ask you if anybody
9  referred to people as black. I didn't ask
10 you that. And you told me those things.
11 Is it true that you didn't consider her
12 use of the N word a racial slur?
13         MR. HARRISON: Objection.
14 Asked and answered.
15         MS. SANDERS: No, that's not
16 answered.
17     Q.  (By Ms. Sanders) Is it true
18 that you did not consider --
19         MR. HARRISON: You can -- my
20 objection --
21     Q.  -- her use of the -- use of the
22 N word a racial slur?
23     A.  Her using the N word in the

Page 303

1  sense that she used it, was hurting to me
2  because of where she used it, because of
3  the elderly patients there.
4      Q.  Was that Rachel?
5      A.  No, that was Brenda Haire, as
6  well as Rachel Thompson and Mandy Bowen
7  across the room from each other.
8      Q.  I want to talk about Brenda
9  Haire first. You didn't answer my
10 question, my original question. When I
11 was asking you about racial slurs, why
12 didn't you tell me about the use of the N
13 word?
14         MR. HARRISON: Objection.
15 Asked and answered.
16         MS. SANDERS: She didn't answer
17 it. Go ahead.
18     A.  You didn't ask me about the N
19 word. To me, the N word is the N word.
20     Q.  Is the N word not a racial
21 slur?
22     A.  Yes, it is.
23     Q.  So when I asked you that --

Page 304

1      A.  You didn't ask me did anybody
2  ever use the N word. You asked me about
3  racial slurs.
4      Q.  Okay. And your response was
5  the black people's hair and black people
6  complaining. So why didn't you tell me
7  about the N word?
8          MR. HARRISON: Again, asked and
9  answered for the 15th time.
10         MS. SANDERS: No, it's not.
11 She never answered. She just said she
12 considered the N word a racial slur --
13         MR. HARRISON: Her answer is
14 you didn't ask her about the N word. Just
15 because she doesn't give you an answer
16 that you like --
17         MS. SANDERS: I don't care --
18         MR. HARRISON: That doesn't
19 mean that --
20         MS. SANDERS: -- about what the
21 answer is. I just want an answer. She
22 said the N word is a racial slur --
23         MR. HARRISON: She's given an

76 (Pages 301 to 304)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 305

1  answer.
2      MS. SANDERS:  When I asked her
3  about racial slurs, she didn't tell me
4  about the N word --
5      MR. HARRISON:  She's given --
6      MS. SANDERS:  -- until you
7  asked her --
8      MR. HARRISON:  Right.
9      MS. SANDERS:  Until you said,
10  anybody ever use the word nigger, she
11  responded --
12      MR. HARRISON:  You did it in
13  the context of hostile environment.
14  That's why I made sure in your direct that
15  I pointed out that the word hostile
16  environment was confusing to her.
17      MS. SANDERS:  I understand.
18  But I asked her about any racial slurs,
19  and she didn't say that.  She didn't
20  respond with the N word.
21      MR. HARRISON:  Well, you've
22  asked and she's answered, like, 15
23  times --

Page 306

1      MS. SANDERS:  Well, she hasn't
2  answered.  I want it noted for the record
3  that she never responded to that question.
4      MR. HARRISON:  She did respond.
5      Q.  (By Ms. Sanders)  Now, let me
6  ask you this:  You said that Glenda
7  Gary -- I want you to tell me exactly, the
8  best you can recall -- because you didn't
9  testify to it earlier.  So now that you've
10  remembered, I'd like for you to tell me
11  exactly when you heard her use the N word.
12  And I'm talking about Brenda Haire.  When
13  did she say nigger?  Tell me when you
14  remember her saying that word.
15      A.  This was even before I even --
16  the administrative leave thing even came
17  up.
18      Q.  Okay.  When did Glenda Gary
19  overhear it?  Because you testified she
20  overheard it.  So when did she --
21      A.  Glenda Gary heard her say it
22  the majority of the time that she said it
23  if she was up there on the floor.

Page 307

1      Q.  Was Glenda Gary the clinic
2  administrator?
3      A.  Yes.  At one point, yes.
4      Q.  No.  That's not my question.
5  When she used the N word --
6      A.  Yes.
7      Q.  -- Glenda Gary --
8      A.  Glenda Gary did hear her use
9  the N word since she has been
10  administrator --
11      Q.  So sometime --
12      A.  -- before I left there.
13      Q.  -- between March, which is when
14  you claim Glenda Gary was the acting
15  administrator, and August of '06; is that
16  correct?
17      A.  Yes.
18      Q.  And you're positive that Glenda
19  Gary --
20      A.  Yes.
21      Q.  -- overheard it?  Were you
22  standing there to hear Glenda Gary hear
23  it?

Page 308

1      A.  Yes.  We were all out on the
2  floor.  I was doing with the charts, and
3  Glenda Gary was working out there at the
4  time because we were short, even though
5  she was administrator.
6      Q.  Did Glenda Gary acknowledge to
7  you that she had heard that comment?
8      A.  No.
9      Q.  Who else heard it?  Who else
10  was standing there that could have heard
11  it?
12      A.  It wasn't a standing process.
13  We were working.
14      Q.  Okay.  Who else was working
15  there?  You said Glenda Gary heard it.
16  Who else heard it?
17      A.  Glenda Gary heard her.  Mandy
18  Bowen was working.  Rachel Thompson was
19  working.  Ronesha was working.  Melissa
20  was working.  Emma Thomas was working.
21      Q.  And all of those people were in
22  earshot and could have heard her use that
23  word?

77  (Pages 305 to 308)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 309

1    A.   Yes.
2    Q.   What about patients?  What
3  patients heard it?
4    A.   Every patient on that floor
5  heard her.
6    Q.   Who?  Tell me who heard it.
7    A.   You've got -- on one side you
8  had Ernest -- I don't know his last name.
9  It's Ernest -- I don't know his last name.
10 But you also had Jasper McGehee.  You had
11 Hillary Gregory.  You had Mr. Goss.  I
12 don't know his first name.  You have Annie
13 Harvey.  You had -- there was one patient
14 that came there, he was from the VA.  I
15 can't think of his name.
16   Q.   And you recall that those
17 patients and those employees were there --
18   A.   Yes.
19   Q.   -- when Brenda Haire used the N
20 word?
21   A.   Yes.
22   Q.   And it's your testimony that
23 they were within earshot and heard it?

Page 310

1    A.   Yes.  She didn't whisper it.
2    Q.   How about Rachel Thompson?  You
3  testified that Glenda Gary heard Rachel
4  Thompson use the N word.
5    A.   Yes.
6    Q.   Tell me when Glenda Gary heard
7  her use that word.
8    A.   It was on the treatment floor.
9    Q.   Why do you believe Glenda Gary
10 heard it?  Did Glenda tell you she heard
11 it?
12   A.   Glenda didn't have to tell me
13 she heard it.  Glenda is not deaf, and she
14 was at the treatment floor at the time.
15   Q.   All right.  When was that?
16   A.   This was prior to August.
17   Q.   Well, I'm --
18   A.   It was on many occasions.  It
19 wasn't just one occasion.
20   Q.   All right.  Tell me the best
21 you can remember.  I need to know when it
22 was said.
23   A.   The month would have been --

Page 311

1  she said -- any time Rachel was -- Rachel
2  didn't care what she said.  Let's say the
3  month was March.
4    Q.   So did she use the word all the
5  time, every day?
6    A.   She used the word all the time.
7  That's just how Rachel talked.
8    Q.   She used the N word every day?
9    A.   Yes.
10   Q.   And you heard her use it every
11 day?
12   A.   Yes.
13   Q.   How about Brenda Haire?  Did
14 she use it every day?
15   A.   Not every day, no.
16   Q.   Did she use it less frequently
17 than Rachel?
18   A.   Yes.
19   Q.   You're testifying today under
20 oath that you heard Brenda use it sometime
21 between March and August of '06?
22   A.   Yes.
23   Q.   And you are testifying under

Page 312

1  oath that Rachel used it every day --
2    A.   Yes.
3    Q.   -- during her entire employment
4  with DCI?
5    A.   Yes.
6    Q.   How about Mandy?  When did she
7  use the N word?
8    A.   Mandy and Rachel talk across
9  the floor when one is over in one section
10 and one is across the room in another
11 section -- nigger, you got shot today,
12 didn't you -- talking about the section
13 they were in.
14   Q.   And Mandy would use that word?
15   A.   Yes.
16   Q.   How often did Mandy use that
17 word?
18   A.   She didn't use it every day.
19   Q.   Were you around when Glenda
20 Gary was around and could have heard Mandy
21 say it?
22   A.   Yes.  She could have heard her,
23 yes, if she was on the floor.

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 313

1    Q.   Do you know whether she heard
2  her? Did she ever tell you, hey, I just
3  heard her say that?
4    A.   No. Glenda and I didn't talk
5  like that.
6    Q.   Did you ask Glenda, did you
7  hear Mandy, Rachel, or Brenda use the N
8  word?
9    A.   No, I didn't.
10   Q.   I think you testified
11  earlier -- or, actually, your attorney
12  testified --
13      MR. HARRISON: Objection.
14   Q.   -- that when Rachel used it, it
15  was hateful and you agreed?
16   A.   Beg your pardon?
17   Q.   Your attorney asked you if when
18  Rachel used it, was it hateful, and you
19  agreed and said yes; is that correct?
20   A.   Yes.
21   Q.   But when Glenda used -- Glenda,
22  I don't think, ever used the N word;
23  correct?

Page 314

1    A.   No.
2    Q.   But Glenda talked about blacks
3  being able to sing better because of
4  something about their nose --
5    A.   Yeah. And she always asked was
6  this our hair.
7    Q.   And did you find that
8  offensive?
9    A.   I find it offensive any time
10  anybody touch my person.
11   Q.   So she touched you?
12   A.   Yeah, to touch my hair. Her
13  finger through my hair to ask me if it's
14  mine. As long as I buy it, it's mine.
15   Q.   Well, did you find it offensive
16  that she was talking about blacks singing
17  better?
18   A.   I don't think black or white --
19  I don't know where she get that. Well,
20  when she said it was something here
21  (indicating).
22   Q.   Right.
23   A.   So what are you saying, we all

Page 315

1  have big noses, small noses? What are you
2  saying? She said that it's here. You
3  sound -- the sound. I don't know what
4  Glenda was talking about.
5    Q.   Because earlier you talked
6  about that, and you said, I'm not a nurse
7  and Glenda is.
8    A.   Yes.
9    Q.   It was some kind of medical
10  thing, I assume; correct?
11   A.   I assume.
12   Q.   Did you find that offensive?
13   A.   Yes.
14   Q.   Did anybody else use the N
15  word?
16   A.   No.
17   Q.   Did any patients use the N
18  word?
19   A.   No.
20   Q.   Did any black employees or
21  patients use the N word?
22   A.   Not to my knowledge.
23   Q.   So the only people you ever

Page 316

1  heard use it, Brenda; correct?
2    A.   Yes.
3    Q.   Rachel?
4    A.   Yes.
5    Q.   And Mandy?
6    A.   Yes.
7    Q.   Now, other than Glenda, Rachel,
8  Mandy, and Brenda, did you hear anybody
9  talk about blacks? Blacks do this better,
10  black hair, anything at all about a black
11  person or black people in general?
12  Anything?
13   A.   Like I mentioned earlier,
14  Debbie Tullier as well.
15   Q.   Okay. What did Debbie say?
16   A.   Like I said earlier, Debbie --
17  when she got upset with Regina and she
18  said, no sense in saying anything about
19  black people; you know, they beat you up.
20   Q.   Right. Anything else?
21   A.   No.
22   Q.   Any other employee?
23      MR. HARRISON: Can you hold on

79 (Pages 313 to 316)

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 317

1  one second, please?
2      (Brief interruption.)
3      Q.    (By Ms. Sanders)  Any other
4  employee said anything about blacks?
5      A.    Not to my knowledge.
6      Q.    When you left DCI's employment,
7  did you take any documents with you?
8      A.    No.
9      MS. SANDERS:  That's all I
10  have.  Thanks.
11      MR. HAGEWOOD:  Can we have two
12  seconds?
13      (Brief recess.)
14      Q.    (By Ms. Sanders)  Ms. Quinnie,
15  I had asked you earlier if you had
16  complained to anybody about any of the
17  racial comments, and you said no.  But now
18  we've talked about some new comments.  Did
19  you ever complain to Glenda Gary, Lee
20  Ashbury, any supervisor, or anybody at the
21  corporate office at DCI, about any of
22  these comments?  The use of the N word or
23  a comment about blacks?  Did you ever

Page 318

1  complain to anybody?
2      A.    The only person I complained to
3  was Lee Ashbury.  I never called anybody
4  in corporate.
5      Q.    When did you complain to Lee?
6  Is that what you already testified and
7  told me about?
8      A.    Yes.
9      Q.    Was that in regards to Brenda
10  or Debbie?
11      A.    Brenda.
12      Q.    And that was when Mr. Ashbury
13  was clinic administrator?
14      A.    Yes.
15      Q.    Now, your attorney asked you
16  about, in that book, if there's anything
17  in that book -- what we have been talking
18  about as the DCI benefit package, he asked
19  you if there was anything in that book
20  that showed you where you waived the right
21  to an attorney.  Do you recall that?
22      A.    Yes.
23      Q.    Is there anything in that book,

Page 319

1  that you know of, that says you have the
2  right to an attorney when your employer
3  wants to talk to you?
4      A.    No.
5      Q.    Are you aware of any law that
6  says you have a right to an attorney if
7  you employer wants to talk to you?
8      A.    Is there any such law?
9      Q.    I'm just asking if you're aware
10  of it.  I understand that you're not a
11  lawyer.  I'm just asking if you're aware
12  personally of any law that gives you the
13  right to have an attorney present when
14  your employer wants to talk to you.
15      MR. HARRISON:  Objection.
16  She's not an attorney.
17      MS. SANDERS:  I'm just asking
18  if she knows.  I'm not going to hold
19  her --
20      A.    I felt that I had a right to an
21  attorney regardless of who talked to me.
22      Q.    Okay.  And on any basis, or is
23  that just your belief?  I mean --

Page 320

1      A.    If I feel that I'm being
2  discriminated against, or if I feel that
3  I'm being accused of something, yes, I'm
4  going to have an attorney present.
5      MS. SANDERS:  That's all.
6
7
8
9      4:15 p.m.
10
11
12  FURTHER THE DEPONENT SAITH NOT

**American Court Reporting**
**February 6, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

```
                                    Page 321

1           C E R T I F I C A T E
2
3    STATE OF ALABAMA )
4    COUNTY OF ELMORE )
5
6           I hereby certify that the
7    above and foregoing deposition was taken
8    down by me in stenotype, and the questions
9    and answers thereto were transcribed by
10   means of computer-aided transcription, and
11   that the foregoing represents a true and
12   correct transcript, to the best of my
13   knowledge, of the deposition given by said
14   witness upon said hearing.  I further
15   certify that I am neither of counsel nor
16   of kin to the parties to the action, nor
17   am I in anywise interested in the result
18   of said cause.
19
20
21   JENNIFER DAVIS, CCR License #161
22   My Commission expires
23   October 11, 2010
```

**American Court Reporting**
**February 6, 2008**

# EXHIBIT
# C

With these objectives of individual and organizational conduct in mind, we are committed to equal employment opportunity, actively seeking and contacting all sources of manpower in the community. We welcome all qualified applicants.

UNLAWFUL HARASSMENT

DCI is committed to providing a work environment that is free of discrimination and unlawful harassment. Actions, words, jokes, or comments based on an individual's sex, race, ethnicity, age, religion, or any other legally protected characteristic will not be tolerated. Harassment (both overt and subtle) is a form of employee misconduct that is demeaning to another person, undermines the integrity of the employment relationship, and is strictly prohibited. Anyone engaging in unlawful harassment will be subject to severe discipline up to and including termination of employment.

Any employee who feels victimized by any type of unlawful harassment is urged to promptly report the matter in confidence to his or her supervisor. If the supervisor is unavailable or the employee believes it would be inappropriate to contact that person, the employee should contact the facility Administrator, the Corporate Human Resources Department or DCI's President.

Any supervisor who becomes aware of possible unlawful harassment should promptly advise the facility Administrator who will assure that the matter is thoroughly and discreetly investigated.

**12**

03/01